**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
(Western Division)

| | |
|---|---|
| KARLA O'NELL NORAMBUENA, NATALIA TAPIA LEIVA, ALMENDRA GONZALEZ DE LA PAZ, DAVID SILVA MORENO, FERNANDO VILCHES CASTILLO, CLAUDIO RAMOS, ALEJANDRO PIZARRO, EDUARDO ANTONIO MUÑOZ VARGAS, CARILYNS SARAI CAMUS JORQUERA, GONZALO ESCOBAR ESPEJO, CATALINA NOEMI RIVAS MORALES, BAIRON MOREL GUERRA, DIEGO CRISTOBAL AHUMADA SOULODRE, and NESTOR ACEVEDO, | Case No. 5:20-cv-4054-LTS-KEM |
| **Plaintiffs,** | **AMENDED COMPLAINT and JURY DEMAND** |
| **vs.** | |
| **WESTERN IOWA TECH COMMUNITY COLLEGE (WITCC); TERRY YI, ; ROSANA SALGADO BURRIGHT,; JULINE ALBERT; TERRY MURELL;JAMES ZUERCHER; LILY CASTRO; PREMIER SERVICES, INC., d/b/a J&L Enterprises, also d/b/a J&L Staffing and Recruiting Inc.; NANCY ALBRECHT; CARLOS ESPINOZA; SOLEDAD ROJAS; JORGE ARCOS; CRISTIAN SAN MARTIN MATTA; TUR-PAK FOODS, INC., & ROYAL CANIN USA INC.;** | |
| **Defendants.** | |

**COME NOW** the Plaintiffs, by and through their undersigned counsel, and for their causes of action, respectfully state the following:

## INTRODUCTION

The Plaintiffs are Chilean international students who arrived in the United States on student J-1 visas procured at the guidance and direction of Western Iowa Tech Community College (hereinafter "WITCC"). The Plaintiffs accepted an offer into WITCC's J-1 visa program after being promised free tuition, room, board, and food along with an internship in their selected field of study. Upon arrival, the Defendants, through an organized scheme, placed the Plaintiffs to work in jobs unrelated to their fields of study, namely processing plants, forcing them to fulfill an exhausting work and academic schedule using threats of deportation and legal action. Further, the Defendants used their power to control the Plaintiffs' personal, academic, and employment lives by, *inter alia*, diverting money from their pay checks to WITCC as repayment for services WITCC previously agreed it would pay for free.

## PARTIES

1.      Plaintiff Karla O'Nell Norambuena is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

2.      Plaintiff Natalia Tapia Leiva is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

3.      Plaintiff Almendra Gonzalez de la Paz is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

4.     Plaintiff David Silva Moreno is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

5.     Plaintiff Fernando Vilches Castillo is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

6.     Plaintiff Claudio Ramos is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

7.     Plaintiff Alejandro Pizarro is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

8.     Plaintiff Eduardo Antonio Muñoz Vargas is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

9.     Plaintiff Carilyns Sarai Camus Jorquera is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

10.     Plaintiff Gonzalo Escobar Espejo is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

11.     Plaintiff Catalina Noemi Rivas Morales is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

12.     Plaintiff Bairon Morel Gurerra is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

13.     Plaintiff Diego Cristobal Ahumada Soulodre is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

14.     Plaintiff Nestor Acevedo is a Chilean citizen and was a resident of Chile and Sioux City, Iowa at all times relevant to the events complained of herein.

15.     Defendant Western Iowa Tech Community College ("WITCC") is a community college and School Corporation capable of suing and being sued under Iowa Code § 260C.16, located in Sioux City, Iowa, and registered with the Iowa Secretary of State at all times relevant to the events complained of herein.

16.     Defendant Terry Yi is a United States citizen and, upon information and belief, was a resident of Sioux City, Iowa and an employee at WITCC at all times relevant to the events complained of herein.

17.     Defendant Rosana Salgado is a United States citizen and, upon information and belief, was a resident of Sioux City, Iowa and an employee at WITCC at all times relevant to the events complained of herein.

18.     Defendant Juline Albert is a United States citizen and, upon information and belief was a resident of Sioux City, Iowa and an employee at WITCC at all times relevant to the events complained of herein.

19.     Defendant Terry Murell is a United States citizen and, upon information and belief, was a resident of Sioux City, Iowa and an employee at WITCC at all times relevant to the events complained of herein.

20.     Defendant James Zuercher is a United States citizen and, upon information and belief, was a resident of Sioux City, Iowa and an employee at WITCC at all times relevant to the events complained of herein.

21.     Defendant Lilly Castro is a United States citizen and, upon information and belief, was a resident of Sioux City, Iowa and an employee at WITCC at all times relevant to the events complained of herein.

22.     Defendant Premier Services, Inc., d/b/a J&L Staffing and Recruiting Inc. and d/b/a J&L Enterprises (hereinafter "J&L") is a corporation organized under the laws of the State of Iowa, and registered in the State of Iowa. It conducts business in and around Sioux City, Iowa as a staffing / placement agency. Its "storefront" is located at 219 West 7th Street, Sioux City, Iowa 51103.

23.     Defendant Nancy Albrecht is a United States citizen and, upon information and belief, was a resident of Sioux City, Iowa and an employee of J&L at all times relevant to the events complained of herein.

24.     Defendant Carlos Espinoza is a Chilean and also traveled to Sioux City, Iowa at times relevant to the events complained of herein.

25.     Defendant Soledad Rojas is a Chilean citizen and also traveled to Sioux City, Iowa at times relevant to the events complained of herein.

26.     Defendant Jorge Arcos is a Chilean citizen and also traveled to Sioux City, Iowa at times relevant to the events complained of herein.

27.     Defendant Cristian San Martin Matta is a Chilean citizen and also traveled to Sioux City, Iowa at times relevant to the events complained of herein.

28.     Defendant Tur-Pak Foods, Inc. (hereinafter "Tur-Pak") is a corporation organized in accordance with Iowa Code Chapter 490. Its registered agent is located in Iowa. Its home office is located in South Dakota. It conducts extensive business in and around Sioux City, Iowa including operating a 185,000 square foot manufacturing facility employing approximately 700 employees in Sioux City, Iowa processing, *inter alia*, Lunchables.[1]

29.     Defendant Royal Canin USA Inc. (hereinafter "Royal Canin") is a corporation organized under the laws of the State of Delaware, with its Headquarters in the State of Missouri, and an agent for service of process in South Dakota. It conducts extensive business in and around Sioux City, Iowa, and runs a dog food factory in North Sioux City, South Dakota.

## JURISDICTION AND VENUE

30.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, 18 U.S.C. § 1595, 18 U.S.C. § 1962, and 18 U.S.C. § 1964,. This court has supplemental jurisdiction to hear and decide the pendent state law claims under 28 U.S.C. § 1367.

31.     This court has personal jurisdiction over Defendants under Iowa Code § 617.3 and under the 14th Amendment to the U.S. Constitution because:

---

[1] "Lunchables" are a brand-name, individually packaged and ready-to-eat meal that is typically targeted towards children.

a. Defendants Espinoza, Arcos, and Mata had substantial, intentional contacts with the state of Iowa, and purposefully availed themselves of the privilege of conducting business within Iowa, thus invoking the benefits and protections of its laws, when they entered into an agreement with the WITCC, J&L, and Corporate defendants to supply Plaintiffs for trafficking.

b. Defendants Yi, Salgado, Albert, Murrell, Zuerch, and Albrecht are Iowa residents.

c. Defendants WITCC, J&L, and Tur-Pak are Iowa Corporations that are registered in the State of Iowa and "at home" in the State of Iowa.

d. Defendant Tur-Pak maintains contact with Iowa sufficient to invoke personal jurisdiction by conducting extensive business in and around Sioux City, Iowa, including operating a facility in Sioux City, Iowa that processes, among other things, Lunchables. The production plant in Sioux City, Iowa, employs over 700 employees.

e. Defendant Royal Canin had substantial, intentional contacts with the state of Iowa, and purposefully availed itself of the privilege of conducting business within Iowa, thus invoking the benefits and protections of its laws, when it contracted with an Iowa staffing company (Defendant J&L), to recruit employees from an Iowa Community College's (Defendant WITCC's) J-1 Visa program.

32.     The court also has personal jurisdiction pursuant to 18 U.S.C. § 1965(a) and (b).

33.     Venue is proper under 28 U.S.C. § 1391(b) because the events or omissions described in this complaint took place in Sioux City, Woodbury County, Iowa. Venue is also appropriate under 18 U.S.C. § 1965.

## ALLEGATIONS COMMON TO ALL CLAIMS

### *Human Trafficking*

34.     Human Trafficking happens in nearly every community in Iowa, but it goes largely unnoticed and underreported.[2]

35.     The term "human trafficking" is used to describe a modern-day form of slavery.[3] Such slavery can present itself in a variety of ways, including involuntary labor.[4] A frequent form of labor trafficking involves noncitizens paying to be illegally transported to the United States, and upon their arrival, they find themselves "in the servitude of the traffickers."[5] Traffickers take advantage of the fact that these noncitizens are "surrounded by an unfamiliar culture and language" and "without identification documents, fearing for their lives and the lives of their families."[6]

---

[2] https://who13.com/news/hiding-in-plain-sight-a-story-of-human-trafficking-in-iowa/

[3] https://www.iowaattorneygeneral.gov/for-crime-victims/fighting-human-trafficking

[4] https://www.iowaattorneygeneral.gov/for-crime-victims/fighting-human-trafficking

[5] *Id.*

[6] *Id.*

8

36.     According to the National Human Trafficking Hotline, which "works closely with service providers, law enforcement, and other professionals in Iowa to serve victims and survivors of trafficking," there were 98 human trafficking cases reported in 2019.[7] Factories, restaurants and housekeeping were the most common venues for labor trafficking.[8]

37.     In 2019, several human trafficking complaints were lodged against Iowa pork processing plant Seaboard Triumph Foods in Sioux City, Iowa (hereinafter "Seaboard").[9] Reportedly, Seaboard recruited nearly 200 Micronesians to work at its plant under promises to pay them $15.95 an hour, pay for their $1,800 plane tickets to the United States, three months of room and board, and cash payments to send back to their families in Micronesia.[10] In return, the Micronesians needed to work at Seaboard's plant and have 11 percent of their paychecks deducted to cover the aforementioned costs.[11]

38.     These works now claim nearly all of these promises were broken. Seaboard began to deduct 50 percent of the Micronesian workers' paychecks. When they questioned the change, Seaboard withheld their passports in order to "threaten and punish" them, and

---

[7] https://humantraffickinghotline.org/state/iowa

[8] *Id.*

[9] https://www.desmoinesregister.com/story/money/business/2019/10/02/seaboard-triumph-foods-iowa-pork-plant-micronesia-recruits-allege-mistreatment-sioux-city/3843359002/

[10] https://www.nytimes.com/2019/10/13/us/iowa-pork-micronesia-workers.html

[11]     https://www.desmoinesregister.com/story/money/business/2019/10/02/seaboard-triumph-foods-iowa-pork-plant-micronesia-recruits-allege-mistreatment-sioux-city/3843359002/

locked them out of their hotel rooms leaving them with no access to food or shelter.[12] Without their passports, the Micronesian workers were unable to cash their checks, open bank accounts or wire the money they were promised back home.[13] Seaboard allegedly issued the workers false social security numbers, provided work inconsistent with what was promised, and failed to provide workers with a translator to ensure they could do their jobs correctly.[14] Seaboard purportedly also threatened workers with deportation if they missed shifts or were sick.[15]

39. The State of Iowa promised Seaboard an enticing incentive package for building its $300 million facility in Sioux City.[16] After the embassy of the Federated States of Micronesia sent the State Department a letter calling for an investigation into Seaboard's misconduct, which included claims of physical, emotional and verbal abuse, Governor of Iowa Kim Reynolds said "the state would temporarily block millions of dollars" in those incentives for Seaboard.[17]

40. Although Iowa has been identified as a hotspot for human trafficking, very few of the reported cases involving these operations have been prosecuted. Additionally,

---

[12] *Id.*

[13] https://www.nytimes.com/2019/10/13/us/iowa-pork-micronesia-workers.html

[14] https://www.desmoinesregister.com/story/news/2019/03/20/human-trafficking-iowa-massage-parlor-pimp-sex-crime-craigslist-prostitution-robert-kraft-patriots/3082329002/

[15] https://www.nytimes.com/2019/10/13/us/iowa-pork-micronesia-workers.html

[16] https://www.desmoinesregister.com/story/news/2019/03/20/human-trafficking-iowa-massage-parlor-pimp-sex-crime-craigslist-prostitution-robert-kraft-patriots/3082329002/

[17] https://www.nytimes.com/2019/10/13/us/iowa-pork-micronesia-workers.html

Iowa seemingly has "some of the best laws in the country to combat sex trafficking" and any conviction is supposed to lead to mandatory jail time.[18] However, as of 2019, only one trafficking ring – the owner of an illicit massage parlor and his wife – had been prosecuted "for human trafficking under Iowa's state statute, 710A.2."[19] Considering the sheer number of trafficking reports each year since 2015, a conservative estimate given that most cases of human trafficking go undocumented, combined with the popularity of these trafficking practices on high profile, "black market" sites, the obvious conclusion is that trafficking operations in Iowa are going almost entirely unprosecuted and severely under punished. In 2017 alone, there were 174 tips of human trafficking in Iowa reported to the National Human Trafficking Hotline. Of those 174 tips, only three reports resulted in investigations and only one resulted in criminal charges.[20]

41.     This is likely for two reasons. According to Representative Marti Anderson, the previous head of the Crime Victims Assistance Division at the Iowa Attorney General's Office, Iowa has been blind to the human trafficking that takes place in the state, both sex and labor, for a long time.[21] Therefore, the prosecutorial structure needed to pursue such charges is lacking among law enforcement and state attorneys.[22] Another major reason

---

[18]  https://www.desmoinesregister.com/story/news/2019/03/20/human-trafficking-iowa-massage-parlor-pimp-sex-crime-craigslist-prostitution-robert-kraft-patriots/3082329002/

[19] *Id.*

[20] https://dps.iowa.gov/sites/default/files/intelligence/ht_overview.pdf

[21]     https://www.desmoinesregister.com/story/news/2016/11/16/des-moines-identified-top-100-human-trafficking-site/93952890/

[22] *Id.*

11

these cases go unprosecuted is due to the fact that the victims are oftentimes illiterate, come from other countries and cultures and do not understand the laws of the United States and the protections it has in place for trafficked workers.[23] Additionally, victims are often afraid to talk to federal agents and investigators, or testify in court, due to their immigration status or previous run-ins with federal officials.[24]

### *The J-1 Visa Program*

42.　The J-1 Visa is a temporary, non-immigrant visa issued to an exchange visitor. *See* 8 U.S.C. § 1101(a)(15)(J).

43.　The J-1 program is grounded in U.S. public diplomacy efforts. Its stated purpose is:

> to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments, and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people around the world; to promote international cooperation for educational and cultural advancement; and thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and other countries of the world.[25]

44.　There are 15 categories of J-1 Visa programs available to promote these purposes.[26] According to U.S. Citizenship and Immigration Services ("USCIS"), a J-1

---

[23] https://iowanaht.org/labor-trafficking-iowa/

[24] *Id*.

[25] 22 U.S.C. § 2451.

[26] For more information on the categories, *see* 22 C.F.R. § 62.4.

Visa, or "Exchange Visitor" visa, is "for those who intend to participate in an approved program for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, receiving training, or to receive graduate medical education or training."[27]

45.    Two categories within the J-1 Visa program are relevant to this case: "Student/College and University," and "Student Interns."

46.    Within the J-1 Visa Program, a "Student" is defined as

A foreign national who is:

(1)    Studying in the United States and:

(i)    Pursuing a full course of study at a secondary accredited academic institution;

(ii)    Pursuing a full course of study leading to or culminating in the award of a U.S. degree from a post-secondary accredited academic institution; or

(iii)    Engaged in full-time in a prescribed course of study of up to 24 months (non-degree) duration conducted by:

(A)    A post-secondary accredited institution; or

(B)    An institute approved by or acceptable to the post-secondary accredited academic institution, where the student is to be enrolled upon completion of the non-degree program;

(2)    Engaged in academic training as permitted in § 62.23(f);

(3)    Engaged in English language training at:

(i)    A post-secondary accredited academic institution, or

---

[27]    U.S. Department of Homeland Security (DHS), USCIS, *Exchange Visitors*, https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/exchange-visitors (last accessed Nov. 19, 2020).

> (ii) An institute approved by or acceptable to the post-secondary accredited institution.[28]

47. The purpose of the J-1 Visa Program for College and University Students is to

> provide[] foreign students the opportunity to participate in a designated exchange visitor program while studying at a degree-granting post-secondary accredited academic institution or participating in a student internship program which fulfills the student's academic study. A student sponsored in this category may participate in a degree, non-degree, or student internship program. Such an exchange is intended to promote mutual understanding by fostering the exchange of ideas between foreign students and their American counterparts.[29]

48. A foreign national can be admitted to the United States through the J-1 Visa Program, subcategory "Student/College and University," if they are enrolled in a United States accredited institution and are enrolled in a full course of study.[30]

49. An exchange student in the J-1 Visa Program, subcategory Student/College and University, may engage in student employment if that employment:

> (i) Is pursuant to the terms of a scholarship, fellowship, or assistantship;

> (ii) Occurs on the premises of the post-secondary accredited academic institution the visitor is authorized to attend; or

> (iii) Occurs off-campus when necessary because of serious, urgent, and unforeseen economic circumstances which have arisen since acquiring exchange visitor status.[31]

---

[28] 22 C.F.R. § 62.4(a).

[29] 22 C.F.R. § 62.23(a).

[30] 22 C.F.R. § 62.23(d), (e).

[31] 22 C.F.R. § 62.23(g)(1).

14

50. An exchange student in the J-1 Visa Program, subcategory Student/College and University, may stay in the United States either (1) as long as it takes to complete the degree program, if they are in a degree program, or (2) for two years, if they are in a non-degree or certificate program.[32]

51. Alternatively, foreign nationals may be admitted to the J-1 Visa Program for the purpose of completing a student internship under the "Student Intern" subcategory.[33] The Student Internship Program must be "sponsored by the post-secondary accredited academic institution that issued" the authorization for the J-1 Visa.[34]

52. Student interns must be "a foreign national enrolled in and pursuing a degree at an accredited post-secondary academic institution outside the United States and … participating in a student internship program in the United States that will fulfill the educational objectives for his or her current degree program at his or her home institution."[35]

53. An internship is not a job. The regulations define an internship program as "[a] structured and guided work-based learning program for an Intern . . . that reinforces an intern's academic study; recognizes the need for work-based experience; provides on-

---

[32] 22 C.F.R. § 62.23(h)(1)-(2).

[33] *See, e.g.* 22 C.F.R. § 62.23(h)(3).

[34] 22 C.F.R. § 62.23(h)(3)(i).

[35] 22 C.F.R. § 62.23(i).

the-job exposure to American techniques, methodologies, and technologies; and enhances the Intern's knowledge of American culture and society."[36]

54.     In order to qualify as a "Student Intern," the student must be "primarily in the United States to engage in a student internship program rather than to engage in employment or provide services to an employer."[37] The internship program must "expand[] upon the participants' existing knowledge and skills."[38] Student Interns cannot be used to "displace full- or part-time or temporary or permanent American workers or serve to fill a labor need," and the "position that the student intern[] fills [must] exist[] solely to assist the student intern in achieving the objectives of his or her participation in a student internship program."[39]

55.     Specific types of "internships" are explicitly precluded for J-1 Visa Student Interns. A sponsor administering a student internship program must:

(i)      Not place a student intern in an unskilled or casual labor position. . .

(ii)     Not place a student intern in a position, occupation, or business that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(iii)    Not engage or otherwise cooperate or contract with a staffing/employment agency to recruit, screen, orient, place, valuate, or train student interns, or in any other way involve such agencies in an Exchange Visitor Program student internship program;

---

[36] 22 C.F.R. § 62.2, *Internship Program.*

[37] 22 C.F.R. § 62.23(i)(1)(ii).

[38] 22 C.F.R. § 62.23(i)(2)(iii).

[39] 22 C.F.R. § 62.23(i)(3)(ii)(B).

(iv)     Ensure that the duties of a student intern as outlined in the T/IPP will not involve more than 20 per cent clerical work, and that all tasks assigned to a student intern are necessary for the completion of the student internship program.[40]

56.     Student Interns in the J-1 Visa program can be paid for their time.[41]

57.     The sponsor of a student intern – in this case, WITCC – is required to "distinguish between work-based learning for student interns, which is permitted, and ordinary employment or unskilled labor, which is not."[42]

58.     Manual labor in particular does not satisfy the J-1 Visa program's goals of diplomatic exchange. Other J-1 Visa categories, such as Summer Workers,[43] are explicitly precluded from working in food and agricultural manufacturing jobs such as those provided by Defendants Tur-Pak and Royal Canin.[44]

59.     The maximum length of a J-1 Visa Program under the Student Intern subcategory is 12 months.[45]

---

[40] 22 C.F.R. § 62.23(i)(8)(i)-(iv).

[41] 22 C.F.R. § 62.23(i)(1)(6).

[42] 22 C.F.R. § 62.23(i)(1)(7).

[43] 22 C.F.R. § 62.32(b), "The purpose of this program is to provide foreign college and university students with opportunities to interact with U.S. citizens, experience U.S. culture while sharing their own cultures with Americans they meet, travel in the United States, and work in jobs that require minimal training and are seasonal or temporary in order to earn funds to help defray a portion of their expenses."

[44] 22 C.F.R. § 62.32(h)(16), cross referencing "positions in the North American Industry Classification System's (NAICS) Goods-Producing Industries occupational categories industry sectors 11, 21, 23, 31-33 numbers (set forth at http://www.bls.gov/iag/tgs/iag_index_naics.htm)." This includes jobs in animal food manufacturing and animal slaughtering and processing. *See* U.S. Bureau of Labor Statistics, *Food Manufacturing*, NAICS 311. https://www.bls.gov/iag/tgs/iag311.htm (last accessed Nov. 19, 2020).

[45] 22 C.F.R. § 62.23(h)(3).

17

60.     The "sponsor must ensure that the student intern has verifiable English language skills sufficient to function on a day-to-day basis in the internship environment."[46]

61.     Finally, because reciprocity is an integral component of the exchange program, regardless of the J-1 Visa category utilized, sponsors like WITCC are required to make every effort to achieve the fullest possible reciprocity, and send their own students to other countries on similar exchange programs.[47]

### Common Allegations

62.     In this case the Defendants worked in concert to traffic the eight plaintiffs from their home in Chile into debt bondage at a Sioux City, Iowa area food packaging plant and dog food factory by offering them a degree with free tuition, room, and board.

63.     Beginning on an unknown date believed to be in 2018 or early 2019, Defendants Albert and Murrell, acting on behalf of WITCC, began the process of seeking authorization from the Department of State for WITCC to host exchange students in the Student: College/University subcategory of the J-1 Visa program.

64.     On February 14, 2019, the Department of State gave notice to Defendant Albert that Defendant WITCC had been approved as a designated sponsor of the Exchange

---

[46] 22 C.F.R. § 62.23(i)(1)(i).

[47] *See* 22 C.F.R. § 62.8(c) ("In conducting its exchange visitor program, sponsors must make a good faith effort to develop and implement, to the fullest extent possible, reciprocal exchanges of persons.").

Visitor program, and that WITCC had been allotted 50 J-1 Visas for the academic year beginning July 31, 2019.

65.     Around the same time, Defendants Albert, Yi, Burright, and Murell, acting on behalf of Defendant WITCC, began negotiations with Defendants J&L and Albrecht to find a way to fund the J-1 Visa Program at WITCC.

66.     The agreed upon plan included WITCC Defendants bringing J-1 Visa students to the United States, and for the J&L Defendants to find local jobs in the Siouxland area for these students.[48]

67.     Defendants J&L and Albrecht provide temporary staffing services to a multitude of Siouxland area business, in particular, to production, industrial, and manufacturing plants in the area.

68.     Defendants Tur-Pak and Royal Canin are two such business that have a working relationship with Defendants J&L and Albrecht. Defendant J&L recruits, hires, and pays hourly workers for Defendants Tur-Pak and Royal Canin, and Defendants Tur-Pak and Royal Canin pay Defendant J&L for this service.

69.     Defendants WITCC, Yi, Burright, Albert, Murell, and Zuerech (collectively, the "WITCC Defendants"), J&L and Albrecht (Collectively, the "J&L Defendants"), Tur-Pak, and Royal Canin entered into an agreement wherein J-1 Visa Students would be recruited to work for Tur-Pak and Royal Canin. The details of the agreement included, at least:

---

[48] "Siouxland" refers to Sioux City, Iowa; South Sioux City, Nebraska; and North Sioux City, South Dakota, as well as the surrounding rural areas and communities.

a. The J&L Defendants would ensure that the J-1 Visa students met the minimum qualifications for the jobs, including limited English proficiency and physical fitness.

b. The J&L Defendants would provide transportation from WITCC's apartment complex to work and back for the J-1 Visa students.

c. The WITCC Defendants would house the J-1 Visa students on campus and secure visas for entry into the United States. This included offering an educational component to recruit the students.

d. Defendants Royal Canin and Tur-Pak would pay $15/hour for the J-1 Visa students' labor, through Defendant J&L. However, unbeknownst to the J-1 Visa students, a majority of those wages ($7.75/hour) would go to Defendant WITCC to pay for the student's housing, tuition, and fees. The students would then make minimum wage, $7.25/hour.

e. Defendant J&L would benefit, at least, by collecting a fee for providing these services.

f. Defendant J&L would also benefit by charging the J-1 Visa students for services such as transportation, and for employment badges.

70. Around the same time, the WITCC Defendants began their campaign to recruit foreign national students for this program.

71. These Defendants entered into an agreement with Defendants Espinoza, Rojas, Actos, and San Martin Matta (collectively, the "Chilean Defendants") to recruit the Plaintiffs from their home country

20

72.     By March of 2019, the WITCC Defendants, the J&L Defendants, and the Chilean Defendants began to recruit students to participate in a J-1 Visa program with Defendant WITCC.

73.     By March 1, 2019, a list of 25 Chilean students had already been generated for the J-1 Visa program.

74.     Defendant Burright, acting on behalf of Defendant WITCC, began communicating with these students using email, Facebook, WhatsApp, and other services to encourage them to complete the required paperwork for the J-1 Visa Program at WITCC.

75.     On March 14, 2019, the Chilean Defendants caused an advertisement for the WITCC J-1 Visa Program to be published on Facebook, with Defendant WITCC's logo. Translated to English, it stated:

**ATTENTION, ALUMS AND FRIENDS OF THE SCHOOL**

ARE YOU INTERESTED IN AN ACADEMIC SCHOLARSHIP AND A JOB IN THE U.S.A?

WESTERN IOWA TECH COMMUNITY COLLEGE, WTICC [sic] IS OFFERING YOU THIS GREAT STUDY AND WORK OPPORTUNITY.

ON THURSDAY 14, AT 5PM, IN OUR SCHOOL, THERE WILL BE AN INFORMATIVE CHAT.

WE'LL BE WAITING FOR YOU!!

76.     The WITCC Defendants and the J&L Defendants all traveled to Chile to meet with the Chilean Defendants, as well as meet the Plaintiffs, their targeted recruits, in April 2019.

21

77.     These Defendants specifically told the Plaintiffs, and others, they would be able to earn a two-year degree in either a culinary arts or robotics program at WITCC along with an internship experience that would improve their chances of furthering their careers.

78.     The Defendants recruited the Plaintiffs to the U.S. on a promised J-1 visa for a work/study exchange at WITCC.

79.     During the recruitment phase, Defendant Burright promised the Plaintiffs room, board, tuition and placement in an internship related to robotics or culinary expertise, and payment for meals.

80.     All of these promises were reiterated in an "Open Letter" from Defendant WITCC to its "Brazilian/Chilean friends." The promised benefits of the program included:

a.      A scholarship to provide a two-year Associate's degree in robotics or culinary arts.

b.      A scholarship to pay for housing on Campus.

c.      Up to $1,000 for travel to the United States

d.      The opportunity to participate in fun cultural activities.

e.      Returning to your home country with a degree from the United States.

81.     This letter informed potential J-1 Visa students they would be required to work as many as 35 hours per week, and attend class for 12 hours per week.

82.     However, this program was being billed as an internship program with scholarships. Students were not informed they would be working in manufacturing plants to pay for these so-called "scholarships."

83.     Although this letter also informed potential J-1 Visa students they would be required to pay for their own meals, this information was changed by later communications.

84.     On April 24, 2019, Defendant Burright, on behalf of Defendant WITCC, sent letters to Plaintiffs indicating their acceptance into WITCC as a J-1 Visa Student. The letter stated:

> We are pleased to notify you of your acceptance into Western Iowa Tech Community College as a J-1 visa student, in the Robotics & Automation program.[49] You should start your Visa application process as soon as you can.
>
> In this package you will find, other than this acceptance letter, your DS2019 form, the pre-arrival handbook, your job offer letter, and your proof of health insurance according to the J1 Visa requirements.
>
> Although you were already tested in English reading and writing, it is part of our procedure for new international students to have them tested again upon arrival in their English language skills. You may need to take intensive English classes in order to prepare you to attend your program classes and job site training.

85.     The referenced "job offer letter" in the packet was a job offer to work with Defendant J&L staffing. It did not indicate the rate of pay, the hours, or the location where the work was to be performed.

86.     The work was described as a "valuable, resume-enhancing experience for candidates to gain work experience."

---

[49] For those Plaintiffs accepted into the Culinary Arts Program, the letter was identical, with the exception of inserting the phrase "Culinary Arts program" instead of "Robotics and Automation program."

23

87.     The packet also included a J-1 Student Agreement for the plaintiffs to sign, outlining the requirements of their program. The J-1 Student Agreement required the students to agree they would:

(1)     Attend English courses if my English skills are determined to be lower than necessary to perform my academic and internship duties.

(2)     Attend classes in my program (Culinary or Robotics/Mechanical Engineering) and maintain a minimum of a 2.0.

(3)     Attend my internship and receive positive reviews from my internship supervisor.

(4)     Live in the Western Iowa Tech student housing, Sun Ridge apartments.

(5)     Return to my home country after graduation or upon request of the College.

        I understand that if I am not attending classes or my internship, or if I am dismissed from either the college or my internship, that I must return to my home country immediately at my own expense.

88.     The agreement did not indicate the cost of tuition, meals, transportation, fees, or any other part of the program. The agreement did not include a promise to pay WITCC by working, through J&L, at Royal Canin or Tur-Pak.

89.     The agreement did not inform students they would be working 35+ hours a week at manufacturing/production type jobs.

90.     The Plaintiffs were not asked to sign anything authorizing Defendants to divert money from their paychecks to Defendant WITCC.

91.     During the interview process, Defendant Albrecht, on behalf of J&L, asked the students whether they could lift 40 pounds to their chest. Defendant Albrecht did not have any other employment-related questions for the students.

24

92.     In June of 2019, the Defendants began to change course. Defendant Burright wrote the plaintiffs, as well as the Chilean Defendants, that Defendant WITCC had "issued our DS2019's in a wrong way," and made some mistakes. Defendant Burright listed those mistakes in English in an informal email,[50] including:

1.     Using J&L company as a partner. J&L is a job agency and, according to the rules, that we, unfortunately, did not know, cannot participate in any J1 program. The reason is that this program has the main purpose of providing a cultural interchange between the US and other countries, even though allowing participants to be trained in the real environment and be paid for that, which is what will happen when you come. J&L will be assisting the college in the process of allocating you among the various business/partners where you will be trained and paid for that[.]

2.     At any moment, we are [not] allowed to mention that the reason for J1 paid internship is the lack of workers in the area, even when indeed there is a need for workers. Also, we cannot call you workers, but student interns, and we cannot use the word salary or wages, but stipends or compensation.

3.     According to SEVIS instructions, we cannot issue a DS2019 form for longer than 1 year. Instead, we have to issue it for a period of 1 year, and then, before it expires, we will have to update your DS2019 forms for 1 more year.

In order to adjust this process according to the law:

1.     In your DS2019 form, you will have a period of 1 year, from August 22, 2019, to August 21, 2020.

2.     Your programs were changed to Food Services or Electromechanical Technician, which corresponds to halfway for Culinary Arts and Robotics. When DS2019 forms are reissued, the name of the programs will eb what originally they meant to be.

---

[50] The English version of this document contains some inconsistencies with the Spanish language version of this document. The Spanish language version also appears to omit some paragraphs that are included in the English language one. Bracketed insertions in this paragraph are meant to clarify a sloppy translation job. It is unknown who did the original translation.

3. Because J&L cannot be an official partner, its name was removed from your DS2019 forms, and the Western Iowa Tech will be the one providing you with the financial assistance, through the paid internship you will be assigned by the time of your arrival.

4. Another form, DS7002, had to be created, which is a training plan where we have to describe how you are going to be trained, step by step.

5. We had to create an invitation letter, improve and add more information in the acceptance letter, and create an accommodation letter.

93. This letter reassured the Plaintiffs that "nothing had changed for them," that they could still stay in the United States and earn their two-year degrees, even though the name of the degree and length of the program had changed.

94. These changes were made for a clear purpose: initially the Plaintiffs were offered the chance to earn a two-year degree. But, J-1 Visa students in the subcategory of Students/College and University cannot work the hours or the type of jobs that all of the Defendants, collectively, had agreed that the Plaintiffs would work in order to fund Defendant WITCC's program. Individuals with a J-1 Visa under the Student/College and University subcategory cannot work off of campus. J-1 Visa Student Interns can work off of campus, in an "internship." This bait and switch allowed was designed to make sure that the agreement between all of the Defendants could go through.

95. This bait and switch was also designed to hide from the Department of State that the planned "internship program" violated the rules for the J-1 Visa Student Intern category. As noted in the letter, Defendant J&L staffing was not permitted to participate in a J-1 Visa internship program, and the purpose of the internship program could not be used

26

to fill a labor shortage in the United States. However, as noted in the letter, Defendant J&L was going to continue to be involved, and the students were intended to fill a labor need.

96. Once recruited, the Plaintiffs had to travel to the U.S. Consulate in Santiago, Chile. Prior to the interview, Defendant coached Plaintiffs as to what to say and not to say during the consular interview, which included demeanor, emotions and instructions as to when to say yes or no.

97. The Plaintiffs were coached on how to pass the English language portion of the interview.

98. The June 2019 email communication from Defendant Burright also instructed the Plaintiffs to destroy evidence that Defendant J&L was involved and had given them a job offer.

99. The June 2019 email falsely promised the Plaintiffs:

> Nothing changed for you, only the way we have to approach and describe this program. This is the main reason for the delay in this process because I was adjusting it following the instructions of the Department of Education that so kindly helped us to be on the right track and be successful in this beautiful project.

100. Formally, the documents initiating Plaintiffs into the J-1 Visa Student Intern program were sent out on June 3, 2019.

101. Plaintiffs received Accommodation Information Letters informing them that they would be living in the Sun Ridge Court apartment complex owned by Defendant WITCC, in two-apartments, with four people to an apartment. The letter did not state that the students would be paying rent.

27

102. Plaintiffs also received new acceptance letters dated June 3, 2019, as promised in Defendant Burright's email. These acceptance letters described a one-year program. "Culinary Arts" became "Food Services," "Robotics and Automation" became "Electromechanical Technician."

103. The acceptance letters described "intensive English language training, customized to meet your need for a specific vocabulary and professional terminology for your training program."

104. The acceptance letters also promised:

[Y]ou are **NOT** responsible for the cost of your tuition, fees, housing, or supplies. Meals will be provided at the College. The necessary materials for your classes and training will be supplied by the college and will have to be returned right after your conclusion of your program.

105. The acceptance letter promised:

You will have your training in an external environment provided by industries/partners that are served by our Corporate College, a division of Western Iowa Tech Community College. These companies send their employees to our Corporate College to acquire knowledge and training when and if it is necessary, and they are willing to participate in this cultural interchange by allowing us to use their facilities and plants, and by providing us an experience and qualified employee to oversee your training together with your instructor.

106. For the rebranded Culinary Arts program (now "Food Service Diploma Program"), the acceptance letter described the program as follows:

The Food Service Diploma emphasizes fundamental and intermediate techniques of food preparation, production and baking skills. This program prepares students for intermediate level positions in the industry more specifically first-line supervisors of food preparation and serving workers.

Once you graduate, you will be ready to directly supervise and coordinate activities of workers engaged in preparing and serving food, and,

28

in our J1 project, directly related to automated food production industries, for humans or pets' consumption. The most common tasks that food services professionals perform are: inspect supplies, equipment and work areas to ensure efficient service and conformance to standards; manage food service operations or parts of operations; balance receipts; communicate with customers to resolve complaints or ensure satisfaction; process customer bills or payments; cut cooked or raw foods. Employees in these occupations need anywhere from a few months to one year of working with experienced employees. A recognized apprenticeship program may be associated with these occupations. For this reason, while you are gaining specific knowledge for that, through your classes, and as part of your training, you will experiment [sic] the activities performed in the real environment in which you are going to do work when you finish your program.

107. For the rebranded Robotics program – now "Electromechanical Technician"

program – the letter provided:

This program provides students with hands-on training to prepare them for an entry level position as an industrial mechanic or maintenance position. Electromechanical technicians utilize knowledge and skills developed from learning various topics including electrical, mechanical, fluid power to maintain and repair industrial equipment and systems. Once you graduate, you will be ready to operate, test, maintain, or calibrate unamend, automated, servo-mechanical, or electromechanical equipment and you may assist engineers in testing and designing robotics equipment, and, in our J1 project, directly related to automated food production industries, for humans or pets' consumption.

The most common tasks that electromechanical technicians perform are: test performance of electromechanical assemblies, using test instruments such as oscilloscopes, electronic voltmeters, or bridges; read blueprints, schematics, diagrams, or technical orders to determine methods and sequences of assembly; inspect parts for surface defects, install electrical or electronic parts and hardware in housing or assemblies, using soldering equipment and hand tools; and verify part dimensions or clearances to ensure conformance to specifications, using precision measuring instruments.

108. Plaintiffs received an "invitation letter" to their programs with the same date.

Like the acceptance letters, the invitation letters made promises about the costs to students:

Western Iowa Tech will be responsible for your international flight to our campus in Sioux City, Iowa. You are **NOT** responsible for the cost of your tuition, fees, housing, or supplies. Meals will be provided by the college.

109. Defendant Burright, acting on behalf of Defendants WITCC, J&L, Tur-Pak, and Royal Canin, made these false promises in order to induce the Plaintiffs to travel to the Sioux City, Iowa area.

110. Meanwhile, Defendants Burright and Albert were working to smooth out the details of the program with the Department of State.

111. Defendant Albert wrote the U.S. Embassy in Chile that it was not necessary for the Plaintiffs to be fluent in English to participate in WITCC's J-1 Visa Program, because "The College runs a strong English as a Second Language Program (ESL) for international students and will provide the exchange student with Intensive English language instruction in order for the student to participate in his or her chosen program of study/training."

112. Defendants Albert and Burright, on behalf of WITCC, certified to the Department of State that the Plaintiffs would be participating in Food Services and Electromechanical training programs, using the required form DS-2019. This form certified to the Department of State that:

a. Plaintiffs in both programs would take classes pertinent to the programs;

b. Plaintiffs in both programs would take intensive English courses;

c. For the Plaintiffs in the "Food Services" program, Defendants Albert and Burright certified that the "internship" component of the program would consist of "*shadowing* in three different environments: the local cafeteria at

30

college, and two business partners consisting in a hotel restaurant, and a food preparation industry *just to observe*. In the three environments, the student will be under the guidance of a local and qualified employee and the instructor's supervision and care."

d.   The defendants certified that the "Food Services" "student will lend support to current food services tasks, quality assurance, database maintenance and updates, process improvement initiatives, as well as assist in ongoing workflows. With this, the student will get substantial knowledge in the Food Service field that will prepare him/her for intermediate level positions in the industry such as cooking services in restaurants."

e.   For the Plaintiffs in the "Electromechanical" program, Defendants Albert and Burright also certified that the "internship" component of the program would consist of job shadowing, specifically "The job *shadowing* will take place at our Corporate College partners . . . The manufacturing instructors will have the students *shadowing* in these locations under the guidance of a local, experienced and qualified employee and the instructor's supervision and care."

f.   The defendants further certified that "[t]he [Electromechanical program] student will support the electromechanical technician staff in the field of maintenance and repairing components and assemblies for industrial technology. Also, the student will project analysis, production management,

31

quality control, testing, and product launch initiatives. With this, the student will get substantial knowledge in the electromechanical technician field."

113. The Defendants knew this was not an accurate description of the work that the Plaintiffs would be performing. The Defendants knew Plaintiffs would be working on a production line, filling a labor shortage in the Siouxland area.

114. Plaintiffs arrived in Sioux City in August, 2019.

115. As soon as Plaintiffs arrived at WITCC, there were no opportunities to be an exchange student and experience American culture. There were no opportunities for them to get acquainted with the school or the classes.

116. Defendant Yi also dictated the women's personal lives; Yi advised them that, if they got pregnant, he would deport them back to their country of origin.

117. Defendant WITCC did not offer Plaintiffs free tuition.

118. Defendant WITCC did not offer Plaintiffs free room and board.

119. Defendant WITCC did not offer intensive ESL courses.

120. Instead, Plaintiffs were placed by staffing agency Defendant J&L, and at the permission and authorization of Defendant WITCC, to work at Defendant Tur-Pak's meat processing plant in Sioux City, Iowa and at Defendant Royal Canin's dog food factory in North Sioux City, South Dakota.

121. Defendant J&L organized transport for the Plaintiffs to and from the WITCC and either Tur-Pak or Royal Canin.

122. The Plaintiffs were required to work as line workers, in positions that required no skills at all and were not related to the Plaintiffs' fields of study and reported

32

to the Department of State.

123.    The work did not include an "educational" component typical of an internship.

124.    In addition, the Plaintiffs were forced to work 40 hours or more per week.

125.    When Plaintiffs received their paycheck, several withdrawals were made for things like employee badges and transportation. These withdrawals included taxes that are not allowed for someone with a J-1 visa.[51]

126.    Further withdrawals happened behind the scenes, so that they were not recorded on the Plaintiffs' pay stubs. Specifically, Tur-Pak and Royal Canin typically pay between $12 and $15/hour for line work.[52] Plaintiffs' were paid $7.25/hour, while $7.75 an hour went to Defendant WITCC as payment for Plaintiffs' tuition, fees, room and board.

127.    Defendant J&L was paid as a recruiter for the work done by the student.

128.    During the week before Plaintiffs' employment started, Plaintiffs were given Walmart or Hy-Vee gift cards for food.

129.    After Plaintiffs started working, WITCC ceased providing gift cards for meals, telling Plaintiffs they had to purchase food using their minimum wage earnings from J&L, Tur-Pak, and Royal Canin.

---

[51] Typically, nonresident aliens working on a J-1 Visa must pay federal, state, and local taxes. However, nonresident aliens on a J-1 Visa are exempt from paying Social Security and Medicare taxes on wages. *See* IRS, *Taxation of Alien Individuals by Immigration Status − J-1*, https://www.irs.gov/individuals/taxation-of-alien-individuals-by-immigration-status-j-1#:~:text=Generally%2C%20wages%20earned%20by%20a,of%20the%20Internal%20Revenue%20Code. (last accessed Nov. 23, 2020).

[52] https://www.indeed.com/career/factory-worker/salaries/IA.

130.   An attorney for J&L told the press that the "company assisted in lining up [the student intern's] internships and that they complied with the law . . . the students signed a contract where they agreed to have a portion of their $15 per hour wages taken to help offset the costs of the program."

131.   The Plaintiffs were encouraged, under duress and coercion, to make "donations" to Defendant WITCC.

132.   Defendant WITCC also encouraged the Plaintiffs to work, outside the scope of their employment authorization, to pay room and board to Defendant WITCC.

133.   Collectively, the Plaintiffs began to complain that the long hours of hard work made it impossible to attend to their classes. Plaintiffs also began to complain that their work was not an "internship" – they were not using skills pertinent to their classes, nor were they gaining any particular experience that would further their careers on tehri return to their home countries.

134.   Plaintiffs complained that they were not provided with the free meals that they were promised – they had to pay for their food out of their minimum wage earnings from Defendants Royal Canin and Tur-Pak.

135.   In response, the WITCC Defendants threatened the Plaintiffs with termination from the education program, termination from employment, and even deportation.

136.   The WITCC Defendants threatened Plaintiffs that they would withhold food and daily needs. In fact, Defendant WITCC did withhold food from Plaintiffs.

137.   Plaintiffs were required to work 8-12 hours daily at Defendant Tur-Pak or

34

Defendant Royal Canin. Defendant WITCC also held classes for the Plaintiffs six hours daily.

138.    Around November of 2019, the U.S. State Department began an investigation into the trafficking of the Plaintiffs.

139.    Upon information and belief, the Department of State informed WITCC of what the WITCC defendants already knew: the jobs at Tur-Pak and Royal Canin were not "internships," and the students working there were in violation of their J-1 Visa status.

140.    In response, the WITCC Defendants told the J-1 Visa students, including plaintiffs, that they had to quit their jobs at Defendant Tur-Pak and Royal Canin.

141.    Some Plaintiffs had already quit their jobs. Defendant WITCC told those students that they owed the college $250.00 a week for room, board, tuition, and fees.

142.    Once all of the Plaintiffs ceased working at Defendants Royal Canin and Tur-Pak, Defendant WITCC began attempting to charge all students $250/week for room, board, tuition, and fees.

143.    The WITCC Defendants informed the Plaintiffs that they were working with Defendant J&L in an attempt to secure compliant internships for the program so that the Plaintiffs would not lose their J-1 Visas (and the Defendants could resume earning money off of the Plaintiffs' labor). These internships never materialized.

144.    Some of the Plaintiffs found alternative employment on their own. The WITCC defendants threatened these Plaintiffs that they were out of compliance with their J-1 Visa and they would be deported.

145.    After the Plaintiffs took their complaints to the press, the WITCC Defendants

attempted to placate Plaintiffs by offering them access to WITCC's food pantry, and by taking them to local churches to solicit donations.

146.    The WITCC defendants then agreed to offer two meals per day – breakfast and lunch – in the WITCC cafeteria.

147.    In the last week of January – January 23, through January 31, 2019 – was the first time Plaintiffs were given meal tickets so that they could eat in WITCC's cafeteria. But the Plaintiffs noticed that other students did not have to use "meal tickets," they were allowed to purchase meal plans. WITCC treated Plaintiffs differently from its regularly enrolled students.

148.    The cafeteria meals were limited to $5.00 for breakfast and $7.50 for lunch. Students were also given a $75.00 gift card to HyVee to cover their food needs for the week.

149.    For Plaintiffs who were concerned about their food coverage going forward, the college recommended that the student interns rely on the food pantry, stating:

> Some people are reluctant to go to the WIT Comet Cupboard (Food Pantry). But please we are not insulting you by offering this food. We do this because we care about you. Before Christmas, employees provided lots and lots and lots of food. People made sacrifices to provide food for ALL students. Donations are provided because people care about people. Not because they look down on people. If you ever need something, you can go there as well.

150.    On March 13, 2020, Defendant WITCC, under investigation by the State Department, cancelled the Plaintiffs' J-1 visas. Defendant WITCC blamed the termination of the visas on the COVID-19 crisis, and bought tickets for students to return home.

151.    Defendant Murrell communicated the decision to terminate the J-1 Visa

36

program to the students via email on March 13, 2020, at 6:21 p.m.

152.    Defendant WITCC, through Albert, informed all of the J-1 Visa students, including Plaintiffs, on March 15, 2020, that they would have to check out of their housing by March 18, 2020 at 8:00 a.m.

153.    These actions functionally resulted in Plaintiffs being evicted.

154.    The return tickets were booked for March 18, 2020.

155.    This was an attempt to get the plaintiffs out of the country and terminate the investigation into the J-1 Visa program.

156.    However, Defendant WITCC did not terminate the visas of non-J-1 students and instead offered those students online studying.

157.    Defendant WITCC informed Plaintiffs and their families that their presence in the United States was unlawful.

***Specific Allegations***

158.    Plaintiffs replead the preceding paragraphs as if fully set forth herein.

159.    In addition to the common experiences each plaintiff endured, the following information provides a description of the experiences of each plaintiff.

### A.    *Karla O'Nell Norambuena*

160.    Karla is a Chilean national, born in 1991. She is the oldest of four children.

161.    Karla's family suffered financially. She spent the early years of her life moving from town-to-town while her parents looked for work, and eventually her parents sent her to live with her paternal grandmother.

37

162. Karla's mother became ill with cancer, so Karla had to work to raise money to support her family. At 16 years old, she worked through the summer and the holidays. However, Karla could not raise sufficient funds to support her family and attend university.

163. Karla deferred applying to many universities since she was financially unprepared to incur the debt accompanying higher education.

164. In March of 2019, Karla began exploring options to study outside of Chile. She received an opportunity to study at the University of Beunos Aires in Argentina and at the University of Baja California in Mexico.

165. Before she committed to one of the universities, she learned of an international education program at WITCC.

166. Like the other plaintiffs, Karla learned about the program through the Chilean Defendants who managed a Facebook page to recruit students.

167. Karla called the Chilean Defendants gather information about the program. Defendant Espinoza invited Karla to attend a conference the following day.

168. In April 2019, Karla participated in a series of interviews with the WITCC Defendants, Chilean Defendants, and J&L Defendants.

169. She was advised she would be allowed to enter in to one of two degree programs, Culinary Arts or Robotics. Karla picked the Robotics program.

170. While in Chile, Karla was only required to pay for her passport. The Chilean Defendants arranged the costs of attending the in-person interviews in April of 2019. Defendant WITTCC paid for the visas and legal counsel.

38

171.    Once Karla reached the in-person interview phase, Karla received breakfast and attended a brief presentation given by Defendants Albert, Salgado, Murrell, and Albrecht.

172.    The presentation consisted of a program summary and description. The presenters informed the prospective students they would reside on college premises with three other students (who could be either Brazilian or Chilean) of the same gender. Additionally, the presenters emphasized student work schedules would not interfere with academic studies.

173.    At the conclusion of the presentation, Karla signed academic applications and several documents which would be presented to the embassy for the visa application.

174.    After executing the documents, Karla was then required to lift and carry twenty-five (25) pound weights. The presenters informed Karla she was approved pending a consular interview at the United States embassy

175.    Like the other plaintiffs, Karla received a packet of letters from Defendants WITCC, Burright and Zuercher, including the acceptance letter, invitation letter, and accommodation letter. In that letter, Karla was promised that she would not be responsible for the cost of her tuition, fees, housing, or supplies.

176.    Karla was informed that she could not "get paid internship [sic] off campus without our permission. You will have your training in an external environment provided by industries/partners that are served by our Corporate College, a division of Western Iowa Tech Community College. These companies send their employees to our Corporate College to acquire knowledge and training when and if it is necessary, and they are willing

39

to participate in this cultural interchange by allowing us to use their facilities and plants, and by providing us an experienced and qualified employee to oversee your training together with your instructor."

177.    Like the other Plaintiffs, on June 12, 2019, Karla received an informal email from Defendant Burright, indicating that the program had been changed to comply with the Department of Education's and the J-1 Visa Program's requirements, and had been re-branded as a one-year, electromechanical technician program.

178.    Before arriving, WITCC told Karla she only needed to bring enough money to cover food for a few weeks since WITCC indicated it would pay all other expenses.

179.    Karla traveled from Chile to the United States once her visa was approved. This was Karla's first time in the United States.

180.    After arriving, Defendant Alberts and Castro greeted her with the college's bus. Albert and Castro drove Karla and other Chileans directly to Sioux City, Iowa. Once there, the bus collected a group of Brazilians and went to dinner.

181.    During the aforementioned dinner, the students were introduced to Defendant Yi.

182.    Following dinner, the students were taken on a tour of the college, given social security numbers, and placed in English level classes.

183.    Defendant Espinoza was also in attendance.

184.    Everyone was taken to the companies where the students would be working. Prior to this, Karla had not been told the names or locations of the companies. She had no knowledge of the type of work they would be doing.

40

185.     The program finally announced to students who selected the Culinary program they would be working for a slaughterhouse owned and operated by Seaboard Triumph Foods[53] and students in the robotics program would be working at a plant owned and operated by Royal Canin.

186.     These announcements came as a total surprise to Karla and the other students. Many students became emotional and began to cry. The emotional impact to the announcement continued, with many students crying daily, feeling devastated by the shock of the work assignments.

187.     Karla was assigned to work at Royal Canin. While there, Karla complained that the work she performed did not correspond to the robotics field.

188.     Karla was in charge of line production to ensure all "cans" passed inspection. She was also directed to pack and carry large, heavy boxes and inventory cans of dog and cat food. This work did not relate to what she was learning in her classes, indeed there was no educational component to this work whatsoever.

189.     The program required Karla to work long hours. Initially, she worked six to 12 hours a day, four days per week. Her weekly schedule often totaled 54 hours. In addition to work, she also needed to attend class every day. She found herself working at the plant, immediately going to class, and then returning to work with no time for proper rest.

---

[53] Plaintiffs named in this complaint did not end up working for Seaboard Triumph. However, upon information and belief, other students who were defrauded and trafficked by Defendants' J-1 Visa program did work for Seaboard Triumph.

190. Eventually, exhaustion began to take its toll on Karla. She experienced problems carrying the weighty boxes, nearing collapse.

191. Karla's family began to worry since she never called.

192. The rigorous work and class schedule caused riffs between the WITCC Defendants and Karla. When Karla was unable to attend class because of work, WITCC simply blamed J&L for the problems. WITCC consistently evaded questions and, when it did respond, would given incomplete answers.

193. When Karla continued to miss classes, the WITCC Defendants, the J&L Defendants, and Royal Canine began to threaten Karla. They told her if she did not go to work, she would be deported.

194. Karla was also told they would be in legal breach of contract if she did not continue to work.

195. On one particular day, Karla was simply too exhausted from her work and academic rigors to work at the plant. She advised WITCC staff, who directed her to get some rest.

196. The following day, Karla went to the supermarket to purchase essentials and, unfamiliar with the bus schedule, missed her bus. Consequently, she was late for work.

197. J&L Staffing terminated her and she was forced to work for Tur-Pak, starting the following Monday.

198. Once Karla began at Tur-Pak, she was assigned to the task of accepting orders. Like her previous job at Royal Canin, this job had nothing to do with Karla's

42

electromechanical technician classes, and did not involve an educational aspect. It was pure labor, for the benefit of the employer.

199.   Karla was told that if she was not compliant with Tur-Pak's instructions and schedule, she would be deported to Chile.

200.   Karla constantly felt unsafe at Tur-Pak because she was assigned to work with and around drug addicts, alcoholics, and criminals. In fact, Karla received a piece of advice her first day – be careful and watch herself at all times. She was told some of the men working in the plant were prone to sexual assault and harassment.

201.   Karla was also required to stand at her job for many hours and only allowed to use the restroom when given permission.

202.   Karla developed severe sinusitis and a stomach infection. When she sought medical treatment, the college denied any aid since she was required  to pay her own health care.

203.   Karla paid for her own medications and spent approximately three weeks vomiting after every meal due to the vile, fetid smell of Tur-Pak.

204.   Eventually, an American co-worker contacted the United States government to complain about the situation.

205.   In response, WITCC required Karla, and others, to break all ties and communications with J&L Staffing. WITCC also gave Karla, and others, the opportunity to search for jobs, even outside their areas of study. However, WITCC requested a weekly payment for their studies.

206. Initially, WITCC requested that Karla pay "what she could afford." WITCC eventually required Karla and other international students to pay approximately $250.00 per week.

207. To keep up with these payments, Karla had to get a job with a cleaning crew at Menard's and work overnight, four (4) days per week.

208. The WITCC Defendants informed Karla she could no longer be enrolled since she failed to fulfill the terms of her contract by failing to work, as required, and attend class, as required.

209. The WITCC Defendants compelled Karla to sign a document attesting she was leaving the program on her own volition.

210. Shortly thereafter, another person advised Karla about the fraudulent and illegal acts of the program. Karla spoke to an advisor and also learned WITCC began to change many things including evaluations and grades.

211. The WITCC Defendants responded to Karla when pressed and explained that an "error" occurred in its system and she would be allowed to remain in the program.

212. Once the media began to report on the trafficking, the WITCC Defendants scheduled a meeting with all of its J-1 students. During the meeting, Defendant Albert informed Karla and others that the culinary arts students were assured internships, but the robotics student were still in limbo.

213. The belated efforts by Defendant WITCC to salvage its illegitimate programs resulted in Karla losing her job as an employment coordinator in Brazil and academic

scholarships with other institutions. The program also alienated her from her family and social relationships.

214.    In March of 2020, Karla received notice that, due to COVID-19, Defendant WITCC was ending its J-1 Visa program. She was requested to leave the country.

215.    Karla declined to do so. On March 16, 2019, Karla contacted Iowa Legal Aid through its online intake system.

216.    Iowa Legal Aid quickly screened the case and assigned it to Attorney Lauren Camp. Attorney Camp's position with Iowa Legal Aid is funded, in part, by a special grant from the United State Department of Justice (DOJ) and the Office of Victims Crimes (OVC) to provide legal assistance to victims of human trafficking as defined by the TVPA.

217.    On or about March 18, 2019, Attorney Camp contacted Karla with a Spanish interpreter. During that call, Karla expressed concern about being removed from student housing and WITCC placed her immigration status in jeopardy.

218.    Karla was ultimate able to retain an immigration attorney to assist with her status and remain in the United States

**B. _Natalia Tapia Leiva_**

219.    Natalia is a Chilean national, born in 1989. She is the oldest of three children.

220.    Since she was a girl, Natalia has dreamed of being a professional chef. Natalia began working at 11 years old to help support her family. Even though both of her parents worked, they were unable to earn enough money to meet the needs of the family. Natalia also worked to help support her family.

45

221.    When Natalia turned 18 years old, she had saved enough money to attend the University of Chile. While in school, she continued to work. However, when she learned her father had an advanced stage of cancer, her family became her priority and delayed her academic pursuits.

222.    Eventually, Natalia's focus returned to her education. Like the other plaintiffs, she learned of an American culinary program offered through Defendant WITCC. According to a public Facebook advertisement, the program offered students the opportunity to earn a degree in robotics or culinary arts through scholarship and an internship program.

223.    Natalia completed the application and interview process in April 2019, with the other plaintiffs. During the interview, J&L administered a strength test to Natalia, requiring her to perform physical tasks such as lifting and moving boxes.

224.    During this process, WITCC provided Natalia with prepared answers for her embassy interview for the J-1 visa program.

225.    Natalia believed she was applying for a two-year Culinary Arts degree program, with an internship component.

226.    After the interview process, Natalia was accepted to and agreed to enroll in the two-year Culinary Arts Program.

227.    Like the other plaintiffs, Natalia received a packet of information dated June 3, 2019, from Defendant WITCC and Defendant Burright, including an acceptance letter, invitation letter, and housing accommodation information. This packet of information

assured Natalia that tuition, costs, supplies, housing, and meals would be provided by the Defendants.

228.   The June 3, 2019 letter also explained Natalia would be prohibited from obtaining a paid internship off campus without permission.

229.   Also in June 2019, Natalia received the same email received by the other Plaintiffs explaining that changes were being made to the program in order to comply with the Department of State's requirements, including omitting Defendant J&L's involvement with the program and changing the name and length of the program. Nevertheless, Natalia was assured that "nothing has changed for you."

230.   Natalia completed her state department interview in Las Condes, Santiago, Chile. She was subsequently approved for the program.

231.   Natalia sold her computer, telephone, and bicycle to raise just under $400USD to cover the initial, incidental costs of her stay.

232.   Natalia also quit her job in import/export thereby relinquishing a contract offer including a salary increase and improved health plan.

233.   Natalia arrived in the United States in August of 2019.

234.   WITCC and the J-1 program promised Natalia covered health insurance, food, and housing. In reality, Natalia paid for her own medical insurance, food, and housing.

235.   J&L placed Natalia at Tur-Pak as a food handler for her internship. She received $7.25 per hour in wages after WITCC deducted $7.25 per hour. Upon information and belief, Natalia never authorized J&L to make this deduction.

47

236. Natalia's job was not related to her field of study at WITCC.

237. WITCC told Natalia if she missed work or allowed her grades to drop, she would be removed from the program, her visa would be revoked, and she would be deported.

238. The WITCC program required her to work overnight, often from 4:30 p.m. to 4:30 a.m. Her work schedule rigors afforded very little, if any, time for rest and hygiene.

239. On one particular frigid winter day, Natalia did not have money for transportation from her job to her residence since Tur-Pak and WITCC withheld most of her paycheck. She had no option but to walk two hours in freezing temperatures. Once she arrived at her residence, she had to shower and attend class at 8:00 a.m.

240. The struggles the Defendants forced Natalia to endure led to her begging for money, becoming alienated from her family, and deeply depressed and dehumanized.

241. Like the other Plaintiffs, Natalia was forced to quit her job when the Department of State began its investigation.

242. With no money coming in, Natalia could not afford food. In response, the WITCC Defendants first offered access to a charity food pantry. Eventually, the defendants relented and offered gift cards and meal tickets to the campus cafeteria.

243. In March of 2020, Natalia received notice from Defendant WITCC that the J-1 Visa program was being cancelled, and that she had days to leave the country on a flight paid for by Defendants.

244. Natalia declined to leave the country, and was able to retain an immigration attorney to assist with her status.

48

### C. *Almendra Gonzalez de la Paz*

245. Almendra Gonzalez de la Paz was born in 1995, in Quillota, Chile.

246. In the spring of 2019, Almendra was studying for a degree in tourism and hospitality. She had worked as a bartender for two years in restaurants and discotheques. She had also worked for one year as a tour guide in Zapallar, Chile.

247. Almendra was hoping to study Culinary Arts to compliment her previous education training so she could advance her career.

248. The Chilean Defendant recruiters sold the WITCC program as an initiative to help fulfill the dreams of students like Almendra.

249. In April 2019, Almendra participated in a series of interviews with the WITCC Defendants, Chilean Defendants, and J&L Defendants.

250. On April 27, 2019, Almendra signed a contract of employment with Defendant J&L.

251. Almendra left her last year at the university to come to the US for the program at WITCC.

252. Like the other plaintiffs, Almendra received a packet of letters from Defendants WITCC, Burright and Zuercher, including the acceptance letter, invitation letter, and accommodation letter. In that letter, Almendra was promised that she would not be responsible for the cost of her tuition, fees, housing, or supplies.

253. Almendra was informed that she could not "get paid internship [sic] off campus without our permission. You will have your training in an external environment provided by industries/partners that are served by our Corporate College, a division of

49

Western Iowa Tech Community College. These companies send their employees to our Corporate College to acquire knowledge and training when and if it is necessary, and they are willing to participate in this cultural interchange by allowing us to use their facilities and plants, and by providing us an experienced and qualified employee to oversee your training together with your instructor."

254. On June 12, 2019, Almendra received the same informal email from Defendant Burright received by the other plaintiffs, indicating that the program had been changed to comply with the Department of Education's and the J-1 Visa program's requirements.

255. Despite these changes, Almendra, along with the other plaintiffs, was told that "Nothing changed for you, only the way we have to approach and describe this program. This is the main reason for the delay in this process because I was adjusting it following the instructions of the Department of Education that so kindly helped us to be on the right track and be successful in this beautiful project."

256. Almendra came to the United States on August 17, 2019.

257. Before Almendra began her internship, she was given a $50/week gift card to Walmart meant to cover the cost of his food.

258. Almendra was provided with an employee handbook from J&L , and asked to electronically sign acknowledging her receipt of that handbook on September 13, 2019.

259. Also on September 13, 2019, Almendra was asked to sign a form in Spanish indicating that she understood J&L required perfect attendance during the first two weeks on the job, otherwise she would be terminated.

50

260. Almendra began her job at Tur-Pak and received paychecks from J&L staffing.

261. Almendra was paid $7.25/hour, for 45-50 hours per week.

262. Once her employment began, Defendant WITCC stopped distributing the Walmart gift cards, stating students would have to pay for their food with their income from their job.

263. When Almendra and other student interns complained they could not afford food, and that they were promised food, WITCC took the student interns to local churches for donations.

264. Almendra thought she would be working in a job related to the career that she had come to the United States to study, such as cooking. Instead, she was told she would be working at Tur-Pak, in food supply.

265. Although Almendra was technically working with food at Tur-Pak, she did not apply anything that she learned in her classes.

266. This job involved no skill at all, and she did not receive any training relevant to her culinary arts classes.

267. Defendant J&L provided transportation to the job, at a cost of $4.00 per ride, deducted from the paycheck.

268. Other deductions, including taxes that are not permissible on a J-1 Visa, were made from her paycheck.

269. Almendra endured inhumane working conditions, working in the freezer at Tur-Pak and suffering several on-the-job injuries. Alemndra was told that if she missed

51

work for any reason, even including injury, she would be out of compliance with the program, not receive her degree, and would be deported.

270.    J&L and Tur-Pak did not care if Almendra or other workers were sick, or if they missed classes because they were tired. For J&L and Tur-Pak, work was more important.

271.    Almendra felt she could not quit or stop working, because she was threatened with deportation. Defendant Albert explained that if she quit her job, she would be out of compliance her his visa and would be deported, with no return to the United States available.

272.    After one group of students made complaints to the Department of State about the program, Almendra received notice that all students would have to stop working at Tur-Pak, and that WITCC would assist the students in finding new jobs.

273.    WITCC never found Almendra a new job, or any suitable internship for the J-1 Visa Program.

274.    In March of 2020, WITCC terminated Alemndra's J-1 Visa, claiming that it could not continue the program due to the ongoing Coronavirus Pandemic. Almendra was asked to vacate WITCC immediately and go back to her home country.

275.    Despite this, Almendra did not leave the country, and retained an immigration attorney to assist with her status.

### D. _David Silva Moreno_

276.    David Silva Moreno was born in 1999, in Chile.

277.    David has had a difficult childhood. He never met his biological father. His

52

mother encountered legal trouble as a result of her husband, and so David was frequently in his grandmother's care. David and his mother also lived with his aunt for a time, but became homeless because David's aunt was abusive. David was diagnosed with Leukemia as a teenager.

278. Because of the immense difficulties in his past, when David came across the opportunity to study in the United States, he jumped for the opportunity for a fresh start.

279. David was recruited for the WITCC J-1 Visa program by the Chilean Defendants. He first saw the advertisement for the program on Facebook.

280. David had a video conference with Defendants Albert and Burright to answer his questions about the program. During this video conference, Defendants Albert and Burright explained that, to participate in the program, the applicant had to know basic English, have finished secondary school, and complete a background check.

281. David attended the April 2019 interviews with the WITCC Defendants and J&L Defendants.

282. Bizarrely, during the presentation, Defendant Albrecht took out a $100 bill, showed it to David and the other students, and stated "You want to have money. You want to have this? You will make a lot more in the U.S."

283. Defendant Albrecht asked David to lift weights.

284. Like the other Plaintiffs, David received a packet of information dated June 3, 2020, including the acceptance letter, invitation letter, and housing accommodation letters. These letters assured David that he had been accepted into the rebranded Food Services Diploma program, that his tuition, housing, supplies, and meals would be

53

provided by the college, and that he would participate in an internship that was relevant to his course of study.

285.   David was also notified that he could not obtain an internship or job outside of what was approved by Defendant WITCC.

286.   Like the other Plaintiffs, David also received the informal email from Defendant Burright, describing the changes that had been made to the program since the April 2019 interviews, and instructing him to destroy the documents from Defendant J&L and not discuss J&: during the Visa Interview.

287.   David decided not to destroy the documents from Defendant J&L.

288.   The WITCC Defendants  prepped David for his interview, explaining he had to tell the consular office that he was only coming to the United States for one year, and that he was coming to study, not to work.

289.   David came to the United States in August with the rest of the Plaintiffs.

290.   Once he arrived, the WITCC defendants provided some gift cards for food. However, these gift cards ceased once David started work.

291.   David was assigned to work for Tur-Pak.

292.   David's job at Tur-Pak was pure menial labor. He did not use any of the skills he was learning in classes at this job, and there was no educational component to it.

293.   David's schedule at Tur-Pak was from 3:30 p.m. to 12:00 a.m., Monday through Friday. If he missed a day of work, the J&L Defendants and WITCC Defendants would tell him that he would have to work a Saturday, or he would be deported.

294.   Defendant Yi in particular repeatedly told David, "If you don't work, you go.

54

If you don't study, you go. If you don't comply, you go."

295.    This schedule, combined with David's class load, was exhausting.

296.    Because of exhaustion, David suffered an injury at work, leaving him with a sprained knee and right elbow.

297.    David was encouraged not to go to a doctor for these injuries, because it would be too expensive. Instead, he was told to return to work.

298.    To this day, his ankle hurts. He has learned to live with the pain.

299.    Defendant WITCC did not care if David was tired or stressed. He was always threatened with being deported to Chile if he did not comply with the Defendants' demands.

300.    David was eventually given the option of quitting at Tur-Pak and finding work elsewhere. However, he was told that if he was not working at Tur-Pak, he would owe the college $250/week.

301.    At some point in November, a complaint was made to the Department of State. A Department of State investigator made an appointment to talk with David. Prior to the appointment, the WITCC Defendants attempted to coach David on how to answer interview questions.

302.    David went two months without a job and with no financial assistance from the WITCC Defendants. He had to beg his parents for money, but they could not afford to help him.

303.    During a meeting with all of the J-1 Visa students, David was told that he was going to be deported for "not complying with different regulations."

55

304. Then, the WITCC Defendants seized on the COVID-19 pandemic as an excuse to terminate the J-1 Visa program. David received notice that his program had ended and his Visa was terminated, and was asked to leave the country within a few days.

305. Instead of leaving, David was able to retain an immigration attorney to help with his statuts.

### E. *Fernando Vilches Castillo*

306. Fernando Vilches Castillo was born in 1998, in Quillota, Chile.

307. Fernando has a high school diploma, and studied Social Work for two years at Andres Bello University in Vina del Mar in Chile. He also has a diploma from a cocktail school called Bar Academia Valparaiso.

308. Fernando was hoping to study Culinary Arts to compliment his cocktail school training, so that he could advance his career.

309. The Chilean defendants sold the WITCC program as an initiative to help fulfill the dreams of students like Fernando.

310. Fernando quit his job, left university, and sold all of his belongings to come up with the money he needed to come to the United States for this program. His parents even sold their house.

311. Fernando received a letter from Defendant Burright dated April 24, 2019, stating that he was accepted into WITCC's J-1 Visa, Culinary Arts Program and to start his visa application process.

312. Fernando believed, based on the WITCC Defendants' promises, that this would be a two-year degree program.

56

313.    Fernando signed a contract of employment with Defendant J&L on April 27, 2019.

314.    Like the other Plaintiffs, Fernando received the June 3, 2019 packet of letters, including the acceptance letter, invitation letter, and accommodation letter. These letters promised Fernando free tuition, housing, fees, and supplies, and that meals would be provided by the college.

315.    Like the other Plaintiffs, Fernando received the informal email from Burright indicating that the program had been changed from a two-year J-1 Student Visa program, to a one-year J-1 Student Intern program.

316.    Fernando came to the United States on August 17, 2019.

317.    Before Fernando began his internship, he was given a $50/week gift card to Walmart meant to cover the cost of his food.

318.    Fernando was provided with an employee handbook from J&L, and asked to electronically sign acknowledging his receipt of that handbook on September 13, 2019.

319.    Also on September 13, 2019, Fernando was asked to sign a form in Spanish indicating that he understood J&L Staffing required perfect attendance during the first two weeks on the job, otherwise he would be terminated.

320.    Fernando began his job at Tur-Pak and received paychecks from J&L staffing.

321.    Fernando was paid $7.25/hour, for 32+ hours per week.

322.    Once his employment began, WITCC stopped distributing the Walmart gift cards, stating students would have to pay for their food with their income from their job.

57

323. When Fernando and other student interns complained they could not afford food, and that they were promised food, WITCC took the student interns to local churches for donations.

324. Fernando thought that he would be working in a job related to the career that he had come to the United States to study, such as cooking. Instead, he was told he would be working at Tur-Pak, in food supply.

325. At Tur-Pak, Fernando worked on an assembly line packing Lunchables from 3:30 p.m. to 12:00 a.m., Monday through Friday. Although he was technically working with food, he did not apply anything that he learned in his classes.

326. This job involved no skill at all, and he did not receive any training relevant to his culinary arts classes.

327. J&L Staffing provided transportation to the job, at a cost of $4.00 per ride, deducted from the paycheck.

328. Other deductions, including taxes that are not permissible on a J-1 Visa, were made from his paycheck.

329. Fernando endured inhumane working conditions, standing in the same position every day for eight hours, doing repetitive work, watching his coworkers fight, use drugs, and occasionally pass out.

330. On October 10, 2019, Fernando emailed Albrecht at J&L and asked to be excused from work, stating (translated):

> Dear Nancy, I do not believe in the necessary conditions to attend work today. I feel very sick and although I do not want to, I will have to miss today to finish the rest of the week without problems. Sorry for my absence,

58

I hate to fail but I really feel very bad today. See you soon, thank you very much.

331. Albrecht replied, one minute later: "[P]lease report to work and if they send you home we will deal with it then but you must go to work."

332. Fernando worked at Tur-Pak for two months when he began experiencing back pain and muscle spasms. Fernando suffers from scoliosis. During these two months, he had to go to the doctor on three occasions, and the doctor told him that this was not an appropriate job for him.

333. Fernando was temporarily restricted to light work duty for three days, with no lifting greater than 10 lbs.

334. Fernando had to be prescribed Tizanidine to treat his muscle spasms, and Naproxen to treat back pain.

335. J&L and Tur-Pak did not care if Fernando or other workers were sick, or if they missed classes because they were tired. For J&L and Tur-Pak, work was more important.

336. Fernando felt that he could not quit or stop working, because he was threatened with deportation. Albert explained that if Fernando quit his job, he would be out of compliance with his visa and would be deported, with no return to the United States available.

337. Fernando had a meeting about his back pain with Defendant Yi. Yi was a chiropractor. Because Fernando did not have money to go to a chiropractor on his own, Yi made Fernando take off his shirt in front of other students for a chiropractic adjustment.

59

338. Next, Fernando had a meeting with Albert. Albert told Fernando that he could leave the job at Tur-Pak, but that he had to find another job and could not delay in doing so.

339. Fernando found another job at The Don's Sports Bar & Grill in Sioux City, Iowa. Fernando worked as a cook and occasionally as a bartender. Fernando worked at Don's Bar for approximately two weeks without any problems.

340. Notably, without the connection between The Don's Sports Bar and J&L, WITCC was no longer receiving a cut of Fernando's pay from his work.

341. After two weeks of this, Albert contacted Fernando and the other student interns who were no longer working at Tur-Pak and informed them that they would have to start making weekly payments to the school to cover their housing.

342. At first, Albert informed the students that they would owe $100/week for housing. Then, Albert informed the students they would have to pay $250/week to cover the fees for the semester.

343. When Fernando stopped working for Tur-Pak, WITCC stopped providing gift cards for food.

344. Fernando's job at Don's Bar earned him approximately $500 every two weeks, meaning that $250/week fees to WITCC would be the entirety of his earnings, with no money left over for food.

345. After one group of students made complaints to the Department of State about the program, Fernando received notice that all students would have to stop working at Tur-Pak, and that WITCC would assist the students in finding new jobs.

60

346. At one point, WITCC issued one round of gift cards for the students that were not working during winter break.

347. Fernando was threatened that if there were any problems, if he did not perform his job adequately or missed too many classes, that he would be deported and removed from the country.

348. WITCC never found Fernando a new job. WITCC never provided Fernando with an internship as required by the J1 Visa Exchange program.

349. Albert stated to Fernando that she doesn't care if he goes to class or not. All WITCC cared about was that the student interns were working.

350. In March of 2020, WITCC terminated Fernando's J-1 Visa, claiming that it could not continue the program due to the ongoing Coronavirus Pandemic. Fernando was asked to vacate WITCC immediately and go back to his home country on a few days' notice.

351. Fernando has not vacated the country. Fernando retained an immigration attorney to help him resolve his status.

352. Since coming to the United States, Fernando has married a U.S. Citizen. Fernando still hopes to pursue a career in Culinary Arts, although the Defendants' actions have set him back by at least a year.

### F. *Claudio Ramos*

353. Claudio Ramos was born in 1992, in La Ligua, Chile.

354.    Claudio has a high school diploma, and he was attending college at the Universidad Santa Maria studying engineering when he came across the WITCC Culinary Arts Program.

355.    Claudio jumped at the opportunity to earn a free degree in Culinary Arts, because baking had long been his passion and his dream.

356.    Claudio had a difficult childhood. His mother had him at age 16, and his biological father was never in the picture. His stepfather struggled to be an adequate parent and connect to Claudio, and the family dealt with extreme poverty.

357.    Despite their struggles, Claudio and his stepfather worked together in a bakery, selling bread and cakes throughout their neighborhood. Claudio was able to put himself through school through this and other odd jobs.

358.    Claudio hoped that the culinary arts program at WITCC would give him the skills he needed to open his own bakery and follow in his stepfather's footsteps.

359.    Claudio was excited to participate in cultural exchange – he was going to learn English and be able to speak it while educating himself to have his own business.

360.    Claudio contacted the Chilean Defendants to learn more about the WITCC Culinary Arts Program. Defendant Espinoza contacted Claudio every day to tell him about the "greatest opportunity."

361.    Claudio was interviewed for the WITCC Culinary Arts program by the WITCC Defendants and the J&L Defendants.

362.    During the interview with Defendant Albrecht, on behalf of J & L, Claudio was asked simple questions, such as if he had any health issues, and whether he could lift 30 kilograms.

363.    Defendant Burright had warned Claudio and others that they would be asked about how much they could lift, but explained that "questions like that are usual here" in the United States.

364.    During the interview with the WITCC Defendants, Claudio was assisted with filling out the application paperwork for the WITCC Culinary Arts program.

365.    Claudio was informed that he was accepted and made plans to come to the United States.

366.    Then, Claudio learned, like the other students, that the program was undergoing some changes. Claudio received the email from Defendant Burright explaining that WITCC had made some mistakes in creating the program, and that the Culinary Arts program was being rebranded as a Food Services program.

367.    Claudio received the same packet of June 3, 2019 letters as the other plaintiffs, including an acceptance letter, invitation letter, and accommodations letter. These letters described the program, and assured Claudio that he would not be paying for tuition, fees, housing, or meals.

368.    Claudio quit his job, and stopped his education in Chile for the opportunity to complete the WITCC Culinary Arts program.

369.    Claudio was concerned to leave his parents behind because his mother was sick. But the opportunity seemed too good to pass up.

63

370. Claudio arrived on August 17, 2020 and settled into the apartment that WITCC had provided.

371. In September, Claudio received his social security number and began work at Defendant Tur-Pak's factory.

372. Claudio was a production-line-worker at Tur-Pak, assembling Lunchables. The work was physically demanding. He would rotate within the same line, but couldn't move from his line. His job was to make sure that the Lunchables were not missing any items.

373. Making sure that the cheese was not missing from the Lunchables packets was not an educational internship. Claudio did not learn anything about the Culinary Arts in this internship.

374. Claudio had classes from 7:00 a.m. to 12:00 p.m., then he would work form 3:00 p.m. to 12:00 a.m. at Tur-Pak.

375. The work environment was also frightening for Claudio, and not suitable for a student. His co-workers were former convicts and drug addicts, and there was workplace harassment towards women.

376. This schedule was physically draining on Claudio. He would wake up with nightmares because he had to do so many things in between working, studying, and cooking. He couldn't keep up with the routine because his body was not getting the rest it needed to continue functioning.

377. Claudio began to miss classes due to exhaustion and psychological stress.

378.    On one occasion, Claudio got a stomach infection. He asked to go to the hospital, but he was told that he would not be taken to the hospital because he had to go to work, despite experiencing nausea and vomiting.

379.    Claudio was told that if he missed work or missed classes to go to the hospital, that his J-1 Visa would be revoked and he would be deported back to Chile for academic or labor failure.

380.    Defendant Yi yelled at Claudio and the other students that they could not miss work because they owed Defendant WITCC so much money. Yi told Claudio and the other students that if they missed even a day of work, their J-1 Visas would be cancelled and they would be deported back to Chile.

381.    After this occasion, a co-worker volunteered to take Claudio to Walmart for medication, which Claudio had to pay for out-of-pocket.

382.    Claudio also began to suffer back pain as a result of his work on the production line. Claudio went to a chiropractor, and the chiropractor communicated to Claudio and Defendant Burright that Claudio had a fever. Defendant Burright told Claudio that he still had to go to work.

383.    On one occasion, a co-worker hit Claudio out of nowhere. Claudio told a supervisor, and no remedial action was taken.

384.    Claudio observed co-workers laying on the floor, and co-workers using drugs in the bathroom. Again, no supervisors ever took any remedial action.

385.     Claudio realized during this time that there were many deductions from his pay stub to cover living expenses, transportation. He complained about this but nothing happened.

386.     In November, after some students made complaints to the Government, Claudio was told to quit his job at Tur-Pak. He did so because he felt he had to comply with WITCC's instructions, as they controlled his J-1 Visa.

387.     Without any income, Claudio had to write his family for money for his basic needs.

388.     In November and December, Claudio was among the students interviewed by the government as it was investigating the allegations against WITCC. After these interviews, WITCC stopped supporting Claudio.

389.     On December 5, 2019, Claudio received a bill indicating that he owed WITCC $2,861 dollars for fees and tuition.

390.     Claudio had no more income as he had been ordered to quit his job at Tur-Pak. Defendant WITCC was no longer providing any money for food, and Claudio had to spend all the money his parents sent him just to survive.

391.     In January, Claudio was called to a meeting with officials at WITCC and the other student interns. The student interns were told they had two options: return to Chile at right away with  a paid ticket and no certificate, or stay at WITCC, but work at a job of WITCC's choosing, and continue to have money deducted from their paychecks.

392.    Students who did not comply – because they quit their jobs and worked outside of the jobs that were approved by WITCC – were excluded from receiving Walmart gift cards from food.

393.    Defendants Burright, Yi, and other WITCC employees constantly addressed Claudio as a debtor, stating that they had done a lot for him, and that he had to pay all of his academic debt.

394.    Defendants Burright and Yi scheduled a second meeting with Claudio after this first meeting.

395.    Defendants Burright and Yi threatened that Claudio would be deported because his grades were below the average expected by the school. However, these defendants refused to produce Claudio's grades so that he could see them.

396.    When Claudio returned to his apartment, he logged into WITCC's portal to check his grades: they were in line with what was expected. Defendants Burright and Yi had lied to him.

397.    Shortly after this meeting, Claudio was informed that he no longer would be deported, and he could work for Chik-Fil-A in food prep. Although this was also paid labor, and still not a real internship, Claudio was at least out of the environment at Tur-Pak.

398.    Claudio has experienced real harm from his time in the United States, being trafficked by WITCC, J&L, Tur-Pak, and their employees. He has a hard time sleeping and has nightmares that the recruiters will do something to his family, or deport him to keep him from testifying. He has severe anxiety due to his treatment and exploitation. This makes it hard for him to complete daily tasks. He has also lost a significant amount of

67

weight due to stress. He needs ongoing psychological assistance and counseling to overcome the severe abuse he received.

399. Claudio received notification in March that Defendant WITCC was cancelling his J-1 Visa (allegedly due to COVID-19) and he had a few days to leave the country.

400. Instead of leaving the country, Claudio retained an immigration attorney to assist with his status.

### G. *Alejandro Pizarro*

401. Alejandro was born in La Ligua, Chile, in 1986.

402. Alejandro graduated from high school, with a focus as a professional technician in risk prevention.

403. Alejandro had an incredibly difficult childhood. His mother was an alcoholic, and abusive. This caused Alejandro to seek comfort in food, leaving him overweight as a child.

404. Alejandro has suffered trauma in his life. He was sexually abused by a tennis coach. He was in a car accident with his best friend, resulting in that friend's death.

405. Alejandro overcame that trauma to pursue a career in construction, where he could have independence and give his life meaning.

406. Alejandro was interested in the Robotics J-1 Visa Program because he thought it could advance his career if he learned English, and learned skills related to electricity, mechanics, and construction with different units of measurement.

68

407. He first came across the program on Facebook in March of 2019. He saw the program as a new door opening for him, to advance his career.

408. Alejandro contacted Defendants Espinoza, Actos, and Martin Matta to get more information about the program. The Chilean Defendants provided dates when informational meetings would take place.

409. Alejandro applied to participate in the Robotics J-1 Visa Program offered by Defendant WITCC.

410. Initially, Alejandro was told that this would be a two-year program, that the program would be supported by scholarships, and that he could use the money he earned from his internship to buy things that he needed.

411. Alejandro attended interviews with the Chilean Defendants, the WITCC Defendants, and the J&L Defendants in April 2019.

412. During the interview with Albrecht for J&L, Alejandro had to demonstrate that he could lift 40 pounds from the floor to the height of his torso.

413. Like the other Plaintiffs, Alejandro received a packet of letters dated June 3, 2019, including the acceptance letter, accommodations letter, and invitation letter for the rebranded "Electromechanical Technician Program." These letters reiterated that Alejandro would not be responsible for the cost of his tuition, fees, housing, supplies, or meals.

414. Like the other Plaintiffs, Alejandro received the email from Defendant Burright explaining that some changes had to be made to the program, including reducing

69

the program to one year with the option to renew, and instructing the students not to mention that J&L was involved in the program.

415. Alejandro was instructed by Defendants Burright and Espinoza on what to say to the Department of State during the visa interview, specifically, he was told he could not tell the embassy he was coming to work, not to mention J&L, and to say that the only work-related thing that he would do would be the "internship," or "professional practice."

416. Finally, Alejandro was instructed to destroy the documents indicating that Defendant J&L was involved in the J-1 Visa program.

417. To prepare for his time in the United States, Alejandro sold his work tools so that he could have cash for his expenses. These tools had more than economic value to Alejandro, they allowed him to be independent because with these tools he could obtain construction jobs.

418. Alejandro also had to cancel a number of his pending jobs. This severely damages his reputation as a worker in his community.

419. Alejandro arrived in the United States on August 17, 2019.

420. Alejandro began working at Royal Canin in September of 2019.

421. Alejandro worked in a production line at Royal Canin. His job was to separate very heavy pieces of meat with a tool that resembled a drill.

422. Alejandro was not using the skills that he learned in his classes on this job. He did not learn anything related to his course of study on this job. The job on the production line at Royal Canin was pure physical labor, for the benefit of Royal Canin, and not for Alejandro.

70

423.    Somedays, he worked six-hour shifts. Other days, he worked 12-hour shifts. The shifts would be from 6p.m. to 12 a.m., or 6 p.m. to 6 a.m.

424.    Alejandro's classes were scheduled from 8 a.m. to 12 p.m. With this schedule, Alejandro was quickly exhausted.

425.    However, he could not stop working. The WITCC and J&L Defendants required him to attend work and class, stating that if he failed to do so he would be kicked out of the program and deported to Chile.

426.    The WITCC and J&L Defendants informed Alejandro that "everyone had a debt to pay."

427.    During one of Alejandro's 12-hour shifts, he dropped a heavy piece of frozen meat onto his hand, severely injuring his thumb.

428.    Alejandro informed Defendant J&L that he would not be returning to work the following day because of his injury. In response, Defendant Albrecht told him Royal Canin would give him a different position that day where he would not have to work with his hands. When he arrived at work, he was not given any assistance and not transferred to a different position.

429.    Alejandro went to Siouxland Community Health Center because he was concerned his thumb was broken. Although there was no fracture, he was prescribed Naproxen for pain management and the use of a splint to protect the injured wrist and thumb.

430.    The following day, he was fired by Defendant Royal Canin because he failed to follow the workplace instructions.

71

431.    Defendants WITCC and J&L arranged for Alejandro to work for Defendant Tur-Pak instead. Again, Alejandro was placed on the production line, this time assembling Lunchables.

432.    Defendant Tur-Pak did not provide a healthy or clean work environment. Alejandro observed several employees and many of his classmates get sick with stomach problems, to the point of vomiting and diarrhea.

433.    Several of Defendant Tur-Pak's employees had criminal records. They used drugs on the job, and there were verbal and physical altercations every day.

434.    At Tur-Pak, Alejandro worked Monday through Friday, from 3:30 in the afternoon until 12 a.m.

435.    Defendant Alejandro was provided with food or gift cards for food before he began working for Royal Canin. However, once he began work, he was told that his $7.25/hour paycheck would have to be spent on food.

436.    Alejandro was given access to the WITCC cafeteria for breakfast and lunch after students reported the school in December.

437.    Alejandro did not have the opportunity to learn English as he expected. The only other students in his classes were Chileans or Brazilians in the same J-1 Visa program.

438.    In November or December, Alejandro was informed that he had to quit the job at Tur-Pak because it did not comply with the J-1 Visa requirements. He was threatened with being deported. He was threatened that if he was deported he would be unable to return to the United States.

72

439.    Alejandro always did what the WITCC Defendants told him to, for fear that they would cause him to be deported and he would be unable to return to the United States.

440.    Alejandro was repeatedly told that he was indebted to Defendant WITCC, and if he did not work, he would not get his diploma.

441.    Instead of finding a replacement internship that would comply with the J-1 Visa program, in February 2020, WITCC put Alejandro to work in maintenance on the college. His first project was to paint the walls in the college. Like the jobs at Royal Canin and Tur-Pak, this was pure physical labor for the employer's benefit, and not an internship.

442.    After Alejandro's J-1 Visa program was terminated by the school in March 2020 (allegedly over COVID-19), his parents began receiving threatening and harassing messages. They received correspondence from the school stating that Alejandro is "currently undocumented" in the United States and could end up in Jail.

443.    Alejandro has suffered physical and psychological harm as a result of being trafficked.

444.    Alejandro struggles to sleep, and often cannot fall asleep until 5 or 6 a.m. He is only able to sleep for four hours before the anxiety wakes him up again.

445.    Alejandro did not leave the country, despite Defendant WITCC's attempts to make him leave in March of 2020. Alejandro retained an immigration attorney to assist with his status.

### H. *Eduardo Antonio Munoz Vargas*

446.    Eduardo Antonio Munoz Vargas was born in La Ligua, Chile, in 1988.

447.    Like the other Plaintiffs, Eduardo first learned about Defendant WITCC's J-

73

1 Visa program through Facebook advertisements placed by the Chilean Defendants.

448. Eduardo saw this program as an opportunity to change the life he had led in Chile. This opportunity filled him with joy and hope.

449. Eduardo applied to participate in the Culinary Arts J-1 Visa Program offered by Defendant WITCC.

450. Initially, Eduardo was told that this would be a two-year program, that the program would be supported by scholarships, and that he could use the money he earned from his internship to buy things that he needed.

451. Eduardo attended interviews with the Chilean Defendants, the WITCC Defendants, and the J&L Defendants in April 2019.

452. During the interview with Albrecht for J&L, Eduardo had to demonstrate that he was physically fit. Defendant Albrecht did not have many other questions during the job interview.

453. After these interviews, Eduardo signed the contract with Defendant WITCC for the J-1 Visa program, and the employment contract with Defendant J&L.

454. Like the other Plaintiffs, Eduardo received a packet of letters dated June 3, 2019, including the acceptance letter, accommodations letter, and invitation letter for the rebranded, one-year "Food Services Program." These letters reiterated that Eduardo would not be responsible for the cost of his tuition, fees, housing, supplies, or meals.

455. Like the other Plaintiffs, Eduardo received the email from Defendant Burright explaining that some changes had to be made to the program, including reducing

the program to one year with the option to renew, and instructing the students not to mention that J&L was involved in the program.

456.    Eduardo was instructed by Defendants Burright and Espinoza on what to say to the Department of State during the visa interview, specifically, he was told he could not tell the embassy he was coming to work, not to mention J&L, and to say that the only work-related thing that he would do would be the "internship," or "professional practice."

457.    Finally, Eduardo was instructed to destroy the documents indicating that Defendant J&L was involved in the J-1 Visa program.

458.    Eduardo arrived in the United States in August 2019. While he was gone, his parents rented out his bedroom to a family member.

459.    Eduardo was greeted in the United States by Defendant Castro.

460.    A week later, Defendants Carlos and Soledad visited the student apartment complex and the factories that the students would be working at to ensure their wellbeing.

461.    It took a month for Eduardo's social security number to arrive so that he could begin work.

462.    Before starting his job, Eduardo and other Plaintiffs had a meeting with Defendant Albrect, informing them that they had to work 40 hours/week, that transportation would be deducted from their paycheck, and if they missed a day of work, the company would assign them make-up hours on the weekend.

463.    During this meeting Defendant Albrecht bizarrely took out a $100 bill and showed it to Eduardo and the other students, stating "If we wanted that money, we should work hard for her."

464.    Eduardo was put to work for Defendant Tur-Pak on September 18, 2019. His job was to put plastic trays for Lunchables into the machine, so that the trays could be filled with food and then sealed.

465.    This was purely routine, physical labor, for the benefit of Tur-Pak. There were no educational components, and he did not use any of the skills learned in his program at this job.

466.    Eduardo was paid $7.25/hour for this work. Additional amounts were taken out of his paycheck for transportation, and for taxes that were not permitted for J-1 Visa students.

467.    Eduardo was informed that more money was being taken out to pay Defendant WITCC for his contract. Eduardo did not authorize this to happen. This money did not appear on Eduardo's pay stub.

468.    Eduardo was in class from 8:30 a.m. to 12 p.m. The transportation from Defendant J&L picked him up at 2:30 p.m., and then he would work until midnight.

469.    Sometimes, the transportation from Defendant J&L back to his apartment was late. Eduardo recalls waiting until 2:00 a.m. for a ride home from work.

470.    Eduardo's job produced  a lot of anxiety for him. If he was too slow, the machine would err and the whole production line would be shut down. He could not sit or move from his spot in the line for the entirety of his shift.

471.    Eduardo began to be exhausted from the repetitive and strenuous work.

472. Defendants Burright and Yi would interrupt Eduardo's classes to take out and talk to students who did not attend work. They would lecture everyone that they had signed a contract they had to fulfill, and that if they did not work, they would be deported.

473. Because of these threats, Eduardo felt powerless to change his employment.

474. During one two-week period, Eduardo was scheduled to work every single day. By the 13th day, his legs were giving out and his mental health was in a precarious state.

475. Eduardo emailed Defendant Albrecht to ask for a day off. Albrecht encouraged him to go to work, despite his precarious state, stating "You must go to work or risk losing your job. If you're truly sick they will send you home."

476. The constant stress was too much for Eduardo. He lost 20 kilos, became depressed, and isolated himself from others.

477. After the investigation into the J-1 Visa program in November, Eduardo was told that he had to stop working at Tur-Pak. He learned from this investigation that, under his J-1 Visa, he was not permitted to work more than 32 hours.

478. The investigators also informed Eduardo that Defendant WITCC was supposed to be paying for the J-1 Visa Program, not deducting it from Eduardo's pay.

479. After this, Defendants WITCC did not follow through and provide an internship for Eduardo that would be compliant with his J-1 Visa Program.

480. In order to have some money to survive, Eduardo began donating plasma, and got various low-income, part-time jobs. Defendant WITCC then made him quit these jobs, as they were not compliant with the J-1 Visa program.

77

481.   Eduardo was in a catch-22 – the school would not provide him with the things he needed to survive, would not provide him with an internship – but he couldn't get these things on his own, because he was not allowed to work.

482.   Despite the promise of free tuition, housing, supplies, room and board, Eduardo received bills from the University for each of these items.

483.   Eventually, the WITCC Defendants placed Eduardo at Hy-Vee, working in the cafeteria. Again, this was a low-wage job, and not an educational internship.

484.   On March 13, 2020, Eduardo received notice that the program was cancelled – ostensibly for COVID-19 – and that he would be returned to his country and must vacate his apartment by March 18, 2020.

485.   Eduardo declined to leave, and retained an immigration attorney to assist with his status.

486.   Defendant WITCC continued to threaten Eduardo, stating it would tell his family that he was present illegally in the United States.

487.   Eduardo continues to suffer mentally and emotionally as a result of the Defendants' actions.

### I.   *Carilyns Sarai Camus Jorquera*

488.   Carilyns is a Chilean national.  She is from a very poor family and has been exposed to a lifetime of domestic violence.

489.   In January of 2019, Carilyns learned of an international academic opportunity on Facebook.  The posting referenced a program through WITCC in Sioux City, Iowa.

490. In response, Carilyns submitted an inquiry and received a response from Defendant Espinoza, including a phone number.

491. Defendant Espinoza discussed the program with Carilyns, advising her that she would not have to pay any money and urged her to apply.

492. Carilyns decided to pursue the program. Defendants Espinoza, Rojas, and Burright requested she provide various documents including a copy of her passport and a video introducing herself. The defendants assisted her through the application process.

493. The prospect of a higher education led Carilyns to believe she could improve her family's poor economic situation including aiding her mother who was just finishing treatment for terminal cancer.

494. In April of 2019, Carilyns was asked to attend a meeting at a hotel in Chile to learn more about the program.

495. Defendants Albrecht, Murrell, Rojas, Espinosa, Castro, Alberts, and Burright attended, among others.

496. These defendants addressed the prospective students and spoke in English. Defendant Murrell cited the need for English proficiency as a reason.

497. The defendants explained the program would be a paid internship. Carilyns, and the other prospective students, were advised they would not have to pay anything to participate in the WITCC J-1 visa program.

498. Defendant Albrecht interviewed the interested prospective students including Carilyns. As part of the interview, Carilyns had to lift a 50-pound bag.

79

499.    Although the WITCC J-1 visa program advertised internships in robotics or culinary arts, the defendants led Carilyns to be believe she could pursue other areas of study once she arrived in the United States.  The defendants also promised Carilyns her tuition and education would be paid through a scholarship, she would receive free airfare to the United States, Defendant J&L would place her in employment related to her field of study, WITCC would arrange and pay for the visa application, WITCC would pay her health insurance, and WITCC would provide her free meal service and housing for two years.

500.    These assurances and promises induced Carilyns to pursue her enrollment application in the program. Carilyns signed the application paperwork to initiate the J-1 visa process.

501.    Defendants Espinoza, Soledad, Rojas, Salgado, and Albert remained in contact with Carilyns over the next several days.

502.    Like the other plaintiffs, Carilyns was eventually notified the J-1 visa documents were erroneously filled out and she should destroy the documents.  WITCC advised Carilyns it would provide her with new, updated paperwork to use at her consulate meeting.  WITCC assured Carilyns the program would remain the same as presented.

503.    Carilyns had ongoing communication with Defendants Burright, Espinosa, Rojas, and Albert.  These individuals advised her on how to respond to the questions posed during her consulate meeting.

504.    Carilyns attended her consulate meeting in mid-2019.  Ultimately, she was conferred a J-1 visa authorizing her to enroll in WITCC's program.

505. Carilyns sold her personal belonging, quit her job in Chile, and left her pets with her parents.

506. Carilyns departed Chile for the United States in August of 2019.

507. Shortly after arriving in Iowa, Carilyns met with Defendants J&L and WITCC. They discussed employment and applying for a social security number.

508. The classes at WITCC initially focused largely on becoming more proficient in communicating in the English language. Very little of the curriculum was devoted to an academic or technical field of study such as robotics or culinary arts.

509. Carilyns approached Defendant Albert to discuss further her intent to pursue a field of study other than robotics or culinary arts. Defendant Albert indicated there would be no problem with Carilyns selecting a different course area.

510. Carilyns chose social work and Defendant Albert did not approve the selection. Eventually, the two settled on Carilyns enrolling in courses for police science.

511. Like the other plaintiffs, Defendant WITCC initially provided Carilyns with Wal-Mart gift cards to purchase food.

512. Defendant WITCC stopped providing the gift cards once Carilyns began working.

513. Carilyns' receipt of her social security card was delayed due to a misspelling of her name. Once she received her card, Defendant J&L attempted to place her to work with Defendant Tur-Pak, however, by that time, the employment positions were filled.

514. Defendant WITCC employed Carilyns on campus which included translation and mailroom chores.

515.    Defendant Alberts advised Carilyns she would receive $7.25 per hour from her hourly wage for her work.

516.    Carilyns was further advised a large portion of her hourly wage would go directly to WITCC.  This announcement contradicted WITCC's representations in Chile that students would be receiving free tuition, food, etc.

517.    Carilyns inquired about the deductions Defendant WITCC made from her paycheck and she was told the withholdings were repayments for college related bills.

518.    Carilyns responded by pointing out the promises of a free tuition, food, etc. but Defendant WITCC refused to address the concern.

519.    Carilyns, like the other plaintiffs, received threats of deportation if she failed to work.  Both Defendants Yi and Burright would repeatedly convey these warnings.

520.    Although Defendant WITCC promised health care coverage to the plaintiffs, Carilyns would receive bills after medical visits.

521.    Eventually, Defendant WITCC fired Carilyns because she missed too much work due to sickness.

522.    Carilyns pleaded with WITCC to employ her so she could pay the mounting medical and college bills Defendant WITCC refused to cover.  Approximately three weeks later, Defendant WITCC hired Carilyns to work as a security guard.

523.    Defendant WITCC also directed Carilyns to charities and food banks to cover her day-to-day needs.

524.    Unable to make ends meet, Carilyns sought permission from Defendant WITCC to take a second job.  Defendant Albert approved Carilyns working as a security officer for Wal-Mart.

525.    Once training began for her Wal-Mart job, Defendant Burright contacted Carilyns and advised her any off-campus employment must be coordinated in connection with Defendant WITCC.  Additionally, a portion of her off-campus employment wage must be given directly to Defendant WITCC.

526.    In or about November of 2019, Defendant Albert directed Carilyns to quit her job at Wal-Mart.

527.    In or about January of 2020, Defendant WITCC notified Carilyns she could no longer study police science despite having good grades.

528.    In March of 2020, Carilyns received notice from Defendant WITCC that the J-1 Visa program was being cancelled.

529.    Carilyns has sustained considerable economic, physical, and emotional damages associated with the Defendants' scheme.

### J.  *Gonzalo Escobar Espejo*

524.    Gonzalo is a Chilean national, born in 1990, in Valparaiso, Chile.

525.    In Chile, Gonzalo obtained his Master's Degree and had been working for several years professionally as a nurse when Chilean Defendants recruited him for the opportunity at WITCC in April of 2019.

526.    Gonzalo had health and dental insurance benefits through his job, he made $2,000 per month, and most importantly, he had a plan for the future of his career.

527.    Gonzalo's mother works as a teacher. His father is an alcoholic and his sister is disabled. While in Chile, Gonzalo cared for and financially supported his family.

528.    Gonzalo saw the WITCC J-1 visa program as an opportunity as a way to fulfill his dreams to open his own business.

529.    Upon agreeing to take the opportunity at WITCC, Gonzalo informed his nursing job of his intent to resign and began the application process.

530.    Like the other Plaintiffs, during his interview for J-1 Visa qualification, several of the defendants coached Gonzalo on what to say and not to say, emphasizing that he was not to disclose that he would be working in the United States to satisfy labor shortages or that the program was to last two years. Gonzalo complied, fearing he had no choice because he had already given up his job and spent significant time on the application process.

531.    Gonzalo received the same packet of June 3, 2019 letters as the other plaintiffs, including an acceptance letter, invitation letter, and accommodations letter for the "Food Services Program". These letters described the program and confirmed Gonzalo would not be paying for tuition, fees, housing, or meals.

532.    Gonzalo was advised that his J-1 program would start with two phases: phase one would occur from July 19, 2019 until November 22, 2019. During that time, he would attend classes in technical English and the basics of culinary arts while participating in job shadowing in a real environment. The second phase would last from November 23, 2019 until July 17, 2019, continuing to take face-to-face classes pertinent to the program and

lend support to current food services tasks, quality assurance, database maintenance and update, process improvement initiatives, and assist in ongoing workflow.

533.     In the beginning of the application process, Gonzalo chose the Culinary Arts program as his program of study. However, after arriving in the United States, Gonzalo changed his degree program to Robotics due to his interest in an opportunity to operate and repair machinery.

534.     Gonzalo arrived in the United States on or about August 17, 2019.

535.     Gonzalo was quickly placed into a job as a line worker at Defendant Royal Canin's factory working 12 hour shifts and up to 56 hours a week.  The job required no skill and had no connection to his Robotics program.

536.     Gonzalo's job duties included lifting and stacking 20-pound slabs of meat in a dirty, wet freezer and grinding bloody meat forcing him to endure blood-soaked feet for hours.

537.     These conditions negatively affected Gonzalo's health, specifically contributing to a worsening of his already chronic asthma and high blood pressure.

538.     Gonzalo was given $7.25 per hour from his total wage with WITCC profiting by diverting a large portion of his wage to pay for housing, tuition, and other costs.

539.     From the time of arrival in the United States to mid-September, students were provided a $50.00 Walmart gift card each week to buy groceries. However, when the students began working, Defendants stopped supplying gift cards and students were told to rely on food pantries and churches for meals.

540. Gonzalo and other students were under constant supervision by security personnel who would enter their apartments without warning, track their whereabouts, and prevent them from finding off-campus housing.

541. Security personnel would check in on their classes to make sure they were awake and attending and further transport them to and from work.

542. Gonzalo consistently faced threats that his J-1 Visa would be terminated if he did not attend work and school.

543. On September 29, 2019, Gonzalo requested a day off from work due to illness. Defendant Albrecht refused, threatening to fire Gonzalo if he missed work.

544. On September 30, 2019, Gonzalo reached out to Defendant Albert expressing concerns about his long work hours, declining health, and physical exhaustion from the combined demands of work and school. Albert responded by calling a meeting and threatening the students that she was preparing a list of them to be deported for falling behind in work and school.

545. Albert allowed Gonzalo to stop working at Royal Canin due to his health issues but subsequently placed him to work as a nursing classes tutor for only 20 hours a week. Gonzalo expected to be working 36 hours a week upon entry into the program.

546. Gonzalo worked as a nursing classes tutor from October to mid-December of 2019 receiving approximately $300 to $500 in pay a month. This compensation did not allow him to fulfill his basic needs.

86

547.    Like the other plaintiffs, Gonzalo was interviewed by the Department of State in November of 2019, regarding his working conditions at Royal Canin. In response to this investigation, Defendants terminated all student jobs at Tur-Pak and Royal Canin.

548.    Due to the financial stress he was under at the time, Gonzalo began to donate plasma in November of 2019.  On one visit to Bio Life, Gonzalo suffered a panic attack and had to be taken by ambulance to the hospital in November of 2019.

549.    Gonzalo sought help from Defendants Burright throughout the traumatic experience, but Burright declined to assist him, even refusing to pick him up from the hospital. The costs of this trip and other medical costs associated with his experience total over $7,600.

550.    During winter break, Gonzalo was forced to begin using his savings to survive. He obtained additional employment at a restaurant in Sioux City, Iowa washing dishes in order to afford food and basic necessities.

551.    However, this employment did not last long. Gonzalo was forced to resign from his off-campus position on February 20, 2020, following threats from Defendant WITCC to terminate his visa.

552.    Gonzalo expressed his concerns about the program and advised WITCC he intended to seek legal assistance. On February 25, 2020, Defendant Albert told Gonzalo that he had violated his visa and subsequently terminated his job, visa, and housing, and referred him to a homeless shelter to live. Gonzalo was escorted from the school and forced out on the streets. He was urged to return to Chile and offered a plane ticket to do so.

553. At this time, Gonzalo was unable to return to Chile due to his lack of financial resources as a result of pooling everything he had to participate in the WITCC program. He was homeless, his physical health was declining, and he was experiencing psychological distress.

554. The Chilean Defendants contacted Gonzalo and his family, making threats of physical harm.

555. On February 26, 2020, with nowhere to go, Gonzalo was forced to either sleep in his car or seek a bed at a homeless shelter.

556. Ultimately, Gonzalo was able to secure a bed at a shelter.

557. On July 16, 2020, Gonzalo applied for T-1 Nonimmigrant Status.

558. Gonzalo fears returning to his home country, worried that he will face stigma and repercussions for telling his story to United States authorities.

559. Moreover, Gonzalo worked extremely hard to create a successful life for himself as a nurse in Chile. He left that security behind, selling all his belongings, to pursue his dreams. Due to the victimization Gonzalo suffered at WITCC, he lost everything.

560. The trauma and abuse he experienced forced Gonzalo to seek out counseling services to assist him in dealing with the psychological turmoil, fear, and stress he faces in the aftermath of his experience.

561. Gonzalo is currently receiving counseling and takes medication for Generalized Anxiety Disorder, Major Depressive Disorder, and panic attacks. Gonzalo is also receiving medical treatment for physical issues including mixed hyperlipidemia,

hypertension, and Vitamin D deficiency because of his working conditions and experience as a whole.

### K. *Catalina Noemi Rivas Morales*

562. Catalina is a Chilean national, born in 2000.

563. In or about March of 2019, Catalina learned of the opportunity to study and work in the United States at WITCC through its J-1 visa program.

564. Like many others, Catalina learned about the program through the Chilean Defendants.

565. Catalina completed the application and was interviewed on or about April 27, 2019 by defendants from WITCC and J&L.

566. Catalina received the same packet of June 3, 2019 letters as the other plaintiffs, including an acceptance letter, invitation letter, and accommodations letter for the "Food Services Program". These letters described the program, and assured Catalina that she would not be paying for tuition, fees, housing, or meals.

567. As set out in her contract, Catalina expected to be working 36 hours a week with a job related to her program of study in the Culinary Arts program.

568. Catalina arrived in the United States on or about August 17, 2019.

569. After settling into her apartment, Catalina had an accident resulting in a sprain of her left foot, making her unable to walk for a month.

570. In September, Defendant J&L placed Catalina at Tur-Pak for her internship. She received $7.25 per hour from her total wages. Various deductions were paid to WITCC.

89

571. Catalina's job was not related to her field of study at WITCC.

572. In addition to working at Tur-Pak, Catalina attended academic classes from 9:30 a.m. to 12:00 p.m.

573. After her classes, she attended work from 3:00 p.m. to 12:00 a.m. standing for hours at a time on her sprained foot. She also experienced harassment from various co-workers who had histories of criminal behavior and drug addiction.

574. There were many times when Catalina and other student employees could not attend their classes due to physical exhaustion from working over 40 hours a week at Tur-Pak.

575. Eventually, Catalina received a doctor's note on September 26, 2019, advising that she should be excused from work and school until October 7, 2019, due to her sprained foot.

576. On September 26, 2019, Catalina advised Defendant Albrecht about her foot's condition stating that she would not be able to go to work. Albrecht ignored Catalina's concerns and instructed her to continue working stating: "You will NEED to report to work today and not miss anytime." Catalina continued: "I understand the situation, but my foot is the one that hurts the most, every moment I stand is hell for me."

577. Albrecht persisted, advising that Tur-Pak had ibuprofen on hand to alleviate the pain and threatening that Catalina must attend work or else lose her job.

578. Catalina also spoke with Defendant Albert about changing her job due to her foot pain. Albert offered Catalina custodial work at WITCC. Catalina accepted the opportunity; however, the work was not related to the culinary arts program.

90

579. In or about November of 2019, following a visit from the Department of State, Catalina and other Chilean students were instructed to stop working at their assigned internships and were advised that WITCC would assist them in finding new jobs.

580. After winter break, in January of 2020, Catalina and other Chilean students were presented with two options: (1) return to Chile immediately on a paid flight without receiving a degree; or (2) complete their visa contract until August of 2020 working a job chosen by WITCC and having money deducted from their paychecks.

581. Catalina was personally encouraged to return to Chile because she had not worked since November, even though she was promised job security by WITCC.

582. On January 26, 2020, Catalina eventually applied for T-1 Nonimmigrant Status.

583. Catalina experienced significant stress, anxiety, and mental fatigue from the chaos in the aftermath of these events.

### L. *Bairon Morel Guerra*

584. Bairon is a Chilean national, born in 2000

585. Bairon was studying at Papudo Technical School when the Chilean Defendants recruited him to participate in the WITCC J-1 visa program.

586. The Chilean Defendants marketed the WITCC program as a great opportunity to live in the United States free of charge and receive a free education.

587. Bairon was excited for the opportunity to develop professionally and pursue a path to creating a successful life for himself and his family.

588.    Bairon enjoyed cooking so he chose the culinary arts program. He was promised a job in this area.

589.    Once recruited, Bairon traveled to the U.S. Consulate in Chile for the interview required to obtain his J-1 Visa. The Defendants coached him as to what to say and not to say.

590.    Bairon arrived in the United States in August of 2019.

591.    Bairon was assigned to work at Tur-Pak where he was paid $7.25 per hour following deductions made by WITCC to pay the "debt" he owed them, even though the money was being used to pay for services Bairon was promised would be free of charge.

592.    At Tur-Pak, Bairon was forced to stand for long hours performing tasks that had no connection to his Culinary Arts program. The factory was cold in order to keep the products at a certain temperature.  Many co-workers were hostile.

593.    Like the other plaintiffs, Bairon had academic obligations to fulfill in addition to work. Bairon's daily routine Monday through Friday consisted of class from morning until 12:00 p.m. followed by work from 2:00 p.m. to 12:00 a.m. or sometimes even 1:00 a.m.

594.    Defendants offered the students an opportunity to work weekends, however, students who worked weekends were not paid overtime. They still received $7.25 per hour. Defendant WITCC simply took more out of their paycheck to repay the "debt" of which the students were never told the total amount.

595.    Along with his other students, Bairon became exhausted keeping up with the academic pressures, learning the English language, and attending work.

92

596. Defendants threatened Bairon and other students not to disclose the problems they had been experiencing or they would be deported.

597. Threats of deportation for not fulfilling work demands from Defendant Burright and Defendant Yi continued throughout the coming weeks.

598. Bairon experienced significant stress and uncertainty feeling that it was near impossible to keep up with all of his responsibilities.

599. In December of 2019, over winter break, Bairon traveled to New York to visit relatives. From New York, he returned to Chile to visit his family.

600. Bairon attempted to get in contact with WITCC to determine the next steps in resuming his program studies for the spring semester, but he never received a clear answer.

601. While back in Chile, Bairon learned of his fellow students' attempts to obtain legal assistance to continue fighting for a better future.

602. Learning that Bairon had returned to Chile, Chilean Defendants attempted to convince Bairon to go on Chilean TV and deny all the allegations of human trafficking.

603. Bairon refused to do so as he had experienced, firsthand, the harassment and intense work demands of the WITCC program.

## M. *Diego Cristobal Ahumada Soulodre*

604. Diego is a Chilean national, born in 1994.

605. In February of 2019, Defendant Rojas contacted Diego about an extraordinary opportunity to study in the United States of America.

93

606.     The program included two course options, namely robotics or culinary arts. Diego was advised that all expenses would be paid for the program.

607.     Diego decided to pursue the program.    He provided the requested documentation and took written and oral English exams.

608.     In April of 2019, Diego attended a meeting at a hotel in Chile to learn more about the program.

609.     Defendants Albrecht, Murrell, Rojas, Espinosa, Castro, Alberts, and Burright attended, among others.

610.     These defendants addressed the prospective students and spoke in English. Defendant Murrell cited the need for English proficiency as a reason.

611.     The defendants explained the program would be a paid internship.  Diego, and the other prospective students, were advised they would not have to pay anything to participate in the WITCC J-1 visa program.

612.     The defendants promised Diego his tuition and education would be paid through a scholarship, he would receive free airfare to the United States, Defendant J&L would place him in employment related to his field of study, WITCC would arrange and pay for the visa application, WITCC would pay his health insurance, and WITCC would provide him free meal service and housing for two years.

613.     These assurances and promises induced Diego to pursue his enrollment application in the program. Diego signed the application paperwork to initiate the J-1 visa process, intending to enroll in culinary arts.

94

614. Like the other plaintiffs, Diego was eventually notified the J-1 visa documents were erroneously filled out and he should destroy the documents. WITCC advised Diego not to discuss compensation during the interview. WITCC assured Diego the program would remain the same as presented.

615. Diego attended his consulate meeting and subsequently obtained a J-1 visa clearing him to enroll in WITCC's program.

616. Diego departed Chile for the United States in August of 2019.

617. Like the other plaintiffs, Defendant WITCC initially provided Diego with Wal-Mart gift cards for food. However, once Diego began the job WITCC and J&L arranged at Tur-Pak, he no longer received the gift cards.

618. While working in Tur-Pak, Diego was exposed to unacceptable work conditions including working in frigid temperatures without proper clothing

619. Additionally, he received $7.25 per hour from his total wage with a majority of his earnings withheld to "repay" WITCC for his educational expenses.

620. Diego was forced to work in excess of 40 hours per week and also attend classes full time.

621. The long hours and grueling schedule began to impact Diego both physically and psychologically. Diego experienced prolonged leg pain and tremors.

622. When Diego asked WITCC if he could go to the doctor, he was told "no" and ordered take Ibuprofen to address the pain. WITCC staff stressed to Diego he could not miss work.

95

623. Diego began to miss class and Defendant Yi summoned Diego to his office and threatened to send Diego back to Chile if he did not meet the demands of his school and work schedule. Defendant Burright repeatedly echoed these threats.

624. Eventually, Diego was hospitalized to undergo an appendectomy.

625. Once the Department of State launched an investigation into the program, Diego received notice that all students would have to stop working at Tur-Pak, and that WITCC would assist the students in finding new jobs.

626. Diego located employment on his own at a local restaurant.

627. In March of 2020, WITCC terminated Diego's J-1 Visa, claiming that it could not continue the program ostensibly due to the ongoing Coronavirus Pandemic. Diego was asked to vacate WITCC immediately and go back to his home country.

### N. *Nestor Acevedo*

628. Nestor is a Chilean national, born in 1997 in Petorca, Chile.

629. In February of 2019, Nestor learned of an international academic opportunity in the United States from Defendant Espinoza at the Papudo Technical School.

630. Defendant Espinoza and his wife, Defendant Rojas, were recruiting individuals to join WITCC's J-1 visa program in either the culinary arts or robotics fields.

631. Nestor participated in a series of interviews and meetings with the WITCC Defendants and Chilean Defendants to learn more about the program, specifically, the Culinary Arts Program he was interested in.

632. One of the last meetings occurred in or about April, 2019, at a hotel in Santiago, Chile with Defendants Murrell, Burright, Castro, and Albrecht. During this

96

meeting, Defendant Albrecht administered a strength test to Nestor and other Plaintiffs to confirm they were able to lift a certain amount of weight.

633.    On the day Nestor and other Plaintiffs signed their contracts, Defendant Albrecht took out a $100 bill, waived it in front of the Plaintiffs, and advised them they could earn much more in the United States.

634.    Throughout the application process, Nestor and the other Plaintiffs were happy and excited about the opportunity to fulfill their dreams in the United States.

635.    Like the other Plaintiffs, Nestor also received correspondence from Defendant Burright, instructing him to destroy documents from Defendant J&L in preparation for his visa approval interview.

636.    Nestor was advised to tell the consular office that he was only coming to the United States to study and not to mention they were working with Defendant J&L. After this interview, his visa was approved.

637.    Nestor arrived in the United States in August, 2019 where Defendant Castro met him, and other J-1 students, upon arrival.

638.    About a week after their arrival, Defendants Espinoza, Rojas, and others from Papudo Technical School and the department of education arrived in the United States to follow up on the program.

639.    Nestor began working at Tur-Pak as part of his Culinary Arts Program. Nestor was told they had a special job for him which included unloading heavy salami, ham, pepperoni, and other meats to and from the refrigerator where he endured sub-zero temperatures.

640.    This job required Nestor to arrive to work before his coworkers.  He typically worked from 3:00 p.m. to 12:20 a.m. and was transported to and from work, being picked up at 2:00 p.m. and dropped off after his shift at 1:00 a.m.

641.    Nestor was advised by a coworker that people normally only work at Tur-Pak for a short period of time due to the intense physical nature of the work.

642.    Nestor suffered various injuries during his work including a broken tooth and a knee injury resulting from lifting heavy weights daily.

643.    While working at Tur-Pak, Nestor was further advised by coworkers that criminals and people who had been to jail worked there. His girlfriend, another Chilean student, also worked at Tur-Pak on the production line. She experienced sexual harassment and even had to physically defend herself after a coworker tried to touch her. These circumstances caused Nestor significant stress.

644.    In addition to fulfilling his work obligations, Nestor also had to attend class Monday through Friday from 8:30 a.m. to 12:30 p.m.

645.    Like the other Plaintiffs, Nestor received the June 3, 2019 packet of letters from Defendants WITCC, Burright and Zuercher, including the acceptance letter, invitation letter, and accommodation letter. In that letter, Nestor was promised that he would not be responsible for the cost of his tuition, fees, housing, supplies, and transportation.

646.    Nestor was unaware a percentage of his wages would be deducted from his paycheck to pay for educational costs promised to be covered by WITCC.  He also did not know he would be working over 40 hours a week and on weekends.

98

647.    continuously threatened Nestor and other Plaintiffs that their visas would be cancelled and would be required to return to Chile if they missed class.

648.    However, Nestor's overwhelming work schedule made it difficult for him to maintain his academic obligations. On one occasion, Nestor's exhaustion caused him to fall asleep. He was subsequently called into Defendant Yi's office, yelled at, and threatened that if he missed work or classes again, he would be returned to Chile.

649.    After this instance, and under duress, Nestor worked to push through his stress and injuries, obeying the orders of WITCC Defendants, to prevent his removal from the program.

650.    Three months into the program, other Chilean students, also struggling under the pressures of the program, sought help from the Department of State. Nestor and other Plaintiffs were interviewed about their experiences.

651.    After this, Nestor was ordered to quit his job at Tur-Pak. He was out of work for three weeks but was still being threatened by WITCC Defendants that if he did not find a job, he would be sent back to Chile.

652.    Nestor applied to work at Chick-Fil-A where he felt he could finally apply his studies in the Culinary Arts Program.

653.    After the fall semester concluded, WITCC Defendants continued to threaten Nestor and other Plaintiffs that they would be returned to Chile because they sought help from the United States government. During this time, Nestor experienced significant psychological distress and lost motivation.

654.     On or about March 13, 2020, Nestor received a letter from Defendant WITCC advising him that the J-1 visa program was being terminated ostensibly due to COVID-19 and that he was required to move out of campus housing less than a week later.

655.     However, due to the pandemic, Chile closed its borders and airports. This resulted in uncertainty for Nestor and other Chilean students as to where they were going to live for the foreseeable future.

656.     Nestor sustained considerable economic, physical, and emotional damages associated with the Defendants' scheme.

## CAUSES OF ACTION

*"…[T]he Declaration of Independence[] recognizes the inherent dignity and worth of all people. It states that all men are created equal and that they are endowed by their Creator with certain unalienable rights. The right to be free from slavery and involuntary servitude is among those unalienable rights. Acknowledging this fact, the United States outlawed slavery and involuntary servitude in 1865, recognizing them as evil institutions that must be abolished."* **22 U.S.C. § 7101(b)(22).**

## COUNT 1
### Trafficking with Respect to Peonage and Forced Labor
### TVPRA, 18 U.S.C. § 1590, § 1595
### (Against All Defendants)

657.     Plaintiffs replead the preceding paragraphs as if fully set forth herein.

658.     Defendants knowingly recruited, harbored, transported, provided, and obtained Plaintiffs for labor in violation of the TVPRA, by one or by any combination, of the following means:

a. Defendants collectively defrauded Plaintiffs as to the purpose, length and cost of the program, as well as to what sort of work Plaintiffs would be doing in the United States.

b. The WITCC Defendants paid for the transportation of Plaintiffs to the United States.

c. The WITCC Defendants and J&L Defendants harbored Plaintiffs by providing housing, food (when it was not being withheld), and transportation.

d. Defendants Royal Canin and Tur-Pak paid the WITCC Defendants and the J&L Defendants to obtain Plaintiffs' labor.

659. The purpose of these actions was to obtain Plaintiffs' labor by force and by peonage.

660. The defendants actually did obtain Plaintiffs' labor by these means.

661. Defendants knew or were in reckless disregard of the fact that their venture involved human trafficking.

662. Plaintiffs were harmed as a result of these actions.

**WHEREFORE** Plaintiffs requests Judgment against the aforementioned Defendants as follows:

a. Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount yet to be determined;

b. Plaintiffs' cost in this action, including reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595;

c. Punitive damages and,

d. Other relief the Court deems just and equitable.

## COUNT 2
## TVPRA, 18 U.S.C. § 1589, § 1595
## (Against All Defendants)

663. Plaintiffs replead the preceding paragraphs as if fully set forth herein.

664. Defendants obtained the labor and/or services of the Plaintiffs by one or by any combination, of the following means:

      a. By means of serious harm or threats of serious harm to that person or another person, including withholding of food and housing.

      b. By means of the abuse or threatened abuse of law or the legal process, including threatening to cancel J-1 visas and have Plaintiffs deported.

665. Defendants knowingly benefited, either financially or by receiving anything of value, specifically:

      a. The Chilean Defendants were compensated for recruiting Plaintiffs into the program.

      b. Defendants Tur-Pak and Royal Canin were compensated with guaranteed workers, who could not quit or leave their jobs without fear of retaliation, and who could not even have a sick day without fear of retaliation.

      c. The WITCC Defendants benefitted financially by receiving a kickback for each hour of labor performed by Plaintiffs. The WITCC Defendants profited, despite the fact that they did provide some classes to the Plaintiffs.

      d. Defendant J&L benefitted through its contract with the WITCC Defendants as well as Royal Canin & Tur-Pak, by having employees who could not quit

102

or even have a sick day for fear of legal repercussions (e.g., deportation) and serious physical harm (withholding of food and housing).

666. Defendants knew or were in reckless disregard to the fact that the venture involved forced labor.

667. Defendants actually obtained forced labor as a result of these actions.

668. Plaintiffs were harmed as a result of these actions.

**WHEREFORE** Plaintiffs requests Judgment against the aforementioned Defendants as follows:

    a. Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount yet to be determined;

    b. Plaintiffs' cost in this action, including reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595;

    c. Punitive damages and,

    d. Other relief the Court deems just and equitable.

**COUNT 3**
**Peonage/Debt Bondage**
**TVPRA, 18 U.S.C. § 1581 and § 1595**
**(Against All Defendants)**

669. Plaintiffs replead the preceding paragraphs as if fully set forth herein.

670. Defendants knowingly provided or obtained the labor or services of the Plaintiffs using peonage/debt bondage. Specifically:

a. Defendants promised Plaintiffs that they would receive a scholarship covering tuition, fees, costs, housing, and food while completing their respective programs at WITCC.

b. Defendants did not inform Plaintiffs that they would be required to pay for this "scholarship" with their labor until after Plaintiffs had been trafficked to the United States.

c. Defendants required Plaintiffs to work 35+ hours/week in menial and, frequently, dangerous production line labor to pay for their "scholarship."

d. Defendants told Plaintiffs they could not miss work or change jobs because of their "debt" to the Defendants.

e. Defendants told Plaintiffs that even if they were deported and were unable to complete their respective programs, Plaintiffs would still owe the school money.

f. When some Plaintiffs did quit their jobs, they were presented with bills from the school for tuition, fees, costs, and housing.

g. Food was withheld from Plaintiffs who were not working for Tur-Pak and Royal Canin.

671. The Defendants knew or were in reckless disregard of the fact that the venture involved peonage/debt bondage.

672. The Defendants actually obtained forced labor through peonage/debt bondage.

673. Plaintiffs were harmed as a result of the Defendants' actions.

**WHEREFORE** Plaintiffs requests Judgment against the aforementioned Defendants as follows:

a. Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount yet to be determined;

b. Plaintiffs' cost in this action, including reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595;

c. Punitive damages and,

d. Other relief the Court deems just and equitable.

## COUNT 4
### Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1961-1967
### Conducting the Affairs of an Enterprise through a Pattern of Racketeering
### 18 U.S.C. § 1962(c)
*(Against Defendants WITCC, J&L, Tur-Pak, and Royal Canin)*

674. Plaintiffs replead the preceding paragraphs as if fully set forth herein.

675. Plaintiffs are all "persons" as defined in the RICO statute. 18 U.S.C. § 1961(3).

676. Defendants WITCC, J&L, Tur-Pak, and Royal Canin are all "persons" as defined in the RICO statute. 18 U.S.C. § 1961(3).

677. Defendants WITCC and J&L formed an enterprise as defined in 18 U.S.C. § 1961(4), by associating in fact for the purpose of trafficking Plaintiffs to the United States for forced labor and/or peonage/debt bondage.

678.    Defendants J&L, Tur-Pak, and WITCC also formed an enterprise as defined in 18 U.S.C. § 1961(4), by associating in fact for the purpose of obtaining the labor of Plaintiffs through forced labor and/or peonage/debt bondage.

679.    Defendants J&L, Royal Canin, and WITCC also formed an enterprise as defined in 18 U.S.C. § 1961(4) by associating in fact for the purpose of obtaining the labor of Plaintiffs through forced labor and/or peonage/debt bondage.

680.    Defendants WITCC, J&L, Tur-Pak, and Royal Canin engaged in racketeering activity, including, but not limited to, violations of 18 U.S.C. § 1581–1592 (relating to peonage, slavery, and trafficking in persons). See 18 U.S. Code § 1961.

681.    Defendants WITCC and J&L engaged in racketeering activity including, but not limited to, violations of 18 U.S.C. § 1546 (relating to fraud and misuse of visas, permits, and other documents).

682.    Defendants WITCC and J&L attempted to prevent the investigation into these actions by evicting the Plaintiffs and forcing them out of the country in March of 2020.

683.    Defendants WITCC and J&L engaged in a campaign to prevent the Plaintiffs from testifying or otherwise seeking recourse by making their presence in the United States unlawful, and communicating the same to the Plaintiffs.

684.    Defendants WITCC, J&L, Tur-Pak, and Royal Canin engaged in those predicate acts willfully or with actual knowledge of the illegal activities.

106

685.   Alternatively, Defendants WITCC, J&L, Tur-Pak, and Royal Canin had a reckless disregard of the fact that they were engaging in illegal acts amounting to predicate acts of racketeering.

686.   Defendants WITCC, J&L, Tur-Pak, and Royal Canin engaged in a pattern of racketeering activity. In fact, the allegations made by these eight Plaintiffs in and of themselves show a pattern. Furthermore, the Defendants have also engaged in this same scheme with students from Brazil, Sudan, and Korea.[54]

687.   The Defendants' illegal acts are both closed-ended and open-ended. The Defendant's illegal acts are closed-ended in so much as the nearly 60 student victims from Brazil and Chile show repeated predicate offense under the RICO statute.

688.   The Defendants' illegal acts are also open-ended, in so much as the Defendants can continue their racketeering enterprise into the future, continuing to import forced labor into the United States from the developing world through fraud and deceit.

689.   One of the instances of racketeering occurred after the effective date of 18 U.S. Code § 1961, and the last of which occurred within 10 years of the prior act of racketeering activity. The instances of racketeering are believed to have begun in 2018 and continued through at least March of 2020.

690.   The Defendants activities, both legal and illegal, had an effect on interstate and/or foreign commerce.

---

[54] Upon information and belief, the students from Brazil were also invited to attend the same two-year Culinary Arts or Robotics programs, and the programs underwent the same re-branding bait and switch for the Brazilians that occurred with the Chilean Plaintiffs.

691. The Plaintiffs have suffered injury to their business and property by reason of the Defendants' violation of the RICO statute.

**WHEREFORE** Plaintiffs request Judgment against the aforementioned Defendants as follows:

a. Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount yet to be determined;

b. Treble damages pursuant to 18 U.S.C. § 1964(c);

c. Plaintiffs' cost in this action, including reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c);

d. An order directing all defendants to divest themselves of any interest in the aforementioned enterprise and prohibiting the defendants from engaging in the same type of endeavor in the future; and

e. Other relief the Court deems just and equitable.

**COUNT 5**
**Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. § 1961-1967**
**Conspiracy to Engage in Racketeering**
**18 U.S.C. § 1962(d)**
(*Against Defendants WITCC, J&L, Tur-Pak, and Royal Canin*)

692. Plaintiffs replead the preceding paragraphs as if fully set forth herein.

693. Defendants WITCC, J&L, Tur-Pak, and Royal Canin each agreed to commit the substantive racketeering offense through agreeing to participate in at least two racketeering acts.

694. At a minimum, Defendants WITCC, J&L, Tur-Pak, and Royal Canin each adopted the goal of furthering or facilitating the criminal endeavor.

695. Defendants WITCC, J&L, Tur-Pak, and Royal Canin each knew the general status of the conspiracy.

**WHEREFORE** Plaintiffs request Judgment against the aforementioned Defendants as follows:

a. Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount yet to be determined;

b. Treble damages pursuant to 18 U.S.C. § 1964(c);

c. Plaintiffs' cost in this action, including reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c);

d. An order directing all defendants to divest themselves of any interest in the aforementioned enterprise and prohibiting the defendants from engaging in the same type of endeavor in the future; and

e. Other relief the Court deems just and equitable.

**COUNT 6**
**Violation of the 13th Amendment**
**Right to be Free from Involuntary Servitude**
**(Against All Defendants)**

696. Plaintiffs replead the preceding paragraphs as if fully set forth herein.

697. Defendants collectively required Plaintiffs to work under conditions that constituted involuntary servitude.

698.     Defendants exerted extreme psychological pressure on Plaintiffs to coerce them to work, including:

a.   Threatening to revoke their J-1 Visas and deport them if they missed a shift of work.

b.   Threatening them with large amounts of debt owed if they missed a shift of work.

c.   Threatening to withhold food or housing if they failed to work.

d.   Actually charging Plaintiffs $250/week if they were not working at a job where Defendants were getting financial benefits from Plaintiffs' work.

699.     Defendants isolated Plaintiffs and controlled their movements, specifically including:

a.   Plaintiffs were required to live in Defendant WITCC's housing.

b.   Plaintiffs did not have vehicles to leave, or money for a flight to leave the country.

c.   Plaintiffs were contractually obligated to make Defendant WITCC aware of their location at all times.

700.     Defendants also took advantage of the natural isolation that occurred because the Plaintiffs were immigrants with limited English abilities.

701.     As a result of these actions, Plaintiffs had no real choice but to work for the Defendants, until the program was shut down.

702.     Once Plaintiffs were brought to the United States and indebted to Defendants, they had no real choice but to do the work demanded of them.

**WHEREFORE**, Plaintiffs request Judgment against the aforementioned Defendants as follows:

   a. Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount yet to be determined;

   b. Plaintiffs' cost in this action, including reasonable attorneys' fees and costs;

   c. Punitive damages; and

   d. Other relief the Court deems just and equitable.

**COUNT 7**
**Fraud**
**(Against the WITCC Defendants and J&L Defendants)**

703.    Plaintiffs replead the preceding paragraphs as if fully set forth herein.

704.    Each of the defendants made several representations to the Plaintiffs, including:

   a. Plaintiffs would participate in a two-year degree program in Robotics or Culinary Arts.

   b. Plaintiffs would receive a scholarship that covered tuition, costs, housing. Meals would be provided.

   c. Plaintiffs would participate in an educational internship in their field of study that would advance their career.

705.    These representations were false. The Plaintiffs did not receive free tuition, room and board, or meals, nor did they participate in internships relevant to their fields of study. Plaintiffs were not offered a two-year degree program in Culinary Arts or Robotics.

706.    These representations were material. They induced the Plaintiffs to act by coming to the United States to pursue their promised degrees through the J-1 visa program.

707.    Defendants knew that the representations were false, and that upon arrival in the United States, Plaintiffs would be placed in low-wage jobs through J&L with Royal Canin and Tur-Pak, in a one-year program that would not result in a degree. Defendants knew that this scheme was not consistent with the requirements of the J-1 visa program.

708.    Defendants intended to deceive the Plaintiffs so that they could obtain the Plaintiffs' forced labor.

709.    The Plaintiffs justifiably relied on Defendants' promises.

710.    The Plaintiffs were harmed as a result of Defendants' promises.

**WHEREFORE**, Plaintiffs request judgment against the aforementioned Defendants as follows:

a.  Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount to be determined;

b.  Plaintiffs' costs in this action, including reasonable attorneys' fees and costs;

c.  Punitive damages; and

d.  Other relief the Court deems equitable and just.

### COUNT 8
### Breach of Contract
### (Against Defendant WITCC)

711.    Plaintiffs replead the preceding paragraphs as if fully set forth herein.

712.    Plaintiffs entered into a contract with Defendant WITCC.

713.    The terms of that contract included, but were not limited to:

112

a.  Plaintiffs would complete a two-year degree program in either Culinary Arts or Robotics.

b.  Plaintiffs would be provided a scholarship that covered tuition, costs, housing, and meals.

c.  Plaintiffs would participate in an educational internship related to their field of study, that would advance their career.

714.  Plaintiffs fulfilled the terms of the contract. They abided by Defendant WITCC's rules for conduct, attended classes, and generally followed Defendant WITCC's instructions regarding the interview and application process, in getting their Visas, and upon coming to campus.

715.  Defendant WITCC breached the terms of the contract:

a.  Defendant WITCC did not offer a two-year degree program in either Culinary Arts or Robotics. Instead, it rebranded these programs into one-year internship programs in Food Services and Electromechanical Technician, while falsely claiming Plaintiffs could stay for an additional year and still get the originally promised-degrees.

b.  Defendant WITCC requires Plaintiffs to pay for tuition, costs, housing, and occasionally meals, through forced labor.

c.  Plaintiffs were not given the opportunity to participate in an educational internship related to their field of study. They were placed at low-skilled, menial, physically demanded jobs, where their labor was entirely to the benefit of the Defendants.

113

716.    Plaintiffs have suffered damages as a result of this breach of contract.

**WHEREFORE**, Plaintiffs request judgment against the aforementioned Defendants as follows:

    a.  Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount to be determined;

    b.  Plaintiffs' costs in this action, including reasonable attorneys' fees and costs;

    c.  Punitive damages; and

    d.  Other relief the Court deems equitable and just.

## COUNT 9
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

717.    Plaintiffs replead the preceding paragraphs as if fully set forth herein.

718.    The Defendants engaged in outrageous conduct by inducing the Plaintiffs to come to the United States with free tuition, free food, and free room and board, and instead forcing Plaintiffs to work under the conditions described above.

719.    Through their outrageous conduct, the Defendants intentionally caused, or recklessly disregarded the probability of causing, emotional distress in each of the Plaintiffs.

720.    Plaintiffs actually suffered severe or extreme emotional distress.

721.    Defendants' actions were the actual and proximate cause of the emotional distress.

114

**WHEREFORE**, Plaintiffs request judgment against the aforementioned Defendants as follows:

a. Actual, compensatory, consequential, and all other allowable damages against Defendants in an amount to be determined;

b. Plaintiffs' costs in this action, including reasonable attorneys' fees and costs;

c. Punitive damages; and

d. Other relief the Court deems equitable and just.

## COUNT 10
## Violations of Iowa Wage Payment Statute – Deductions from Pay, Iowa Code § 91A *et seq.*
## (Against Defendants J&L, Tur-Pak, and Royal Canin)

722. Plaintiffs re-plead the preceding paragraphs as if fully set forth herein.

723. Defendants' practice and policy of diverting $7.75/hour worked of Plaintiffs' paychecks to Defendant WITCC violated Iowa Code § 91A.5(1).

724. There was no valid court order requiring Defendants to deduct wages for Plaintiffs' alleged "debt." Upon information and belief, Plaintiffs did not agree to such a deduction in a written authorization.

725. Further, the deduction was not to the Plaintiffs' benefit, as the purpose of the deduction was to reimburse Defendants WITCC for trafficking Plaintiffs.

726. The effect of the deduction was to hold Plaintiffs in debt bondage/peonage.

727. As a result of Defendants' practices and policies, Plaintiffs have not received wages due to them under Iowa Code § 91A *et seq.*

115

**WHEREFORE**, the Plaintiffs request judgment against the aforementioned defendants, to include:

a.  Wages owed;

b.  Liquidated damages as permitted under Iowa Code § 91A.2(6) and § 91A.8;

c.  Court costs and reasonable attorneys' fees;

d.  Other relief the Court deems equitable and just.

**COUNT 11**
**Respondeat Superior**
**(Against Defendants WITCC and J&L)**

728.    Plaintiffs re-plead the preceding paragraphs as if fully set forth herein.

729.    Defendant WITCC employed Defendants Albert, Yi, Burright, Murell, Zuerech, and Castro at all times referenced within the complaint.

730.    Defendant J&L employed Defendant Albrecht at all times referenced within the complaint.

731.    Under the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment.

732.    Defendants Albert, Yi, Burright, Murrell, Zuerech, and Castro were acting within the scope of their employment with Defendant WITCC with respect to each of their actions herein described.

733.    Defendants Albert, Yi, Burright, Murrell, Zuerich, and Castro were advancing the interests of Defendant WITCC with respect to each of the actions herein described.

116

734. Defendants Albert, Yi, Burright, Murrell, Zuerech, and Castro used Defendant WITCC's resources, facilities, name, and logo with respect to each of the actions herein described.

735. Defendant Albrecht was acting within the scope of her employment with Defendant J&L with respect to each of her actions herein described.

736. Defendant Albrecht acted with a purpose of advancing the interests of Defendant J&L with respect to each of her actions herein described.

737. Defendant Albrecht used Defendant J&L's resources, facilities, name, and logo with respect to each of the actions herein described.

738. Defendants WITCC and J&L are vicariously liable for the actions of their employees, including the named defendants and others.

## **JURY DEMAND**

**COME NOW** the Plaintiffs and demand a jury trial for all counts pled herein.

*Respectfully submitted,*

> **PARRISH KRUIDENIER DUNN GENTRY**
> **BROWN BERGMANN & MESSAMER, L.L.P.**
>
> By:   /s/ *Benjamin Bergmann*
> Brandon Brown          AT0001199
> Benjamin Bergmann     AT0009469
> 2910 Grand Avenue
> Des Moines, Iowa 50312
> Telephone: (515) 284-5737
> Facsimile: (515) 284-1704
> E-Mail:      bbrown@parrishlaw.com
>                    bbergmann@parrishlaw.com
> **ATTORNEYS FOR PLAINTIFFS**

117

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause by:

| | | | |
|---|---|---|---|
| ( ) | personal service | ( ) | first class mail |
| ( ) | certified mail, return receipt requested | ( ) | facsimile |
| ( ) | Airborne Express (overnight) | (X) | electronic filing |
| | | ( ) | e-mail |

on February 24, 2021.

I declare that the statements above are true to the best of my information, knowledge, and belief.

_/s/ Anita Soderblom_

**Copies to:**

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.
Holly Logan
Email: hollylogan@davisbrownlaw.com
Scott Brennan
Email: scottbrennan@davisbrownlaw.com
Elizabeth Van Arkel
Email: elizabethvanarkel@davisbrownlaw.com
Spencer Willems
Email: spencerwillems@davisbrownlaw.com
**ATTORNEYS FOR:**
**WITCC**
**TERRY YI**
**ROSANA SALGADO BURRIGHT**
**JULINE ALBERT**
**TERRY MURELL**
**JAMES ZUERCHER and**
**LILY CASTRO**

JACKSON LEWIS P.C.
Sarah Millsap
Email: sarah.millsap@jacksonlewis.com
Brock Pohlmeier
Email: brock.pohlmeier@jacksonlewis.com
**ATTORNEYS FOR**
**PREMIER SERVICES, INC. and**
**NANCY ALBRECHT**

GORDON REES, et al.
Matthew Dixon
Email: mdixon@grsm.com

GOOSMANN LAW FIRM
James Drury
Email: druryj@goosmannlaw.com

118

Kelsey Heino
Email: heinok@goosmannlaw.com
**ATTORNEYS FOR TUR-PAK FOODS**

KLASS LAW FIRM, L.L.P.
Ryland Deinert
Email: deinert@klasslaw.com

GREENBERG TRAURIG, LLP
Pro Hac Vice Elizabeth Ralph
Email: ralphe@gtlaw.com
**ATTORNEYS FOR ROYAL CANIN USA INC**