# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| KARLA O'NELL NORAMBUENA, et al., | |
| Plaintiffs, | No.  C20-4054-LTS |
| vs. | |
| WESTERN IOWA TECH COMMUNITY COLLEGE, et al., | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS** |
| Defendants. | |

## I.    INTRODUCTION

This case is before me on motions (Docs. 102, 106, 107, 112) to dismiss the third amended complaint (TAC) filed by (1) defendants Premier Services, Inc. d/b/a J&L Enterprises and d/b/a J&L Staffing and Recruiting (J&L) and Nancy Albrecht (together, the J&L defendants); (2) Juline Albert, Rosana Salgado Burright, Lilly Castro, Terry Murell, Terry Yi, James Zuercher and Western Iowa Tech Community College (WITCC) (together, the WITCC defendants); (3) Royal Canin USA, Inc. (Royal Canin); and (4) Tur-Pak Foods, Inc. (Tur-Pak).  Plaintiffs have filed resistances (Docs. 127, 128, 129 and 130) and defendants have filed replies.  *See* Docs. 139, 141, 142, and 143.  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.    FACTUAL ALLEGATIONS

The following allegations from the TAC (Doc. 93) are accepted as true for purposes of the motions to dismiss:

The J-1 visa program grants temporary visas to "those who intend to participate in an approved program for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, receiving

training, or to receive graduate medical education or training." Students may receive these visas to complete an internship, which the program defines as "[a] structured and guided work-based learning program for an Intern . . . that reinforces an intern's academic study; recognizes the need for work-based experience; provides on the-job exposure to American techniques, methodologies, and technologies; and enhances the Intern's knowledge of American culture and society."

To qualify as a "student intern," the student must be "primarily in the United States to engage in a student internship program rather than to engage in employment or provide services to an employer." The internship program must "expand[] upon the participants' existing knowledge and skills." Interns cannot be used to "displace full- or part-time or temporary or permanent American workers or serve to fill a labor need," and the "position that the student intern[] fills [must] exist[] solely to assist the student intern in achieving the objectives of his or her participation in a student internship program." Sponsors of a J-1 intern must:

(i) Not place a student intern in an unskilled or casual labor position. . .

(ii) Not place a student intern in a position, occupation, or business that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;

(iii) Not engage or otherwise cooperate or contract with a staffing/employment agency to recruit, screen, orient, place, valuate, or train student interns, or in any other way involve such agencies in an Exchange Visitor Program student internship program;

(iv) Ensure that the duties of a student intern as outlined in the T/IPP will not involve more than 20 per cent clerical work, and that all tasks assigned to a student intern are necessary for the completion of the student internship program.

Further, the program requires sponsors to "distinguish between work-based learning for student interns, which is permitted, and ordinary employment or unskilled labor, which is not."

Beginning in 2018 or early 2019, the WITCC defendants began to seek authorization from the United States Department of State to host students as part of the J-1 visa program. On February 14, 2019, the State Department notified WITCC it had been approved as a sponsor and would be allocated 50 J-1 visas for the academic year beginning on July 31, 2019. Around this time, the WITCC defendants began working with J&L, a local staffing agency, to find a way to fund the program. Ultimately, the agreed-upon plan was that WITCC would bring the students to the United States and J&L would find local jobs for the students. WITCC, J&L, and local companies Tur-Pak and Royal Canin entered into an agreement where:

- J&L would ensure that the J-1 visa students met the minimum qualifications for the jobs, including limited English proficiency and physical fitness.
- J&L would provide transportation from WITCC's apartment complex to work and back for the J-1 visa students.
- WITCC would house the J-1 visa students on campus and secure visas for entry into the United States. This included offering an educational component to recruit the students.
- Royal Canin and Tur-Pak would pay $15/hour for the J-1 visa students' labor, through J&L. However, unbeknownst to the J-1 visa students, a majority of those wages ($7.75/hour) would go to WITCC to pay for the student's housing, tuition, and fees. The students would then make minimum wage, $7.25/hour.
- J&L would benefit, at least, by collecting a fee for providing these services.
- J&L would also benefit by charging the J-1 visa students for services such as transportation, and for employment badges.

Meanwhile, WITCC began to recruit students to take part in the program. On March 14, 2019, the Chilean Defendants[1] advertised the WITCC J-1 visa program on Facebook, including WITCC's logo, which is how many of the plaintiffs learned of the

---

[1] The Chilean Defendants include Carlos Espinoza, Soledad Rojas, Jorge Arcos and Cristian San Martin Matta. This group of Chilean nationals assisted WITCC and J&L in recruiting students for the program. While the plaintiffs have named them in the TAC, the allegations against them are not relevant for the purposes of the pending motions to dismiss.

3

program. In April 2019, the WITCC and J&L defendants traveled to Chile to meet with their recruits, including plaintiffs. These defendants gave presentations describing the program and told plaintiffs they would receive a two-year degree in either culinary arts or robotics. Further, they promised plaintiffs free room, board, tuition and meals. These were reiterated in an letter provided to plaintiffs, which promised:

- a scholarship to provide a two-year associate's degree in robotics or culinary arts,
- a scholarship to pay for housing on campus,
- up to $1,000 for travel to the United States,
- the opportunity to participate in fun cultural activities.

This letter also stated students would be required to work as many as 35 hours per week and attend classes 12 hours per week.

During this trip, WITCC and J&L also interviewed plaintiffs. While the details of the interview are unclear, many plaintiffs were required to show they could lift and carry various amounts of weight. Additionally, WITCC and J&L attempted to prepare plaintiffs for their interviews at the United States embassy, a requirement to receive the visa. They told plaintiffs not to mention their work and to say the program only lasted a year, even though the defendants were assuring plaintiffs it was a two-year program.

On April 24, 2019, the WITCC defendants sent acceptance letters to each plaintiff, which stated:

We are pleased to notify you of your acceptance into Western Iowa Tech Community College as a J-1 visa student, in the Robotics & Automation program. You should start your Visa application process as soon as you can.

In this package you will find, other than this acceptance letter, your DS2019 form, the pre-arrival handbook, your job offer letter, and your proof of health insurance according to the J1 Visa requirements.

Although you were already tested in English reading and writing, it is part of our procedure for new international students to have them tested again upon arrival in their English language skills. You may need to take intensive English classes in order to prepare you to attend your program classes and job site training.

4

The letter also included an offer to work with the J&L defendants but did not indicate the rate of pay or hours. The letter described the work as "valuable, resume-enhancing experience for candidates to gain work experience."

The acceptance packet included an agreement for the students to sign, which stated they would:

(1) Attend English courses if my English skills are determined to be lower than necessary to perform my academic and internship duties.

(2) Attend classes in my program (Culinary or Robotics/Mechanical Engineering) and maintain a minimum of a 2.0.

(3) Attend my internship and receive positive reviews from my internship supervisor.

(4) Live in the Western Iowa Tech student housing, Sun Ridge apartments.

(5) Return to my home country after graduation or upon request of the College. I understand that if I am not attending classes or my internship, or if I am dismissed from either the college or my internship, that I must return to my home country immediately at my own expense.

The agreement did not mention the cost of tuition, meals, or transportation, nor did the agreement discuss an arrangement to pay WITCC through the students' work at Royal Canin or Tur-Pak.

In June 2019, the WITCC defendants advised plaintiffs that WITCC had made some mistakes:

1. Using J&L company as a partner. J&L is a job agency and, according to the rules, that we, unfortunately, did not know, cannot participate in any J1 program. The reason is that this program has the main purpose of providing a cultural interchange between the US and other countries, even though allowing participants to be trained in the real environment and be paid for that, which is what will happen when you come. J&L will be assisting the college in the process of allocating you among the various business/partners where you will be trained and paid for that[.]

2. At any moment, we are [not] allowed to mention that the reason for J1 paid internship is the lack of workers in the area, even when indeed there is a need for workers. Also, we cannot call you workers, but student interns, and we cannot use the word salary or wages, but stipends or compensation.

5

3. According to SEVIS instructions, we cannot issue a DS2019 form for longer than 1 year. Instead, we have to issue it for a period of 1 year, and then, before it expires, we will have to update your DS2019 forms for 1 more year.

In order to adjust this process according to the law:

1. In your DS2019 form, you will have a period of 1 year, from August 22, 2019, to August 21, 2020.

2. Your programs were changed to Food Services or Electromechanical Technician, which corresponds to halfway for Culinary Arts and Robotics. When DS2019 forms are reissued, the name of the program will [be] what originally they meant to be.

3. Because J&L cannot be an official partner, its name was removed from your DS2019 forms, and the Western Iowa Tech will be the one providing you with the financial assistance, through the paid internship you will be assigned by the time of your arrival.

4. Another form, DS7002, had to be created, which is a training plan where we have to describe how you are going to be trained, step by step.

5. We had to create an invitation letter, improve and add more information in the acceptance letter, and create an accommodation letter.

However, the communication assured the plaintiffs nothing had changed for them and instructed them to destroy evidence of J&L's involvement.

Subsequently, plaintiffs received a second acceptance letter, dated June 3, 2019. In the new letter, WITCC changed the names of the programs from "Culinary Arts" to "Food Services," while "Robotics and Automation" became "Electromechanical Technician. WITCC described the rebranded Food Services Diploma Program described as follows:

The Food Service Diploma emphasizes fundamental and intermediate techniques of food preparation, production and baking skills. This program prepares students for intermediate level positions in the industry more specifically first-line supervisors of food preparation and serving workers.

Once you graduate, you will be ready to directly supervise and coordinate activities of workers engaged in preparing and serving food, and, in our J1 project, directly related to automated food production industries, for humans or pets' consumption. The most common tasks that food services

6

professionals perform are: inspect supplies, equipment and work areas to ensure efficient service and conformance to standards; manage food service operations or parts of operations; balance receipts; communicate with customers to resolve complaints or ensure satisfaction; process customer bill or payments; cut cooked or raw foods. Employees in these occupations need anywhere from a few months to one year of working with experienced employees. A recognized apprenticeship program may be associated with these occupations. For this reason, while you are gaining specific knowledge for that, through your classes, and as part of your training, you will experiment [sic] the activities performed in the real environment in which you are going to do work when you finish your program.

The new acceptance letter described the rebranded Electromechanical Technician program as:

This program provides students with hands-on training to prepare them for an entry level position as an industrial mechanic or maintenance position. Electromechanical technicians utilize knowledge and skills developed from learning various topics including electrical, mechanical, fluid power to maintain and repair industrial equipment and systems. Once you graduate, you will be ready to operate, test, maintain, or calibrate unamend, automated, servo-mechanical, or electromechanical equipment and you may assist engineers in testing and designing robotics equipment, and, in our J1 project, directly related to automated food production industries, for humans or pets' consumption.

The most common tasks that electromechanical technicians perform are: test performance of electromechanical assemblies, using test instruments such as oscilloscopes, electronic voltmeters, or bridges; read blueprints, schematics, diagrams, or technical orders to determine methods and sequences of assembly; inspect parts for surface defects, install electrical or electronic parts and hardware in housing or assemblies, using soldering equipment and hand tools; and verify part dimensions or clearances to ensure conformance to specifications, using precision measuring instruments.

Plaintiffs also received invitation letters to the programs, dated June 3, 2019. These letters provided

[Y]ou are NOT responsible for the cost of your tuition, fees, housing, or supplies. Meals will be provided at the College. The necessary materials for your classes and training will be supplied by the college and will have to be returned right after your conclusion of your program.

7

You will have your training in an external environment provided by industries/partners that are served by our Corporate College, a division of Western Iowa Tech Community College. These companies send their employees to our Corporate College to acquire knowledge and training when and if it is necessary, and they are willing to participate in this cultural interchange by allowing us to use their facilities and plants, and by providing us an experience and qualified employee to oversee your training together with your instructor.

Meanwhile, WITCC certified to the State Department that for those plaintiffs in the "Food Services" program, the "internship" component of the program would consist of "shadowing in three different environments: the local cafeteria at college, and two business partners consisting in a hotel restaurant, and a food preparation industry just to observe. In the three environments, the student will be under the guidance of a local and qualified employee and the instructor's supervision and care." Further, WITCC certified the "student[s] will lend support to current food services tasks, quality assurance, database maintenance and updates, process improvement initiatives, as well as assist in ongoing workflows. With this, the student will get substantial knowledge in the Food Service field that will prepare him/her for intermediate level positions in the industry such as cooking services in restaurants."

For those plaintiffs in the "Electromechanical" program, WITCC certified that the "internship" component of the program would consist of job shadowing, specifically "[t]he job shadowing will take place at our Corporate College partners . . . The manufacturing instructors will have the students shadowing in these locations under the guidance of a local, experienced and qualified employee and the instructor's supervision and care." Finally, WITCC certified that "[t]he [Electromechanical program] student[s] will support the electromechanical technician staff in the field of maintenance and repairing components and assemblies for industrial technology. Also, the student[s] will [engage in] project analysis, production management, quality control, testing, and product launch initiatives. With this, the student[s] will get substantial knowledge in the electromechanical technician field."

8

Plaintiffs arrived in Sioux City in August 2019. At the beginning of the program, they were given Walmart or Hy-Vee gifts cards to purchase their food. However, once the J&L defendants placed students in their internships, WITCC stopped providing gift cards, telling plaintiffs they needed to use their wages to buy their meals. The WITCC defendants also encouraged plaintiffs to obtain other employment to pay room and board.

J&L placed plaintiffs in their "internship" positions shortly after their arrival. They learned for the first time that they would be working at Tur-Pak's meat-packing processing plant or Royal Canin's dog food factory. These placements came as a surprise to the plaintiffs, with some of them reduced to tears. Once they began working, they worked 40 or more hours per week, often in harsh conditions. The jobs varied but all involved unskilled labor. For instance, some plaintiffs carried and packed cans of dog and cat food while others packed Lunchables.

Royal Canin and Tur-Pak paid $15 per hour for each plaintiffs' labor, with $7.25 per hour paid to each plaintiff and the other $7.75 per hour being sent to WITCC as payment for plaintiffs' tuition, fees, room and board. The J&L defendants organized transport for plaintiffs to and from their positions and subsequently charged them for those rides. Additionally, plaintiffs attended classes for six hours daily.

As the program progressed, plaintiffs complained that their experience was not what WITCC promised. Students began to miss class or work because of their demanding schedules and various defendants threatened to deport them. At some point, an unidentified American co-worker contacted the United States government about the program. Around November 2019, the State Department began an investigation and ultimately found that the positions at Tur-Pak and Royal Canin were not the type of "internships" the program contemplated. The WITCC defendants instructed plaintiffs to quit their jobs. In turn, the WITCC defendants told plaintiffs they now owed the college $250 per week for room, board, tuition, and fees.

Some plaintiffs found other jobs, while others did not. When plaintiffs could not afford food, the WITCC defendants took them to local churches and food pantries. The

9

WITCC defendants assured plaintiffs they were attempting to find compliant internships, though they never materialized. Beginning on January 23, 2020, the WITCC defendants provided plaintiffs with meal tickets to eat in the cafeteria. These were limited to $5 for breakfast and $7.50 for lunch. The WITCC defendants also gave plaintiffs $75 gift cards to Hy-Vee to help cover food costs for the week. On March 13, 2020, the school notified plaintiffs it was canceling the J-1 visa program. The WITCC defendants told plaintiffs they had to check out of housing by March 18, 2020, citing the COVID-19 pandemic as the reason for ending the program. However, many retained immigration attorneys and have remained in the United States.

The TAC describes circumstances unique to each individual plaintiff, including how they heard about the visa program, their intended fields of study, representations made to them about the program by WITCC and J&L representatives, where they worked, the nature of their work, their hours and pay and when they left WITCC housing. The TAC asserts the following claims against the defendants:

- Count 1 – Violations of 18 U.S.C. §§ 1590, 1595, Trafficking Victims Protection Reauthorization Act (TVPRA), for human trafficking (against all defendants)
- Count 2 – Violations of 18 U.S.C. § 1589, TVRPA, for forced labor (against all defendants)
- Count 3 – Violations of 18 U.S.C. § 1581, 1595, TVRPA, for peonage/debt bondage (against all defendants)
- Count 4 – Violations of 18 U.S.C. §§ 1961-67, 1962(c), Racketeer Influenced and Corrupt Organizations Act, for conducting the affairs of an enterprise through a pattern of racketeering (against all defendants)
- Count 5 – Violations of 18 U.S.C. §§1961-67, 1962(d), RICO, for conspiracy to engage in racketeering (against all defendants)
- Count 6 – Violations of the 13th Amendment, for indentured servitude (against all defendants)
- Count 7 – Fraudulent Misrepresentation (against WITCC and J&L)
- Count 8 – Breach of Contract (against WITCC)
- Count 9 – Tortious Infliction of Emotional Distress (against all defendants)
- Count 10 – Violations of the Iowa Wage Payment Collection Law

10

(IWPCL) (against defendants J&L and Tur-Pak)
- Count 11 – Respondeat Superior (against WITCC and J&L)

Doc. 93. The defendants collectively seek dismissal of all counts, with one exception (J&L does not seek dismissal of Count 10).

## III. APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

11

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)). While *factual* "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014).

In considering a Rule 12(b)(6) motion to dismiss, ordinarily the court "cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment." *McMahon v. Transamerica Life Ins.*, No. C17-149-LTS, 2018 WL 3381406, at *2 n.2 (N.D. Iowa July 11, 2018); *see* Fed. R. Civ. P. 12(b)(6). On the other hand, when a copy of a "written instrument" is attached to a pleading, it is considered "a part of the pleading for all purposes," pursuant to Federal Rule of Civil Procedure 10(c). Thus, when the pleadings necessarily embrace certain documents, I may consider those documents without turning a motion to dismiss into a motion for summary judgment. *Id.*

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead. The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within 21 days. *See* Fed. R. Civ. P. 15(a)(1)(B). Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to

12

do so. When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am.,* 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

## IV.    ANALYSIS

### A.    Counts 1 to 3 – Violations of TVPRA

Plaintiffs allege the following violations of TVPRA against all defendants:

- Count 1: Trafficking in violation of 18 U.S.C. § 1590
- Count 2: Forced labor in violation of 18 U.S.C. § 1589
- Count 3: Peonage in violation of 18 U.S.C. § 1581

Allegations under Section 1590 (trafficking) require a plaintiff first establish a predicate violation of Section 1589 (forced labor). For this reason, I will address Count 2 (the forced labor predicate violation) first, followed by Counts 1 and 3.

#### 1.    Count 2: Forced Labor – 18 U.S.C. § 1589

##### a.    Legal standards

Section 1589(a) provides what some courts have referred to as the "perpetrator theory" of liability under the forced labor statute:

> (a)    Whoever knowingly provides or obtains the labor services of a person by any one of, or by any combination of, the following means—
>
> (1)    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

13

  (2) by means of serious harm or threats of serious harm to that person or another person;

  (3) by means of the abuse or threatened abuse of law or legal process; or

  (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

Plaintiffs allege violations of the TVRPA under the perpetrator theory of liability against the WITCC defendants and the J&L defendants, specifically under Sections 1589(a)(2) and (a)(3). Comparably, 18 U.S.C. § 1589(b) provides what is known as the "beneficiary" theory of liability:

  (b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

18 U.S.C. § 1589(b). Plaintiffs allege that Royal Canin and Tur-Pak are liable under the beneficiary theory of liability.

### b. *WITCC defendants*

  The WITCC defendants argue that plaintiffs have failed to plausibly allege any of their actions constitute a harm or threat of harm in violation of Section 1589(a)(2) or 1589(a)(3). Doc. 114 at 15, 18. Plaintiffs counter that the serious harms alleged in this

case include threats to and the actual withholding of food and housing, financial harm, and visa fraud and threatened deportation.[2]  Doc. 130 at 12.

> ### i. Do the plaintiffs plausibly allege WITCC obtained labor services through a serious harm by threatening to and actually withholding food or housing?

"Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2).  "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her."  *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).

The WITCC defendants argue that plaintiffs "make no specific allegations that the WITCC defendants withheld food and housing or threatened to do so in an effort to get them to perform forced labor or services."  Doc. 114 at 16.  The WITCC defendants also argue that "[p]laintiffs do not establish, nor do they explain how these alleged threats (or actual acts) of withholding food or housing were fashioned to induce them to work. Quite simply, it is unclear if these threats (or acts) of withholding were used as an incentive, as retribution, or both."  *Id.*  Therefore, the question is whether (1) plaintiffs have plausibly alleged the WITCC defendants created a link between plaintiffs' labor and their food and housing, and (2) whether those threats were "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and

---

[2] Because plaintiffs allege that a threat of deportation is both a serious harm under Section 1589(a)(2) and an abuse or threatened abuse of law or legal process in violation of Section 1589(a)(3), I will address both arguments together.

Case 5:20-cv-04054-LTS-KEM   Document 157   Filed 03/31/22   Page 15 of 47

in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

When plaintiffs were accepted to WITCC's program, they received letters stating that "you are NOT responsible for the cost of your tuition, fees, housing, or supplies. Meals will be provided at the College. The necessary materials for your classes and training will be supplied by the college and will have to be returned right after your conclusion of your program." Doc. 93 at ¶ 105. Plaintiffs simultaneously received "invitation letters" that stated, "Western Iowa Tech will be responsible for your international flight to our campus in Sioux City, Iowa. You are NOT responsible for the cost of your tuition, fees, housing, or supplies. Meals will be provided by the college." *Id.* at ¶ 109.

Upon plaintiffs' arrival, WITCC provided Walmart or Hy-Vee gift cards to purchase food. *Id.* at ¶ 130. After plaintiffs began working at Tur-Pak and Royal Canin, WITCC stopped providing gift cards for food, telling them they should use their paychecks to purchase their meals. Doc. 93 at ¶ 131. Further, plaintiffs were told they could not secure off-campus employment without permission. *See* Doc. 93 at ¶ 186.

Accepting these pleadings as true, plaintiffs have plausibly established that the WITCC defendants withheld food and housing, or threatened to do so, to induce plaintiffs' labor. WITCC recruited the plaintiffs to participate in its program under the premise that they would not have to pay for their own housing or meals. Upon their arrival, WITCC provided means for plaintiffs to purchase food. But once they started working at Tur-Pak or Royal Canin, WITCC suspended its assistance and told plaintiffs to purchase their own food. It is at least plausible that by withholding its financial assistance for food, WITCC attempted to induce, and successfully induced, the plaintiffs' forced labor. WITCC specifically prohibited plaintiffs from seeking other employment without permission, making their labor for Tur-Pak or Royal Canin the only way they could provide for themselves. This is bolstered by the fact that students who did not

16

work at a job of WITCC's choosing were excluded from receiving gift cards to buy food. Doc. 93 at ¶¶ 355, 404.

For similar reasons, it is plausible that plaintiffs' access to housing was tied to their employment. Plaintiffs came to the United States believing they would not be financially responsible for their housing costs. When various plaintiffs quit their WITCC-arranged positions, the WITCC defendants required them to make payments to the school to cover housing and fees, and they were not allowed to live elsewhere. Doc. 93 at ¶¶ 352-54, 494, 580.

The WITCC defendants argue that because WITCC later provided cafeteria tickets, gift-cards, and "other food resources" (such as encouraging plaintiffs to seek assistance from food banks and local churches) after plaintiffs quit their jobs with Tur-Pak or Royal Canin at WITCC's direction, plaintiffs cannot tie their food and housing to their labor. However, this does not automatically undermine the plausibility of plaintiffs' allegations. WITCC provided these resources only after the State Department initiated an investigation into the program in November 2019. Even then, the pleadings allege WITCC provided these resources to the plaintiffs starting at the end of January 2020, and that WITCC ended the J-1 program roughly six weeks later.

The final question is whether these threats of harm would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." Based on the allegations in the TAC, I find that they would. The plaintiffs are foreign nationals with varying levels of proficiency in English. They all made financial sacrifices to be a part of the program, with several of them selling nearly everything they owned prior to enrolling in the program. Thus, they had no obvious alternatives. Plaintiffs have sufficiently alleged a harm or threat of serious harm under Section 1589(a)(2).

### ii.     Do the plaintiffs plausibly allege WITCC obtained labor through threats of deportation?

The WITCC defendants argue that a threat of deportation cannot constitute serious harm or abuse of the legal process because plaintiffs knew they had to comply with the visa requirements or risk being deported.  However, courts have recognized that the threat of deportation "can constitute serious harm to an immigrant within the meaning of the forced labor statute." *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 523 (D. Md. Jan. 21, 2014) (quoting *United States v. Rivera*, No. 09-CR-619 (SJF), 2012 WL 2339318, at *5 (E.D.N.Y. June 19, 2012)).  *See also United States v. Kozminski*, 487 U.S. 931, 948 (1988) ("threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude.").  *Ramo-Madrigal v. Mendiola Forestry Service, LLC*, 799 F. Supp. 2d 958, 960 (W.D. Ark. 2011) (when accepting plaintiffs' facts as true and viewing them in the light most favorable to plaintiffs, threatening H-2B workers with serious immigration consequences to prevent them from leaving employment constitutes "threatened abuse of the legal process" and states a valid claim under the TVPRA).  "Abuse or threatened abuse of law or legal process" is defined as "the use or threatened use of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).

In the context of H-2B visas,[3] courts have determined that threats of deportation are sufficient to meet the "serious harm" element under either subsection 1589(a)(2) or (4) or "abuse of the legal process" element under subsection 1589(a)(3).  *See Aida v.*

---

[3] "The H-2B program allows U.S. employers or U.S. agents who meet specific regulatory requirements to bring foreign nationals to the United States to fill temporary nonagricultural jobs."  *See* H-2b Temporary Non-Agricultural Workers, United States Citizenship and Immigration Services, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (last visited August 9, 2021).  The maximum period of stay for an H-2B visa is three years.

18

*Grandeur Mgmt., Inc.*, 933 F.3d 89, 93-94 (2d Cir. 2019) (allegations that defendants threatened to cancel plaintiff's immigration sponsorship or terminate his employment if he complained about not receiving overtime pay constituted an abuse of legal process for purposes of subsection 1589(a)(3) and a scheme intended to cause plaintiff to believe he would face serious harm under subsection 1589(a)(4)); *United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) (evidence that defendant repeatedly threatened foreign nationals with legal action, revocation of their visas, deportation and financial ruin were "precisely the types of threats that could 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to void incurring that harm.'") (quoting 18 U.S.C. § 1589(c)(2)); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107,115 (D.D.C. 2012) (rejecting defendant's motion to dismiss forced labor claim under 18 U.S.C. § 1589 because plaintiff sufficiently alleged that defendants abused the legal process by threatening her with deportation should she fail to perform the work demanded of her); *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 952 (N.D. Cal. 2019) (threats of deportation in addition to other threats were sufficient to state a claim under § 1589); *see also Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. Aug. 16, 2013) ("The threat of deportation alone may support a claim for forced labor.").

Taking plaintiffs' allegations as true, they have sufficiently alleged a threat of serious harm under Section 1589(a)(2) and threatened abuse of legal process under Section 1589(a)(3). They allege that WITCC repeatedly threatened them with deportation if they missed work. Doc. 93 at ¶¶ 136, 151, 204, 248, 282, 304, 310, 347, 392, 407, 437, 484, 531, 544, 597.[4] While the WITCC defendants argue that reminding plaintiffs of the immigration consequences of choosing not to perform the requirements of the J-1

---

[4] The harms I have addressed are specifically alleged in the TAC. In their resistance, plaintiffs also argue their allegations can support threats of other "serious harms." Because they have plausibly alleged threats of serious harm through the withholding of food and housing, and threats of deportation, I need not consider these additional alleged harms.

program is not a threat of serious harm, this argument assumes the work plaintiffs performed was, in fact, a requirement of the J-1 visa program. Based on the State Department's determination, it was not. The ultimate question is whether the WITCC defendants intimidated and coerced plaintiffs into working by causing them to believe they would face serious harm or legal consequences if they did not continue to work. Plaintiffs have plausibly alleged that this occurred.

### c.    J&L defendants

Plaintiffs allege several types of harm or threats of serious harm by the J&L defendants.[5]   For instance, they allege J&L subjected them to execrable working conditions and assisted WITCC in withholding over half of their paychecks. Doc. 127 at 9-16.  However, it is not clear how either of these actions would operate to induce plaintiffs' labor.  Plaintiffs also vaguely assert that J&L took part in a scheme to induce them to come to the United States and work in a fraudulent program.  However, the scheme under § 1589 must "cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint," and plaintiffs do not elaborate how the scheme they describe would cause a person to believe they might suffer serious harm.

In addition, plaintiffs allege that the J&L defendants repeatedly threatened them with deportation if they did not continue their work with Royal Canin and Tur-Pak.  The relevant allegations in the TAC include:

> 204. When Karla continued to miss classes, the WITCC Defendants, the J&L Defendants, and Royal Canin began to threaten Karla. They told her if she did not go to work, she would be deported.
>
> 304. David's schedule at Tur-Pak was from 3:30 p.m. to 12:00 a.m., Monday through Friday. If he missed a day of work, the J&L Defendants

---

[5] Multiple defendants argue that plaintiffs resorted to shotgun-style pleading, and therefore, all claims should be dismissed.  However, and except as otherwise noted in this order, the TAC as a whole is largely sufficient to put the defendants on notice of the allegations against them.

and WITCC Defendants would tell him that he would have to work a Saturday, or he would be deported.

437. However, [Alejandro] could not stop working. The WITCC and J&L Defendants required him to attend work and class, stating that if he failed to do so he would be kicked out of the program and deported to Chile.

Doc. 93. The J&L defendants argue that because all three of the plaintiffs who were threatened with deportation subsequently quit or were fired by co-defendants Royal Canin and Tur-Park, those plaintiffs clearly did not feel compelled to continue working. Doc. 139 at 6-7. However, at most this suggests there is a factual question as to whether the plaintiffs felt compelled to continue providing their labor. I may not resolve that question on a motion to dismiss. Taking plaintiffs' allegations as true, they have sufficiently alleged the abuse or threatened abuse of legal process under 1589(a)(2) and (a)(3).[6]

> ### d.     *Royal Canin*

Plaintiffs allege Royal Canin is liable under the beneficiary theory of liability. Section 1589(b) requires that defendants (1) "knowingly benefit[ed] financially or by receiving anything of value from" (2) participation in a venture they knew or should have known has engaged in providing or obtaining of labor or services by any means described in subsection (a). Therefore, there are two knowledge components: (1) knowledge of the benefit and (2) knowledge or reckless disregard of the means by which the venture obtained the labor. Conditions of a person's mind may be alleged generally. *See* Fed. R. Civ. P. 9(b).

Regarding the first element, plaintiffs allege Royal Canin knowingly benefited from the venture because it was "compensated with guaranteed workers, who could not quit or leave their jobs without fear of retaliation, and who could not even have a sick day without fear of retaliation." Doc. 93 at ¶ 620. Multiple plaintiffs worked at Royal

---

[6] Because the plaintiffs plausibly allege violations of the forced labor statute by the J&L defendants under the perpetrator theory of liability, I do not address allegations based on the beneficiary theory of liability.

Canin during the relevant period. Doc. 93 at ¶ 197 (Karla Norambuena), Doc. 93 at ¶ 432 (Alejandro Pizarro); Doc. 93 at ¶ 535 (Gonzalo Escobar Espejo). Therefore, plaintiffs have sufficiently alleged that Royal Canin "knowingly benefit[ed] financially or by receiving anything of value from" the alleged venture.

As for the second element, Royal Canin argues there are no factual allegations supporting plaintiffs' argument that it knew or should have known the means by which the venture obtained labor. Doc. 142 at 11. Plaintiffs counter that employees at Royal Canin, including at least one supervisor, expressed confusion about plaintiffs' jobs at Royal Canin, as those jobs were not related to the culinary arts. *See* Doc. 128 at 22. The TAC alleges:

> 199. Supervisors at Royal Canin made comments about it seeming odd Karla was working there as part of an internship since her job had nothing to do with culinary arts or robotics.

> 143. Plaintiffs' work at Royal Canin was a topic of discussion among Royal Canin employees, as they found it strange that Plaintiffs were working there as part of an "internship." At least one supervisor was involved in such a discussion. Doc. 93 at 35.

> 643. Nestor had also heard similar things from his fellow students working at Royal Canin − namely, that their coworkers had expressed confusion over the amount they were being paid and what led them to be working in a plant as part of an internship at all.

These facts sufficiently allege that Royal Canin knew or should have known the means by which the other defendants obtained plaintiffs' labor. Taking the facts alleged as true, employees and supervisors at Royal Canin knew the foreign-born students were supposed to be working at internships in the culinary arts and robotics, but instead were working

22

up to 56 hours per week stacking slabs of meat. As noted above, states of mind may be alleged generally.[7] Royal Canin is not entitled to dismissal on this count.[8]

### e. Tur-Pak

Plaintiffs allege Tur-Pak is also liable under the beneficiary theory of liability. First, they allege Tur-Pak knowingly benefitted from other defendants' forced labor violations because it was "compensated with guaranteed workers, who could not quit or leave their jobs without fear of retaliation, and who could not even have a sick day without fear of retaliation." Doc. 93 at ¶ 620. Several plaintiffs worked at Tur-Pak. *Id.* at ¶ 246 (Natalia Tapia Leiva); *Id.* at ¶ 271 (Almendra Gonzalez de la Paz); *Id.* at ¶ 302 (David Silva Moreno); *Id.* at ¶ 331 (Fernando Vilches Castillo); *Id.* at ¶ 383 (Claudio Ramos); *Id.* at ¶ 443 (Alejandro Pizzaro); *Id.* at ¶ 476 (Eduardo Antonio Munoz Vargas); Doc. 93 at ¶ 572 (Catalina Noemi Rivas Morales); *Id.* at ¶ 592 (Bairon Morel Guerra); *Id.* at ¶¶ 617-18 (Diego Cristobal Ahumada Soulodre); *Id.* at ¶ 639 (Nestor Acevedo). As with Royal Canin, plaintiffs have sufficiently alleged the knowledge component against Tur-Pak.

---

[7] Many TVPRA cases discussing whether a defendant knew or should have known a venture was engaged in criminal activity arise in the sex-trafficking context. Those cases often involve victims suing a hotel and alleging that it knew or should have known the venture was committing sex trafficking crimes in the hotel. In those cases, no court has found the plaintiff must allege the hotel knew or had reason to know that the offense was perpetrated by force, threats of force, fraud, or coercion. *See, e.g., S.Y. v. Naples Hotel Co.*, 476 F.Supp.3d 1251, 1257 (M.D. Fla. August 5, 2020) (holding a hotel operator should have known about sexual abuse in the hotel when traffickers paid with cash, men visited those rooms without any luggage, and older men escorted younger women around the hotel).

[8] I reached a different conclusion as to this claim, and certain others addressed in this order, in my recent ruling in a similar case. *See Bucco v. Western Iowa Tech Comm. College*, No. C21-4001-LTS, 2022 WL 605801 (N.D. Iowa March 1, 2022). All such differences in outcomes are the result of the different factual allegations present in the two cases.

Next, Tur-Pak argues there are no allegations to suggest it knew or should have known the means by which the venture obtained labor. Doc. 142 at 11. The TAC alleges:

> 142. Supervisors at Tur-Pak commented to Plaintiffs that he did not understand why Plaintiffs were working at Tur-Pak since the work had nothing to do with culinary arts or robotics. Doc. 93 at 35.
>
> 348. Fernando was involved with conversations with supervisors at Tur-Pak wherein the supervisors made comments that work for Tur-Pak did not include any educational aspect relating to culinary arts or robotics. Doc. 93 at 61.
>
> 642. Nestor was involved in many conversations at Tur-Pak where co-workers would express disbelief about how much less Nestor and the other Plaintiffs were making compared to the rest of the employees. Co-workers also expressed confusion to Nestor about why Plaintiffs were working at Tur-Pak when they were supposed to be studying culinary arts and robotics. Doc. 93 at 100.

These alleged facts are sufficient, at this stage, to support an inference that Tur-Pak knew or should have known the means by which the other defendants obtained the labor. As with Royal Canin, plaintiffs allege that employees and supervisors at Tur-Pak knew they were supposed to be working at internships in the culinary arts and robotics, but instead were working long hours at jobs that did not align with their studies. Tur-Pak is not entitled to dismissal on this count.

### 2. Count 1: Trafficking – 18 U.S.C. § 1590

#### a. Legal standards

Section 1590 provides:

> (a) Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

Violations of this section require at least one predicate violation of the forced labor statute, which I have found the plaintiffs sufficiently alleged. Therefore, I will now consider plaintiffs' trafficking allegations.

24

As with the forced labor statute, a defendant may be guilty under a perpetrator theory or a beneficiary theory. The beneficiary theory of liability originates in 18 U.S.C. § 1595, which allows a victim to bring a claim against "whoever knowingly benefits . . . from participation in a venture which that person knew or should have known" was engaged in a violation of Section 1590(a). Therefore, under the beneficiary theory a plaintiff must plausibly allege the defendants knowingly benefitted from participating in a venture they knew or should have known engaged in human trafficking.

### b.    WITCC defendants

The WITCC defendants' only argument as to Count 1 is that plaintiffs have not sufficiently alleged a predicate violation of the forced labor statute. *See* Doc. 114. Because I have found that the TAC sets forth a plausible claim that the WITCC defendants violated the forced labor statute, they are not entitled to dismissal on this basis.

### c.    J&L defendants

The J&L defendants argue that plaintiffs have not sufficiently alleged a trafficking violation against them. Specifically, they contend that the allegations do not demonstrate that the J&L defendants knew or should have known plaintiffs would be working in circumstances that violated the TVPRA, either when they assisted in recruiting plaintiffs or when they benefited from the program. Doc. 113 at 15. Plaintiffs counter that the J&L defendants were part of the scheme to fraudulently induce them to enter the J-1 program and that this satisfies the knowledge requirement.

The TAC alleges that the J-1 program at issue was largely a partnership between WITCC and J&L. WITCC and J&L worked together to find a way to fund the program. Doc. 93 at ¶ 65. J&L was tasked with finding employment opportunities for the plaintiffs. *Id.* at ¶ 66. The J&L defendants traveled with the WITCC defendants to Chile to recruit students and gave presentations about the program. *Id.* at ¶¶ 76, 181. The TAC alleges that the J&L defendants asked plaintiffs to perform strength tests during

25

their interviews, which was at odds with the representations the WITCC defendants were making about the program.  Doc. 93 at ¶¶ 234, 294, 424, 464, 632, 510.  During the interviews, the J&L defendants acted somewhat bizarrely, presenting a $100 bill and telling one plaintiff, "If [the plaintiffs] wanted that money, they should work hard for her."  *Id.* at ¶¶ 293, 475, 633.  After the plaintiffs arrived in the United States, the J&L defendants repeatedly threatened to deport any plaintiffs who did not work at Tur-Pak or Royal Canin.  Meanwhile, J&L received a portion of plaintiffs' paychecks.

At this stage, the question is whether plaintiffs have alleged sufficient facts to put the defendants on notice and to proceed, and a state of mind may be alleged generally.  I find plaintiffs have sufficiently alleged a trafficking claim against the J&L defendants under both a perpetrator theory and a beneficiary theory.  First, plaintiffs have alleged enough facts to suggest it is plausible the J&L defendants knew they were being recruited or transported to perform forced labor.  Second, plaintiffs have sufficiently alleged the J&L defendants benefitted from WITCC's trafficking of the plaintiffs, and they knew or should have known plaintiffs were recruited or transported to perform forced labor.  The J&L defendants are not entitled to dismissal of this claim.

### d.    *Royal Canin and Tur-Pak*

Royal Canin and Tur-Pak both argue that the TAC does not sufficiently allege that they knew or should have known plaintiffs had been transported to perform forced labor. Royal Canin also argues plaintiffs are simply attempting to repackage their forced labor claims as trafficking claims.  Doc. 142 at 6.  Plaintiffs argue that they have alleged sufficient facts to suggest, at minimum, that Royal Canin and Tur-Pak acted with reckless disregard of the fact that they were benefitting from a human trafficking venture.  Doc. 129 at 11-12.

I have found that the TAC sufficiently alleges that Royal Canin and Tur-Pak knew or should have known plaintiffs were performing forced labor and benefitted from that labor.  Additionally, plaintiffs have alleged Royal Canin and Tur-Pak knew they had been

transported from Chile to participate in the program. Doc. 93 at ¶ 69. Therefore, plaintiffs have sufficiently alleged both Royal Canin and Tur-Pak may be liable for human trafficking under the beneficiary theory of liability because it is plausible those defendants knowingly benefitted from participating in a venture they knew or should have known engaged in human trafficking.

Royal Canin's argument that plaintiffs are simply repackaging their forced labor claims misses the point. The forced labor statute and the trafficking statute are similar, but aim to punish different conduct, which often go hand in hand. *See Adia v. Grandeur Management Inc.*, 933 F.3d 89, 94 (2d Cir. 2019) ("[The plaintiff] alleges that when he was working in South Dakota, [the defendant] recruited him to come work for Grandeur . . . . This allegation is distinct from the forced labor allegations . . . . Therefore, if a defendant violates section 1589, he also violates section 1590 if he recruited the person to perform forced labor."). Plaintiffs have sufficiently alleged two distinct wrongs: (1) being forced to provide labor, and (2) being recruited and transported for that purpose, and that Royal Canin and Tur-Pak benefited from those wrongs. *See also Akhtar v. Vitamin Herbal Homeopathic Center Inc.*, No. 19-CV-1422, 2021 WL 7186030 at *10 (E.D. NY April 30, 2021 ("Unlike . . . force labor claims, which focus on the illicit means of maintaining subjugation, trafficking claims under Section 1590 focus on how a victim was initially subjugated.")

### 3. Count 3: Peonage – 18 U.S.C. § 1591

#### a. Legal standards

Section 1581 provides

(a) Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both.

The Eighth Circuit has summarized the law concerning peonage as follows:

27

> Peonage is 'compulsory service in payment of a debt.' *Bailey v. Alabama*, 219 U.S. 219, 242 (1911). '[C]ompulsory service' is the equivalent of 'involuntary servitude,' *id.* at 243, which the Supreme Court has defined as 'a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process.' *United States v. Kozminski*, 487 U.S. 931, 952 (1988). Thus, in order to prove peonage, the government must show that the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force. *See id.* at 952-53. In determining whether 'physical or legal coercion or threats thereof could plausibly have compelled the victim to serve,' the jury is entitled to consider 'evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities.'

*United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009). Again, under § 1595 a defendant may be guilty under a perpetrator theory or a beneficiary theory. Plaintiffs argue the WITCC defendants and the J&L defendants are liable under a perpetrator theory while Royal Canin and Tur-Pak are liable under a beneficiary theory.

### b.     WITCC defendants

The WITCC defendants argue that plaintiffs have not alleged they owed the WITCC defendants a specific debt, nor that the WITCC defendants subjected the plaintiffs to compulsory service through force, legal coercion, or a threat of either. Doc. 114 at 22-23. Instead, the WITCC defendants argue that the alleged "debts" (such as the costs of tuition or housing) are "effectively the terms and conditions of a program they knowingly and willfully entered." Doc. 114 at 22. The WITCC defendants cite no cases suggesting that the debts at issue must be improperly tendered or otherwise illegitimate. I find the costs of housing or tuition may serve as a debt for the purposes of peonage.

Secondly, the WITCC defendants argue that plaintiffs were not subject to threats of legal coercion simply because they were "inform[ed] or remind[ed] . . . of the consequences for failing to comply with the terms of the program." Doc. 114 at 23.

However, I have found that a threat of deportation may amount to legal coercion. *See United States v. Kozminski*, 487 U.S. 931, 948 (1988) ("threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude."). Plaintiffs allege that the WITCC Defendants threatened them with deportation. *See* Doc. 93 at ¶¶ 136, 151, 204, 248, 282, 304, 310, 347, 392, 407, 437, 484, 531, 544, 597. Plaintiffs have sufficiently stated a claim of peonage under § 1581 as to the WITCC Defendants.

### c.    *J&L defendants*

The J&L defendants argue that plaintiffs have not sufficiently alleged a peonage claim because they have not demonstrated that they owed J&L a debt. Doc. 113 at 14. Instead, the J&L defendants argue, the plaintiffs owed a debt to WITCC. *Id.* However, I recently held in *Bucco v. Western Iowa Tech Comm. College*, No. C21-4001-LTS, 2022 WL 605801 (N.D. Iowa March 1, 2022), that § 1581 does not require that the alleged debt must be owed to the defendant. *See Bailey v. Alabama*, 219 U.S. 219, 242 (1911) (defining peonage as "compulsory service in payment of a debt."). Plaintiffs sufficiently allege that the J&L defendants' coercion was aimed at the same alleged "debt" plaintiffs believed they owed to WITCC. In the absence of any other argument from the J&L defendants, plaintiffs have sufficiently alleged a claim of peonage against them.

### d.    *Royal Canin and Tur-Pak*

Royal Canin and Tur-Pak argue (1) plaintiffs never owed them a debt, and (2) neither defendant subjected plaintiffs to compulsory service through force, legal coercion, or a threat of either. These defendants further argue there are no facts to suggest they knew or should have known plaintiffs were subject to peonage. As previously discussed, plaintiffs allege supervisors and employees at both Royal Canin and Tur-Pak expressed confusion as to why plaintiffs were working in positions that were clearly unrelated to culinary arts and robotics. Further, both defendants knew more than half of each

plaintiff's pay was being diverted to WITCC. At Tur-Pak, employees expressed concern over how little money the plaintiffs made. Taking all inferences in favor of plaintiffs, the TAC sufficiently alleges Royal Canin and Tur-Pak are liable under a beneficiary theory of liability for peonage, as they benefited from plaintiffs' labor and it is plausible that they knew or should have known plaintiffs were being subjected to peonage.

## B. Counts 4: RICO – 18 U.S.C. § 1962

### 1. Legal standards

RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A civil claim under RICO requires plaintiffs to show that defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *H & Q Props. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (citations omitted). To establish a RICO conspiracy, plaintiffs must additionally prove that a defendant "objectively manifested an agreement to participate . . . in the affairs of [the] enterprise." *United States v. Darden*, 70 F.3d 1507, 1518 (8th Cir. 1995). The elements must be pleaded with respect to each defendant. *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008). Plaintiffs acknowledge their RICO claims are subject to the heightened pleading requirements under Rule 9(b). Because a RICO claim for one defendant necessarily implicates another, I will address the defendants' common arguments first and then arguments made by specific defendants.

### 2. Do plaintiffs plausibly allege an actionable RICO enterprise?

Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact requires: "(1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354 (8th Cir. 2011) (internal citation and quotations omitted). "In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering, we must determine if the enterprise would still exist were the predicate act removed from the equation." *Id.* at 354-55

The Eighth Circuit has declined to find a RICO enterprise when "[t]he only common factor that linked . . . the parties together and defined them as a distinct group was their direct or indirect participation in [the] scheme to defraud [the plaintiff]." *Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808, 815-16 (8th Cir. 1992). Without the alleged predicate acts, the association-in-fact enterprise "had no form or structure." *Id. See also Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1096-97 (N.D. Iowa 2005) ("As a matter of law, it is not sufficient that several organized, ongoing groups come together for one concerted action, unless those groups can also be shown to constitute a larger unit, over and above their separate structures and operations, and that this unit meets the [] criteria for an association-in-fact.").

Here, all defendants argue that plaintiffs have not sufficiently alleged an ascertainable structure separate from the pattern of racketeering. However, plaintiffs have alleged distinct relationships among the defendants independent of the scheme at hand. With regard to WITCC, plaintiffs allege "[u]pon information and belief, WITCC had previously advertised employment opportunities at Premier Services on its careers website. WITCC also employs a recruiting specialist who was previously a recruiter at J&L." Doc. 93 at 65. Further, WITCC's acceptance letters stated:

> You will have your training in an external environment provided by industries/partners that are served by our Corporate College, a division of Western Iowa Tech Community College. These companies send their employees to our Corporate College to acquire knowledge and training

31

when and if it is necessary, and they are willing to participate in this cultural interchange by allowing us to use their facilities and plants, and by providing us an experience and qualified employee to oversee your training together with your instructor.

Doc. 93 at ¶ 106. This suggests Royal Canin and Tur-Pak are "partners served by [WITCC's] corporate college." Therefore, plaintiffs have plausibly alleged the WITCC defendants were engaged in an association separate from their pattern of alleged racketeering. Further, the allegations sufficiently allege J&L had relationships with both Tur-Pak and Royal Canin distinct from the scheme, as the J&L defendants had provided temporary staffing services to both companies previously. Doc. 93 at ¶ 67-68. Plaintiffs have plausibly alleged that an enterprise still existed absent the scheme at hand.

### 3. Do the plaintiffs plausibly allege a pattern of racketeering activity?

"Racketeering activity" includes various indictable acts listed in Section 1962, including peonage, slavery, and human trafficking. A pattern of racketeering activity requires at least "two acts of racketeering activity" that amount to or pose a threat of continued criminal activity. *Craig Outdoor Advert., Inc.,* 528 F.3d at 1028. Such a pattern requires either "multiple predicate acts occurring over a substantial period of time (closed-ended continuity)" or "predicate acts [that] threaten to extend into the future (open-ended continuity)." *Crest II,* 660 F.3d at 356 (internal citation and quotations omitted. A "substantial period of time" for closed-ended continuity is defined as "a period of time lasting at least one year." *United States v. Hively,* 437 F.3d 752, 761 (8th Cir. 2006). All defendants claim the plaintiffs cannot credibly allege a pattern of racketeering through either closed-end or open-ended continuity. Plaintiffs argue they have sufficiently alleged racketeering activity, as they allege all defendants engaged in racketeering acts including, but not limited to, violations of 18 U.S.C. §§ 1581-1592, 18 U.S.C. § 1546 and fraud among others, from an unknown date in 2018 or early 2019, when the WITCC defendants began to utilize the J-1 program, to its end in March 2020. Doc. 93 at ¶¶ 63, 163.

Plaintiffs' allegations against each defendant suffer the same deficiency. It is not clear that *each defendant's* alleged *racketeering* activities took place over a year's time. For instance, plaintiffs generally allege the racketeering activity began in 2018 or early 2019, when WITCC sought authorization to participate in a J-1 visa program, but they have not specified how that initial act amounted to *racketeering* activity. Nor have they alleged facts indicating how that initial act implicates the other defendants, such that their racketeering activities also began at that time. Plaintiffs seemingly argue all defendants participated in a fraudulent venture to bring the plaintiffs to the United States, which began when WITCC sought authorization from the federal government, but plaintiffs do not specify which indictable offenses (if any) each defendant committed at that time.

In short, plaintiffs' allegations of a "fraudulent venture" are too vague to put the defendants on notice as to what racketeering activities plaintiffs allege the defendants participated in as early as February or March 2019. For instance, plaintiffs do not specify whether they are referring to § 1028 (relating to fraud and related activity in connection with identification documents), § 1341 (relating to mail fraud), § 1343 (relating to wire fraud), § 1351 (relating to fraud in foreign labor contracting) or § 1952 (relating to racketeering). This flaw exists with regard to all defendants.

Further, plaintiffs have failed to allege that the predicate acts were the "regular way of conducting an ongoing legitimate business or RICO enterprise" that could constitute open-ended continuity. *See Crest II*, 660 F.3d at 358. The J-1 program ended in March 2020 and no facts suggest a threat of continued criminal activity. Plaintiffs have not alleged a larger or ongoing scheme to continuously recruit J-1 visa holders and place them at Royal Canin or Tur-Pak. Their allegations are limited to a single program, which has ended, with no allegations suggesting its return. For these reasons, plaintiffs have not plausibly alleged a pattern of racketeering against any defendant.[9]

[9] The WITCC defendants also allege plaintiffs lack statutory standing because they cannot show (1) they suffered an injury to their business or property (2) by reason of the alleged RICO

### 4. Do the plaintiffs plausibly allege WITCC is subject to RICO?

The WITCC defendants argue that WITCC is a not a "person" subject to RICO. Doc. 143 at 11. Under the RICO statute, a person "includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Because I have found that plaintiffs have not plausibly alleged a pattern of racketeering against any defendant, I need not address this alternative argument.

### C. Count 5: RICO Conspiracy

To state a claim of RICO conspiracy, plaintiffs must sufficiently allege the elements of a RICO violation. Because I have found that plaintiffs failed to sufficiently allege a RICO violation, the plaintiffs have failed to allege a RICO conspiracy as to all defendants.

### D. Count 6: Violation of the Thirteenth Amendment

The Thirteenth Amendment to the United States Constitution states:

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have the power to enforce this article by appropriate legislation.

---

violations because their only injuries are "unfulfilled expectations." *See* Doc. 114 at 29 (citing *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012)). In response, plaintiffs argue that their injuries included improperly deducted wages (Doc. 93 at ¶ 128) and out-of-pocket costs for room and board. *Id.* at ¶¶ 120, 133. Further, plaintiffs allege various facts indicating that individual plaintiffs quit jobs, delayed opportunities, sold their personal effects or otherwise paid out-of-pocket costs to take part in the program. *See* Doc. 130 at 36 (citing Doc. 83 at ¶¶ 173-75, 242-43, 262, 321, 429-30, 529). However, because the statute requires the injuries be related to the RICO violations, and plaintiffs have failed to sufficiently allege a RICO claim against all defendants, it follows that they do not have RICO standing.

U.S. Const. amend. XIII. The Supreme Court has held the Thirteenth Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil Rights Cases*, 109 U.S. 3, 20 (1883).

All defendants argue that the Thirteenth Amendment does not allow for a private right of action. Plaintiffs argue 18 U.S.C. § 1584 provides them a vehicle to bring a Thirteenth Amendment claim. Notably, however, the plaintiffs do not allege a violation of any enabling statutes or refer to § 1584 in the TAC. This court has held,[10] in conformity with most federal courts,[11] that the Thirteenth Amendment does not afford a private right of action. I agree. Count 6 fails as to all defendants.

### E. Count 7: Fraud

#### 1. Legal standards

Fraudulent misrepresentation requires proof of: (1) a representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury. *See* Smidt v. Porter, 695 N.W.2d 9, 22 (Iowa 2005). Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This means a plaintiff must identify the "who, what, when, where, and how: the first paragraph of any newspaper story." *See Great Plains Trust Co. v. Union Pac. R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), cert. denied, 498

---

[10] *See, e.g., Goss v. Stream Global Services, Inc.*, No. C14–4033–MWB, 2015 WL 1268192 (N.D. Iowa, March 19, 2015); *Getachew v. West Side Transport, Inc.*, No. 13–CV–97–LRR, 2013 WL 6222715 (N.D. Iowa Nov. 29, 2013).

[11] *See John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 997 (S.D. Ind. 2007) (listing cases in which courts have found no implied right of action under the Thirteenth Amendment).

U.S. 941 (1990)). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (quoting *Commercial Property Invs. Inc. v. Quality Inns Int'l Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)). "[O]ne of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud." *Commercial Property Investments, Inc., Quality Inns Intern., Inc.*, 61 F.3d 639, 644 (8th Cir. 1995).

### 2.    *WITCC defendants*

The WITCC defendants argue that plaintiffs have failed to allege facts to suggest any intent to deceive. *See* Doc. 143 at 17.[12] Plaintiffs argue that the WITCC defendants promised "a free course of study resulting in an associate's degree, an internship related to their field of study, free room, board and meals, and travel to the United States to participate in culinary exchange," but failed to deliver on these promises, which sufficiently alleges fraud.  Doc. 130 at 40-41.  Further, plaintiffs argue the WITCC defendants represented the program to the State Department differently than they did to the plaintiffs, which further supports that WITCC defendants knew their statements to the plaintiffs were false and fraudulent.  Doc. 130 at 40.

The federal rules allow "malice, intent, knowledge, and other conditions of a person's mind" to be alleged "generally."  Fed. R. Civ. P. 9(b).  During recruitment, the WITCC defendants promised the plaintiffs an internship "related to robotics or culinary experience," as a part of their J-1 program experience.  Doc. 93 at ¶ 79.  However, WITCC instructed plaintiffs not to discuss their employment or J&L during

---

[12] The WITCC defendants also argue that plaintiffs have not alleged fraudulent misrepresentation with any particularity, instead grouping all defendants' actions together.  Doc. 114 at 32-33.  This argument is not at all persuasive.  The TAC alleges a multitude of specific actions and false statements attributed to the WITCC defendants.  *See* Doc. 93 at ¶¶ 100, 103-10.

36

their visa interviews, suggesting they knew they would not provide the type of internship contemplated by the J-1 program. Doc. 93 at 297. For instance:

> 299. The WITCC Defendants prepped David for his interview, explaining he had to tell the consular office that he was only coming to the United States for one year, and that he was coming to study, not to work.

> 468. Eduardo was instructed by Defendants Burright and Espinoza on what to say to the Department of State during the visa interview, specifically, he was told he could not tell the embassy he was coming to work, not to mention J&L, and to say that the only work[-]related thing that he would do would be the "internship," or "professional practice."

At the same time the defendants were recruiting plaintiffs, they entered into an agreement with Royal Canin and Tur-Pak, suggesting the WITCC defendants to place plaintiffs in unskilled, manual labor positions, contrary to what they were telling plaintiffs. The WITCC defendants even admitted in an email the purpose of the program was to address the local labor shortage. Doc. 93 at ¶ 92 ("At any moment, we are [not] allowed to mention that the reason for J1 paid internship is the lack of workers in the area, even when indeed there is a need for workers."). Plaintiffs have sufficiently alleged scienter as against the WITCC defendants.

### 3.    *J&L defendants*

The J&L defendants argue that plaintiffs do not allege any false representations attributable to J&L. Doc. 139 at 14. The TAC alleges:

> 76. The WITCC Defendants and the J&L defendants all traveled to Chile to meet with the Chilean Defendants, as well as meet the Plaintiffs, their targeted recruits, in April 2019.

> 77. These Defendants specifically told the Plaintiffs, and others, they would be able to earn a two-year degree in either a culinary arts or robotics program at WITCC along with an internship experience that would improve their chances of furthering their careers.

> 506. In April of 2019, Carilyns was asked to attend a meeting at a hotel in Chile to learn more about the program.

37

507. Defendants Albrecht, Murrell, Rojas, Espinosa, Castro, Alberts, and Burright attended, among others.

508. These defendants addressed the prospective students and spoke in English. Defendant Murrell cited the need for English proficiency as a reason.

509. The defendants explained the program would be a paid internship. Carilyns, and the other prospective students, were advised they would not have to pay anything to participate in the WITCC J-1 visa program.

511. Although the WITCC J-1 visa program advertised internships in robotics or culinary arts, the defendants led Carilyns to believe she could pursue other areas of study once she arrived in the United States. The defendants also promised Carilyns her tuition and education would be paid through a scholarship, she would receive free airfare to the United States, Defendant J&L would place her in employment related to her field of study, WITCC would arrange and pay for the visa application, WITCC would pay her health insurance, and WITCC would provide her free meal service and housing for two years.

To demonstrate falsity and scienter, plaintiffs allege J&L directed many of them to complete strength tests during their interviews, which suggests J&L knew the plaintiffs would not be participating in an internship in their fields of study, but rather, the unskilled labor the plaintiffs ultimately performed. Doc. 93 at ¶¶ 234, 294, 424, 464, 510, 632. Further, J&L arranged plaintiffs' employment at Royal Canin and Tur-Pak, further bolstering the allegation that they knew plaintiffs would not be performing work related to their fields of study. Plaintiffs have also sufficiently alleged that the representations were material and plaintiffs justifiably relied on them. *See* Doc. 93. Defendants' motions to dismiss Count 7 will be denied.

F.    *Count 8: Breach of Contract*

To prevail on a breach of contract claim, a plaintiff must prove:

(1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [the claimant] has performed all the terms and conditions required under the contract, (4) the [opposing party's] breach of the contract in some

38

particular way, and (5) that [the claimant] has suffered damages as a result of [the opposing party's] breach.

*Royal Indem. Co. v. Factor Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). The WITCC defendants argue that plaintiffs have failed to "sufficiently identify any specific contract or provisions of a contract with the WITCC Defendants that the WITCC Defendants allegedly briefed." Doc. 114 at 136. Plaintiffs allege contracts between themselves and the WITCC Defendants that included the following provisions:

- A scholarship to provide a two-year Associate's degree in robotics or culinary arts,
- Intensive ESL classes,
- A scholarship to pay for housing on campus and
- Up to $1,000 to pay for travel to the United States

Doc. 93 at ¶ 80. Plaintiffs allege the contracts, delivered via "open letters" to them, informed potential J-1 Visa students they would be required to work up to 35 hours per week. *Id.* at ¶ 81. Further, the TAC alleges the WITCC defendants promised plaintiffs an internship related to "robotics or culinary expertise." Doc. 93 at ¶ 79.

Plaintiffs allege they were not provided with free tuition (Doc. 93 at ¶ 119), free room and board (*Id.* at ¶ 120) or ESL courses (*Id.* at ¶ 121). They further allege their internships were not related to their fields of study, nor did they include an educational component in line with an internship. *Id.* at ¶ 125-26. Plaintiffs allege they worked more than 35 hours per week and, ultimately, that the WITCC defendants terminated the program before they could earn a degree. *Id.* at ¶¶ 157, 272, 304, 446, 535, 620, 648. Plaintiffs allege damages based on the fact that they did not receive the education or professional skills promised to them, they suffered physical and mental anguish, and incurred financial losses. *See* Doc. 93. These allegations are sufficient to state a plausible claim for breach of contract against the WITCC defendants.

39

### G.  Count 9: Intentional Infliction of Emotional Distress

#### 1.  Legal standards

A plaintiff must prove the following elements to prevail on a claim of intentional[13] infliction of emotional distress under Iowa law:

(1)  outrageous conduct by the defendant;

(2)  the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress;

(3)  plaintiff suffered severe or extreme emotional distress; and

(4)  the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (quoting *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)).  Outrageous conduct is conduct that is "so extreme in degree as to go beyond all possible bounds of decency" and is "regarded atrocious, and utterly intolerable in a civilized community."  *Id.*  "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!"  *Smith v. Iowa State University of Sci. and Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156-57 (Iowa 1996)).  "[I]t is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous."  *Smith*, 851 N.W.2d at 26 (quoting *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118-19 (Iowa 1984)).  "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."  *Id.* (quoting Restatement (Second) of Torts § 46, cmt. *h*, at 77 (1965)).

---

[13] *See Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985) (noting that while Iowa cases refer to this claim as an "intentional infliction of emotional distress," neither the Restatement nor Iowa case law requires proof of an intentional act; a "reckless disregard of the probability of causing" emotional distress is enough).

Extreme emotional distress requires a plaintiff to "establish more than the fact that they felt bad for a period of time." *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 71 (Iowa 2002) (internal quotation marks and citation omitted). There must be "direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct." *Smith*, 851 N.W.2d at 30 (internal quotation marks and citation omitted). *Compare Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 855-60 (Iowa 1973) (describing abdominal pains and cramps, losing 40 pounds, receiving medication for her nerves, multiple breakdowns and vomiting in public as sufficient evidence to generate a jury question) *with Pousen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981) (evidence that plaintiff "was very, very down," "was feeling super badly" and "felt he lost everything" during a month or two-month time period was insufficient evidence of extreme emotional distress).

"When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable." *Smith*, 851 N.W.2d at 26 (quoting *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990)). In determining whether conduct is outrageous "the court should consider the relationship between the parties" such as whether the conduct arises "from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Vinson*, 360 N.W.2d at 118 (quoting Restatement (Second) of Torts § 46, comment e (1965)). "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Id.*

### 2.     *WITCC defendants and J&L defendants*

The plaintiffs cite the same alleged facts as against both the WITCC defendants and the J&L defendants to show they suffered from emotional distress. However, many

41

of these examples of alleged emotional distress are tied to their working conditions, which (1) were not at the control of either the WITCC defendants or the J&L defendants, and 2) do not amount to "outrageous" conduct. *See* Doc. 93 at ¶ 201 (exhaustion from carrying boxes); ¶482 (anxiety from the pace of the job); ¶ 488 (the stress of the job); ¶ 595 (exhaustion from work and school); ¶ 621 (leg pain and tremors from long hours and a grueling schedule). Many other examples of alleged emotional distress are vaguely attributed to plaintiffs' "experiences" and are not tied to any specific act of "outrageous conduct" by the WITCC Defendants or the J&L defendants, or the allegations are conclusory. Doc. 93 at ¶ 251 ("The struggles the Defendants forced Natalia to endure led to her begging for money, becoming alienated from her family, and deeply depressed and dehumanized.); ¶ 499 ("Eduardo continues to suffer mentally and emotionally as a result of the Defendants' actions."); ¶ 541 ("Carilyns has sustained considerable economic, physical, and emotional damages associated with the Defendants' scheme."); ¶ 558 ("Gonzalo fears returning to his home country, worried that he will face stigma and repercussions for telling his story to United States authorities."); ¶ 559 ("Moreover, Gonzalo worked extremely hard to create a successful life for himself as a nurse in Chile. He left that security behind, selling all his belongings, to pursue his dreams. Due to the victimization Gonzalo suffered at WITCC, he lost everything."); ¶ 560 ("The trauma and abuse he experienced forced Gonzalo to seek out counseling services to assist him in dealing with the psychological turmoil, fear, and stress he faces in the aftermath of his experience."); ¶ 561 ("Gonzalo is currently receiving counseling and takes medication for . . . . his experience as a whole."); ¶ 658 ("Nestor sustained considerable economic, physical, and emotional damages associated with the Defendants' scheme.").

However, two of the allegations are more meritorious. The TAC alleges:

410. Claudio has experienced real harm from his time in the United States, being trafficked by WITCC, J&L, Tur-Pak, and their employees. He has a hard time sleeping and has nightmares that the recruiters will do something to his family, or deport him to keep him from testifying. He has severe anxiety due to his treatment and exploitation. This makes it hard for

42

him to complete daily tasks.  He has also lost a significant amount of weight due to stress.  He needs ongoing psychological assistance and counseling to overcome the severe abuse he received.

455-56.  Alejandro has suffered physical and psychological harm as a result of being trafficked.  Alejandro struggles to sleep, and often cannot fall asleep until 5 or 6 a.m.  He is only able to sleep for four hours before the anxiety wakes him up again.

The issue is whether trafficking alone constitutes "outrageous conduct," as plaintiffs sufficiently allege more than "feeling bad" for a period of time.  Criminal intent is not sufficient to demonstrate outrageous conduct.  However, I am to consider the relationship between the parties, and this is no ordinary employer-employee dispute.  Plaintiffs were effectively at the mercy of the WITCC and the J&L defendants upon entering the United States.  They were far removed from their homes and families, with some of them in need of English proficiency classes.  Further, human trafficking is not a typical crime. One court has found that once a plaintiff plausibly alleged human trafficking, any arguments that the defendants did not engage in outrageous conduct were "meritless" and on the verge of "frivolousness."  *Franco v. Diaz*, 51 F.Supp.3d 235, 247 (E.D.N.Y. 2014).  I agree.  Plaintiffs have sufficiently alleged both the WITCC defendants and the J&L defendants engaged in human trafficking.  Such conduct, if it occurred, is sufficient to support the "outrageous conduct" element of an intentional infliction of emotional distress claim.  This claim may proceed against the WITCC defendants and the J&L defendants.

### 3.     *Royal Canin and Tur-Pak*

Royal Canin and Tur-Pak argue the plaintiffs have not alleged that any of their conduct is "outrageous."   Plaintiffs argue that Royal Canin engaged in outrageous conduct when it (1) fired Karla Norambuena for one absence, (2) refused to transfer a plaintiff to a different position, despite his workplace injury, (3) trafficked the plaintiffs (4) and provided horrendous working conditions.  *See* Doc. 128 at 38-39.  Plaintiffs argue

43

that Tur-Pak engaged in outrageous conduct when it (1) discouraged one plaintiff from seeing the doctor after an injury, (2) forcing plaintiffs to work with "former convicts and drug addicts," (3) allowed one plaintiff to be assaulted at work and (4) required plaintiffs to stand for many hours and use the restroom only when given permission." Doc. 129 at 37-38.

Among these allegations, trafficking is the only conduct that could meet the standard of outrageous conduct under Iowa law. *See, e.g., Hedlund v. State*, 930 N.W.2d 707, 724 (Iowa 2019) ("The standard of outrageous conduct is not easily met, especially in employment cases . . . We have said the outrageous conduct must be extremely egregious; mere insults, bad manners, or hurt feelings are insufficient.") (internal citations and quotation marks omitted). For instance, while one plaintiff was assaulted at work and alleges that the employer took no remedial action, the TAC provides no details to suggest that the employer's response to the assault was outrageous.

As for trafficking, while plaintiffs have alleged Royal Canin may have benefited from participation in a venture it knew or should have known engaged in human trafficking, they have not alleged facts indicating that Royal Canin actually trafficked the plaintiffs. Because the TAC does not provide sufficient information to state a plausible claim that either Royal Canin or Tur-Pak engaged in outrageous conduct, Count 9 will be dismissed as against those defendants.

### H.     *Count 10: Violations of the Iowa Wage Payment Collection Law*

Plaintiffs allege a violation of the IWPCL against Tur-Pak and J&L. Iowa Code § 91A.5 provides: "an employer shall not withhold or divert any portion of an employee's wages" unless certain exceptions apply. The IWPCL provides that employer means "a person, as defined in chapter 4, who in this state employs for wages a natural person." Iowa Code § 91A.2. According to the Iowa Supreme Court, to employ means to

> To engage in one's service; to hire; to use as an agent or substitute in
> transacting business; to commission and intrust with the performance of

certain acts or functions or with the management of one's affairs; … the term is equivalent to hiring, which implies a request and a contract for a compensation. To make use of, to keep at work, to entrust with some duty.

*Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 5854 (Iowa 2002) (quoting Black's Law Dictionary 362 (abridged 6th ed. 1991) (internal quotation marks omitted).

While J&L does not seek dismissal of Count 10, Tur-Pak argues that this claim must be dismissed as against it because Tur-Pak was not an "employer" under Iowa law. Tur-Pak argues "[p]laintiffs do not plead how Tur-Pak actually acted as their employer beyond confirming that they performed work in Tur-Pak's facilities."

Plaintiffs claim, without support, in their Response that Tur-Pak "knew" J&L and/or WITCC were allegedly withholding portions of the money paid by Tur-Pak to J&L for the services of Plaintiffs working in Tur-Pak's facility. This is insufficient to create the employment nexus to sustain this claim even by Plaintiffs' own allegations, as Plaintiffs do not allege that Tur-Pak actually withheld anything nor that they paid Plaintiffs directly nor that they were involved in any way in hiring Plaintiffs or directing the employment relationship in any way. These allegations are the same vague shotgun pleading that Plaintiffs engage in elsewhere and is not sufficient to avoid dismissal of this claim.

Doc. 141 at 7-8. Tur-Pak paid $15 per hour for plaintiffs' labor at Tur-Pak's facility, which Tur-Pak directed to J&L. Doc. 93 at ¶ 69. At this stage of the case, these facts sufficiently allege (1) Tur-Pak acted as an employer and (2) it withheld a portion of plaintiffs' wages. Count 10 will proceed against both Tur-Pak and J&L.

## I.     *Count 11: Respondeat Superior*

Count 11 of the TAC purports to state a claim for respondeat superior. Respondeat superior is not a claim, but rather a theory of vicarious liability under which an employer may be held liable for the tortious actions of its employees. *See, e.g., Walderbach v. Archdiocese of Dubuque, Inc.*, 730 N.W.2d 198, 201 (Iowa 2007). Because Count 11 does not state an independent claim under Iowa law, it will be dismissed.

*J.      Should Plaintiffs be Granted Leave to Amend?*

The court has granted three requests by the plaintiffs to amend their initial complaint.   The first two requests (Docs. 29, 42) were for the purpose of adding plaintiffs, while the third request was to add factual allegations in response to the defendants' motions to dismiss.   *See* Docs. 29, 42, 77.  Tur-Pak, Royal Canin and the J&L defendants request that the claims against them be dismissed with prejudice and without leave to amend.  See Docs. 108 at 32; 112 at 23; 113 at 31-32.  Plaintiffs request leave to amend any claim in the event the court grants any of the four defendants' motions.  Doc. 127 at 35-36; Doc. 128 at 39-40; Doc. 129 at 40; Doc. 130 at 45-46.

The defendants collectively argue that the plaintiffs have been granted leave to amend multiple times and any other additional amendments would be futile.   Plaintiffs argue dismissal with prejudice is a drastic remedy and that justice requires they be allowed to amend their complaint again, as necessary.   Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and that "[t]he court should freely give leave when justice so requires."   In determining whether plaintiffs should be given leave to amend, I should consider:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance  to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan,* 978 F. Supp. 2d at 982.

Having considered these factors, and the procedural history of this case, I find that the plaintiffs have had ample opportunity to allege all available facts in support of their various claims.   I further find that permitting yet another amendment to bolster any defective claims would be futile.  As such, no further amendment will be permitted with regard to any claim that is dismissed as a result of this order.

## V.    CONCLUSION

For the reasons set forth herein, defendants' motions (Docs. 102, 106, 107, 112) to dismiss are **granted** in part and **denied** in part, as follows:

1.    The motions are **denied** as to Counts 1, 2, 3, 7, 8 and 9 (as against the WITCC defendants and J&L defendants) and 10 (as against Tur-Pak).  Those claims will proceed as currently set forth in the Third Amended Complaint (Doc. 93).

2.    The motions are **granted** as to Counts 4, 5, 6 and 11 (as against all defendants) and as to Count 9 (as against Royal Canin and Tur-Pak only).  Those claims are hereby **dismissed with prejudice**.


IT IS SO ORDERED.

**DATED** this 31st day of March, 2022.


_____
Leonard T. Strand, Chief Judge

47