# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

KARLA O'NELL NORAMBUENA, et al.,

      Plaintiffs,

vs.

WESTERN IOWA TECH COMMUNITY COLLEGE, et al.,

      Defendants.

No.  C20-4054-LTS

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

This case is before me on a motion (Doc. 261) for summary judgment by defendants Premier Service Inc., d/b/a J&L Enterprises, also d/b/a J&L Staffing and Recruiting, Inc. (J&L), and Nancy Albrecht (Nancy).[1]  Plaintiffs have filed a resistance (Doc. 285) and the J&L Defendants have filed a reply (Doc. 293).  Plaintiffs also amended their resistance materials with the court's permission (Docs. 304, 317) and J&L submitted amended responses to these materials.  Docs. 308, 316, 321.  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.    PROCEDURAL HISTORY

Fourteen named plaintiffs commenced this action by filing a complaint (Doc. 1) and jury demand in this court on November 25, 2020.  On March 31, 2022, I entered an

---

[1] Throughout this order, I will use "the J&L Defendants" to refer collectively to J&L and Nancy, when appropriate.  In addition, while my typical practice is to refer to individuals by their last names, the parties refer to several individuals involved in this case by their first names throughout their filings.  This appears to be to maintain consistency with the extensive discovery record, which refers to many individuals almost exclusively by their first names.  To avoid confusion, I will similarly use first names.

order (Doc. 157) that granted in part and denied in part the J&L Defendants' partial motion (Doc. 102) to dismiss the third amended complaint (TAC) (Doc. 93).[2]  Doc. 157. The following claims remain against the J&L Defendants:[3]

- Count I – Violations of 18 U.S.C. §§ 1590 and 1595 – Human Trafficking;
- Count II – Violations of 18 U.S.C. § 1589 – Forced Labor;
- Count III – Violations of 18 U.S.C. §§ 1581 and 1595 – Peonage;
- Count VII – Fraudulent Misrepresentation; and
- Count IX – Intentional Infliction of Emotional Distress.

The J&L Defendants seek summary judgment on all remaining counts.  Trial is scheduled to begin January 5, 2026.

## III.  SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus,

---

[2] The TAC also included claims against Western Iowa Tech Community College (WITCC), Terry Yi, Rosana Salgado, Juline Albert, Terry Murrell, James Zuercher, Lilly Castro, Carlos Espinoza, Soledad Rojas, Jorge Arcos, Cristian San Martin Matta, Tur-Pak Foods, Inc. (Tur-Pak) and Royal Canin USA Inc. (Royal Canin).  These defendants have been dismissed from the case pursuant to various settlements.  Docs. 300, 311, 322.  Only the J&L Defendants remain.

[3] In the TAC, plaintiff Carilyns Jorquera does not plead any of the remaining counts against the J&L Defendants.  Doc. 93 at 103, 105, 107, 116, 119  Because none of the defendants against whom Jorquera brought her claims remain part of this case, she will be dismissed as a plaintiff. Another named plaintiff, Catalina Noemi Rivas Morales, was previously dismissed.  Doc. 224. This order will address the remaining claims brought by the remaining 12 plaintiffs.

2

"the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences

3

that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV. ADMISSIBILITY OF PLAINTIFFS' EVIDENCE

As a preliminary matter, in their response to plaintiffs' amended statement of additional facts, the J&L Defendants object to over 250 of plaintiffs' asserted facts because they claim that plaintiffs failed to cite to testimony or evidence authenticating cited documents, thus making those documents inadmissible. *See, e.g.*, Doc. 321 at 29 ¶ 111 ("Disputed because Plaintiffs fail to cite any testimony authenticating the document, meaning it is inadmissible."). After reviewing the challenged evidence, I find that considering that evidence is proper for purposes of addressing this summary judgment motion. A vast majority of the documents the J&L Defendants claim have not been properly authenticated were produced in discovery either by J&L or its co-defendants. *See, e.g.*, Doc. 321 at 46 ¶ 164 (disputing authenticity of Plaintiff Exhibit 53 (Doc. 285-7 at 17-18), which contains Bates number DEFWITCC003407, indicating that this piece of evidence was produced by WITCC in discovery). "Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent." *Corelink v. Phygen*, LLC, No. 4:13-CV-1842, 2014 WL 7140442 at *2 (E.D. Mo. Dec. 12, 2014) (quoting *Anand v. BP W. Coast Products LLC*, 484 F. Supp. 2d 1086, 1092 (C.D. Cal. 2007)); *Walsh v. Fusion Japanese Steakhouse, Inc.*, 585 F. Supp. 3d 766, 780-81 (W.D. Pa. 2022); *Jones v. Chapman*, Civil No. ELH-14-2627, 2017 WL 1546432 at *3, (D. Md. Apr. 28, 2017) ("Defendants 'cannot have it both ways. They cannot voluntarily produce documents and implicitly represent their authenticity and then contend they

4

cannot be used by the Plaintiffs because the authenticity is lacking.'"); 31 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 7105 (2d ed.) ("Authentication can ... be accomplished through judicial admissions such as ... production of items in response to [a] discovery request.").

Further, "when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002). I also note that the J&L Defendants do not appear to be challenging the actual authenticity of the offered documents, but rather argue that the documents should not be admissible because of plaintiffs' alleged failure to properly authenticate them.

> [C]ourts in the past have frowned upon mere pro forma objections based on authenticity without any indication that the evidence may not in fact be genuine." *Quinn v. Wexford Health Sources, Inc.*, No. 3:17-CV-00669-NJR, 2020 WL 888048, at *2 (S.D. Ill. Feb. 24, 2020) (declining to strike prison medical records in the absence of actual doubt as to their authenticity), *aff'd*, 8 F.4th 557 (7th Cir. 2021).

*Montoya v. Mitchell*, No. 1:17-cv-01796, 2024 WL 1328799, at *3 (N.D. Ill. Mar. 28, 2024); *see also Gannon Intern., Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) ("[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form. See Rule 56(c)(2).").

With this guidance in mind, the J&L Defendants' arguments regarding the admissibility of plaintiffs' documents are unavailing for two reasons. First, it is not clear that plaintiffs have actually failed to authenticate the documents cited in their statement of additional facts. Both the original appendix and the amended appendix are accompanied by a declaration of counsel in compliance with Eighth Circuit authentication requirements. Doc. 285-22 at 37-61; Doc. 308-1 at 33-38; *Stuart v. General Motors Corp.*, 217 F.3d 621, 635 n.20 (8th Cir. 2000).

5

Second, it is clear that the documents offered by plaintiffs "could be presented at trial in an admissible form." *Gannon Intern.*, 684 F.3d at 793. This is an extremely complex case with massive amounts of discovery. It would be overly-exacting at this stage to exclude evidence that plaintiffs will be able to authenticate through testimony at trial, or that was authenticated through deposition testimony that plaintiffs failed to cite in their statement of facts. I also reiterate that most of the objected-to documents are already self-authenticating due to J&L or other parties producing them in discovery. Finally, if certain documents do pose genuine admissibility concerns and are material to the outcome of any issue raised by the motion for summary judgment, I will make that clear in this order and will not consider those documents. However, unless otherwise noted, I overrule the J&L Defendants' objections to the admissibility of plaintiffs' cited evidence.

## V. RELEVANT FACTS

This case involves a student exchange program that brought the 12 remaining plaintiffs from their home country of Chile to study at Western Iowa Technical Community College (WITCC) and work in the Sioux City area. Plaintiffs characterize this program as a fraudulent scheme that resulted in the trafficking of the plaintiffs. The J&L Defendants state that the allegations are "complete fiction." Doc. 262 at 4.

Both parties submitted detailed statements of facts and both strongly dispute the other side's version of the facts. I will recount the facts submitted by the parties below, viewing the record in the light most favorable to the plaintiffs as the non-moving party.

### A. Parties and Witnesses

The following, remaining plaintiffs are each Chilean citizens and were residents of Chile and Sioux City, Iowa, at all times relevant to this case: Karla O'Nell Norambuena (Karla); Natalia Tapia Leiva (Natalia); Almendra Gonzalez de la Paz (Almendra); David Silva Moreno (David); Fernando Vilches Castillo (Fernando);

6

Claudio Ramos (Claudio); Alejandro Pizarro (Alejandro); Eduardo Antonio Munoz Vargas (Eduardo); Gonzalo Escobar Espejo (Gonzalo); Bairon Morel Guerra (Bairon); Diego Cristobal Ahumada Soulodre (Diego); and Nestor Acevedo (Nestor). Doc. 321 at ¶¶ 1-8, 10-13.

As for the named defendants, WITCC is a community college and school corporation capable of suing and being sued under Iowa Code § 260C.16, located in Sioux City, Iowa. *Id.* at 4 ¶ 14. The following individuals were employed by WITCC at relevant times (titles listed when available): Terry Yi, Dean of the International Education Institute; Rosana Salgado Burright (Rosana), employee in the Global Education Department; Juline Albert (Juline), Vice President of Learning; Terry Murrell, President; James Zuercher (James), Coordinator of Global Learning in the International Department; Lily Castro (Lily); Director of Special Programs; Brett McCarthy; Steele Welcher; Mike Gasaway; Matthew Peabody; Janet Gill; Andrea Rohlena; Troy Jasman; and Darin Moeller. *Id.* 4-6 ¶¶ 15-21.

J&L is a corporation organized under the laws of Iowa. At all times relevant, it conducted business in and around Sioux City, Iowa, as a staffing agency. Doc. 321 at 6 ¶ 22. J&L primarily placed employees in manufacturing labor positions. *Id.* ¶ 23. Prior to the events of this case, J&L never specifically hired students and never placed students in internships. *Id.* ¶ 24. J&L is the parent company of other business entities, including Premier Property Management and P.S. Transportation. *Id.* at 7 ¶ 25. P.S. transportation owns a fleet of vans that Premier Services used to transport employees to employers that were clients of J&L. *Id.* ¶ 26. The following individuals held the following positions at J&L at all times relevant: defendant Nancy Albrecht (Nancy), Account Executive; Kelly Connolly (Kelly), Vice President; John Wockenfuss (John), President; Gene Wockenfuss, Vice President of Executive Recruiting and Business Development; Jennifer Coburn (Jennifer), Operations Manager; Araceli Vargas (Araceli), Workers' Compensation Director and Safety Director; Curtis Baker, Executive Recruiter. *Id.* at 7-8 ¶¶ 27-32.

7

Tur-Pak Foods, Inc. (Tur-Pak), is an Iowa corporation with its home office located in South Dakota. *Id.* at 9 ¶ 38. At all times relevant, it conducted business in and around Sioux City, Iowa, including operating a manufacturing facility that employed approximately 700 employees and processed Lunchables. *Id.* Nathan Phipps (Nathan) was the Plant Manager and Leroy Zachow (Leroy) was the President of Tur-Pak at all times relevant. *Id.* ¶¶ 39-40.

Royal Canin USA Inc. (Royal Canin) is a Delaware corporation with its headquarters in Missouri. *Id.* at 10 ¶ 41. At all times relevant, it conducted business in and around Sioux City, Iowa, and operated a dog food factory in North Sioux City, South Dakota. *Id.* Daniel Klapuch (Daniel), Michael Martinez (Michael), Susan Lowrey (Susan), Gen Cols-Wagner (Gen) and Michelle Ellowitz (Michelle) were employed by Royal Canin at times relevant to this action. *Id.* ¶ 42.

The following individuals are Chilean citizens who traveled to Sioux City, Iowa, at relevant times: Carlos Espinoza (Carlos); Soledad Rojas (Soledad); Jorge Arcos; and Cristian San Martin Matta (Jorge). Doc. 321 at 8-9 ¶¶ 34-37.

## B. *Legal Requirements of J-1 Visa Programs[4]*

The J-1 Visa is a temporary, non-immigrant visa issued to an exchange visitor. *See* 8 U.S.C. § 1101(a)(15)(J). The J-1 Visa program is grounded in U.S. public diplomacy efforts, with the stated purpose -

> to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interest, developments and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people

---

[4] Pursuant to Federal Rule of Evidence 201(b)(2), I may take judicial notice of the J-1 Visa Program's regulatory scheme. *Klossner v. IADU Table Mound MHP, LLC,* 565 F. Supp. 3d 1118, 1123 (N.D. Iowa 2021) (citing *Roemer v. Bd. Pub. Works,* 426 U.S. 736, 742 n. 4 (8th Cir. 1994); *Newcomb v. Brennan,* 558 F. 2d 825, 829 (7th Cir. 1977).

8

around the world; to promote international cooperation for educational and cultural advancement; and thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and other countries of the world.

22 U.S.C. § 2451. There are 15 categories of J-1 Visa programs available. 22 C.F.R. § 62.20 - 62.32. Two categories within the J-1 Visa program are relevant to this case: "Student/College and University" and "Student Interns." Within the J-1 Visa Program, a "Student" is defined as a foreign national who is:

> (1) Studying in the United States and:
>
> > (i) Pursuing a full course of study at a secondary accredited academic institution;
> >
> > (ii) Pursuing a full course of study leading to or culminating in the award of a U.S. degree from a post-secondary accredited academic institution; or
> >
> > (iii) Engaged full-time in a prescribed course of study of up to 24 months (non-degree) duration conducted by:
> >
> > > (A) A post-secondary accredited institution; or
> > >
> > > (B) An institute approved by or acceptable to the post-secondary accredited academic institution, where the student is to be enrolled upon completion of the non-degree program;
>
> (2) Engaged in academic training as permitted in § 62.23(f);
>
> (3) Engaged in English language training at:
>
> > (i) A post-secondary accredited academic institution, or
> >
> > (ii) An institute approved by or acceptable to the post-secondary accredited academic institution where the college or university student is to be enrolled upon completion of the language training; or

9

(4) Engaged full-time in a student internship program conducted by a post-secondary accredited academic institution.

22 C.F.R. § 62.4(a). An exchange student in the J-1 Visa Program, subcategory Student/College and University, may engage in student employment if that employment:

(i) Is pursuant to the terms of a scholarship, fellowship, or assistantship;

(ii) Occurs on the premises of the post-secondary accredited academic institution the visitor is authorized to attend; or

(iii) Occurs off-campus when necessary because of serious, urgent, and unforeseen economic circumstances which have arisen since acquiring exchange visitor status.

22 C.F.R. § 62.23(g)(1). Exchange students in the J-1 Visa Program, subcategory Student/College, who are granted permission to work are limited to 20 hours of work per week, except during official school breaks and the student's annual vacation. 22 C.F.R. § 62.23(g)(2).

Alternatively, exchange students in the J-1 Visa Program, subcategory Student/College and University, may receive permission to complete "Academic Training." 22 C.F.R. § 62.23(f). "The primary purpose of academic training is to permit a student, other than a student intern described in paragraph (i) of this section, to participate in an academic training program during his or her studies, *without wages or other remuneration*, with the approval of the academic dean or advisor and the responsible officer." 22 C.F.R. § 62.23(f)(1) (emphasis added). An exchange student in the J-1 Visa Program, subcategory Student/College and University, is eligible for academic training with pay if "(i) The student is primarily in the United States to study rather than engage in academic training; (ii) The student is participating in academic training that is directly related to his or her major field of study… (iii) The student is in good academic standing with the post-secondary accredited academic institution; and (iv) The student receives written approval in advance from the responsible officer for the duration and type of academic training." 22 C.F.R. § 62.23(f)(2)-(3). To obtain authorization to engage in

10

academic training, the student must present to the responsible officer (RO) or alternate responsible officer (ARO) a letter of recommendation from the student's academic dean or advisor that sets forth:

>(A) The goals and objectives of the academic training program;
>
>(B) A description of the academic training program, including its location, the name and address of the training supervisor, number of hours per week, and dates of the training;
>
>(C) How the academic training relates to the student's major field of study; and
>
>(D) Why it is an integral or critical part of the academic program of the student.

22 C.F.R. § 62.23(f)(5)(i). The RO or ARO must then:

>(A) Determine if and to what extent the student has previously participated in academic training as a student, in order to ensure the student does not exceed the period of time authorized for academic training;
>
>(B) Review the letter of recommendation described above; and
>
>(C) Make a written determination of whether the academic training currently being requested is warranted and the criteria and time limitations set forth in [22 C.F.R. § 62.23](f)(3) and (4) are satisfied.

22 C.F.R. § 62.23(f)(5)(ii).

Academic training while school is in session is limited to 20 hours per week. 22 C.F.R. § 62.23(g)(2)(iii). J-1 Program Sponsors who oversee students completing academic training must "evaluate the effectiveness of the academic training in achieving the stated goals and objectives in order to ensure the quality of the academic training program. 22 C.F.R. § 62.23(f)(6). Sponsors are cautioned by the United States State Department (the State Department) to "ensure that College and University Student placements in academic training prioritize academic objectives and are not driven by the labor needs of a host organization." U.S. DOS, Guidance Directive 201801, *College and*

11

*University Student Category: Avoiding Unskilled Placements in Academic Training and Student Internship Programs.* The State Department "expects that non-substantive or unskilled activities, taken together, will not constitute a substantial portion of the placement." *Id.* Exchange students in the J-1 Visa Program, subcategory Student/College and University, may stay in the United States either (1) as long as it takes to complete the degree program, if they are in a degree program, or (2) for two years, if they are in a non-degree or certificate program. 22 C.F.R. § 62.23(h)(1)-(2). This period can be extended if an exchange student in the J-1 Visa Program, subcategory Student/College and University, receives permission to complete Academic Training. 22 C.F.R. § 622.23(f)(4), (i).

Alternatively, foreign nationals may be admitted to the J-1 Visa Program for the purpose of completing a student internship program under the "Student Intern" subcategory. 22 C.F.R. § 62.23(h). The student internship program must be "sponsored by the post-secondary accredited academic institution that issued" the authorization for the J-1 Visa. 22 C.F.R. § 62.23(h)(3)(i). To be eligible for a J-1 Visa, subcategory Student Intern, the foreign national must be "enrolled in and pursuing a degree at an accredited post-secondary institution outside the United States and . . . participating in a student internship program in the United States that will fulfill the educational objectives for his or her current degree program at his or her home institution." 22 C.F.R. § 62.23(i).

The regulations define an internship program as "[a] structured and guided work-based learning program for an Intern . . . that reinforces an intern's academic study; recognizes the need for work-based experience; provides on-the-job exposure to American techniques, methodologies, and technologies; and enhances the Intern's knowledge of American culture and society." 22 C.F.R. § 62.2, *Internship Program.* To qualify as a "Student Intern," the student must be "primarily in the United States to engage in a student internship program rather than to engage in employment or provide services to an employer." 22 C.F.R. § 62.23(i)(1)(ii). The internship program must

12

"expand[] upon the participants' existing knowledge and skills." 22 C.F.R. § 62.23(i)(2)(iii). Student interns cannot be used to "displace full- or part-time or temporary or permanent American workers or serve to fill a labor need," and the "position that the student intern[] fills [must] exist[] solely to assist the student intern in achieving the objectives of his or her participation in a student internship program." 22 C.F.R. § 62.23(i)(3)(ii)(B). A sponsor administering a J-1 Visa Student Internship program must:

> (i) Not place a student intern in an unskilled or casual labor position. . .
>
> (ii) Not place a student intern in a position, occupation, or business that could bring the Exchange Visitor Program or the Department into notoriety or disrepute;
>
> (iii) Not engage or otherwise cooperate or contract with a staffing/employment agency to recruit, screen, orient, place, evaluate, or train student interns, or in any other way involve such agencies in an Exchange Visitor Program student internship program.
>
> (iv) Ensure that the duties of a student intern as outlined in the T/IPP will not involve more than 20 percent clerical work, and that all tasks assigned to a student intern are necessary for the completion of the student internship program.

22 C.F.R. § 62.23(i)(8)(i)-(iv). The sponsor of a student intern is required to "distinguish between work-based learning for student interns, which is permitted, and ordinary employment or unskilled labor, which is not." 22 C.F.R. 62.23(i)(1)(7). The sponsor of a student internship program "must ensure that the student intern has verifiable English language skills sufficient to function on a day-to-day basis in the internship environment." 22 C.F.R. § 62.23(i)(1)(i). Student Interns in the J-1 Visa Program can be paid for their time. 22 C.F.R. 62.23(i)(1)(6).

The maximum length of a J-1 Visa Program under the Student Intern subcategory is 12 months. 22 C.F.R. § 62.23(h)(3). Sponsors should not issue a DS-2019 to a student intern unless an internship placement has already been secured, and an appropriate internship program established. 22 C.F.R. § 62.23(i)(7)(i). If sponsors place interns with

third parties (i.e., host organizations), they must have a written agreement in place with the host organization and ensure that the host organization is sufficiently educated on the goals, objectives, and regulations of the Exchange Visitor Program and will adhere to the regulations. 22 C.F.R. §§ 62.2, 62.23(i)(3)(B), (i)(4). Using a host organization to place student interns does not relieve sponsors of their obligation to follow the applicable regulations governing the J-1 Student Intern program. *Id.*

## C.    *The Defendants' J-1 Program*

Juline Albert (Juline), in her capacity as Vice President of Learning at WITCC, decided to start a J-1 Visa program (the J-1 Program) for international students to attend WITCC. Doc. 321 at 19 ¶ 76; Doc. 285-3 at 1 ¶ 3. Juline initially reached out to J&L about partnering with WITCC to place students in jobs as part of this prospective J-1 Program. Doc. 285-3 at 1 ¶ 8. She originally planned for the program to be in food production, which is what she proposed to J&L. *Id.* ¶ 9. At the same time this J-1 program was being devised, the Siouxland area was experiencing a workforce shortage. Doc. 321 at 20 ¶ 77. In fact, that remained true at all times relevant to this lawsuit. *Id.*

On January 17, 2017, Juline emailed Kelly Connolly (Kelly) and John Wockenfuss (John) of J&L and apologized for not having the J-1 Program up and running yet. Kelly responded to Juline stating: "we are preparing our contractual updates with clients and would like to include the program at the earliest opportunity." *Id.* at 21 ¶ 80. In June 2017, Juline met with Kelly and John and other representatives of J&L to discuss their potential partnership to bring students to the Siouxland area to work and attend classes at WITCC. *Id.* ¶ 81. Following this meeting, Juline and Kelly exchanged emails about the program. On June 29, 2017, Juline emailed Kelly:

> I'm really excited about the potential partnership between WITCC and J&L Staffing; it will be good for the city and the students. Today I visited with the following who pledged their support.

14

President Terry Murrell will work with the mayor and others to seek out relocation (plane ticket) funding.

VP of Finance Tory Jasman will put together a plan so we can receive the scholarship money as the students earn (rather than pay upfront – our usual policy).

Dean of Instruction Darin Moeller will hire faculty and open programming in the evening for those students who work during the day.

Dean of Enrollment Janet Gill will prepare marketing materials for our recruitment efforts.

Do you think any of the businesses would be willing to help with relocation (plane ticket) money? Some are offering a sign-on bonus, aren't they?

*Id.* ¶ 82.

J&L then retained the services of immigration attorney Amy Peck to obtain advice about the J-1 Program.[5]  *Id.* at 22 ¶ 83.   On July 12, 2017, John emailed Peck with "Two items of discussion I would like to address."  *Id.* ¶ 85.  The second item, titled "Western Iowa Tech School international student program," was where John described how the program would work:

a. WIT and J&L recruit together from other countries to bring students in to attend school where there schooling, housing, and other items are taken care of by the school (WIT). J&L participates by taking all of these students (looking at 100 students by January 2018 and countries targeted as WIT has relations in the following countries: Brazil and Chile) and provides jobs for them around the Sioux City market (basically to our clients). The student pays for the education by working with WIT in a contractual agreement that they will pay for their schooling by going to work for J&L at our clients. We then pay the student an agreed upon wage with a difference in wage being paid to WIT for schooling.

b. WIT makes sure that all of the legal immigration paperwork is completed before the students are allowed to attend their school. WIT is also looking

---

[5] Peck practices at Jackson Lewis, PC, in Omaha, NE.  *Id.* ¶ 84.

at doing a domestic student program in the US similar to the international program.

c. WIT is going to send us a Memorandum of Understanding which I will then forward to you for review.

1. The main question I have regarding the WIT program is what kind of agreement do we need to have with the students for them to go to school and work for us with us deducting out of there [sic] pay schooling cost made payable to WIT. Example is as follows:

> a. Student takes a job at one of our clients making $12/hr. but we pay the student minimum wage of $7.25 and pay WIT the difference of 4.75/hour. I have already gone over this with my tax accountant and there would be no tax implications we will need to be concerned about. I am just looking at it from the immigration laws and labor laws aspect.

*Id.* at 22-23 ¶ 86. John also emailed Juline and Terry Murrell (Terry), thanking WITCC for the partnership and for joining "in the endeavor of the quest of increasing both the student and labor population in the Siouxland market…" *Id.* at 23 ¶ 87.

On August 2, 2017, in response to a question about the progress of the J-1 Program, Juline emailed Kelly and John:

Hi folks,

Yes, the program is still moving forward. We are writing the MRHD grant now to help cover airline costs. We need to submit it on August 15. By Sept. 1 we should be deep in the planning stages to begin recruiting, provided we get the grant. Our president and I have a meeting next week to discuss our plan with some of the folks involved in MRHD.
. . . So as soon as we get this grant submitted, I will bring you the MOU and letter of support.

*Id.* at 23-24 ¶ 88.

On August 15, 2017, Kelly followed up with Peck and forwarded her an email from Juline stating that she had approval "to go ahead and submit the J1 application." *Id.* at 24 ¶ 89. On August 24, 2017, Kelly provided Peck with a copy of a Memorandum

16

of Understanding (MOU) that WITCC drafted for the partnership between WITCC and J&L. *Id.* ¶ 90. The MOU had a sub-heading that stated: "Global Workforce Program: Meeting the Workforce Needs of Siouxland." *Id.* ¶ 91. Section 3.0 of the MOU, entitled "Purpose," stated:

> The parties have entered into this Agreement for the purpose of enabling J&L to provide coordination services of the Name of initiative to benefit WITCC students. The purpose of the coordination is to place students in paid internships to enhance the students learning. The coordinator will serve as the intermediary between WITCC, students and employers through coordination of the internship job placement services.

*Id.* ¶ 92. Section 4.0 of the MOU, entitled "Scope of Services," stated that J&L would provide coordination services to WITCC students, provide scholarships to the students, co-interview potential students and identify paid internship opportunities for the students. *Id.* at 25 ¶ 93.

On August 25, 2017, Peck responded to Kelly stating: "I reviewed the contract and then gave it to an employment lawyer to review. I will send it shortly." *Id.* ¶ 94. Peck emailed the MOU to attorney Sarah Millsap.[6] *Id.* ¶ 95. Millsap reviewed the MOU, provided redline edits and left feedback on the document for Peck and J&L.[7] *Id.* ¶ 96. One section of the MOU that Millsap edited and left feedback on was Section 4.0, commenting as follows regarding J&L's obligation to provide scholarships: "This obligation is unclear. If the scholarships are already in place, we should identify them in more detail. If J&L already has the obligation to find scholarship opportunities, we may want to further define that obligation so it doesn't appear J&L is liable to fully fund students' education." *Id.* at 26 ¶¶ 97, 98. Later that day, Peck provided Kelly with a

---

[6] Like Peck, Millsap practices at Jackson Lewis, PC. *Id.*

[7] The parties dispute whether this feedback was intended for Peck or for J&L. In her email to Peck, Millsap wrote "Attached is a revised Mou for J&L. Please let me know if you or the client would like to discuss my suggestions." Doc. 285-5 at 14. Construing this statement in the light most favorable to plaintiffs, this could be interpreted to mean that Millsap left the feedback on the document for J&L.

marked-up MOU that included the feedback that she and Millsap had provided. *Id.* ¶ 99. Peck also told J&L that it was WITCC's responsibility, as the host, to ensure that everything was done correctly in the J-1 Program, though plaintiffs dispute that J&L provided Peck with all the pertinent information to properly advise J&L of its legal obligations under the J-1 Program. Doc. 285-3 at 3 ¶ 18.

Around August 25, 2017, John signed a letter of support for a student internship program at WITCC. In that letter, John stated as follows on behalf of J&L:

> J&L Enterprises is pleased to partner with Western Iowa Tech Community College to support the Student Initiative by providing scholarships to cover the cost of tuition, fees, and housing expenses. J&L Enterprises will also partner with the College to place the students into paid internships for up to 100 students. If for some reason the initial internship is not a good fit for the student, J&L Enterprises will work with the student to find another suitable internship. J&L Enterprises will provide an orientation prior to the start of the internship that will focus on the specific areas pertaining to the internship. In addition, J&L Enterprises will co-host two events with the College. J&L Enterprises is excited to partner with the College on this endeavor.

*Id.* ¶ 100.

Kelly testified that his understanding of the program was that students had to be placed in a job that pertained to their major. *Id.* at 27 ¶ 101. On September 15, 2017, Kelly emailed Juline and provided an updated copy of the MOU, stating that this version of the MOU was one "that our immigration attorney revised." *Id.* ¶ 108. In a November 7, 2017, email, Juline again apologized to Kelly and John that it was "taking so long" to get the visa program running. *Id.* ¶ 109. Prior to entering into the MOU, J&L explained to Juline the types of jobs it had available. Doc. 285-3 at 4 ¶ 21. WITCC indicated to J&L Staffing that placement of a J-1 student at Royal Canin corresponded with the area of study for a robotics student. *Id.* ¶ 22. WITCC indicated to J&L that placement of a J-1 student at Tur-Pak corresponded with the area of study for a culinary arts student. *Id.* ¶ 23.

18

On the other hand, Michael Martinez (Michael) of Royal Canin testified that no one from J&L told him the students needed to be placed in a specific position related to their field of study. Doc. 321 at 27 ¶ 103. Daniel Klapuch (Daniel), also of Royal Canin, testified that no one from either WITCC or J&L told him that the J-1 students needed to be placed in jobs related to their fields of study. *Id.* ¶ 104. Daniel also testified that J&L understood what kinds of jobs were available at Royal Canin. *Id.* ¶ 105. Daniel's understanding of J&L's role in the program was that it would do a background check to ensure that the students could work at Royal Canin. *Id.* at 28 ¶ 106. Michael testified that Royal Canin relied on J&L for ensuring workers had proper authorization to work for immigration purposes. *Id.* ¶ 107. Nancy was the main point of contact between Royal Canin and J&L. *Id.* at 27 ¶ 102.

On November 30, 2017, John signed the MOU between J&L and WITCC, entitled "Global Workforce Program: Meeting the Workforce Needs of Siouxland." *Id.* at 29 ¶ 110. WITCC Board President Robert Rasmus executed the MOU on behalf of WITCC on February 19, 2018. *Id.* ¶ 111. In the MOU, J&L agreed to provide "scholarships" to the students, which were described as follows:

> PAYMENT J&L will remit funding to WITCC on a weekly basis for students scholarship [sic]. The scholarship funding shall consist of the salary paid by the vendor less the minimum wage salary paid to the student. For example, when the worksite company offers $12.00/hour, the student will be paid $7.25/hour and WITCC will receive $4.75 per hour, for all hours worked. The difference paid to WITCC is the actual wage paid and the government mandated minimum wage to the student. Payments to be sent to Western Iowa Tech Community College, Atten: Business Office, 4647 Stone Avenue, Sioux City, Iowa 51106.

*Id.* ¶ 112.

J&L would not be paid by WITCC. Rather, it would be paid by the companies at which students were placed. *Id.* at 29-30 ¶ 113. For example, Tur-Pak and J&L agreed on a formula with a percentage markup on the hourly wages of J&L's employees placed at Tur-Pak, which would cover J&L's recruitment and payroll services. *Id.* at 30 ¶ 114.

19

Tur-Pak produced pre-packaged lunch trays, processed pork products and processed raw chicken. *Id.* ¶ 115. J&L was the primary staffing agency Tur-Pak used to meet its staffing needs. *Id.* at 31 ¶ 116.

On December 1, 2017, Kelly, on behalf of J&L, emailed Juline: "Thanks for coming out yesterday with the MOU. We are looking forward to this program. Can you tell me again what Visa program this will fall under? I am trying to finish my binder and was not sure what the designation was for the program." *Id.* ¶ 117. Juline responded on behalf of WITCC: "J1. Thanks for everything. We are really excited about this partnership. Community colleges need business partnerships in order to be truly successful and in order to truly serve the community." *Id.* ¶ 118.

WITCC initially submitted its application to be designated an official sponsor of a J-1 exchange program around December 21, 2017.[8] Doc. 321 at 32-33 ¶ 123. The first step involved submitting Form DS-3036 online. *Id.* at 33 ¶ 124. The DS-3036 is an application form that specifies which type of J-1 visa an exchange program sponsor wishes to administer and contains information specific to the exchange program. *Id.* ¶ 125. Juline was listed as the "Responsible Officer" on the DS-3036 and Terry was listed as the "Alternate Responsible Officer." *Id.* ¶¶ 126, 127. For immigration purposes, the "Responsible Officer" and "Alternate Responsible Officer" must:

> (a) Be thoroughly familiar with the Exchange Visitor Program regulations, relevant immigration laws, and all federal and state regulations and laws pertaining to the administration of their exchange visitor program(s), including the Department of State's and the Department of Homeland Security's policies, manuals, instructions, and guidance on SEVIS and all other operations relevant to the Exchange Visitor Program; if Responsible Officers and Alternate Responsible Officers work with programs with an employment component, they also must have a detailed knowledge of federal, state, and local laws pertaining to employment, including the Fair Labor Standards Act;

---

[8] Juline testified that she was the person who submitted the application. Doc. 285-3 at 2 ¶¶ 5, 6.

(b) Monitor that the exchange visitor obtains sufficient advice and assistance to facilitate the successful completion of his or her exchange visitor program;

(c) Conduct all official communications relating to their sponsor's exchange visitor program with the Department of State and the Department of Homeland Security. A sponsor must include its exchange visitor program number on all correspondence submitted to the Department of State and to the Department of Homeland Security;

(d) Monitor to ensure that the sponsor spam filters do not block receipt of SEVIS or Department of State and Department of Homeland Security notices; and

(e) Control and issue Forms DS-2019 as set forth in § 62.12.

22 C.F.R. § 62.11. Put more simply, as the responsible officer and alternate responsible officer, Juline and Terry were responsible for ensuring that WITCC complied with the rules and regulations of the J-1 Program.[9] Doc. 285-3 at 2 ¶ 4. This included educating third parties like J&L on the applicable regulations. *Id.* ¶¶ 55, 56. Specifically, WITCC was obligated to advise a third party if that party was doing something that was out of compliance, however J&L also was on notice that the jobs J&L had available for the students did not align with the requirements of the culinary arts and robotics programs. *Id.* ¶ 57; Doc. 285-7 at 24-25 (Coburn emailing J&L employees about Royal Canin not having robotics positions and students needing to be in the knife position to "stick with the J1 visa guidelines").

In the Form DS-3036, WITCC requested permission to host 50 J-1 Exchange Students, subcategory College/University. Doc. 321 at 34-35 ¶ 129. WITCC attached a document to Form DS-3036 titled "Western Iowa Tech Community College Application for Exchange Visitor Program: Method of Selection and Arrangements for Financial Support of Exchange Visitor while in the U.S." *Id.* at 35 ¶ 130. This document explained

---

[9] As discussed later, WITCC later changed the designated AROs. The same legal obligations would apply to the new AROs.

that WITCC would recruit students from Brazil and Chile "to study in program areas that are closely tied to their paid internships." *Id.* ¶ 131. It further explained that WITCC and J&L would select the program participants together. *Id.* ¶ 132.

The document confirmed that WITCC and J&L would require only a high school diploma or recognized equivalency to satisfy the previous education or training requirement. *Id.* at 36 ¶ 133. The document also specified that the exchange program participants would be responsible for limited costs, including meals, in-country transportation, medical insurance, housing damage deposit, flight costs in excess of $1,000 into the United States, return flight, clothing and personal items. *Id.* ¶ 134. However, the document claimed that the full cost of tuition, fees and housing would be provided by J&L. *Id.* ¶ 135. It also explained that the participants would take part in a paid internship with internship hours paid at a minimum wage but did not explain that participants' scholarships would be paid through their hours working at the internship. *Id.* at 37 ¶¶ 136, 137. Finally, the document did not explain where the internship would take place, who the host organization would be or what the internship would entail. *Id.* ¶ 138.

On August 24, 2018, Kelly emailed Peck asking for assistance with the J-1 program. *Id.* ¶ 139. Peck responded: "I can help the college but need more info. I'm assuming they are getting SEVIS accreditation?" *Id.* at 38 ¶ 140. Kelly responded: "They have applied under a J1 visa program to have English speaking students come to their school here in Sioux City and work towards a 2 or 4 year degree. While going to school they will work for wages which will help them pay for their tuition. The students are coming from Brazil and Chili [sic]." *Id.* ¶ 141. Peck offered to have WITCC sign a G-28 form to notify United States Customs and Immigrations Services (USCIS) that Peck was appearing on WITCC's behalf. *Id.* ¶ 142. Kelly replied, "I spoke with Juline Albert at Western Iowa Tech and she would like to proceed with you on the G-28 document. I am attaching Juline's email address for you to reach out to her and move forward with the process." *Id.* at 38-39 ¶ 143.

22

Around October 3, 2018, WITCC received notice from the State Department that more information was needed to support their application to be J-1 Exchange Program Sponsors. *Id.* at 39 ¶ 144. After receiving this letter, Juline emailed Yi and James:

> We are very close to finalizing the 2nd J1 visa application. I have received all the required documentation from HR and other departments. I am very confident we will get approval based on my conversations with the government officials and feedback from the initial application.

*Id.* ¶ 145; Doc. 285-6 at 10.

In support of the supplemented application, Terry Murrell prepared a document titled "Western Iowa Tech Community College Workforce J1 Visa Proposal."[10] *Id.* ¶ 146. The proposal addressed the question, "How will this program impact the local economy?":

> Employers in Siouxland are facing a critical shortage of skilled workers and a broader workforce shortage in general. According to Iowa Workforce Development, the average unemployment rate is 2.9% for the six counties within the college's service area (December 2017). This equates to approximately 2,658 unemployed individuals in a total labor force of 90,650.
>
> The J1 Visa program will place students into paid internships in three areas – food science production, mechanical engineering, and industrial maintenance technology. Internships are structured to provide mutual benefits to the student and employer. Students will receive training from a knowledgeable employer and a skillset that coincides with their area of study at the college. Students will also return to their home country having earned a terminal degree and relevant work experience. Employers will benefit from the presence of additional staff for the duration of each participant's stay in the United States, averaging a period of 2-3 years. Internship schedules will be oriented around each student's evening/night classes.

---

[10] J&L disputes this fact, arguing "Plaintiffs fail to cite evidence supporting the assertion that [Terry] Murrell prepared the document or the intent in creating the document." Doc. 321 at 39-40 ¶ 146. The cited document lists "Terry A. Murrell, Ph.D.—President, Western Iowa Tech Community College" as its author. Doc. 285-6 at 12. The objection is overruled.

*Id.* at 40 ¶ 147.  The proposal also addressed the question, "How will their education be paid for?":

> The full cost of tuition, fees, and housing will be covered through scholarships sponsored by local employers and private donations. Participants will stay in one and two-bedroom furnished apartments on campus with access to academic advisors, student services, health and wellness programming, and twenty-four hour security. The internship will pay students an hourly wage to help offset the student's personal costs (meals, transportation, entertainment, personal items). The cost of airfare to relocate to Sioux City, Iowa (up to the amount of $1,000) will be provided through a grant from the College and Sioux City businesses. A participant may choose to cancel or withdraw from the program at any time following the completion of a full semester. If the participant chooses to leave the program before the end of a semester, he or she may be responsible to refund tuition and fees for that semester to the scholarship program.

*Id.* at 40-41 ¶ 148.  In an attachment to a December 14, 2018, email, James described the benefits of the J-1 program to the community as: "Workers for local employers[,] $ for local economy, [and] Exposure to South American culture."  *Id.* at 41 ¶ 149.

As of January 11, 2019, WITCC designated Juline as the Responsible Officer and James and Lily Castro (Lily) as alternate responsible officers in the supplemented application.  Doc. 285-3 at 5 ¶ 26.  Juline does not remember if she had a conversation with Lily or James about being designated alternate responsible officers but she is sure she did.  *Id.* ¶ 27.  Lily was born in Chile and came to the United States when she was seventeen.  *Id.* ¶ 28.  Another WITCC employee, Rosana Salgado Burright (Rosana), also became involved in the J-1 Program around this time.  *Id.* ¶ 25.  Lily first learned about the J-1 Program in late 2018 or early 2019 when she was in an office with Juline and Rosana and they were talking about Chile and Brazil.  Juline said they were going to have a program bringing people from Chile and Brazil, Lily's and Rosana's home countries.  *Id.* ¶ 29.  Lily was not educated in the J-1 Visa requirements and does not have any knowledge of them.  *Id.* ¶ 30.

24

The supplement to WITCC's application was emailed to State Department employees, including Debra Shetler, on January 11, 2019. *Id.* ¶ 150. It included a pre-arrival handbook for J-1 students. *Id.* at 42 ¶ 151. This supplemental information did not address the benefits of the J-1 program to the community previously highlighted by James. *Id.* ¶ 152. This supplemental information did not explain how the program would be paid for, did not describe the J-1 program as a "workforce program" and did not explain the workforce shortage in the Siouxland area. *Id.* at 42-43 ¶ 153-155.

On February 14, 2019, WITCC received confirmation from the State Department that the application to become a designated sponsor of a J-1 exchange program had been approved. *Id.* ¶ 156. The notice stated that WITCC was approved to issue 50 J-1 visas, subcategory Student, College/University. *Id.* at 43 ¶ 157. Attached to the notice was a welcome letter on State Department letterhead that provided resources for administering the exchange program. Doc. 285-6 at 749-50. WITCC also received a document entitled "A Guide for Responsible Officers and Alternate Responsible Officers," authored by the State Department. Doc. 321 at 44 ¶ 159.

After receiving approval to sponsor J-1 Students in the College/University subcategory, Juline, Lily and Rosana drafted a memo to Terry that described the program as a workforce solution:

> Area employers are constantly approaching the College to assist in training and recruiting new workers to help meet the worker shortage. Instead of merely shuffling workers from one business or industry to the next, this program will allow us to add 50 new workers per year to the area workforce. Students will work and study for three years; therefore, within three years we will serve 150 students per year. That means 150 new workers for the Siouxland community by year 3 of the program.

*Id.* at 31-32 ¶ 119. Lily used Facebook Messenger to contact Carlos Espinoza (Carlos) and inform him that the program had been approved. *Id.* at 45 ¶ 160. On February 18, 2019, Juline reached out to John and Kelly at J&L to notify them that the visa program had been approved and they could begin next steps:

We received word that we were approved for the J1! Tomorrow I will meet with the two people who will help recruit in Brazil and Chile. We are finalizing our marketing and travel plans. I will need to meet with one or both of you very soon to talk about recruitment. The expectation from the government is that we start immediately, so we need to move quickly. This is a great opportunity for all of us. If we find we are able to handle these 50 participants, we can up our numbers easily. Kosovo, Iowa's sister state, is very interested in pursuing this with us, and we need to move quickly because Ft. Dodge became aware of what we are doing and they now want to use this method of recruiting workers from Kosovo.

*Id.* ¶ 161. John forwarded Juline's email to J&L employees, writing: [S]o this is going to be another advantage we have over the competition!" *Id.* at 45-46 ¶ 161.

Juline, Lily and Rosana sought to recruit students from a lower socio-economic background who they thought needed an education and money. *Id.* at 46 ¶ 163. They worked together to prepare an outline of the application process to share with potential J-1 students for the program. *Id.* ¶ 164. This draft outline listed the following requirements of the program:

You will be required to live on the college campus. Western Iowa Tech Community College (WITCC) is a tobacco-free and alcohol-free campus.

You will be required to work as many as 35 hours per week. You will be required to go to class for 12 hours per week and complete your assignments.

You will be required to purchase health insurance at your cost.

You will be required to pay for your own transportation in the USA.

You will be required to participate in cultural activities.

You will be required to pay for your own food.

You will be required to pay your return plane ticket to your home country.

*Id.* at 46-47 ¶ 165. This draft outline also listed the following benefits:

26

You will receive a scholarship to provide a college education in advanced manufacturing/robotics or culinary!

You will receive a scholarship to pay for a shared apartment.

You will receive a scholarship to pay up to $1000 for you to travel to the USA.

You will receive valuable work experience.

You will have an opportunity to participate in fun cultural activities.

You will make new friends from the USA and other parts of the world.

You will receive a weekly paycheck to help pay for your food and other expenses.

You will return to your country with a degree from the USA.

*Id.* at 47-48 ¶ 166. Juline edited the outline in response to Rosana's suggestions. *Id.* at 48 ¶ 167. On February 21, 2019, Lily sent Carlos a document in Spanish explaining the application process, which Lily, Juline and Rosana had prepared. *Id.* ¶ 168.

Juline, Lily, Rosana and J&L employees attended a meeting on February 22, 2019, to further discuss the recruitment of international workers. *Id.* at 48-49 ¶ 169. Prior to attending this meeting, Lily informed Carlos over Facebook Messenger that she would be asking a lot of questions about the jobs J&L would be offering. *Id.* ¶ 170. Rosana prepared an agenda and emailed it to Juline. *Id.* ¶ 171. The agenda stated that "[a]pplicants must totally understand what they will be doing in the U.S." *Id.* ¶ 172. Rosana proposed that marketing material should include a "[t]otal explanation of how this program will be run at WIT. This should include the jobsites with the nature of the jobs to be performed, pictures, and if necessary, short videos." *Id.* at 50 ¶ 174.

During the meeting, J&L suggested placing J-1 students in jobs with the primary duty of slicing meat. *Id.* ¶ 175. Lily recorded a short video of this meeting to share with Carlos. *Id.* at 51 ¶ 176. Rosana did not like J&L's suggestion, and she told J&L that

27

the jobs they were describing were not appropriate for the students, specifically objecting to positions in which the students would be required to slice meat. *Id.* at 51-52 ¶¶ 177, 178. Kelly responded that the students would be making "almost $16.00 an hour" working at the meat processing facility. *Id.* ¶ 179.

After the February 22, 2019, meeting, J&L employee Jennifer Coburn emailed a recap to J&L employees Kelly, John, Nancy and Matt Short. *Id.* at 53 ¶ 180. In this email, Coburn summarized her understanding of the requirements of the J-1 program, and how J&L would meet those requirements:

> They would like us to put together a video showing the J&L culture and processes along with some shots of Sioux City. We will need to get with John Nash to get this done quickly. They would also like videos from potential employers showing what the jobs may be like that they are placed at.
>
>         *      *      *
>
> The students cannot work more than 35 hours per week while school is in session they can work more during holiday breaks and summer. They have to be placed in a job that pertains to their major. Wit is trying to push the majority of the people into their Culinary program (food science) and Robotics program. Lily mentioned that Tyson actively seeks out their robotics students now and sometimes takes them before they graduate. Kelly said he would reach out to Tyson in regards to this program to see if they would be interested in employing the students. The only other robotic job we have would be at Royal (when they get their new plant open) however we do not hire for robotic positions at this time. We talked about putting the culinary students in the part time positions at seaboard. Kelly will reach out to George to see if they will accommodate the 35 hour rule and to see fi [sic] they could have all of the students start and end time. The students will need to be in the knife position in order to stick with the J1 visa guidelines.

*Id.* ¶ 181.

Rosana testified that she "did not like the suggestions" J&L was giving for the students' job placements. *Id.* at 54 ¶ 183. After the meeting, Rosana emailed Nancy for

28

more information about the students' job placements. *Id.* ¶ 184.  In an internal email to Rosana and Lily following the meeting with J&L, Juline stated:

> I am talking to my people, explaining as much as I could about this program and what is involved. As a selling point, I showed the difference between coming as a regular international student, and a J-1 Participant, that means, how much they would spend as an F1, and how much they will make as a J1.

*Id.* at 55 ¶ 185.  In response, Rosana acknowledged that she had told Brazilian recruits they were planning to put them into jobs that did not fully fit with the majors WITCC was promoting: "Also, I told them about the kind of area we are and the types of jobs we have. I told them the jobs may not be totally related to their program, but will be somewhat related, due to the nature of what we do around here." *Id.* ¶ 186.  In the same email, Rosana noted that "cutting meat" was not related to study in culinary arts. *Id.* at 56 ¶ 187.  Rosana also wrote that the program description for Culinary Arts was meant to prepare students to provide professional chef and related cooking services in restaurants and other commercial food establishments. *Id.* ¶ 188.  Despite this, Rosana acknowledged that the students would not be placed in restaurants. *Id.* ¶ 189.  Rosana planned to email J&L the program descriptions to ensure that students would be placed in jobs that fit their majors. *Id.* at 57 ¶ 190.  Juline told Rosana to "hold off:"

> Hold off on sending things to J&L. We know we can't place students in culinary positions. They will not make enough money. I'm working with Kelly to try to find other places, but they will be food related. The program we planned to create was food production. This is what we initially proposed to J&L and what Darin will be working on.

*Id.* ¶ 191.

At the same time, Lily was already communicating with Carlos to recruit Chileans. *Id.* 57-58 ¶ 192.  Lily told Carlos the students would work Friday, Sunday and Mondays and go to class during the week. *Id.* at 58 ¶ 193.  When Carlos asked how many hours of work per week, Castro responded that the students would pocket about $200 per week,

explaining, "They have to leave time to study and get good grades to keep the visa." *Id.* ¶ 194.

Meanwhile, Nancy, on behalf of J&L, recruited Royal Canin to the program. *Id.* ¶ 195. Following a meeting at Royal Canin, Nancy emailed Royal Canin employee Daniel Klapuch:

> Kelly would like to call you today regarding our conversation on Friday. Is there a good time that he should call and a number? Also, we are putting together a short video and would like to include Royal Canin in this video. Can you please send over some Training Videos that you have to show what the job at Royal Canin entails? If you have any questions, Kelly will be able to answer them in your conversation today.

*Id.* at 59 ¶ 196. In a follow-up email, Kelly provided an explanation of Royal Canin's intended role:

> These students will be English speaking foreign students attending WIT for a food science or robotics degree program. They will be limited to working 35 hours per week while school is in session. During the summer, winter, and spring breaks, they can work all hours available. The students will not be eligible to be taken company while in this program, they must remain employed through J&L during their entire Visa stay. They will be here a minimum of two years and that can be extended to four years if needed to complete their degree. Once they receive their degree they must return to their home country and apply for another Visa program to return to the U.S. There is no commitment by your company to guarantee a position for these workers or to keep them employed.

> \*        \*        \*

> The college will work classes around their work schedule, but would ideally like to have the students work a similar schedule so they can attend their classes either during the day or in the evening. Also, keeping them on the same shift would help the logistics of transporting them to and from work.

*Id.* at 59-60 ¶ 197. Daniel testified that it can be inferred that Kelly was prioritizing the students' work over their studies. *Id.* at 60 ¶ 198. Kelly further described the benefits Royal Canin would receive from participating in the program: "I think this would be a

continuous steady work force for your company, which if successful, will continue to grow in numbers in the future." *Id.* ¶ 199.

Meanwhile, Nancy, Juline and Rosana discussed with J&L employees whether the J-1 students would be available to work more hours. *Id.* at 60-61 ¶ 200. Specifically, Kelly explained:

> I have met with some of our clients and there seems to be a consistent question as to whether the students are limited to the 35 hours/week. Some have asked whether this is M-F hours or includes Saturday also. I have gone through the manual and I do not see that verbiage. Can you elaborate any further?

*Id.* at 61 ¶ 201. Juline answered:

> At the time we wrote the document we considered the students' schedules and didn't think they could be successful as full-time students and full-time employees. We settled on 30-35 hours a week because they would make enough money to pay their expenses. I think Saturday or Sunday hours are ok too. Remember that in the summer and on winter break the students can work as many hours as you/they want. We will need to teach them about income tax, btw.

*Id.* at 61 ¶ 202.

Nancy told Royal Canin's site manager that some of the students had college degrees or higher education from their own countries. *Id.* ¶ 203. This incentivized Royal Canin to hire the students because educated tech-savvy employees would "fit into some of the things that we were doing, particularly with building a new factory." *Id.* ¶ 204. When asked if Nancy had told Royal Canin that the students were coming from a lower socioeconomic background, Daniel testified, "She probably did, yes." *Id.* at 62 ¶ 205. Daniel also testified that Nancy "expressed some concerns" to Royal Canin regarding the students' English proficiency. *Id.* ¶ 206.

In an email, Kelly and Juline discussed potential difficulties with the 35-hour per week limit for recruiting employers to the program and Juline suggested possibly adjusting the hours to 40-hours per week. *Id.* at 62-63 ¶ 207. On March 4, 2019, Kelly

31

informed Royal Canin that WITCC had agreed to allow the students to work 40 hours per week during the school year. *Id.* at 63 ¶ 208. On March 13, 2019, Kelly explained to Royal Canin employees that the students would be able to work any hours May 15 through August 15, and 40 hours per week once classes started. *Id.* ¶ 209. Kelly further described the program as "a great program to get in place for you and maintain a steady workforce." *Id.* ¶ 210. On March 19, 2019, Nancy invited WITCC's Robotics and Automation staff to tour the Royal Canin facility and answer questions about the program. *Id.* at 64 ¶ 211. Rosana, Juline and Lily asked to join this tour to "help us explain to our candidates some facts about their jobs." *Id.* ¶ 212.

On March 22, 2019, Rosana emailed Nancy the culinary arts and robotics course descriptions to inform J&L of the types of skilled positions they wished to offer the J-1 students. *Id.* ¶ 213; Doc. 285-4 at 503. On March 25, 2019, Rosana, Lily and Juline began to discuss requesting additional J-1 visas from the State Department, above the 50 they were initially authorized to issue. Doc. 321 at 64 ¶ 214. This request came after "an extremely successful recruitment process." *Id.* at 65 ¶ 215. They brainstormed additional reasons for increasing the number of visas: a shortage in the labor force and more openings for jobs related to the program. *Id.* ¶ 216. Despite not yet interviewing the applicants, Rosana and Juline were preparing DS-2019 forms with WITCC listed as the primary site of activity, and J&L listed as a secondary site of activity as well as the sponsor of the program. *Id.* ¶ 217.

WITCC representatives asked for someone from J&L to travel to Chile to interview applicants. Doc. 285-3 at 7 ¶ 44. On April 15, 2019, Nancy emailed Juline and Rosana asking if they could bring 25- and 50-pound weights to South America "so that we can have students lift the required amount of weight." Doc. 321 at 66 ¶ 218. On April 22, 2019, John sent a company-wide email to J&L employees with a weekly update, stating: "Nancy Albrecht will be leaving on Thursday April 25th to go over to Brazil and Chile with representatives from WIT to begin the process of getting student/employees to work the J-1 visa program." That same day, J&L sent Juline an

email with a copy of the job offer letter that J&L would provide to the participants at the April 27, 2019, meeting in Chile. Doc. 285-3 at 8 ¶ 48. The job offer letter stated that work would be 30 to 40 hours per week and contained the following job description:

> The work may include any or all of the following depending on where they are placed. Placing prepared food items on trays, making sure undesirable items are thrown away. Placing trays on conveyor belt. Removing trays after plastic film has been applied and stacking trays in boxes. Stacking boxes onto pallet and shrink-wrapping pallet for transport. Standing for long periods of time, up to eight and occasionally twelve hours per day. Lifting to fifty pounds occasionally each day. Bending, squatting, walking, stretching, and reaching may be incurred during each work period. May be required to use a knife, occasionally climb and be able to follow safety and food regulations.
>
> Standing along conveyor belt, insuring food product is correctly inserted in each container, ensuring placement of labeling is correctly applied, placing of labeling is correctly applied, placing containers into boxes, stacking boxes by product descriptions and running a shrink-wrap machine. May be in a cold and or wet environment requiring an added layer of clothing. Ergonomic flooring and all PPE will be provided by company.
>
> Pre-employment background check and drug screen will be required.

*Id.* ¶ 49. Juline does not remember telling J&L that the job description was inappropriate for the work the J-1 Visa students were supposed to be doing. The job offer letters given to the plaintiffs were identical to the job offer letter sent to Juline, though the job offer letters were not translated into Spanish. *Id.* ¶ 50.

On April 27, 2019, Juline, Lily, Rosana, Terry and Nancy met with the Chilean applicants for the first time at a hotel in Santiago, Chile. Doc. 321 at 66 ¶ 221. In a conference room at the hotel, the students were placed at tables in groups of four, while information was provided to them about the program. Doc. 321 at 67 ¶ 223. During this meeting, the WITCC representatives introduced themselves to the students and explained how the program would work. *Id.* ¶ 224. The J-1 program was described as a free program at this meeting. *Id.* at 68 ¶ 225.

The WITCC representatives then explained the two majors available to the students: robotics and culinary arts. *Id.* ¶ 226. According to the WITCC defendants, the program would last two years. *Id.* ¶ 227. Students then took turns speaking to different individuals in small groups or in one-on-one conversations. *Id.* ¶ 228. The students also took turns meeting with Nancy one-on-one, with each interaction lasting five minutes or less. *Id.* ¶¶ 229, 230. Nancy did not speak to the J-1 students in Spanish and none of the documents Nancy brought for the students to review and sign were translated into Spanish. *Id.* ¶¶ 231, 232. Araceli did not review or translate any of the documents into Spanish before Nancy left the United States. *Id.* ¶ 233.

Lily accompanied Nancy during these one-on-one meetings to translate but testified that only one potential student asked her to translate a question, which related to Nancy's request for him to lift weights. Doc. 285-7 at 11. Additionally, plaintiffs state that no one else translated the documents for them and that Lily told the students that they did not need translated copies of any documents. Doc. 321 at 70-71 ¶¶ 235, 236.

During the interviews, Nancy had the students lift the 25- and 50-pound weights that she had brought to the hotel. *Id.* at 72 ¶ 240. The applicants also signed a "job acceptance" form. *Id.* at 73 ¶ 241. The form did not advise applicants of the rate of pay, instead stating "your rate of pay will vary depending on the job you are placed in." *Id.* ¶ 242. The form did not advise applicants of a specific job location or title. *Id.* ¶ 243. Some of the plaintiffs testified that they were not informed they would be working in a factory or handling meat. *Id.* ¶ 244. Claudio testified that he would not have signed the paperwork and participated in the program if he knew he had to work in a factory handling meat. *Id.* at 73 ¶ 245.

At that time, Lily thought the students were going to work for Nancy at a factory owned and operated by Seaboard Triumph Foods. *Id.* ¶ 246. Lily also stated that they had discussed other potential internships with Royal Canin but nothing had been finalized with them. Doc. 285-7 at 14. The form advised applicants of some job duties, but the form was in English and was not translated. *Id.* ¶ 247. Karla and Gonzalo testified that

34

they did not understand at the time they were signing agreements to work at Royal Canin or any specific employer. *Id.* at 75 ¶ 248. Lily testified that although some of the plaintiffs appeared to have very low English skills, she did not translate the form to any of the plaintiffs. Doc. 285-7 at 15. Nor did she see anyone else translate the form. *Id.* Nancy told the students that if they wanted to come to the United States, they had to sign the documents. Doc. 321 at 76 ¶ 250.

At no point during the meeting in Santiago were the students told their own labor would fund their scholarships. *Id.* ¶ 251. David testified that no one from WITCC or J&L told the students that they would pay for meals using gift cards provided by WITCC. *Id.* ¶ 252.

WITCC never verified whether the students were enrolled in a full-time post-secondary academic institution as they recruited the students. *Id.* ¶ 254. Lily did not tell the students they would be required to pay any amount of money to WITCC because she did not know the students were required to pay WITCC. *Id.* at 78 ¶ 255. Lily testified that she sat in the back of the room while Nancy had the students sign paperwork, "in case Nancy needed me, as I was just visiting with the parents." *Id.* ¶ 256.

After the interviews, Nancy acknowledged her and Juline's concerns about the ability of the applicants to pass a consular interview in an email dated April 29, 2019:

> The students that we made job offers to here in Chile will now need to apply for their visa in the final part of the J1 visa. Juli is concerned that the students will not be eligible as the majority of them did not speak English. One of the requirements for the program is that they speak English. It will be up to the Embassy when the student interviews with them to determine if they can still come with the program. Juli does not know how long this process will take but is hopeful.

*Id.* ¶ 257. Ultimately, 32 Chilean students received employment/visa offers. *Id.* at 78-79 ¶ 258. WITCC and J&L then began to coordinate with Royal Canin to find positions for the J-1 applicants around May 10, 2019. *Id.* at 79 ¶ 259.

As the J-1 delegation was returning from Brazil and Chile to the United States, Rosana and Juline began to receive signs that the program was not compliant with the J-1 Visa regulations. *Id.* ¶ 261. Specifically, on May 10, 2019, Rosana had a conversation with "Rodrigo" from StarVisas, the company hired to process DS-260 applications for the Brazilian students, that led her to believe that many documentary changes needed to be made before students could enter the United States. *Id.* at 80 ¶ 262. As Rosana explained to Juline and Lily in a May 11, 2019, email:

> Yesterday I had a very, very productive, important and serious meeting with the person who will be totally dedicated to review documentation and do the procedure in the US consulate website for the visa application. His name is Rodrigo.
>
> There are some documents that we will have to create, others to adjust.
>
> There is another form called DS7002 – Training Placement Plan, which is kind of a job information document to complement the job offer letter, created by SEVIS. Only, you get it online and download. You find it just by googling it. One per student. I am going to do a simulation and Rodrigo will check. I am attaching a copy, please read. We will need to have another person other than Juli to be "our" supervisor. I am thinking about James, once he is the Coordinator now. This document requires detailed information.
>
> We will have to create another letter, which name I do not remember now, but consists in officially inform that we will be paying the plane ticket, providing this or that amount.
>
> We will have to create a letter informing that we will be housing them in our facilities, with an address. I know the students have this information in the prearrival. Even so, we need to do that FOR the interviewer. A Picture or blue print has to be added.
>
> As a complement of the acceptance letter I have to write another one being more specific about their program, which will include the program descriptions and schedule for classes, through the semester, including the Intensive English. Juli, in one of the letters you received from the Department of Education, it is strongly emphasized that the student is not to be considered an employee, is not taking a job spot for any American,

and it is not in the US to supply a job shortage. So, we need to change our terminology and never again justify the partnership of employers because they NEED employees. Job partners are engaging in the exchange cultural experience, and that is all. All these are easy to do, and I will write the texts. But each one of the students will need their own. It has to be the original, and has to be signed. So, Juli, you have to designate a person at the college to assist you on receiving the emails I will prepare, and print them in a head letter sheet. The person to sign it cannot be you Juli. I remember one woman from SEVIS who regularly visited Global pointing out that the DSO or PDSO, in our case RO or ARO, cannot be the person who recruits. I am thinking about James too.

Now comes the part that sincerely upset me a little, because that is something that I kept saying since the very beginning – having lunch with Lily, Nancy and Jennifer and then when all of them visited us. : The job letter is wrong. It has to match the program description. The job description will be in one of these extra documents the students will take in their interviews. They provided the kind of job description that they probably use for any employee who works in the production line. Also, Nancy did not write the students names according their names in the passport, skipping middle names. It will have to be corrected, for both countries. The right way is: Last name, First name and Middle name, like it is in the DS2019, Acceptance Letter and Health Insurance Proof. Other than these mistakes, there are NO signatures in the bottom of the job letter. Nancy is aware that she might redo all of them, I talked to her in the hotel in Rio. This brought us to another point. Culinary students CANNOT work at Seaboards, and I really, really think and felt by the time that I was there visiting, that our students should be sent to Royal Canin and Blue Bunny only. Royal Canin is building a HUGE plant and will be willing to take many, many students. This I heard there. I am going to create the job descriptions according to the program description. We will have to mention the place where they are going to work as well. And Royal Canin has facilities in Brazil, which would be a strong point to mention in the interview, and a strong reason to go back, at least for Brazilians, that they might get a job here, in Brazil, in the same company.

*Id.* at 80-82 ¶ 263.

Two days later, on May 13, 2019, Juline called Debra Shetler at the State Department about problems with the J1 Visa Program. *Id.* at 82 ¶ 264. After the call, Shetler sent Juline a "link to the regulations." *Id.* ¶ 265. Juline replied: "Thank you for

37

all your help today. I'm sorry to have made such a mess of things. I will get it straightened out." *Id.* ¶ 266. Following this exchange, Juline understood that J&L, a staffing agency, could not be involved in WITCC's J-1 Program. *Id.* at 83 ¶ 267. Juline further understood that participants in WITCC's J-1 Program could not be used to fill a local labor shortage. *Id.* ¶ 268. Shortly after this phone call, Juline messaged Rosana telling her they would have to reissue all of the forms and to check her email. *Id.* ¶ 269. She also emailed Rosana and Lily an update on the conversation, which she summarized, as follows:

> 1. We need to redo all of the DS-2019s
>
> a. Remove J&L Staffing
>
> b. Change start date to date they will come
>
> c. Change ?? to academic training, not internship.
>
> 2. They are allowed to work a max of 18 months. It's my recommendation that they come in July. Those with great English skills start their program in August and earn a diploma and a certificate. Those with poor English skills study English until Dec. They will earn a diploma. Students will stay a total of 18 months, not 3 years.
>
> We can discuss all of this at next week's meeting. Rosana, I will send you a zoom link.
>
> OH... one bit of good news. We can change their program without permission.

*Id.* at 83-84 ¶ 270. Juline then emailed Nancy and other J&L representatives, explaining: "I just got off the phone with the state department. We are going to need to make some adjustments with our letters, etcetera. I can go over everything at the meeting." *Id.* at 84 ¶ 271.

Juline, Lily and Rosana continued to discuss changes to be made to the program over email on May 14, 2019. Rosana outlined her plan to adjust the program, explaining:

Please read the file attached. It is a list of documents we have to provide for each students [sic] sent by StarVisas, the visa process assistance office in Rio. It is VERY IMPORTANT that you read it before our meeting with J&L on Monday. I will be there.

\*      \*      \*

J&L will have to understand that it is not our way or their way, but the way the US wants it to be. Everything that is been required now is totally manageable. We can make it. No worries.

*Id.* at 84-85 ¶ 272. The attached file was a list of documents/document descriptions needed to complete the students' DS-260s, in Portuguese. *Id.* ¶ 273. Regarding the "letter from the company that will provide the training," Rosana added an additional comment to StarVisa's instructions: "Juli: J&L MUST not do this, we are the ones. We need to be inserted in the communication between J&L and either Royal Canin and Blue Bunny. Seaboards IS NOT the proper business for it." *Id.* ¶ 274.

On May 19, 2019, Rosana and Juline discussed an upcoming meeting with J&L to go over the contract between WITCC and J&L. *Id.* ¶ 275. Juline, Rosana and Lily continued to discuss the job offer letter and form DS-7002 requirements in text messages on May 20, 2019:

**Juline:** Hi. I had a good talk with J&L today. Rosana, do we need to have both the DS7002 and the letter from the employer? J&L will help us by getting job descriptions from the various places. Then we can write up the letters and have the businesses sign. The job descriptions should help us with the DS7002 also. Welcome home Rosana. Lily, I need your help tomorrow to call Carlos. Thanks.

\*      \*      \*

**Rosana:** Juli…tbe [sic] DS7002, job letter and prgram [sic] description MUST match. They have to speak the same thing. I'm glad to be back. Lots of perspectives for us in Brazil. Other than J1s.

**Juline:** Ok. We can do that. Thanks.

*Id.* at 86 ¶ 276.

On May 13, 2019, Juline sent Rosana, Lily and Nancy an email stating they needed to redo all of the DS-2019s to "remove J&L staffing," change the start date that students would arrive and change the category to academic training instead of internship. *Id.* ¶ 70. On May 20, 2019, Juline and other WITCC representatives met with Nancy and various J&L representatives. Doc. 321 at 86 ¶ 277. Afterwards, Juline emailed Nancy, John and Kelly:

> I really think the possibilities of our working together and bringing workers and students to the Sioux City area are endless. I spoke to the president this morning and he is on board with both of the two options we discussed yesterday. If we have a few minutes on Thursday let's discuss further.

*Id.* at 87 ¶ 278.

Juline asked Debra Shetler of the State Department if she had to list the name of the business offering the student training and scholarship on the DS-2019. *Id.* ¶ 279. Shetler instructed Juline to list the company under the "site of activity" section. *Id.* ¶ 280. The following day, on May 23, 2019, Rosana emailed Juline explaining that they could not use J&L's legal name, "Premier Services" on the DS-2019:

> Unfortunately I do not believe we can use Premier Services, either the holder of J&L in our DS2019 or either to provide the training letter.
>
> The DS7002 requires the information about the company where they are going to have their training. It asks for the EIN and the web url.
>
> Visiting this company online, that's the description I found about them: Business Description Premier Services is located in Sioux City, Iowa. This organization primarily operates in the Employment Agencies business/industry within the Business Services sector. This organization has been operating for approximately 14 years. Premier Services is estimated to generate $1.6 million in annual revenues, and employs approximately 22 people at this single location.
>
> When the Dept of Education checks the company, it will be obvious that they are a job agency. Once again I say: J&L cannot appears in this process. I know they are our partners, but I believe that we will have to change that

40

too I [sic] the original J1 project. I know it is complicated. Maybe they can participate like the ones that will manage the stipends, I don't know. We will really have to use Royal Canin or the others to sign the training (not job) letter. I hope Royal Canin has agreed to receive all the students.

*Id.* at 87-88 ¶ 281. Juline responded, "We will have to talk next week and figure a way around this." *Id.* at 88 ¶ 282. In a text message conversation at or near the same time, Juline informed Rosana that "[J]ohn [Wockenfuss] said we can't have the employers sign the letter, so I don't know what we are going to do." *Id.* ¶ 283.

Meanwhile, Terry and Juline made plans to distribute a "sanitized" version of their J-1 program to other community colleges that wished to replicate it. *Id.* at 89 ¶ 285. In this email, Juline acknowledged concerns about the WITCC J-1 Program:

Yes. I intended to send it on, I just have to make some changes first. I'm afraid we squeaked by with the state department and they are going to be pickier now. I don't want it to be ruined for us if others try to submit the same thing. I have been in touch with the city of Ft. Dodge and they are clearly wanting to use this as a work force solution. My rewrite that I'm sending Ft. Dodge will be less open to interpretation. Tell them it's coming. I learned a lot more from Rosana yesterday that I need to incorporate. My concern is not so much that they won't get it as it is that we will be negatively impacted if they spin this as workforce.

Does that make sense?

*Id.* ¶ 286.

On the following day, May 24, 2019, Rosana and Juline discussed whether they were offering a J-1 Internship Program, Trainee Program, or Academic Training. First, Rosana texted Juline:

Juli...are you here at the College. I looked over some information. This woman who is telling you that our program is a trainee category is wrong. I would [like] to show you what I found.

\*       \*       \*

Juli.....Let me call you to bring you some peace. The woman who talked to you in the Dept of Education [sic] is wrong. I have all the information from the US embassy right in front of my eyes. We were approved for the

41

Student, College/University category. Its [sic] there stamped on our SEVIS page. If you can't talk. At least check the email I'm preparing for you.

*Id.* at 90 ¶ 287. The referenced email was sent that day at 10:17 a.m., and read:

Please read carefully this email. Like I said in my text, whomever is talking to you in the Dept of Education [sic] is mistaken. WE are NOT a trainee program. We could never be. Trainees come to the US under a J! [sic] visa not to study, but to go to their fields to gain more practice. See below.

This is the information from where I took the information. It is a governmental and official website:

https://j1visa.state.gov/programs/college-and-university-student/

https://j1visa.state.gov/programs/trainee/

That's what I found there:

Trainee Program

Training programs are designed to allow foreign professionals to come to the United States to gain exposure to U.S. culture and to receive training in U.S. business practices in their chosen occupational field.

It says PROFESSIONALS, not students. They don't come to STUDY. You did not apply for this category.

A trainee must be a foreign national who:

Has a degree or professional certificate from a foreign post-secondary academic institution and at least one year of prior related work experience in his or her occupational field outside the United States; or

Has five years of work experience outside the United States in the occupational field in which they are seeking training.

\* \* \*

We are not in the intern category either, although it can be combined. Keep reading

42

Intern Program

Internship programs are designed to allow foreign college and university students or recent graduates to come to the Untied States to gain exposure to U.S. culture and to receive hands-on experience in U.S. business practices in their chosen occupational field.

Interns must be foreign nationals:

> Who are currently enrolled in and pursuing studies at a foreign degree-or certificate-granting post-secondary academic institution outside the United States; or

> Who have graduated from such an institution no more than 12 months prior to their exchange visitor program start date.

*    *    *

College and University Student Program

Foreign students have the opportunity to study at American degree-granting post-secondary accredited academic institutions, or participate in a student internship program that will fulfill the educational objectives of the student's degree program in his or her home country.

College/University Students must:

> Be financed directly or indirectly by the U.S. government, the government of their home country, an international organization of which the Untied States is a member by treaty or statute, or supported substantially by funding from any source other than personal or family funds.

> Be carried out according to an agreement between the U.S. government and a foreign government, or according to a written agreement between American and Foreign educational institutions, an American educational institution and a foreign government or a state or local government in the United States and a foreign government; or Student is participating in a student internship program that will fulfill the educational

> objectives for the student's degree program in his or her home
> country; or
>
> Pursue a non-degree program must be enrolled full-time in a
> prescribed course of study. The maximum duration of a non-
> degree program is 24 months inclusive of academic training.

*Id.* at 90-92 ¶ 288.

After reviewing Rosana's email, and a phone conversation with the State
Department, Juline texted Rosana:

> Ok. I talked with the lady who approved our application from the state
> department. This is what she told me. I told her I thought the training was
> something else, like a mom [sic] credit program. She said no and that she's
> been doing this for 30 years so she knew what she was talking about.

*Id.* at 92 ¶ 289. Rosana responded:

> I understand that this is what she said. But, according to the immigration
> information. We could never be in a trainee category, because this is for
> professionals and our category on SEVIS is student college/university,
> which can be related to Intern. You said she is retiring on the 31st. We will
> need to talk to another person. I mean, call SEVIS and confirm our
> category, ask for more clarification and go from there. This woman cannot
> be right and immigration and SEVIS wrong. That's what I think. Let's do
> it Tuesday? Talk to SEVIS? And, we may wait and talk to another person
> in the Dept of EducatCanoi [sic] And as for Royal Canin, well, there's still
> Seaboards, Tyson.

*Id.* at 92-93 ¶ 290. Rosana and Juline both referenced a need to do some "reading," with
Rosana acknowledging that she was reading the "ARO guide, on pages 31 and 34." *Id.*
at 93 ¶ 291. The "ARO guide" referenced by Rosana was the packet, "A Guide for
Responsible Officers and Alternate Responsible Officers," authored by the State
Department, October 2018 version. *Id.* ¶ 292. This document was sent to Juline by the
State Department in February 2019, when WITCC was approved for the J-1 Program,
and was forwarded to Rosana on May 9, 2019. *Id.* at 94 ¶ 293.

44

Page 31 of the Guide explained a frequently asked question about "Academic Training" under the J-1 Visa category for college and university students:

> Q: Academic training – Is there any guidance on collection and retention of information about Academic Training sites, as well as evaluation expectation and or content?
>
> A: Many exchange visitors in the college and university student category are eligible to participate in academic training as part of their exchange program. Per the regulations, certain requirements, including securing written approval from the responsible officer, must be met prior to beginning any training program[.] See § 62.23(f) and (f)(3)(iv) of the regulations.
>
> Our assessment of academic training defines the site of activities as third party entities. Sponsors should begin putting a process in place to screen the third parties to ensure they understand the purpose of the Exchange Visitor Program. Sponsors should also put a monitoring plan in place to ensure the exchange visitor's health, safety and welfare. Because academic training usually occurs off campus, it is imperative sponsors have sufficient oversight of the exchange visitor's program and that includes monitoring the exchange visitors and knowing the host entity is meeting the purpose of the Exchange Visitor Program.

*Id.* ¶ 294.

On May 28, 2019, Rosana and Juline continued their discussion about disclosing the actual host companies where the students would be working on government paperwork. *Id.* at 95 ¶ 296. Rosana explained:

> Host Organization IS the companies, not us…. I found the official information. So, yes, you will need to talk to John [Wockenfuss] and visit with Royal Canin again, Seaboards and any other company to talk about training, not job, offer letters and theis [sic] participation in the DS7002 providing specific information and signatures.

*Id.* ¶ 297. Juline responded: "Let's be the host and have J&L run the scholarship and payroll through us. We can place the students wherever we want." *Id.* ¶ 298. The same day, Juline emailed State Department employee Rhonda Convert: "[C]an the college be the sponsor as well as the host on the DS-7002?" *Id.* at 96 ¶ 299. Convert responded

45

with the definition of Host Organization, Sponsor, and the regulation regarding sponsorship eligibility:

> *Host Organization.* A third party in the United States that conducts training and/or internship programs on behalf of a designated sponsor pursuant to an executed written agreement between the two parties.

> *Sponsor.* A legal entity designated by the Secretary of State to conduct an exchange visitor program.

> 62.3 Sponsor eligibility.

> (a) the following types of entities are eligible to apply for designation as a sponsor of an exchange visitor program:

>> (1) U.S. local, state, and federal government agencies to include the District of Columbia; and government agencies of any U.S. territories and outlying possessions;

>> (2) International agencies or organizations of which the United States is a member and that have an office in the United States; or

>> (3) Reputable organizations that are United States Persons.

> (b) To be eligible for designation as a sponsor, an entity is required to:

>> (1) Demonstrate, to the Department of State's satisfaction, its ability to comply and remain in continual compliance with all applicable provisions of this part;

>> (2) Meet at all times its financial obligations and responsibilities attendant to successful sponsorship of its exchange visitor program; and

>> (3) Demonstrate that the organization or its proposed Responsible Officer has no fewer than three years' experience in international exchange.

I hope this information is helpful.

46

*Id.* at 96-97 ¶ 300.

On May 29, 2019, in sharing J-1 Visa information with other community colleges, Juline again acknowledged to Terry that the J-1 Visa cannot be used as a workforce program. *Id.* at 97 ¶ 301. Rosana retained the services of an attorney in Chile, Erwin Schulz, and WITCC paid for his services. *Id.* ¶¶ 302, 303. Together, Rosana and Schulz filled out documents that stated the J-1 students were enrolled as full-time post-secondary students at the Liceo of Papudo, a college in Chile. *Id.* ¶ 304.

Juline and Rosana acknowledged that WITCC could not, and were not going to, use J&L for the J-1 Program in WhatsApp messages amongst themselves on July 17, 2019. *Id.* at 98 ¶¶ 305, 306. Around this time, Terry Yi questioned Rosana about the program. According to Rosana's message to Juline, Yi was "very worried about J&L, that we cannot do that, because it is illegal, blah blah blah." *Id.* ¶ 307. Rosana and Juline then moved on to discussing the process of getting a social security card for the students without mentioning that they were using J&L. *Id.* at 98-99 ¶ 308. Rosana and Juline further discussed that it would be dangerous for the college if there was any communication between the Social Security Office and the State Department. *Id.* at 99 ¶ 309.

### D. The J-1 Program from the Plaintiffs' Perspective

The J-1 program was advertised as a program in which students could earn money and learn at the same time. *Id.* at 99 ¶ 310. Lily told applicants that they did not need to be fluent in English because they would study English at WITCC. *Id.* ¶ 311.

After receiving interest from applicants, WITCC held a video meeting to provide information to prospective students. *Id.* at 100 ¶ 312. During this video call, Lily and Rosana told the applicants that there were two academic programs available: robotics and culinary arts. *Id.* ¶ 313. WITCC promised the students paid internships related to the area of study they selected and promised that they would receive a degree at the end of their participation in the J-1 program. *Id.* ¶¶ 314-15. Lily and Rosana then told the

47

applicants that the program and their housing was going to be free.  *Id.* ¶ 316.  The applicants were also told they would be provided with health insurance.  *Id.* ¶ 317.  On May 6, 2019, WITCC's Director of Marketing shared a new advertisement for the J-1 program with Rosana and Lily.  *Id.* at 101 ¶ 318.   This advertisement, in large bold letters, stated the J-1 program had "FREE COLLEGE AND HOUSING" and further stated that the student would receive a "technical diploma."  *Id.* at 101 ¶¶ 319-20.

Around the same time, Lily began promoting the program on social media.  *Id.* ¶ 321.  The plaintiffs relied on the promises of free tuition, free housing, an internship and a degree from an American educational institution when they decided to apply for the program.  *Id.* at 101-02 ¶ 322.  Despite these advertisements, Rosana stated in a private conversation with Juline and Lily that "Our students will receive minimum wage" and that "J&L is kind of a crappy agency, but we got to start with something."  *Id.* at 102 ¶ 323.   On March 21, 2019, during Lily's recruitment efforts, she explained to a prospective J-1 student that "I assure you, the jobs here are going to give you depression….I'm going through all that…are jobs that nobody wants to do."  *Id.* ¶ 324.

Based on conversations with Rosana and Lily, plaintiffs believed they would not have to pay for meals either.  *Id.* at 103 ¶ 326.  On March 31, 2019, Lily messaged Fernando privately on Facebook telling him: "In Santiago they're going to meet us and they're going to have a job interview in English with an American who's going to give the job contacts."  *Id.* ¶ 327.  After the students were accepted into the program, but before they arrived in the United States, Rosana informed them that J&L was not going to be the sponsor of the J-1 program.  *Id.* ¶ 328.  On May 23, 2019, the Chilean students were informed that the program would in fact only last one year.  *Id.* at 104 ¶ 329.  Rosana also informed the students that the courses of study were being changed from culinary arts to "Food preparation" and robotics was being changed to "manufacturing.  *Id.* ¶ 330.

On June 3, 2019, each J-1 student was sent an acceptance letter for a one-year program. These acceptance letters repeated that the students would not be responsible for

any tuition, fees, housing, class supplies, or meals. *Id.* ¶ 331. Also included was an "Accommodation Information Letter" informing the students that they were required to live in WITCC's on-campus housing. *Id.* at 104-05 ¶ 332. When plaintiffs were informed of their internship placements, they were surprised that the jobs did not seem to be related to their field of study.[11] *Id.* at 105-06 ¶ 335.

On June 12, 2019, Rosana provided plaintiffs with a letter stating that there were multiple mistakes on the students' visa applications. Doc. 285-11 at 49. This letter instructed the J-1 students that they could not refer to themselves as "workers" that earn a "salary" or "wage," but instead that they were "interns" that would receive a "stipend" or "compensation." Doc. 321 at 106 ¶ 337. This letter further explained that WITCC could not list J&L as a partner on the visa applications, despite the fact that J&L would place the students at jobs. *Id.* at 107 ¶ 338. Rosana wrote: "At any moment, we are allowed to mention that the reason for J1 paid internship is the lack of workers in the area, even when indeed there is a need for workers." *Id.* ¶ 339. The students were then informed their program titles were changed from "culinary arts" to "food services" and from "robotics" to "electromechanical technician." *Id.* ¶ 340. The letter concluded by instructing the students to return their visa materials to Carlos "to be destroyed." *Id.* ¶ 341.

Lily and Carlos told the students if the consulate saw those documents, their visa applications would be denied. *Id.* ¶ 342. Claudio followed this instruction and destroyed his documents. *Id.* at 108 ¶ 343. Fernando furnished these documents to Carlos so that he could destroy them. *Id.* ¶ 344. Eduardo, David, Nestor, Alejandro, Natalia, Gonzalo, and Diego did not follow Defendants' instruction to destroy the documents they received

---

[11] Plaintiffs state specific dates and meetings of when they were informed of their internships, but they have failed to cite to any evidence outside of the Third Amended Complaint (Doc. 93), which is not evidence for summary judgment purposes. However, construing the facts in the light most favorable to the non-moving party, it stands to reason that plaintiffs were informed of their internship placements at some point before beginning their internships.

in Santiago.  *Id.* ¶ 345.  Nestor did not destroy the documents because "it's very rare that they ask you to sign a contract, and then ask you to destroy it."  *Id.* ¶ 346.  Natalia kept the documents because she started to distrust WITCC after they told her to destroy the documents.  *Id.* ¶ 347.

Lily, Carlos, and Soledad coached the students on what to say during their consular interviews to get their visas.  *Id.* ¶ 348.  To avoid failing their interviews, the students were instructed not to mention they were filling a labor need "because Iowa needs workers."  *Id.* at 109 ¶ 349.  To receive their education and paid internships, the students followed these instructions.  *Id.* at 110 ¶ 350.  Alejandro testified that Carlos, Soledad and Lily threatened immigration consequences if he said the wrong thing during the interview.  Doc. 285-8 at 93-94.

Prior to the students' arrival in the United States, Yi shared concerns he had about the program with Rosana and Juline.  Doc. 321 at 110 ¶ 353.  Juline sent another message to Rosana stating "Does [Terry Yi] know we aren't supposed to use [J&L] or just that we decided not to? Terry Murrell and I met last week with J&L about something else and decided not to tell them anything yet. I am afraid Terry Yi will turn us into the state dept…."  *Id.* ¶ 354.  Rosana replied to Juline's message with an audio recording, stating:

> Terry said he is very worried about J&L, that we cannot do that, because it is illegal, blah blah blah. So somehow even Terry Murrell said something about that.

*    *    *

> And if he wants to know the calculations oh how much money are we gonna make or are we making money with that or not. Well. You tell him whatever you want. I remember you telling me the biggest purpose, remember I asked you one time, Juline what is the college gaining with all that? Well it needs to fill out the dorms because we pay the bill, the construction bill. So if we don't make any extra money, or profit, but if we can at least use the money that the housing that they are paying to help bills, then yes it is a good deal. There is something called a normal profit. It is when there is no profit and no loss. Enough money to pay your bills.

50

It is helping us to pay off the construction for Prairie Place and Bur Oak.

*Id.* at 110-111 ¶ 355.  Prairie Place and Bur Oak are the newest dormitories constructed on WITCC's campus.  *Id.* at 111 ¶ 356.

On August 1, 2019, Kelly emailed Juline: "Nancy let me know about the access office needing a letter stating where the students would be working.  If need be you can put Premier Services Inc. as the employer of record. We are a business incorporated in the state of Iowa. Let me know if there are issues." *Id.* ¶ 358.  After receiving Kelly's email, Juline emailed various employees at the State Department, saying:

> At Western Iowa Tech Community College we work with a local business who helps us to place students into paid internships. They arrange the internships and are the point of contact between the student and the business. Is it possible to use this company in placing our J1 students in their internships as well?

*Id.* ¶ 359.  This email did not state the local business was a staffing agency.  *Id.* at 113 ¶ 360.  A State Department official replied: "Sponsors are authorized to engage third party organizations considering there's a written agreement in place between the designated J1 sponsor and the proposed third party. I hope this information is helpful." *Id.* ¶ 361.

On August 16, 2019, Andrea Rohlena provided a draft of a press release about WITCC and J&L's partnership, which stated:

> WITCC along with local business partners [is] proud to announce the arrival of 65 international students from Brazil and Chilean along with for dignitaries routinely. WITC will be installing a welcome reception for the students and dignitaries on Monday August 19th from 11:00 AM to noon and W 108 Fe WITC Sioux City campus.
>
> This is a very exciting opportunity for all of us at WTCC, says doctor Julian Albert vice president of learning at WITC. The presence of international students creates A wonderfully diverse and robust learning environment for

51

students faculty and staff. We are honored to be able to provide our students with the opportunity to prepare for a globally competitive workforce.

The international students are part of a unique collaborative partnership with premier services. John wockenfuss and Kelly Connolly with premier services have helped WIC expand upon the students to your academic program by arranging academic training of students at royal cannon and seaboard triumph. We were able to provide these students with valuable training that they will be able to take back to their home countries says Wockenfuss.

*Id.* ¶ 362. John responded to the draft, as follows:

I think this looks fine with Kelly's suggestions of his name (Conolly) and our titles (mine as President and Kelly Vice President) and include Seaboard Triumph Foods (add Foods). If you are ok to add the J&L only that is fine, but the focus needs to be on the students so if we are concerned about the J&L then just leave it at Premier Service Inc. Word is already getting out that we are involved with offering J&L or even Premier Services Inc. Scholarships for students to attend WITCC. So if we want to add that is our contribution to this campaign to assist WITCC then that is fine but does not need to be. When we begin the domestic recruiting then we can grow off of this initial campaign with J&L Staffing and Recruiting in the headlines.

Doc. 285-11 at 78.

On August 18, 2019, Nancy emailed Daniel, Michael, and other Royal Canin employees a list of seven J-1 students who were going to start working at Royal Canin, and included the students' names, gender, level of education, their course of study at WITCC and other skills they possessed. Doc. 321 at 115 ¶¶ 364-65. Michael testified that it was not typical for J&L to provide this information for traditional temporary employees and he did not know what to do with the information because he thought J&L was supplying workers for unskilled labor positions. *Id.* at 116 ¶ 366. On August 20, 2019, Andrea Rohlena prepared the press release and asked Juline for clarification on whether WITCC was partnering with J&L or Premier Services. *Id.* ¶ 368. Juline replied: "Premier Services will provide scholarships to help offset the costs of the students' tuition

and housing costs." *Id.* ¶ 369. Kelly and John both testified that J&L did not fund a scholarship or offer any scholarships for the J-1 program. *Id.* ¶ 370.

On August 17, 2019, the first group of Chilean students arrived in the U.S. *Id.* at 117 ¶ 371. The remaining Chilean students arrived in the U.S. over the next two days. *Id.* ¶ 372. Shortly after the students arrived at WITCC, Nancy met with the students and Lily. *Id.* ¶ 373. Nancy displayed a one-hundred-dollar bill and told the students that they would have to work hard to make money. *Id.* ¶ 374.

On August 26, 2019, Nancy emailed Rosana and stated that a Brazilian J-1 student would work at Seaboard Triumph Foods, and that "We only have 20 places open at RC [Royal Canin] and they have been filled. Either job is good for culinary or robotics." *Id.* ¶ 408. According to Juline, J&L decided job placements and WITCC "went along with that." Doc. 285-4 at 495. Later on August 26, 2019, Rosana emailed Nancy and requested clarification on some of the job placements because they did not correspond to some students' academic programs. Doc. 285-12 at 2.

For a few weeks, the students were not required to work. *Id.* ¶ 375. After their arrival in the United States, WITCC provided the students with weekly $50 Walmart gift cards so they could buy food and other necessities. *Id.* at 118 ¶ 376. All of the classes provided to the students at WITCC were taught in English. *Id.* ¶ 377.

As a prerequisite to begin working in the United States, the students needed to complete a process called "E-Verify." *Id.* ¶ 378. E-Verify is the process certain employers must complete where the employer enters an employee's information into a government database to confirm whether the employee is authorized to work in the United States. *Id.* ¶ 379. E-Verify will cross-reference the information provided by the employer with records kept by the Department of Homeland Security and the Social Security Administration. *Id.* at 119 ¶ 380. Nancy worked with Rosana to complete the students' E-Verify paperwork. *Id.* ¶ 381. J&L, not Royal Canin or Tur-Pak, was responsible for completing the students' E-Verify. *Id.* ¶ 382.

Prior to the J-1 Program, Tur-Pak primarily used J&L to find workers to work in unskilled production jobs. *Id.* ¶ 384. The jobs in which J&L placed the J-1 students at Tur-Pak were unskilled labor positions. *Id.* ¶ 385. Rosana conveyed to J&L that she did not believe the positions at Tur-Pak were appropriate for the students. *Id.* ¶ 387. There were no skilled labor positions available at Tur-Pak during the J-1 program. *Id.* ¶ 388. No one from J&L informed Tur-Pak that the students were interns who needed to be placed in skilled positions. *Id.* at 121 ¶ 389.

J&L placed approximately 20 J-1 students at Royal Canin. *Id.* ¶ 390. Other than the J-1 program, Daniel Klapuch (Daniel) could not remember a time when Royal Canin hired 20 new workers at the same time. *Id.* ¶ 391. Royal Canin had never used J&L's services to fill skilled positions. *Id.* ¶ 392. Royal Canin was not involved in any internship programs and did not hire any interns at its facility in Sioux City. *Id.* ¶ 393. Daniel, as the site manager for Royal Canin, made "very, very clear" to Nancy that Royal Canin could not put students into formalized internships. *Id.* ¶ 394. Despite this, Nancy pursued employment opportunities at Royal Canin for the students. *Id.* ¶ 395. Michael testified that the student workers were not interns: "Because they were working for J&L." *Id.* at 122 ¶ 396. The robotics students who were placed at Royal Canin were not placed in positions pertaining to robotics. *Id.* ¶ 397. At the time, Royal Canin did not offer internships of any kind, let alone internships in culinary arts or robotics. *Id.* ¶ 398.

Vans owned by P.S. Transportation, a Premier Services company, would pick the students up before their scheduled shifts and drive them to Royal Canin or Tur-Pak. *Id.* ¶ 399. The students would arrive about 30 minutes before their shifts. *Id.* ¶ 400. The students who worked at Tur-Pak were charged a fee between $40 and $50 a week to ride in the vans. *Id.* ¶ 402.

Once the students began working, WITCC stopped providing them with gift cards to pay for food. *Id.* ¶ 403. The first J-1 student to start working was Diego Mondaca.[12] *Id.* ¶ 404. Mondaca is the son of Soledad Rojas and the stepson of Carlos Espinoza. *Id.* at 123-24 ¶ 405. Mondaca did not know his rate of pay until his first day working for J&L, when Nancy told him it would be $7.25 an hour. *Id.* at 124 ¶ 406. Mondaca was scheduled to work from 5:30 pm to 6:00 am. *Id.* ¶ 407.

Gonzalo's job duties at Royal Canin included stacking frozen pieces of meat. Doc. 321 at 125 ¶ 410. Karla's job duties at Royal Canin included carrying boxes of pet food containers. *Id.* ¶ 411. Alejandro's job duties at Royal Canin included removing meat from packaging and working on a production line canning pet food. *Id.* ¶ 412. Natalia, Almendra, David, Fernando, Eduardo, Deigo, Nestor, Bairon and Claudio worked on the production line at Tur-Pak, where they placed crackers and lunch meats into a plastic tray. *Id.* at 125-26 ¶ 413. The temperature inside the plant was very cold. *Id.* at 126 ¶ 414.

On August 27, 2019, Nancy emailed Juline stating that "at this time we are placing the students on a work schedule that includes Friday, Saturday, Sunday with one day during the week. Each company that we assign the students to do have a point system that must be maintained in order to not get terminated." *Id.* ¶ 415. On August 28, 2019, after Nancy scheduled two of the students to work overnight shifts, Rosana voiced her concerns to Juline about the demanding overnight hours in which Nancy placed the students. Doc. 308-1 at 30. On August 29, 2019, John sent an internal email to J&L employees regarding a conversation he had with Juline. Doc. 321 at 127 ¶ 417. In this email, John wrote that one covered topic in the conversation was: "Express to WITCC the importance of the rules the students must follow with regards to keeping there [sic] jobs with our partnering employers and WITCC cannot just take them out anytime for cultural events or the student will lose their employment." Doc. 285-22 at 32. Also in

---

[12] Mondaca is not a plaintiff in this lawsuit.

55

this email, John discussed placing students in jobs at Tur-Pak. Doc. 321 at 128 ¶ 418. Nathan Phipps, the plant manager at Tur-Pak, testified that shortly before the students arrived, "J&L gave us a heads up" that J&L wanted to place the students at Tur-Pak. *Id.* ¶ 419.

The students struggled to communicate with their co-workers and supervisors at Royal Canin and Tur-Pak due to their lack of English proficiency, relying on gestures to communicate. *Id.* ¶ 420. Multiple J-1 students complained to Juline, Rosana and Lily that they were unhappy with their jobs at Tur-Pak because they had nothing to do with culinary arts. *Id.* ¶ 421. Karla testified that there was confusion surrounding who she was supposed to notify if she had to miss work: WITCC, J&L or her supervisors at Royal Canin. Doc. 285-8 at 121. If the students missed work, Rosana, Terry Yi, and Nancy[13] told them not to miss work again because they would be deported. Doc. 321 at 129 ¶ 423.

While working at Tur-Pak, female J-1 students were sexually harassed by their co-workers. *Id.* at 130 ¶ 424. On September 11, 2019, Juline notified Nancy that J-1 students were getting sexually harassed while working at Tur-Pak. *Id.* ¶ 425. John was then notified about the students' complaints of sexual harassment. In response, he wrote: "OMG! We definitely will meet with WIT to fill them in on the business world!" *Id.* at 130-31 ¶ 426.

Plaintiffs argue that the J-1 program was bent to force the students to work more hours. They point to an example of WITCC scheduling a cultural event for Chilean Independence Day. *Id.* at 131 ¶ 427. Rosana texted Juline about a disagreement she had with Nancy about the students' attendance at the cultural event:

> So…. Nancy WANTS those who did not work during the week to work tomorrow to compensate. At first I told her that they are students and need to study…blab la bla. She said that [they] have to work 40 hours. I said

---

[13] The J&L Defendants point out that only three of the plaintiffs testified that Nancy directly threatened them with deportation. Doc. 321 at 129 ¶ 423.

the contract they signed with college says that can not be lass than 36. Do I get her point and Im gonna tell the students who will not complete 36 hours to work tomorrow as many hours are needed to complete 36. But I need you to approve it. I'll tell you how the meeting was later. It was tense...but I kept my diplomacy and even in the end, alone, I talked to Nancy, I hugged her, I told her to cam down... and I explained her certain things about dealing with international people that [she] should know. Also I talked to her about TurPak not being a good place for them and that most of them are not even doing anything related to their program. She listened... I'll tell you the rest when we have time...

Doc. 308-1 at 31 (errors in original).

Nancy also continued to schedule some of the students to work from 5:30 pm to 6:00 am at Royal Canin. Doc. 321 at 132 ¶ 430. Tur-Pak wanted the students to work only five days a week, but Nancy told Tur-Pak and the students they had to work six days a week. *Id.* at 133 ¶ 431. On September 13, 2019, Michael sent an email to Nancy asking: "If the school schedule is changed can they work 12 hours?" *Id.* ¶ 432.

When students went to work at Tur-Pak on September 16, 2019, they had no method of contacting J&L's van to come pick them up and take them back to WITCC. *Id.* ¶ 433. On September 17, 2019, when the Chilean students were picked up by the J&L van to go to work, the van was filled over-capacity. *Id.* ¶ 434.

Nancy, without direction from WITCC, began changing the students' work schedules. *Id.* at 134 ¶ 435; Doc. 285-13 at 2. On September 18, 2019, Nancy and Michael agreed to change the students' work schedule at Royal Canin. Doc. 321 at 132 ¶ 436. In an email memorializing her discussion with Michael, Nancy wrote that Royal Canin would "[s]tart allowing the students to work in skilled positions." *Id.* ¶ 437. Michael testified that the skilled positions at Royal Canin available at the time were "operator positions...in the processing area as well as the HRC area." *Id.* at 135 ¶ 438. Michael testified that moving the students into skilled positions was not related to the requirements of the J-1 program, but rather were based on the workers' merit. *Id.* ¶ 440. Michael further testified that Nancy did not want to move the students into skilled

57

positions, but rather it was the shift managers who wanted the students to move into those positions. Doc. 285-4 at 466.

On September 19, 2019, Nancy emailed multiple WITCC and J&L employees regarding the work schedule at Royal Canin. Doc. 321 at 135 ¶ 442. In that email, Nancy attached the students' work schedule, which listed that the students would work from 5:30 p.m. until 12:00 a.m. or 12:00 a.m. to 6:00 p.m. *Id.* at 136 ¶ 443. In a text message, it was alleged that Nancy was insisting that the J-1 students work more than 40 hours a week. *Id.* ¶ 444; Doc. 285-13 at 8-9 ("This is crazy. Why [Nancy] insists that they have to work over 40 hours...they can if they want, but this not part of the deal.").

A J-1 student named Sebastian struggled to keep up with the physical demands of his job at Tur-Pak. *Id.* at 137 ¶ 446. Another J-1 student named Angelica had her visa terminated for refusing to work and was sent back to Chile as a result. *Id.* ¶ 447; Doc. 285-18 at 5. At the same time, the students were receiving conflicting information about their work schedules from WITCC, J&L, Tur-Pak and Royal Canin. Doc. 321 at 138 ¶ 448. The students were confused about who they needed to talk to about the work and school aspects of the J-1 program. *Id.* ¶ 449. When a student came to Juline with questions about work, Juline would direct them to Nancy. *Id.* ¶ 450. The students were confused about who the actual program sponsor was. Fernando testified that when they asked WITCC who the sponsor was, WITCC would say it was J&L, and they asked J&L who the sponsor was, J&L would state it was WITCC. *Id.* at 138-39 ¶ 451.

When the J-1 students missed work, Nancy instructed them to work on weekends. *Id.* ¶ 452. Lily suggested to the students that they should work on weekends because they would be able to pay back their debt to the college faster. *Id.* ¶ 453. On September 23, 2019, Natalia messaged Nancy asking for help with her employment paperwork, but Nancy responded, "you have nothing to sign as you are not our employee." *Id.* at 139-40 ¶ 454.

On September 24, 2019, Gonzalo emailed Nancy stating: "Dear Nancy, I write for ask respect the schedule of work in royal canin, I would like work with the another

58

system turn of twelve hours, because I need study and rest, also I wanna have more days free; greeting." *Id.* at 140 ¶ 455. Also, on September 24, 2019, Diego requested off of work from Tur-Pak due to "very strong pain" in his leg. Doc. 285-14 at 7. On September 26, 2019, a J-1 student named Catalina emailed Nancy about missing work due to health issues. Doc. 321 at 140 ¶ 457. Nancy responded:

> You will NEED to report to work today and not miss any time. We understand that your body is feeling fatigued. Please ask for some ibuprofen at Turpak. Araceli and I will be at Turpak today regarding any questions. It will take time for your body to adjust to the work and hours so you must continue to go to work as scheduled in order to not lose your job.

*Id.* at 141 ¶ 458.

On September 27, 2019, Karla emailed Juline complaining that her work and class schedule was exhausting. *Id.* ¶ 459. On September 28, 2019, Juline messaged Rosana and Lily about the students' jobs. *Id.* at 142 ¶ 461. Juline wrote:

> No more Royal unless/until they change the hours. They can't work for 12 days straight overnight shifts and function. I'm telling Nancy no more royal. If the ones who are there want to stay there then great. But we can't put anyone else there with those hours. We have to find better jobs.

*Id.* On September 28, 2019, Karla was fired from Royal Canin. *Id.* ¶ 462.

On September 30, 2019, Karla emailed Juline, Nancy, and Araceli informing them that the reason she missed work at Royal Canin was because she was receiving conflicting information from WITCC and J&L. *Id.* at 143 ¶ 464. Karla complained to Lily when she was fired from Royal Canin and was placed at Tur-Pak. Lily spoke with Nancy about Karla going back to Royal Canin but Nancy said no. Doc. 285-3 at 13 ¶ 81. On September 30, 2019, Gonzalo emailed Nancy that he felt unwell and could not go to work. *Id.* ¶ 465. Gonzalo then sent another email to Nancy, copying Juline, stating:

> I must indicate that I don't have time for rest and study, I have one example: Since this Monday 30th of September until the next Friday of the next week, I will have to work everyday and go to class in the morning for come back to work, so I don't will have time for study, also this is affecting to my

59

health, I don't can sleep as now at 3am, because arrived recent to my home
at 1 am, I feel bad and I don't have energy for to work.

*Id.* at 143-44 ¶ 466. Gonzalo reported for work that evening from 4:54 p.m. until 12:14
a.m. *Id.* at 144 ¶ 467. Gonzalo had class scheduled at 8:00 a.m. the next morning, but
he was unable to attend on time because of how late he arrived home from work. *Id.* ¶
468; Doc. 285-8 at 162.

Juline attempted to work with Nancy to adjust the work schedule at Royal Canin.
Doc. 321 at 145 ¶ 469; Doc. 285-14 at 2-3. Nancy responded: "Juli please do not talk
to Royal about the schedule, the students just need to be told this is the way it is until
December." *Id.* at 145 ¶ 470. Juline testified that she had multiple conversations with
Nancy in which she emphasized that the J-1 students were students and not workers. *Id.*
¶ 471. Juline also testified that she told Nancy she could not yell at the students for
missing work or require them to work extra hours. *Id.* at 146 ¶ 472. Juline further
testified that WITCC president Terry Murrell even visited J&L to emphasize that the
students' studies were more important than their work. Doc. 308-1 at 11.

On October 1, 2019, Alejandro sustained an injury to his thumb while working at
Royal Canin. Doc. 321 at 147 ¶ 474. Alejandro was fired shortly after and was told
that the reason for his firing was not reporting to work and failing to report an injury.
Doc. 262-17 at 189.

Also on October 1, 2019, Karla's E-Verify was rejected by the Department of
Homeland Security. Doc. 321 at 147 ¶ 475. That same day, Diego emailed WITCC
professor Matthew Peabody stating: "I am writing to apologize for missing today, but I
am still very bad on my leg, and they do not let me miss work." *Id.* at 148 ¶ 476.
Peabody responded: "Too bad they won't let you miss work when you are hurt, but class
is important too!" *Id.* ¶ 477.

On October 4, 2019, Eduardo emailed Nancy and Araceli, notifying them that he
was sick. *Id.* ¶ 478. Nancy responded: "You must go to work or risk losing your job.
If you're truly sick they will send you home." *Id.* ¶ 479. On October 8, 2019, Almendra

60

emailed Nancy stating she would need to miss work for a dentist appointment. *Id.* at 149 ¶ 480. Nancy responded, stating "All appointments MUST be scheduled either before or after work; No exceptions! You MUST go to work!" *Id.* ¶ 481.

On October 10, 2019, Nancy emailed WITCC employees listing multiple Chilean students who needed to still complete E-Verify. *Id.* ¶ 482. Juline forwarded this message to WITCC professor Matthew Peabody, stating the students' "status in the US depends on [completing E-Verify]." *Id.* Rosana emailed Juline identifying the problem with E-Verify: "All of them fell into [sic] e-verify because J&L or Premium are not in the DS2019. We took them out of the DS2019 because that's what the woman told you to do." *Id.* at 150 ¶ 483. By October 15, 2019, multiple J-1 students failed E-Verify. *Id.* ¶ 484. As Rosana stated, the information being provided to E-Verify did not match the information that was provided to the Department of Homeland Security when the students applied for their visas. *Id.* ¶ 485.

Juline texted Nancy that WITCC was "potentially sending 11 [students] home but please keep that silent. They shouldn't know yet." *Id.* at 151 ¶ 486. Nancy responded and suggested that Juline should change the students' E-Verify paperwork to list Premier Services as the employer instead of J&L. *Id.* ¶ 487. The next day, Juline texted Nancy: "I am sending you an email. Again, I'm asking you not to contact the Chileans who did not pass and not to contact E-Verify." *Id.* ¶ 488.

Nancy continued to try and schedule the students to work shifts on Saturdays. *Id.* ¶ 489. She also suggested that if the students worked 40 hours a week, weekend shifts would include overtime pay. *Id.* Juline did not want to allow the students to work overtime due to their struggles in their classes. Doc. 285-16 at 6.

On October 16, 2019, Juline messaged Rosana on WhatsApp asking for help with SEVIS. Doc. 321 at 152 ¶ 491. Rosana told Juline she needed to find a way to "put Premier Services together with Western Iowa Tech as a first site of activity…remember we took J&L off as a site of activity…." *Id.* ¶ 492. Nancy texted Juline: "Juli, in the paperwork that WITC did the employer needs to be premier services not WITC or J&L.

61

Rosana changed this for the Brazilian students can you do this for the Chilean students so they can pass E-Verify? That is what is hanging them up." *Id.* at 153 ¶ 493. At Nancy's direction, Araceli messaged Karla on WhatsApp to try and fix Karla's E-Verify issues. Doc. 285-16 at 9-11. Then, Juline emailed J&L, instructing it to stop contacting E-Verify because "WITCC is the sponsor of the program" instead of J&L. Doc. 321 at 153 ¶ 495.

On October 17, 2019, Nancy texted Juline, Rosana and Lily: "Can you give me all the other dates for cultural events so I can let both companies know if people are going to be missing from work. Also are you okay with me telling students they must work on Saturdays now...." *Id.* at 154-55 ¶ 496. Rosana messaged Juline separately on WhatsApp: "Please say no to Nancy to her last request. Supervisors said they don't need too [sic]...only if they want...and that will be the only day for them to look for jobs. They are not supposed to work more than 40 hours." *Id.* at 155 ¶ 497.

On October 19, 2019, Juline messaged Rosana and Lily on Facebook instructing them to collect payments from students for their health insurance. *Id.* ¶ 498. Juline also instructed them to collect money from a J-1 student named Catalina because "it is only fair that she pay the money back as she gets her check from WIT." *Id.* ¶ 499.

On October 22, 2019, Nancy messaged Juline and informed her that students were asking for more information about their paychecks. *Id.* ¶ 500. The students had complained to J&L that they did not want to work through J&L because J&L and WITCC were stealing part of the wage they were earning by working at Royal Canin and Tur-Pak. *Id.* at 155 ¶ 501. Juline replied:

> How many and which ones? I'm so upset with these kids. Honestly, just let them go. We can't hold them. They can get their own jobs and do payroll deduct to pay their bill. Honestly, Nancy, we are getting next to nothing for those working at turpak. It's almost November and many have paid less than $150. It's just not worth the extra hassle. Turn them loose, Terry Yi will talk to them and let them know they are 100 percent on their own. I didn't tell you but 3 weeks ago I had 2 monthers [sic] emailing and threatening. Going to call immigration. Calling turpak slavery. Saying

> J&L and wit are treating students like slaves. It's just not worth the risk.
> I really want you to let all troublemakers go. Tell them they are all fired.
> I can [sic] risk wit being on the front page of the paper. Thanks.

*Id.* ¶ 502.

On October 24, 2019, Nancy emailed multiple employees at Royal Canin that a Brazilian student would be hired to replace a J-1 student who J&L had fired. *Id.* at 156 ¶ 504. Royal Canin employee Susan Lowrey emailed other Royal Canin employees writing: "What happened to [REDACTED]? Rumor mill is fired because of attendance because had emergency surgery and Nancy told [REDACTED] too bad and fired. Hope not the message that RC is sending this and that this is a J and L/Nancy decision. I have also heard that Nancy is not treating them nice and that they are not happy."[14] *Id.* ¶ 505. Another Royal Canin employee named Quentin Bruguier responded, writing, "Yeah those are the rumors I am hearing as well. I forgot to send her message last week saying we want to keep [REDACTED]."[15] *Id.* at 157-58 ¶ 506. Susan replied, "Thank you for the input. I believe all is true and it makes me sad." *Id.* ¶ 507. When Michael received the emails from Susan about Nancy, he was concerned. *Id.* ¶ 508.

Some students began asking their co-workers at Royal Canin and Tur-Pak how much they were being paid. *Id.* ¶ 509. Other Royal Canin and Tur-Pak employees,

---

[14] The J&L Defendants argue that this fact contains multiple levels of hearsay. The statements made by Lowrey are admissible as opposing party statements under Federal Rule of Evidence 801(d)(2)(D). Nancy's alleged statements are admissible as opposing party statements under Federal Rule of Evidence 801(d)(2)(A). Finally, Lowrey's statements about the "rumor mill" and impressions of Nancy's treatment are admissible because they are not being offered for the truth of the matter asserted, but rather to convey Lowrey's impressions.

[15] The J&L Defendants argue that there is no evidence Quentin Bruguier was a Royal Canin employee and thus the party-opponent rule does not apply. However, the referenced email came from the following email account" quentin.gruguier@royalcanin.com. At this stage, this is sufficient evidence to apply the party-opponent rule to his statements. Fed. R. Evid. 801(d)(2)(D). The rumors he references are not being offered for the truth of the matter asserted, thus making that portion of his email admissible.

including managers, told the students they were making significantly more money than the minimum wage. *Id.* at 158 ¶ 510.

Employees at Tur-Pak told plaintiffs they were being "robbed."[16] *Id.* ¶ 512. Fernando's supervisor at Tur-Pak laughed when they learned the students were studying culinary arts and were working in a factory packing Lunchables. *Id.* ¶ 513. After speaking with their coworkers, the students were confused about why their pay was so low. *Id.* ¶ 514. The students met with Araceli to review their paystubs because they were wondering where part of their wages were going. *Id.* ¶ 515. Araceli told the students that the students were being paid $10.35 an hour, with $3.10 per hour being withheld and sent to WITCC once a month. *Id.* ¶ 516. Araceli was unaware of this pay arrangement between J&L and WITCC until she met with the students to review their paystubs. *Id.* ¶ 517. The students also asked why Nancy was making them work even when they were sick. *Id.* at 160 ¶ 518. Araceli said that Nancy was making sure the students met their hours required for them to remain in the J-1 program. *Id.* ¶ 519. The students then asked if they could speak with anyone other than Nancy or Araceli. *Id.* ¶ 520.

John was aware that the students had complaints about their jobs at Royal Canin and Tur-Pak. *Id.* ¶ 521. John believed these complaints were nothing out of the ordinary because Nancy told him the businesses were accommodating the students' needs. *Id.* ¶ 522. John was unable to identify anything specific that Royal Canin or Tur-Pak did to accommodate the students. *Id.* at 161 ¶ 523.

Some students began seeking employment at businesses other than Royal Canin and Tur-Pak. *Id.* ¶ 524. Students were told that there were no other jobs available outside of Royal Canin and Tur-Pak. *Id.* ¶ 525. Some students who were working at employers who were not partnered with J&L were threatened with deportation. *Id.* at

---

[16] These statements are admissible as opposing party statements under Federal Rule of Evidence 801(d)(2)(D) because they came from co-defendant Tur-Pak's employees.

161-62 ¶ 526. Terry Yi threatened the J-1 students with deportation if they missed classes or work. *Id.* at 162 ¶ 527. Rosana threatened to deport the J-1 students for not attending classes and work. *Id.* at 163 ¶ 528. Three J-1 students testified that Nancy herself delivered threats of deportation if they missed work. *Id.* ¶ 529.

If students worked at outside jobs after being terminated by Royal Canin, Tur-Pak or J&L, Juline had other WITCC employees set up payment plans so that WITCC received money from them. Doc. 285-16 at 26-29. Some students were placed in jobs at WITCC in which they received the minimum wage. Doc. 321 at 164 ¶ 532. Gonzalo was placed in a tutoring position at WITCC. *Id.* at 165 ¶ 533. Alejandro was placed in a position painting the university dorms. *Id.* ¶ 534. After WITCC parted ways with J&L, the students received bills indicating they owed hundreds or thousands of dollars to the college. *Id.* ¶ 535.

On October 28, 2019, Daniel Klapuch from Royal Canin emailed J&L expressing concerns he had about the J-1 program, including that students were not receiving accommodations for their medical needs. *Id.* at 166 ¶ 536. Nancy replied that the students all "love their jobs at RC [Royal Canin]." *Id.* ¶ 537. Nancy also wrote, "We did have one student have a medical issue at Royal Canin; it was an injury that happened outside of work; due to his dishonesty with his injury, his employment was terminated with approval from his Supervisor." *Id.* at 166-67 ¶ 538.

On October 30, 2019, internal emails were exchanged amongst J&L employees, including Nancy, John, Kelly and Jennifer Coburn. *Id.* at 167 ¶ 539. The purpose of Nancy's initial email was for Nancy to update the rest of J&L's leadership about a meeting she had with WITCC. *Id.* ¶ 540. Nancy described how WITCC was garnishing the wages of students who no longer worked for J&L or WITCC. *Id.* ¶ 541. Matt Short responded to Nancy's email, writing: "Just a couple of questions came to mind. Was it addressed that it is against the law and the agreement we have with WIT that the students are not working for J&L or WIT?" *Id.* ¶ 542. Gene Wockenfuss, Vice President of Executive Recruiting and Business Development for J&L, then suggested a method for

65

making sure J-1 students would continue working at J&L, writing: "I would strongly add one more piece for future recruitment…. Not only does the student sign off on our stipulations, BUT need to have 'skin' in the game to assure their vested and understand the expectation! My suggestion is a $500 deposit! Why, well, if they don't work out, we use it to send them home!" *Id.* at 168 ¶¶ 543, 544.

On November 1, 2019, Juline emailed Nancy asking if the students could have time off from work in December for cultural exchange activities. *Id.* ¶ 545. Nancy responded that only half of the students working at Royal Canin could have that time off. *Id.* at 169. ¶ 546. On November 6, 2019, Juline messaged Lily that the students must "pay their own way" home to South America. *Id.* ¶ 547. Lily replied: "Let's make a list and give them the day we want them to leave the college and apartments. And cancel their visas." *Id.* ¶ 548.

On November 11, 2019, a Brazilian J-1 student named Natasha emailed Juline informing her that she would be working overtime. Doc. 285-17 at 32. Juline forwarded this message to Nancy, Jennifer, and Araceli asking if Natasha could work overtime hours. Doc. 321 at 170 ¶ 550. Juline also asked if J&L could "giv[e] the Royal employees 100% of their overtime[.]" Doc. 308-1 at 25. Jennifer responded that J&L would "continue to send the funds to [WITCC] as originally set up." Doc. 308-1 at 25. Nancy followed up with Juline and wrote: "I thought that once the students paid off their school tuition with WITCC, they would then receive any extra money that is in their 'account' at WITC from the college." Doc. 321 at 170 ¶ 552. On November 11, 2019, Juline texted Rosana that even if J-1 students worked overtime, they were not entitled to the full amount they earned:

> Rosana, sadly you will need to break the bad news to the Brazilian students that J&L will not pay 100 percent of the overtime to the students. They will continue to split the difference between wit and the student. Even Natasha. Perhaps the students could participate in a fundraiser to help Natasha raise some money? I think you should tell all students to stop with overtime. I think that makes us out of compliance.

66

*Id.* at 171 ¶ 553.

On November 12, 2019, Mark Howard, a representative of the Private Sector Exchange Program Administration within the State Department's Bureau of Educational and Cultural Affairs, emailed Juline to schedule an inspection of the student intern program. *Id.* ¶ 554. Juline later learned that the investigation was due to complaints made by the J-1 students. *Id.* ¶ 555. Juline informed Rosana that the investigators wanted to look at the students' files, including the students who were returned to Chile. *Id.* at 172 ¶ 556. Rosana later sent an audio message where she stated: "Don't forget to say there was a student who refused to go to classes. I don't know. I don't know how we are going to explain Sebastian and Angelica." *Id.* ¶ 557. Juline shared this with Nancy via text messages, writing: "They basically implied we were using them for cheap labor" and "Basically the complaint is we have them doing menial jobs and that's not what they are supposed to do. *Id.* ¶ 558.

In response, Nancy wrote: "So none of this has to do with Royal correct [?] If we can save Royal then were [sic] still in the game I'm scared." *Id.* at 173 ¶ 559. Later that day, Rosana sent Juline an audio message in which Rosana reported she was communicating with a manager at Royal Canin. *Id.* ¶ 560. Rosana told Juline she was attempting to convince Royal Canin to hire the J-1 students directly so they could stop partnering with J&L in violation of the federal regulations.[17] *Id.* The next day, Rosana sent an email to Nancy, John, Jennifer and Kelly notifying them that "Wit students are no longer working at turpak or connected to J&L. We have to follow government

---

[17] The J&L Defendants dispute this fact because they argue that the recording does not specifically discuss federal regulations. In the recording, Rosana discusses how it is not allowable under the law to partner with J&L: "[Students] are not happy with J&L. And even if J&L were—was-- the best company ever, we cannot do it. And I showed him the law and he said 'Yeah, it's very clear.'" Construing this recording in the light most favorable to the non-moving party, I find that is reasonable to infer that Rosana was referring to the federal regulations that applied to the J-1 program. Additionally, Rosana quoting another party is not hearsay because the quotation is not offered for the truth of the matter asserted, but rather to show that she was discussing federal regulations generally.

regulation and the legal process." *Id.* ¶ 561. Following Rosana's email, Daniel emailed Nancy directly with the subject line "22 CFR 62.23 Section 8 Sub 3."[18] *Id.* at 174 ¶ 562. Daniel asked Nancy:

> Is this possibly what WIT is referring to in regards to their regulations comment? Have you heard anything else? On another note: would Royal Canin be able to hire any of the students? Is there anything within the J and L/RC contract that would prohibit us from pursuing this? … I hope there is some way to salvage this program with you and J and L.

*Id.* at 174 ¶ 563. Kelly forwarded Rosana's message to Juline and Terry and wrote:

> We received this email and have been dealing with the talks of replacing all of the students at their workplace. The speculations are all over the board and we would like to have an idea of what is transpiring on your end. We have discussed the situation with our immigration attorney and we were advised not to jump to any conclusions and see what is actually happening. We will wait for directive from you and proceed accordingly. Hopefully this is only a hiccup and does not jeopardize future programs.

*Id.* ¶ 565.

Prior to the State Department's arrival in Sioux City, John and Kelly contacted attorney Amy Peck seeking advice. *Id.* at 175 ¶ 566. On November 14, 2019, John emailed Peck writing: "Are you available to speak this morning about a situation that has happened most recently? Thanks." *Id.* ¶ 567. On November 15, 2019, Howard e-mailed Juline to inform her that the State Department would be visiting campus from November 18 to November 21 for interviews with the WITCC faculty, the J-1 interns and the staff of Premier Services. *Id.* ¶ 568. Diego testified that Lily told him "It was better for me to stay quiet to say that everything was fine to the investigators." Doc. 285-8 at 176. Lily told at least one student that if the students told the State Department the truth about

---

[18] 22 CFR 62.23(8)(iii) provides that sponsors of student internship programs must "[n]ot engage or otherwise cooperate or contract with a staffing/employment agency to recruit, screen, orient, place, evaluate, or train student interns, or in any other way involve such agencies in an Exchange Visitor Program student internship program."

the program, the program would end and all of the students would be returned to Chile, which would mean that they would not receive a degree. Doc. 321 at 176 ¶ 570.

The State Department's investigators arrived on November 19, 2019. *Id.* at 176-77 ¶ 571. Rosana and Lily were interviewed. *Id.* at 177 ¶ 572. Each J-1 student was interviewed for varying amounts of time, between 20 and 90 minutes. *Id.* ¶ 573. Eduardo told the investigators that he was not receiving his full paycheck because he owed a debt to WITCC. *Id.* ¶ 574. David told the investigators that WITCC was taking money out of his paychecks. *Id.* ¶ 575. Natalia told the investigators that she had doubts about whether she had legal status to remain in the U.S. and was uncertain if she was going to be able to finish her classes. *Id.* ¶ 576.

While these interviews were happening, Michael emailed Daniel and other managers at Royal Canin about the investigation. *Id.* at 178 ¶ 577. He wrote:

> I had a conversation with Juline Albert from Western Iowa Tech College and WIT is being interviewed by the EVP (Exchange visitor program). They are investigating concerns around the Health/Safety and Welfare of the students. The concerns mentioned to WIT during the interview was around the hours the students were working, in my brief conversation this was the only thing that was mentioned. The EVP spent 2 hours interviewing the Staff at WIT and are currently spending 30 min with each student.
>
> There was a request for Daniel and I to give statements to the EVP on what we knew about the program, what we know about the MOU (Memorandum of Understanding) as well as what we know about J1 visas. I suspect they will ask about the jobs the students were doing.
>
> Information that Juline shared with me was they had told them that positions were entry level but Royal Canin was going to give them more responsibility after the semester was over and that we were going to switch the schedule so that they can have more days off during the week.

*     *     *

> Our involvement in this program was minimal just a conversation with J&L representatives that we would be willing to let the students work in our factory.

*Id.* ¶ 578. Michael was not concerned about the State Department visit because "[the J-1 program] wasn't a Royal Canin program. This was a J&L program[.]" *Id.* at 178-79 ¶ 579; Doc. 285-4 at 469. Prior to the state department visit, Michael did not see the students working in entry level positions as a problem. Doc. 321 at 179 ¶ 580.

Juline texted Nancy that the State Department wanted to visit J&L later that week to discuss the program. *Id.* ¶ 581. Nancy directed Juline to call Kelly. *Id.* ¶ 582. Kelly was interviewed by the State Department. *Id.* ¶ 583. During his interview, Kelly "impressed upon" the investigators "the quality of assistance from [Royal Canin] and the importance of allowing the students to have a positive experience while in the program." Doc. 285-19 at 8. Nancy was not interviewed by the State Department. Doc. 321 at 180 ¶ 585.

Daniel Klapuch and Michael Martinez were interviewed by the State Department. *Id.* ¶ 586. Michael was asked about the kind of work the students were doing at Royal Canin. *Id.* ¶ 587. Towards the end of November 2019, Michael learned that the J-1 students were supposed to have cultural exchange experiences and learned "more details around internships and what they were supposed to be studying should have been where they should have been working." *Id.* at 180-81 ¶ 588. Following the State Department's visit, Michael did some independent research into J-1 visas "because from all of the conversations we were having, we knew that there was something that wasn't going right." *Id.* at 181 ¶ 589. By November 24, 2019, Royal Canin was investigating what it could to do to potentially sponsor and hire the students. *Id.* ¶ 590.

On November 25, 2019, Juline emailed Jennifer Coburn asking for more clarification on how the students were being paid overtime. *Id.* ¶ 591. Coburn responded: "The students made $22.50 for all overtime hours. We paid them $10.88/hr for overtime (7.25 x 1.5 = 10.88). So we would have paid the college the difference (22.50 – 10.88

70

= 11.62/OT hour). I hope this helps. Let me know if you need anything else!" *Id.* ¶ 592.

On December 9, 2019, the State Department issued a letter to WITCC identifying 16 different ways the J-1 program was out of compliance with federal regulations. *Id.* at 181-82 ¶ 593. On December 18, 2019, Howard sent Juline an email requesting a phone conference with WIT the following day so they could discuss the changes the program needed to make. *Id.* at 182 ¶ 594. The phone call between WIT and the State Department was held on December 19, 2019. *Id.* ¶ 595.

Because the J-1 students were international workers, they were not required to pay social security taxes out of their paychecks. *Id.* ¶ 596. J&L paid WITCC $36,500 for the labor the J-1 students completed during the month of October. *Id.* at 183 ¶ 597. Juline estimated that J&L paid WITCC roughly $37,000 for the labor the J-1 students completed in November. *Id.* ¶ 598; Doc. 285-20 at 19. For each overtime hour a student worked at Royal Canin, J&L paid them $10.88, which was the time-and-a-half rate for minimum wage. *Id.* at 184 ¶ 600. WITCC received the difference of the total amount earned minus $10.88 an hour. *Id.* ¶ 601.

On November 15, 2019, shortly before the State Department began its investigation, Jennifer sent an internal email to staff at J&L stating, "Just responding to Royal Canin's request to hire [the J-1 students] directly. I realize they may not be able to hire all 20 of them, but any that they hire will be taking revenue from us correct? I was just thinking out loud in an internal company email." *Id.* ¶ 602.

From September 27, 2019 to December 6, 2019, a period of 70 days, the plaintiffs employed at Royal Canin worked the following hours:

    a. Plaintiff Gonzalo Escobar – 88 hours

    b. Plaintiff Karla Norambuena – 56.8 hours

    c. Plaintiff Alejandro Pizarro – 58.45 hours

*Id.* at 185 ¶ 604. From September 27, 2019, to December 6, 2019, the plaintiffs employed at Tur-Pak worked the following hours:

a. Plaintiff Diego Soulodre – 199.6 hours

b. Plaintiff Almendra Gonzales – 281.15 hours

c. Plaintiff Bairon Morel Guerra – 214.65 hours

d. Plaintiff Eduardo Munoz – 267.95 hours

e. Plaintiff Karla Norambuena – 92.45 hours

f. Plaintiff Alejandro Pizarro – 212.6 hours

g. Plaintiff Claudio Ramos – 256.8 hours

h. Plaintiff David Silva Moreno – 296.55 hours

i. Plaintiff Natalia Tapia Leiva – 40.15 hours

j. Plaintiff Fernando Vilches Castillo – 118.95 hours

k. Plaintiff Nestor Acevedo – 338.85 hours

*Id.* at 185-86 ¶ 605.

Michael Martinez testified that Royal Canin benefitted from the program because J&L "provided the head count that we needed to be able to run our old plant." *Id.* at 186-87. ¶ 608. Susan Lowrey testified that Royal Canin received the benefits of the students' labor. *Id.* at 187 ¶ 608. Nathan Phipps testified that his only issue with the J-1 students "was they left too soon." *Id.* ¶ 609.

WITCC charged all J-1 students for tuition, classroom and student fees, housing fees, books charges, computer fees and equipment fees. *Id.* ¶ 613. On April 1, 2020, WITCC controller Brian Smith emailed a "Dormitory Disclosure Summary," which provided financial information about dormitory revenue and stated "[Fiscal Year] 2021 coverage would be more concerning without J-1 Program, outsourcing of Cafeteria, declining Bookstore sales and potential impact of Covid-19 on enrollments." Doc. 285-21 at 1. For the fall 2019 semester, WITCC charged the J-1 students a total of $288,407.80 in fees, though not all of these J-1 students are parties to this lawsuit. Doc. 321 at 189 ¶ 617. The J-1 Program generated $53,430.50 in fees from the J-1 students who are parties to this lawsuit. Doc. 285-20 at 31.

On December 30, 2021, attorneys Sarah Millsap and Amy Peck authored an article called Avoiding Immigration-Related Litigation in the Current Labor Market. Doc. 321 at 189 ¶ 619. This article provided advice to employers on the potential legal issues they could face in the immigration and employment context. *Id.* at 190 ¶ 620.

## E.    *Facts Pertaining to Individual Plaintiffs*

J&L Defendants have also provided facts specific to the individual plaintiffs. Doc. 285-3 at 19-112. I will construe these facts in the light most favorable to the plaintiffs, as the non-moving parties, and include only those facts that may be relevant in ruling on this summary judgment motion.

### 1.    *Nestor Acevedo Contreras*

Nestor Acevedo Contreras (Nestor) was 22 years old when he applied for the J-1 Program. Doc. 285-3 at 19 ¶ 111. Nestor attended high school and graduated from a program dealing with extractive iron work or metallurgy. *Id.* ¶ 112. His high school was four years and he graduated when he was 18. *Id.* ¶ 113. He then attended college in Vina del Mar to be a personal trainer. *Id.* ¶ 114. Before applying for the J-1 Program, Nestor went to Denmark on a "working holiday" visa. *Id.* ¶ 115. In Denmark, he performed carpentry work related to the construction of a gym. *Id.* ¶ 116. He worked five days a week from 7:00 am to 3:00 pm. *Id.* ¶ 117. He communicated with his co-workers in Denmark in English and learned some Danish. *Id.* ¶ 118.

After his job in Denmark ended, he took a six-month holiday and traveled to France, Spain, Andorra, Iran, Thailand and New York. *Id.* ¶ 119. In New York, he stayed in Brooklyn in an Airbnb and took English classes in Manhattan. *Id.* at 20 ¶ 120. He returned home to live with his parents in February 2019. *Id.* ¶ 121. Nestor first learned about the J-1 Program in the middle of March 2019 from a friend. *Id.* ¶ 122. Nestor also went to a meeting with Carlos and Soledad before he applied for the program. *Id.* ¶ 123.

On March 26, 2019, Nestor submitted his application for the J-1 Program via email to Lily. *Id.* ¶ 124. On April 24, 2019, Nestor received an Acceptance Letter from Rosana on behalf of WITCC stating he had been accepted to the J-1 Program. *Id.* ¶ 125. The first time Nestor had contact with anyone from J&L was at the April 27, 2019, meeting in Chile. *Id.* ¶ 126. That meeting was the first and only time Nestor met Nancy or anyone from J&L before he came to the United States to participate in the program. *Id.* ¶ 127. WITCC's President and Lily made a presentation to the group. *Id.* ¶ 128. Nestor met with Nancy at this meeting and she gave him a job offer letter, which was not translated into Spanish. *Id.* at 21 ¶ 130. This offer letter contained a job description in English that matches what Nestor did at Tur-Pak. *Id.* ¶ 131. At the interview, Nestor told Nancy he could read and write English, but J&L passed on concerns about the plaintiffs' ability to speak English after the interviews. *Id.* ¶ 132; Doc. 321 at 61 ¶ 206. Nestor's interview lasted about five minutes. Doc. 285-3 at 21 ¶ 133. After the interview, Nestor took a copy of the job offer letter with him. *Id.* ¶ 134. He reviewed it and signed it at the hotel. *Id.* ¶ 135. Nestor saw the June 12, 2019, email from Soledad and the attached letter. *Id.* ¶ 136.

Nestor brought $1,500.00 with him to the United States. *Id.* at 22 ¶ 137. WITCC purchased his plane ticket. *Id.* ¶ 138. Nestor arrived in the United States on August 17, 2019. *Id.* ¶ 139. During the entire time he was in the United States, he had access to his passport, his social security card (after he received it), his immigration documents and his bank account. *Id.* ¶ 140. He also had a personal cell phone that he used to talk "constantly" with his family and friends in Chile. *Id.* ¶ 141. Nestor used WhatsApp every day to communicate with his friends, family or classmates while at WITCC. *Id.* ¶¶ 142, 143. Nestor sent a friend a video saying he was working in a factory and that it was hard work but worth it because he was receiving an education. *Id.* ¶ 144. No one limited Nestor's ability to talk to his family in Chile or to use his phone to call people in Chile and he was able to freely communicate with anyone about anything. *Id.* ¶¶ 145,

74

146. However, Nestor did not have enough money to return to Chile if he quit the J-1 program. Doc. 285-6 at 222.

Nestor had about four weeks without employment before he started working for J&L. Doc. 285-3 at 23 ¶ 148. During this time, he went to the Omaha Zoo, socialized with others and went to a foam party. *Id.* ¶ 149. On August 25, 2019, Nestor sent a friend a Facebook message stating "Oh, don't have any job, but will get one next month. Is a job about beef," and "I need to cut meat in a big company." *Id.* ¶ 150.

Nestor went to an orientation at the J&L office where he received copies of J&L's employee handbook, Tur-Pak's safety package and attendance policies. *Id.* ¶ 152. Nestor understood J&L's attendance policy when he signed it, including that he was required to call in if he was going to be absent from work and that if he did not report to work or call in two times, his employment would be terminated. *Id.* ¶ 153. Nestor also knew that this attendance policy applied to all J&L employees placed at Tur-Pak. *Id.* ¶ 154.

Nestor worked for J&L at Tur-Pak for a total of nine weeks. *Id.* ¶ 155. His shifts were typically five days per week from approximately 2 p.m. to 11 p.m., however transport to and from work could add over an hour to each shift. *Id.* at 24 ¶ 156; Doc. 285-4 at 419. Nestor got breaks during his shifts at Tur-Pak, including for meals. He generally brought leftovers for dinner. Doc. 285-3 at 24 ¶ 157. He was able to speak with his co-workers at Tur-Pak, including conversations about wages with other Spanish-speaking co-workers. *Id.* ¶ 158; Doc. 262-5 at 2. He worked one Saturday and no Sundays. Doc. 285-3 at 24 ¶ 159.

Nestor testified that Nancy threatened him in a text message on October 4, 2019. The message stated:

> All checks will be delivered to the college today and you can pick them up with Marti by Juli's office. If you have any questions regarding your payroll or your job please call our office at 712-227-2090. For those of you not going to work every day for your scheduled shift, you are at risk of losing

your job, remember a no call no show results in termination! Please refer
to your attendance policy that was given to you at your orientation.

*Id.* ¶ 160. Nestor testified that he perceived Nancy to be saying "remember that if you don't go to work or don't show up, we will have the determination that will be a consequence of to be closed from the program and sent to Chile." *Id.* ¶ 161.

On October 8, 2019, Nestor did not work because he was sick and was not fired or deported. However, he claims "Terry" and Rosana threatened to deport him as a result. *Id.* at 25 ¶ 162. He further testified that Nancy asked the students to work on Saturdays and told the students "[w]e would be canceled from the program and sent to Chile" if they did not go to work. Doc. 262-4 at 15. Nestor believes he was forced to work because he was not able to choose his job and he was threatened that if he did not go to work, he would "not be able to continue going to school, and going to school had been the main reason that [he] came here." Doc. 285-3 at 25 ¶ 163.

Nestor never made a complaint to Nancy or anyone with J&L while he was a J&L employee. *Id.* ¶ 166. In total, Nestor spoke with Nancy three or four times while he was in the United States. *Id.* ¶ 167. He does not claim any other J&L employees threatened him. *Id.* ¶ 168. Nestor broke his tooth and injured his knee while working at Tur-Pak. Doc. 262-5 at 1. However, he did not report these injuries to J&L because he "didn't know how they would take it." *Id.* Nestor also testified that his girlfriend was sexually harassed at Tur-Pak but he did not report it to J&L because "it was so obvious those things were happening and would happen, and it's, you know, dangerous that way, that we thought they wouldn't care." *Id.* at 2.

Nestor's last day working for J&L was November 12, 2019. Doc. 285-3 at 25 ¶ 170. Nestor learned his employment with J&L would end at a meeting with Rosana. *Id.* at 26 ¶ 171. After his last day of work for J&L, he had no contact with Nancy or anyone from J&L, and no one from J&L tried to force him to continue working. *Id.* ¶ 172.

Nestor testified that he was fired from a job at Wells Blue Bunny, Iowa, because he "accumulated ten points because you had to work upwards of 60 hours a week there."

He went on to explain that "the company has a policy that if you arrive to work late - - I mean, it's a points policy. If you arrive to work late, you get points. If you miss work, you get points. You get to ten points, and they say - - they basically fire you." *Id.* ¶ 174.

### 2. *Diego Cristobal Ahumada Soulodre*

Diego Cristobal Ahumada Soulodre (Diego) was born on August 5, 1994. *Id.* ¶ 176. He attended and graduated from high school in Chile. *Id.* at 27 ¶ 177. After high school, he attended Duoc UC in Chile and graduated in 2018 with a degree as a publicist. *Id.* ¶ 178. While he was attending college, he worked as an Uber driver and with his mother at el Mercurio. *Id.* ¶ 179. After he graduated from college, he worked as a publicist at the University of Chile. *Id.* ¶ 180. He worked in an office setting doing marketing work. *Id.* ¶ 181.

Diego learned about the J-1 Program from a friend in February 2019 who put Diego in touch with his friend's mother, Soledad Rojas. *Id.* ¶ 182. Diego's friend told him the program would be "totally free." *Id.* ¶ 183. Diego's friend told him Soledad was involved in the J-1 Program and she told him all about the program in Spanish. *Id.* ¶ 184. Soledad told Diego that the program was in the United States, involved the study of culinary arts or robotics and was free. *Id.* ¶ 185. Soledad told him he had to take some English proficiency tests. He took these tests and passed them, though he testified that he rated his English as a "2" out of "10" at the time he applied for the J-1 Program. Doc. 285-8 at 168.

Soledad and Carlos did not tell Diego what the pay would be. Diego remembers Soledad and her husband told him the students would work about 30 hours per week. Doc. 285-3 at 28 ¶ 187. Soledad and her husband further told Diego that the students would work in an internship at WITCC. *Id.* ¶ 188. The first time Diego talked to anyone from J&L was at the April meeting in Santiago, Chile. *Id.* ¶ 189. Diego did not meet anyone from WITCC until that meeting. *Id.* ¶ 190. He received paperwork from WITCC before that, but it all came through Soledad and her husband via email. *Id.* ¶ 191.

On March 21, 2019, Diego submitted his application for the J-1 Program via email to Lily. *Id.* ¶ 192. Diego did not pay to apply. *Id.* ¶ 193. He learned he was accepted prior to the April 27, 2019, meeting in Santiago, Chile. *Id*. at 29 ¶ 196. Before that meeting, Diego received an "Acceptance Letter" signed by Rosana on behalf of WITCC and an "Invitation Letter" signed by James Zuercher on behalf of WITCC. Both letters were dated April 24, 2019. *Id.* ¶ 197; Doc. 262-8 at 15-16.

The Acceptance Letter notified Diego that he had been accepted into the "Robotics & Automation program." Doc. 285-3 at 29 ¶ 198. The Invitation Letter invited Diego to participate in "the Food Services Diploma Program" for a "duration of 1 year" and stated that Diego was not responsible for the cost of his tuition, fees, housing or supplies and that meals would be provided by WITCC. *Id.* ¶ 199. Diego applied for, and was accepted to, the J-1 Program before he met anyone from J&L. *Id.* ¶ 200. At the meeting in Santiago, Diego did not ask any questions, including about pay, because he did not speak English. *Id.* ¶¶ 201, 202; Doc. 262-7 at 1. Diego received and reviewed WITCC's J-1 Student Orientation Handbook, did not have any questions about it and relied on it when deciding to come participate in the J-1 Program, though at the time he did not speak or understand English well. Doc. 285-3 at 30 ¶ 203; Doc. 285-8 at 168.

At the meeting in Santiago, Diego remembers Nancy handing him a document, telling him he needed to sign it. Doc. 285-3 at 30 ¶ 204. Diego also remembers that someone else was there telling him to sign it to come to the United States and that Nancy was talking very fast. *Id.* ¶ 205. Diego understood that the document was a job offer letter but could not read it because it was in English. *Id.* ¶¶ 205, 206. He met with Nancy for about five minutes. *Id.* ¶ 208. When he signed the document, Diego was under the impression that the job would be "at the college." Doc. 262-7 at 1. Diego did not ask Nancy any questions because he "didn't speak English." *Id.* Diego claims Nancy intentionally misled him at this meeting because she said that in order for the students to be able to travel to the United States, they had to sign the papers. Doc. 285-3 at 31 ¶ 213.

Diego testified that the job description in the job offer letter did not match the work he did at Tur-Pak because he had to work for more than 40 hours, stand more than described and had to lift more weight. *Id.* ¶ 214. Diego took the job offer letter with him from the meeting. *Id.* ¶ 215. Diego did not communicate with Nancy from the date of the meeting until his arrival in the United States. *Id.* ¶ 216. Diego does not remember who told him to destroy the J&L job offer letter. *Id.* ¶ 217.

Diego testified that he thought his rent and utilities would be included in the program because that is what "everyone" told him, specifically Lily, Soledad, Carlos and Juline from WITCC. *Id.* ¶ 218. Diego thought food was included in the J-1 Program because that is what he was told by Lily, Rosana, Juline, Carlos and Soledad. *Id.* at 32 ¶ 219.

Diego received the June 12, 2019, email from Soledad with a letter from Rosana attached and says he would have read the email and letter when he received them. *Id.* ¶ 220. Diego did not destroy the job offer letter from J&L after receiving this communication because he thought the request to destroy a document that was so important for him to come to the United States was "odd." *Id.* ¶ 221. Diego received a T/IPP from WITCC, signed by Juline on June 4, 2019. *Id.* ¶ 222. Diego's T/IPP said the J-1 Program would be from August 22, 2019, to August 21, 2020. It listed WITCC as the Program Sponsor and the Host Organization. *Id.* ¶ 223. Diego took a copy of his DS-2019 to his interview at the consulate and signed it. *Id.* ¶ 224.

Diego arrived in the United States between August 17 and 19, 2019. *Id.* ¶ 226. He flew into Omaha, Nebraska, and was taken to lunch. *Id.* ¶ 227. Diego's housing unit was clean, had heating, air conditioning and a lock on the door that he had a key to. *Id.* ¶ 228. The unit also had wireless internet. *Id.* ¶ 229. Diego was given a laptop to use while he was enrolled at WITCC and was able to connect the laptop to Wi-Fi and use email on the laptop. *Id.* ¶ 230.

Diego had access to his visa the entire time he was enrolled in the J-1 Program. *Id.* ¶ 231. He also had access to a laptop and had access to a cell phone the entire time

he was a J-1 student. *Id.* ¶ 232. Diego always had access to his bank account. *Id.* ¶ 233. He owned a 2003 Jeep Liberty while he was enrolled at WITCC and had continuous access to his car. *Id.* ¶ 234. Diego took the bus and used ride share services like Uber and Lyft while he was at WITCC. *Id.* ¶ 235.

Diego went to the Omaha Zoo and a party after he arrived in the United States. *Id.* ¶ 236. He recalls that there was a period of time after he arrived in the United States when he did not work. *Id.* ¶ 237. During this time, he went out with friends to see Sioux City and also got a haircut. *Id.* ¶ 238. He also played billiards at WITCC. *Id.* ¶ 239.

On September 13, 2019, Diego went to J&L for an orientation and remembers signing a lot of paperwork. *Id.* ¶¶ 240, 242. He filled out the paperwork on a computer. *Id.* ¶ 241. Diego received a copy of the J&L employee handbook. *Id.* ¶ 243. He also received a copy of J&L and Tur-Pak's attendance policy in Spanish and he read the policy and agreed to it. *Id.* ¶ 244. The attendance policy said it was mandatory to have perfect attendance the first two weeks and that if he was going to be absent or late, he needed to contact Tur-Pak. *Id.* ¶ 245.

Diego started work for J&L at Tur-Pak on September 16, 2019. *Id.* ¶ 246. His last day was October 28, 2019. *Id.* ¶ 247. Diego never worked a Saturday or Sunday. *Id.* at 35 ¶ 248. Nor did he have classes on Saturdays or Sundays. *Id.* ¶ 249. On Saturdays and Sundays he would go to Walmart, study and sleep. *Id.* ¶ 250. No one from J&L stopped him from socializing with other people at WITCC. *Id.* ¶ 251. Diego met his boyfriend, now husband, at WITCC in 2019. *Id.* ¶ 252. There were days that Diego was excused from going to work and was not fired. *Id.* ¶ 254.

On September 25, 2019, Diego emailed Nancy, Araceli and Juline, stating that he had pain in his leg from standing in the same place at work for a long period. *Id.* ¶ 255. Nancy replied and told Diego she understood it would take his body some time to adjust to his job and wrote: "Please go to work today and take the suggested pain reliever." *Id.* ¶ 256. Nancy followed up and told Diego that he needed to "report to work tomorrow

80

at Tur-Pak for your normal shift or bring us a doctor note releasing you from work. If you are unable to continue at this job, we do not have another position to put you in." *Id.* ¶ 257. Diego did not go in work on September 25, 2019, and September 26, 2019, but was not fired because he had a doctor's note excusing him from work. *Id.* ¶ 258.

Diego did not work from October 14, 2019, to October 20, 2019, or October 25, 2019, and was not fired. *Id.* ¶ 259. His employment with J&L ended because he asked for permission to get another job and Lily granted his request. *Id.* ¶ 260. While Diego worked at Tur-Pak he had class in the morning and then worked shifts from 3:00 p.m. to 12:00 a.m., arriving early due to the van transport schedule. *Id.* ¶ 262. He was able to take meal breaks during his shifts at Tur-Pak. *Id.* ¶ 263.

Diego testified that when he first started at Tur-Pak, he would eat the food they provided but after his leg injury, J&L took the food away. *Id.* ¶ 264. Specifically, Diego testified that Nancy and Araceli took the food away, with Araceli telling him "You have to have perfect attendance." Doc. 262-7 at 15. Diego was told by J&L that Tur-Pak had an incentive program for perfect attendance that involved giving workers vouchers for food. Doc. 285-3 at 37 ¶ 266. However, Tur-Pak had a cafeteria and even when he did not get the vouchers, he was able to buy food at Tur-Pak. *Id.* ¶ 267.

Diego worked on the line at Tur-Pak and, like everyone else, had a white hard hat, a blue coat and plastic apron provided by Tur-Pak. *Id.* ¶ 268. Diego was able to speak with coworkers, though it is not clear how much his English ability had improved by this point. *Id.* ¶ 269. Diego complained to Nancy, using Araceli as an interpreter, between four and five times about the topic of "how the work was there and also the topic that we were paid very little." *Id.* ¶ 270. Diego remembers an incident in which a worker at Tur-Pak got close to him and said he liked young girls. *Id.* ¶ 271. He does not remember the man's name and he never spoke with him again. *Id.* ¶ 272. Diego did not report the incident to Nancy but thinks he told Araceli. Doc. 262-8 at 1. He was offered cocaine in the bathroom one time by a person he does not know and saw people do cocaine in the men's bathroom. *Id.* at 1-2. He does not remember what month this incident occurred

81

and he does not think he reported the incident to anyone at J&L or Tur-Pak, but he did discuss the incident with his co-workers. *Id.* at 2. Nancy addressed Diego's complaints regarding the work at Tur-Pak "like in the email that said. . .to go to work and all those things." Doc. 262-7 at 16.

Diego received a weekly paycheck from J&L, though he disputes that he was paid full compensation for all the hours he worked. Doc. 285-3 at 38 ¶ 276. He would deposit his checks at Wells Fargo. *Id.* ¶ 277. No one from J&L attempted to force him to continue to work for J&L after he quit. *Id.* ¶ 278. No one from J&L told Diego he could not return home to Chile. *Id.* at 39 ¶ 282. No one from J&L physically abused Diego or threatened his family. *Id.* ¶¶ 283, 285. He was able to see a doctor for his leg pain and the visit was covered by health insurance. *Id.* ¶ 286.

### 3. *Eduardo Antonio Munoz Vargas*

Eduardo Antonia Munoz Vargas (Eduardo) was born on August 11, 1988. *Id.* ¶ 287. Eduardo was 31 years old when he applied to the J-1 Program. *Id.* at 40 ¶ 288. Eduardo attended high school in La Ligua. *Id.* ¶ 289. He finished school when he was 17 or 18 years old in 2006. *Id.* ¶ 290. After he graduated from high school, he went to a university for one year where he studied general pedagogy to teach first through eighth grade. *Id.* ¶ 291. After that, he went to college to study advertising and it took him "like six years to reach his career." *Id.* ¶ 292. He obtained a degree and was hired at an advertising agency. *Id.* ¶ 293.

On March 20, 2019, Eduardo submitted his application for the J-1 Program via email to Lily. *Id.* ¶ 294. Carlos told Eduardo he was accepted to the J-1 Program before the April 27, 2019, meeting. *Id.* ¶ 296. The April 27, 2019, meeting was the first time he met anyone from J&L. There, Eduardo received a job offer letter from Nancy but he "didn't understand hardly anything." Doc. 285-8 at 25. The offer letter contained the job description that matches the work Eduardo did at Tur-Pak and stated that he would work 30 to 40 hours per week, though again, Eduardo "didn't understand hardly

82

anything." Doc. 285-3 at 41 ¶¶ 298, 300; Doc. 285-8 at 25. However, Eduardo understood that by signing the offer letter he had accepted a job. Doc. 285-3 at 41 ¶ 301.

Eduardo thinks he took the offer letter home with him. *Id.* ¶ 303. He did not do research about the job he had accepted in this time. *Id.* ¶ 304. Later, Carlos told Eduardo to destroy the document he had signed with J&L at the meeting because this document did not comply with the J-1 visa requirements. *Id.* ¶ 305. Carlos also told Eduardo not to bring the document to the United States and stressed that it had to be destroyed. However, Eduardo did not destroy the document and he left it at his house with his parents. *Id.* ¶ 306.

With respect to the legal requirements of the J-1 Program, Eduardo knew that the program lasted one year, that he could work a certain number of hours and it was for students. *Id.* ¶ 307. Eduardo understood he was required to attend and pass his classes and was required to work as part of the J-1 Program, though he did not know this would entail work in a factory. *Id.* ¶ 308; Doc. 285-8 at 13-14. He understood there would be consequences if he failed to attend his classes and potential consequences if he failed to attend work. Doc. 285-3 at 42 ¶ 309.

On June 3, 2019, Eduardo received an Invitation Letter signed by James and an Acceptance Letter signed by Rosana. *Id.* ¶ 310. Eduardo remembers receiving a T/IPP signed by Rosana and Juline and that it was a very important document. *Id.* ¶ 311. Eduardo received a copy of the J-1 Student Orientation Handbook. *Id.* at 43 ¶ 312. Eduardo brought a DS-2019 form signed by Juline to his interview at the consulate. *Id.* ¶ 313. The DS-2019 form said that WITCC was the Sponsor of the J-1 Program. *Id.* ¶ 314. Eduardo signed the DS-2019 form on August 6, 2019. *Id.* ¶ 315.

Eduardo's WITCC apartment had a kitchen, bathroom, heating and air conditioning and was clean. *Id.* ¶ 316. The apartment had a lock on the door to which he had a key. *Id.* ¶ 317. He had access to Wi-Fi in the apartment and received a laptop from WITCC that he was able to connect to the Wi-Fi. *Id.* ¶ 318. He had access to a WITCC email address and his personal email address. *Id.* ¶ 319.

Eduardo enjoyed his classes at WITCC. *Id.* ¶ 320. He had access to other buildings on campus and he described the campus as very big with a gym, a library and a lake that he would sometimes walk around. *Id.* ¶ 321. Eduardo had a cell phone while he was enrolled in the J-1 Program and used it to communicate with his family and friends in Chile. *Id.* at 44 ¶ 322. His ability to communicate with his friends and family was not limited or monitored, and he was able to freely communicate with anyone about anything. *Id.* ¶ 323. With the exception of an instance when Rosana had to make a copy of his passport, Eduardo had his passport and visa the entire time he was enrolled in the J-1 Program. *Id.* ¶ 324.

When Eduardo arrived in the United States, he had about four weeks before he started work. *Id.* ¶ 325. He attended a "fancy" reception with cocktails, which J&L also attended, and he went to the Omaha Zoo. *Id.* ¶ 327. He also attended a breakfast, introduction classes and got to know the campus. *Id.* ¶ 328. As an "adventure," Eduardo and others would go to a gas station to speak with people and he made friends with a woman who worked there. *Id.* ¶ 329. He also went to explore an abandoned house near WITCC campus in the forest and went to the gym. *Id.* ¶ 330.

Eduardo testified that WITCC forced him to work. *Id.* at 45 ¶ 331. On September 13, 2019, Eduardo participated in an orientation at the J&L office where he received copies of J&L policies. *Id.* ¶ 332. Eduardo understood that he was required to call in to work if he was going to be absent from work. *Id.* ¶ 333. He also understood that if he did not let J&L know that he was not going to be at work or call in two times, he could lose his job. *Id.* ¶ 334. Eduardo worked for J&L from September 18, 2019, to November 12, 2019. *Id.* ¶ 335. He never worked on a weekend and never worked overtime. *Id.* ¶ 336. On the weekends, he would rest, study, do laundry, call his family, go to Wal Mart and watch TV. *Id.* ¶ 337. Eduardo did not have classes on Saturday or Sunday. *Id.* ¶ 338.

Eduardo had his phone the entire time he worked at J&L and posted a photograph of where he worked at Tur-Pak on Instagram. *Id.* at 46 ¶ 339. Eduardo received a hard

84

hat and apron like the other Tur-Pak employees. *Id.* ¶ 340. Eduardo received breaks while he was working at Tur-Pak, including meal breaks. *Id.* ¶ 341. He would use a voucher to get food at the Tur-Pak cafeteria or would cook food at home and bring it to work. *Id.* ¶ 342. Eduardo spoke "very little" English during his time in the J-1 Program, but did speak with his Tur-Pak co-workers in English. Doc. 285-6 at 9. Eduardo's English skills did not improve during the J-1 program. *Id.*

Eduardo had a break between classes and his work at Tur-Pak. Doc. 285-3 at 46 ¶ 345. He did not make any complaints to Nancy about the work he was doing at Tur-Pak but clarified that he made comments to Araceli because she spoke Spanish and Nancy did not. *Id.* ¶ 349; Doc. 262-10 at 3-4. On October 4, 2019, Eduardo sent Nancy an email saying he was sick. Doc. 285-3 at 47 ¶ 350. Nancy emailed Eduardo back and wrote, "You must go to work or risk losing your job. If you're truly sick they will send you home." *Id.* ¶ 351. Eduardo interpreted this email to mean that if he did not go to work, he would be returned to Chile, but he later testified that this was a misinterpretation. *Id.* ¶ 352; Doc. 262-10 at 4. Eduardo was sent home from work that evening but J&L did not want to give him a ride back to WITCC so he had to pay for a taxi to WITCC. Doc. 262-10 at 4.

Eduardo further interpreted Nancy's conduct in visiting classes, when she waved a $100 bill and told students "Don't miss work," to be threatening. *Id.* at 5. No other J&L employees made threats to Eduardo. Doc. 285-3 at 47 ¶ 354. Eduardo did not work on October 4, 2019, and was not fired or deported. *Id.* at 48 ¶ 356. No one at Tur-Pak threatened to deport Eduardo. *Id.* ¶ 357. Eduardo's Tur-Pak supervisors treated him with respect. *Id.* ¶ 358.

During this time, Eduardo and Diego were in a relationship. *Id.* ¶ 359. They went out to eat at restaurants in the Sioux City area. *Id.* ¶ 362. In October 2019, Eduardo and Diego went to Omaha to see a friend who worked there. *Id.* ¶ 363.

Eduardo's employment with J&L ended when WITCC told the students they could not keep working at Tur-Pak. *Id.* at 49 ¶ 365. Eduardo was paid for all of the hours he

85

worked for J&L, though he disputes that he was compensated fully for his labor. *Id.* at 46 ¶ 346. After Eduardo stopped working for J&L, no one from J&L tried to force him to continue working for J&L. *Id.* at 49 ¶ 366. No one from J&L contacted Eduardo after he stopped working for J&L. *Id.* ¶ 367. No one from J&L claimed that Eduardo owed a debt to J&L. *Id.* ¶ 368. However, Eduardo testified that "We all knew there was a debt with WIT" and "Nancy, Lily, Juline, Rosana, the young woman that spoke Spanish, but I don't remember the name now of the person. They all said, 'Work because we have pay the debt,' or, 'the debt has to be paid.'" Doc. 262-10 at 5. No one from J&L withheld food from Eduardo. Doc. 321 at 49 ¶ 371. He testified that no one from J&L withheld housing, however his "free housing" was paid for with money that was withheld from his paycheck by J&L and WITCC. *Id.* ¶ 372; Doc. 285-7 at 11.

Eduardo testified that Araceli told him he could not change jobs, because a month after he began working, he asked Lily about the possibility of changing jobs and Lily told him to speak with Araceli. Araceli then said that there were not any other job placement options. Doc. 285-3 at 50 ¶ 373.

### 4. *Gonzalo Escobar Espejo*

Gonzalo Escobar Espejo (Gonzalo) was born on January 10, 1990. *Id.* ¶ 375 Gonzalo was approximately 29 years old when he applied for the J-1 Program. *Id.* ¶ 376. From June 2017 to August 2019, Gonzalo worked as a nurse in Chile. *Id.* ¶ 377. To become a nurse, he studied for six years at the University of Magallanes in Punta Arenas, Chile and obtained a nursing degree. *Id.* ¶ 378. He believes the degree he obtained in Chile is equivalent to a master's degree in nursing in the United States. *Id.* ¶ 379. He also worked as a nurse in a public hospital in Chile in the critical care unit. His job duties involved giving out medication, controlling mechanical ventilation and invasive catheters and monitoring patients. *Id.* at 50-51 ¶ 380. From 2015 to 2016, he worked as nurse in a primary health care center and as a supervisor of an emergency service. *Id.* at 51 ¶ 381. Before coming to the United States for the J-1 Program, Gonzalo traveled

86

to France, Spain, Amsterdam, Barcelona, the Czech Republic and Italy. *Id.* ¶ 383. He also traveled to Argentina, Brazil and the United States. *Id.* ¶ 384.

Gonzalo first learned about the J-1 Program from his mother's friend. *Id.* ¶ 385. Gonzalo's first contact with WITCC was a 30-minute phone call with Lily. *Id.* ¶ 386. Lily explained the J-1 Program to Gonzalo and told him he could work in something related to what he was studying. She also told him that the program would provide him food and housing and he would not have to pay for his studies. Lily then sent him a contract to sign. *Id.* ¶ 387. Gonzalo completed his application for the J-1 Program on March 8, 2019, and signed a J-1 Student Agreement. *Id.* ¶ 388. Gonzalo did not speak with anyone from J&L before applying for the J-1 Program. *Id.* ¶ 390. Gonzalo understood at the time he applied for the J-1 Program that the program entailed working and being a student. *Id.* ¶ 391.

Gonzalo received a copy of WITCC's J-1 Student Pre-Arrival Handbook before he arrived in the United States. *Id.* ¶ 392. Gonzalo also received a version of WITCC's Open Letter in English and Spanish before he arrived in the United States. *Id.* ¶ 393. He received an Acceptance Letter dated April 24, 2019, signed by Rosana, notifying him he was accepted to the "Culinary Arts" program. *Id.* ¶ 394. Gonzalo received a DS-2019 form from WITCC, signed by Juline on April 24, 2019, that listed J&L and Recruiting on it. It identified WITCC as the J-1 Program Sponsor and the J-1 Program as lasting from August 22, 2019, to July 23, 2021. *Id.* at 53 ¶ 395. He was told to destroy this document. *Id.* ¶ 396.

The first time Gonzalo met with anyone from J&L was the April 27, 2019, meeting in Santiago, Chile. *Id.* ¶ 397. Gonzalo testified that at that time he does not think he knew he would be making $7.25 an hour and he did not ask. *Id.* ¶ 398. Gonzalo does not remember anyone from J&L addressing the group at the meeting. *Id.* ¶ 399. At the meeting, Nancy gave Gonzalo a job offer letter with a job description. *Id.* ¶ 400. Gonzalo did not read it before he signed it because he did not speak English. *Id.* ¶ 401. Gonzalo recounts his interaction with Nancy as follows:

I remember that somebody there—I think it was Carlos Espinoza was translating. And so I was called to talk to her. I was made to lift some weights to see if I could lift them to see if I was strong enough to work.

And then they had me sign the form. It was never read to me. Nobody ever translated it to me. They would just call people up from the group, and everyone had to go and just sign, because Lily Castro had already given us an introduction about what the jobs would be and where we would supposedly be working.

And so when I went—or when people would go and talk to J&L, it was just for this physical check and signing the paperwork. That's all I remember.

Doc. 262-13 at 1. Gonzalo does not remember how long his interaction with Nancy was but stated that it was fast. *Id.*

Gonzalo does not remember if he took a copy of the job offer letter from the meeting. Doc. 285-3 at 54 ¶ 405. Gonzalo did not think he accepted a job at the April 27, 2019, meeting. *Id.* ¶ 406. Gonzalo did not have any communication with anyone from J&L after April 27, 2019, through the date he arrived in the United States. *Id.* ¶ 407. Before he came to the United States, Gonzalo was told that the students would be working in factories in something related to their major. *Id.* ¶ 408. However, the information about where students would be working did not come from any employee of J&L. *Id.* ¶ 409.

No one from J&L contacted Gonzalo to destroy documents. *Id.* ¶ 410. Gonzalo did not do any research about the J-1 Program from the date of his application through his arrival in the United States. *Id.* at 55 ¶ 411. To prepare for his participation in the J-1 Program, Gonzalo gave notice at his job, borrowed money, canceled his insurance and flew to the United States when WITCC bought him his ticket. *Id.* ¶ 412. No one from J&L coached Gonzalo on what to say at his interview to get his visa but WITCC representatives did so. *Id.* ¶ 413.

Gonzalo brought about $7,000.00 with him in his Chilean bank account and had access to that account the entire time he was in the United States. *Id.* ¶ 414. Gonzalo

had a car during his time at WITCC that he bought with his Chilean savings and was able to use that car to go where he wanted. *Id.* ¶ 415. Gonzalo's student apartment had Wi-Fi that he could access. *Id.* ¶ 416. He was given a laptop while he was at WITCC and he was able to connect that to Wi-Fi. *Id.* ¶ 417. He was able to use email while he was at WITCC to communicate with his family members and he had a cell phone he was able to use to communicate with his family back in Chile. *Id.* ¶ 418. Gonzalo was able to switch his course of study at WITCC to business. *Id.* ¶ 419. During his time at WITCC, he had access to all of the buildings on campus including the library and the computer lab. *Id.* at 56 ¶ 420. Gonzalo had a bank account in Iowa at Wells Fargo and he was the only one with access or control of it. *Id.* ¶ 421. Gonzalo always had access to a cell phone while he was enrolled at WITCC. *Id.* ¶ 422. He was able to use Facebook and Instagram to communicate with friends and family. *Id.* ¶ 423.

Gonzalo suffered from severe anxiety and panic attacks during his time in the J-1 Program because he felt threatened by the power the defendants had over him and he was "constantly" receiving deportation threats via WhatsApp and at meetings. Doc. 285-8 at 154. Regarding WITCC's authority to deport Gonzalo, he testified that he knew they could not remove him from the country but they did have the power to take his visa and leave him without any legal status in the United States, which "practically speaking, is similar to deportation." Doc. 285-3 at 56 ¶ 424.

Gonzalo had his own cell phone and no one from J&L ever tried to stop Gonzalo from using his cell phone. *Id.* ¶ 425. No one from J&L ever took possession of his ID, passport or visa. *Id.* ¶ 426. Gonzalo had about four weeks after arriving in the United States before he started work. *Id.* ¶ 427. Before starting work, there was a meeting in the United States where Nancy showed the students a $100 bill and Gonzalo remembers her saying, "You'll be making $7.25 an hour." *Id.* ¶ 428.

Gonzalo participated in an orientation at which he was given copies of attendance policies and signed them. He did not read them. *Id.* at 57 ¶ 429. Before he started work

at Royal Canin, Gonzalo understood that he was required to call in if he was going to be absent from work. *Id.* ¶ 430.

Gonzalo worked for J&L at Royal Canin from September 17, 2019, to October 1, 2019. *Id.* ¶ 431. He worked a 12-hour shift on September 17, 2019. *Id.* ¶ 433. Gonzalo had two 15-minute breaks and one 30-minute break during his shifts at Royal Canin. *Id.* ¶ 434. Gonzalo asked to be changed to a different position that was not in the cold and this request was granted. *Id.* ¶ 435. He did not work on September 18 or September 19, 2019. *Id.* ¶ 436.

Gonzalo worked a 12-hour shift on September 20 and 21, 2019. *Id.* ¶ 437. After September 21, 2019, Gonzalo did not work any 12-hour shifts. *Id.* ¶ 438. Nancy told Gonzalo that the change to six-and-a-half hour shifts was established by J&L and Royal Canin so that students could complete their weekly hours and still go to class. *Id.* at 58 ¶ 439. Gonzalo never worked on the weekends at Royal Canin. *Id.* ¶ 440. Nor was he ever scheduled to work 56 hours in a week. *Id.* ¶ 441. Gonzalo never complained to Nancy or anyone at J&L about the work he was doing at Royal Canin, but he did complain to Nancy about being changed from 12-hour shifts to six-hour shifts every day. *Id.* ¶ 442.

Gonzalo described his confusion about the circumstances under which he could be fired as follows:

> I talked to Nancy one day and told her that I couldn't come into work because I was not feeling good. And she told me that the last time a Chilean student had missed work, Royal Canin had fired them.
>
> But, curiously, when I would actually ask at Royal Canin—I asked supervisors what would happen if you were to miss a day of work. And I was just told that all I had to do was call and tell them I wouldn't come— be able to come in and that there would—nothing would happen. And that I would be at risk of being fired if I missed too many days, but that there would be no problem if I just missed one day. This was something that I asked a supervisor, along with two other people.

And so this business about being fired for missing a single day was J&L's rule, not Royal Canin's. It would be Nancy who fired me, not Royal Canin, for just missing one day. And so—so, well, when I asked that and said that I couldn't come in, I was told that I had to, even if I were sick. And I have that in an email with that information.

Doc. 262-13 at 10.

Gonzalo was able to communicate with his co-workers at Royal Canin using Google translate and could communicate without a translator for basic things. Doc. 285-3 at 58 ¶ 445. On September 29, 2019, Gonzalo emailed Nancy saying he could not go to work because he felt "bad." *Id.* ¶ 446. Before Nancy replied, Gonzalo sent her another email saying, "I will go, but bad." *Id.* ¶ 447. Gonzalo further testified that "It was known among students that if you missed a day, you could be fired and then would be kicked out of school. And so I wasn't just looking for a response from Nancy. I asked the other students what would happen, and I was told that my visa could be canceled for missing a single day." Doc. 262-13 at 11.

On September 30, 2019, Gonzalo had an email exchange with Nancy about his shift. Doc. 285-13 at 59 ¶ 449. Nancy told Gonzalo she thought it was best that he switch to Tur-Pak. *Id.* ¶ 450. Gonzalo did not accept a position at Tur-Pak. *Id.* ¶ 451. On October 2, 2019, Gonzalo sent Nancy a text saying he was going to get a job at WITCC. *Id.* ¶ 452. Gonzalo told Nancy that he would not be coming in to work at Royal Canin and would call Royal Canin. *Id.* ¶ 453. Gonzalo voluntarily quit his employment at Royal Canin and was not deported. *Id.* ¶¶ 454, 455. No one from J&L or Royal Canin tried to force Gonzalo to continue for working for J&L or Royal Canin. *Id.* at 60 ¶ 456. No one from J&L claimed Gonzalo owed a debt to J&L and no one from Royal Canin ever claimed he owed a debt to J&L or WITCC. *Id.* ¶ 457. Other than the communications from Nancy discussed above, Gonzalo does not remember any threats from anyone at J&L. *Id.* ¶ 458. No one from Royal Canin threatened Gonzalo. *Id.* ¶ 459. He testified that no one from J&L withheld food or housing from him, but his "free housing" and meals were paid for with money withheld from his paycheck by J&L

91

and WITCC. *Id.* ¶ 460; Doc. 285-7 at 11. No one from J&L told Gonzalo he could not return home to Chile. Doc. 285-3 at 60 ¶ 462.

### 5. *Fernando Castillo Vilches*

Fernando Castillo Vilches (Fernando) was born on May 24, 1998. *Id.* ¶ 467. He was 20 years old when he applied to the J-1 Program. *Id.* ¶ 468. He attended high school in Chile and finished school in 2015. *Id.* ¶¶ 469, 470. After graduating high school, he attended a University Andres Bello in Vina Del Mar from 2016 to 2017 where he studied social work. *Id.* ¶ 471. He left University Andres Bello because he did not like the academic track he was on and decided to study cocktail studies at Bar Academy in Valparaiso in 2017 or 2018. *Id.* ¶ 472. He received a bartending degree with a work flair specialization. *Id.* ¶ 473.

Fernando first learned about the J-1 Program from Lily. *Id.* ¶ 474. On March 4, 2019, Lily emailed Fernando a document with details of the J-1 Program. *Id.* ¶ 475. Before applying for the J-1 Program, Fernando understood that he would be required to work as many as 35 hours per week, attend classes 12 hours per week, purchase his own health insurance and pay for his own transportation. *Id.* ¶ 476. The document also said that Fernando would have to pay for his own food, but he did not understand this part. *Id.* ¶ 477.

On March 13, 2019, Fernando submitted his application for the J-1 Program via email to Lily. *Id.* ¶ 478. He signed a J-1 Student Agreement and understood it when he signed it. *Id.* ¶ 479. He understood he would be required to attend English classes, maintain a 2.0 GPA, attend his internship, live in Sun Ridge Apartments, return home upon graduation or at the request of WITCC and not use or possess tobacco, drugs, alcohol, weapons or firearms on campus. *Id.* ¶ 480. He also understood that if he was not attending his classes or his internship, or if he was dismissed from WITCC or his internship, he would have to return to Chile at his own expense. *Id.* ¶ 481.

Fernando's application contained a letter he wrote in Spanish and translated to English using Google. *Id.* at 63 ¶ 482. He did not communicate with Nancy or anyone from J&L before he applied. *Id.* ¶ 484. Fernando reviewed copies of the J-1 Student Pre-Arrival Handbook and the J-1 Student Orientation Handbook using Google Translate because he did not understand English. Doc. 262-14 at 33. On April 24, 2019, Fernando received an Acceptance Letter signed by Rosana on behalf of WITCC. Doc. 285-3 at 64 ¶ 487. He received a DS-2019 form, the J-1 Pre-Arrival Handbook, a job offer letter, and proof of health insurance with the Acceptance Letter. *Id.* ¶ 488. He reviewed the Acceptance Letter and the documents before he came to the United States and testified that he understood them though he later clarified that he needed Google Translate to understand documents. *Id.* ¶ 489; Doc. 262-14 at 33.

The first time Fernando met anyone from J&L was at the meeting in Santiago in April 2019. Doc. 285-3 at 64 ¶ 490. Fernando did not have any communication with anyone from J&L between the date of his application and the April 2019 meeting in Santiago. *Id.* ¶ 491. He spoke with Nancy for between 10 and 20 minutes at the meeting in Santiago. *Id.* ¶ 492. During this meeting with Nancy, she spoke vaguely about two factories in Sioux City, which is how Fernando learned that he would not be working in a restaurant as part of the J-1 Program. *Id.* ¶ 493. Fernando did not ask Nancy any questions. *Id.* at 65 ¶ 494. When Fernando met with Nancy, he told her he could understand English but could not have a conversation. *Id.* ¶ 495. He also testified that his English skills were poor at that time. Doc. 285-8 at 31. Nancy provided Fernando a job offer letter at this time. Doc. 285-3 at 65 ¶ 497. Fernando saw that the job offer letter said he would be scheduled to work a minimum of 30 hours and up to 40 hours a week. *Id.* ¶ 498. Fernando signed the job offer letter and took it with him from the meeting with Nancy. *Id.* ¶ 499. This is the only time Fernando spoke with Nancy before he came to the United States. *Id.* ¶ 500.

After signing the document, Fernando understood he accepted a job. *Id.* ¶ 502. Not everything in the job description matches what Fernando did at Tur-Pak, specifically

93

that he did not lift more than 50 pounds and was not using a knife.  *Id.* ¶ 503.  Fernando testified that Lily told him that these duties were included because they would either be working at Seaboard or a place that makes Lunchables.  *Id.* ¶ 504.

Fernando used Google to translate a copy of the J-1 Student Pre-Arrival Handbook before coming to the United States and a copy of the J-1 Student Orientation Handbook. *Id.* ¶ 505.  At one point in the deposition, Fernando testified that he understood he would be paid $7.25 per hour but he also testified that no one ever told him what he would earn in America.  Doc. 285-8 at 43; Doc. 262-15 at 7.

Before coming to the United States, Fernando received a visa that was valid for one year.  Doc. 285-3 at 66 ¶ 507.  He reviewed and signed a T/IPP before coming to the United States.  *Id.* ¶ 508.  He flew into Omaha on August 17, 2019.  *Id.* at 67 ¶ 509. His first apartment on the WITCC campus had two bedrooms, one bathroom and a small kitchen.  *Id.* ¶ 510.  Fernando had access to Wi-Fi.  *Id.* ¶ 511.  Fernando felt his housing at WITCC was a safe place to live and did not have any complaints about it.  *Id.* ¶ 512.

Fernando met his ex-wife Breanna at a foam party in the WITCC parking lot the first week he arrived in the United States.  *Id.* ¶ 514.  Fernando did not start work at J&L until September 17, 2019.  *Id.* ¶ 515.  During this time, he didn't have any expenses other than buying food using the gift cards WITCC provided him.  *Id.* ¶ 516.  The first time he spoke with someone from J&L after arriving in the United States was when he got his social security card in September.  *Id.* at 68 ¶ 517.  The entire time he was in the United States as a participant in the J-1 Program, Fernando spoke with Araceli three or four times and with Nancy two times in person and two times via email.  *Id.* ¶¶ 518, 519.

Fernando participated in an orientation on September 13, 2019, at the J&L offices, where he received a copy of the J&L employee handbook.  *Id.* ¶ 520.  Fernando's first day of work for J&L was September 17, 2019, and his last day of work for J&L was October 11, 2019.  *Id.* ¶ 521.  He also received a copy of J&L's attendance policy on September 13, 2019.  *Id.* ¶ 522.  He asked Araceli about the attendance policy and specifically whether or not he had to call the company where he was placed or if he

needed to call J&L if he was going to be absent from work. *Id.* ¶ 523. Araceli told Fernando if he was going to be absent from work, he should email Nancy and let the company where he was working know. *Id.* ¶ 524.

Fernando worked for J&L for a total of four weeks. *Id.* at 69 ¶ 525. He worked Monday through Friday and had Saturdays and Sundays off. *Id.* ¶ 526. He did not have classes on Saturdays and Sundays. *Id.* ¶ 527. He would rest on Saturdays, then have breakfast with Lily on Sundays and go grocery shopping with other students. *Id.* ¶ 528. The most hours he worked in a week was 39 hours. *Id.* ¶¶ 529, 531. During these four weeks, Fernando reported to J&L that a female co-worker was being harassed and that people were drinking at work. *Id.* ¶ 530.

Fernando testified that WITCC forced him to work, specifically that Terry Yi told him if he did not go to work, he would be deported. *Id.* ¶ 532. Fernando further testified that he emailed Nancy in October and said that his doctor said he needed rest, but she "forced" him to go to work anyway. *Id.* at 70 ¶ 533. On October 2, 2019, Fernando emailed Nancy stating, "Dear Nancy, I do not believe in the necessary conditions to attend work today, I feel very sick and although I do not want to, I will have to miss today to finish the rest of the week without problems. Sorry for my absence, I hate to fail but I really feel very bad today. See you soon, thank you very much." *Id.* ¶ 534. Nancy replied, "Come home now please report to work and if they send you home we will deal with it then but you must go to work." *Id.* ¶ 535.

Fernando agrees that Nancy's response was consistent with the attendance policy he reviewed before he started work at Tur-Pak. *Id.* ¶ 536. Although Nancy asked him to come into work on October 2, 2019, he did not. *Id.* ¶ 537. Fernando did not work on October 2, 2019, or October 3, 2019, and was not fired or deported. *Id.* ¶ 538. Fernando also did not work on October 9 or 10, 2019, because he was still sick, and he was not fired. *Id.* ¶ 539. However, Fernando testified that WITCC continued threatening him "the whole time." Doc. 262-15 at 13.

Fernando quit his job with J&L on October 11, 2019. Doc. 285-3 at 71 ¶ 541. Juline told J&L that Fernando was quitting. *Id.* ¶ 542. After October 11, 2019, Fernando did not have any contact with anyone from J&L. *Id.* ¶ 543. Fernando had access to his visa and his passport the entire time he was employed by J&L. *Id.* ¶ 544. No one from J&L ever physically abused him. *Id.* ¶ 545. No one from J&L ever tried to stop him from communicating with his friends or family. *Id.* ¶ 546. Fernando testified that no one from J&L ever withheld food or housing from him, however his "free housing" and meals were paid for with money that was withheld from his paycheck by J&L and WITCC. *Id.* ¶ 547; Doc. 285-7 at 11.

Fernando is not sure if anyone from J&L ever told him he could not quit his job with J&L. Doc. 262-16 at 1. No one from J&L claimed that he owed anything to J&L. Doc. 285-3 at 72 ¶ 549. No one from J&L contacted him after he stopped working for J&L. *Id.* ¶ 552. No one from J&L ever attempted to get him to continue working for J&L after he left employment with J&L. *Id.* ¶ 553. Fernando did not speak with Nancy after he left Tur-Pak. *Id.* ¶ 554. After Fernando stopped working for J&L, the WITCC school platform showed that he owed a debt to the school. *Id.* ¶ 555. While he was working for J&L that same platform had showed a balance of zero. *Id.* ¶ 556.

### 6. *David Alejandro Silva Moreno*

David Alejandro Silva Moreno (David) was 19 years old when he came to the United States. *Id.* ¶ 558. David attended a high school in Papudo, Chile, named Liceo Tecnico Profesional de Papudo and graduated in 2018. *Id.* ¶ 559. After graduating, David went to school for about a week for message therapy and completed the basic level of an English course in Santiago, Chile. *Id.* ¶¶ 560, 561.

In February 2019, David learned about the J-1 Program from a Facebook post made by Carlos. *Id.* ¶ 562. David attended a meeting with Carlos at the high school in March 2019. *Id.* ¶ 563. On March 19, 2019, David submitted his application for the J-1 Program via email. *Id.* at 74 ¶ 564. David did not speak with anyone from J&L before

96

he decided to apply to the J-1 Program. *Id.* ¶ 566. The first time David met anyone from J&L was when he met Nancy at the April 27, 2019, meeting. *Id.* ¶ 567. David remembers that Nancy spoke to the group at the hotel and brought out a bill and put it up in front of their faces and said, "this is what you're going to earn while you're working with us." *Id.* ¶ 568. The meeting with Nancy lasted three to five minutes. *Id.* ¶ 569.

When Nancy met David, she gave him a job offer letter that he signed. *Id.* ¶ 570. Nancy spoke to David in English and he understood "just the signing and that was it." *Id.* ¶ 571. David did not read the job offer letter; rather, Nancy handed it to him, he signed it, then she took it away and made him lift a weight. *Id.* at 75 ¶ 572. David testified that he did not tell Nancy anything at the interview but just said "hello" to her. *Id.* ¶ 573. David further testified that the only thing Nancy said to him was "lift that up." *Id.* ¶ 574.

David never asked to see the document he signed because he "believed her." *Id.* ¶ 575. As he put it, "I believed the lie that they told me. I believed in them. I didn't think it was something bad. I just figured it was a job. Not that they were going to have me in a factory." Doc. 262-16 at 61. The job description in the job offer letter David signed matches the work he did at Tur-Pak, except he did not use a knife on the job. Doc. 285-3 at 75 ¶ 576. He also testified that Nancy never told him that everything would be free. *Id.* ¶ 577.

David did not destroy any document and brought documents with him to the United States, including a copy of the J&L job offer letter. *Id.* at 76 ¶ 579. David received the J-1 Pre-Arrival Handbook and the J-1 Orientation Handbook before he came to the United States. *Id.* ¶ 580. No one from J&L told David how to answer questions at his visa interview. *Id.* ¶ 581. David was notified about the changes to the J-1 Program. *Id.* ¶ 582.

David felt safe in student housing. *Id.* ¶ 583. He had access to Wi-Fi in his apartment and was able to connect the laptop he got from WITCC to the Wi-Fi. *Id.* ¶ 584. David liked his classes and his professors at WITCC. *Id.* ¶ 585. David met other

non-J-1 Visa students in the WITCC cafeteria. *Id.* at 77 ¶ 586. David went to social events with other WITCC students one or two times a month. *Id.* ¶ 587. David also drank alcohol off campus and used marijuana at a bar with Karla and Natalia. *Id.* ¶¶ 588, 589.

During the entire time he was in the United States, David spoke with Nancy in person once. *Id.* ¶ 590. During that conversation, Nancy handed him his paycheck, he said, "Thank you for the check. Bye," and Nancy said, "You're welcome." *Id.* ¶ 591. The only other time David interacted with Nancy was at a meeting with others at Tur-Pak. *Id.* ¶ 592.

David worked for J&L for about nine weeks from September 17, 2019, to November 11, 2019. *Id.* ¶ 599. His hours worked ranged between 8 and 40 hours per week. *Id.* ¶ 600. David testified that "WIT" forced him to work at Tur-Pak. *Id.* ¶ 601. The first few two weeks, he took the J&L van to get to and from Tur-Pak, then started to get rides from Oscar. *Id.* ¶ 602. David got Oscar's phone number when he met Oscar at Lily's house in August or the beginning of September 2019, before he started work. *Id.* at 79 ¶ 603. He paid Oscar about $25.00 or $30.00 in cash a week to take him. *Id.* ¶ 604. David had a break between his WITCC classes in the morning and his work that started in the afternoon, so he would go home and shower. *Id.* ¶ 605.

David's scheduled shifts never totaled more than 40 hours per week but his obligations may have exceeded 40 hours when accounting for travel time to and from work. *Id.* ¶ 606; Doc. 285-4 at 419. He worked only one Saturday and no Sundays. Doc. 285-3 at 79 ¶ 607. He did not have any classes on Saturdays or Sundays while he worked for J&L. *Id.* ¶ 608. On Saturdays and Sundays, he would sleep, do homework and socialize with Natalia, Karla and Almendra. *Id.* ¶ 609. Sometimes he would go grocery shopping and use the wages he earned from J&L. *Id.* ¶ 610.

David attended classes during the nine weeks he worked for J&L. *Id.* ¶ 611. He was paid for all of the hours he worked for J&L, though he disputes that he was compensated fully for his labor. *Id.* at 80 ¶ 612. David had enough food to eat while he

98

was working for J&L at Tur-Pak. *Id.* ¶ 614. He had breaks during his shift at Tur-Pak to eat. *Id.* ¶ 615. David was provided food at Tur-Pak his first week of work and then brought in food that he prepared at his WITCC apartment after that. *Id.* ¶ 616. David spoke "horrible" English when he came to the United States and only spoke with a co-worker at Tur-Pak who spoke Spanish with him. Doc. 285-8 at 53-54, 79-80.

David was given a white hardhat and earplugs for his work. *Id.* ¶ 618. This was the same equipment given to all of the employees who worked in the same location as David. *Id.* ¶ 619. Tur-Pak was a refrigerated facility because food was processed and packaged there, and everyone who worked there worked in a refrigerated environment. *Id.* ¶ 620. David never reported any on the job injuries to Nancy or anyone with J&L. *Id.* ¶ 621. He testified that he reported on the job injuries to Rosana. *Id.* ¶ 623. David did not complain to Nancy or anyone at J&L about the work. *Id.* ¶ 624. He "felt bad" when his employment with J&L ended because that was the only income he had. *Id.* ¶ 626. David had about $100 dollars in his bank account when his employment with J&L ended. *Id.* ¶ 627.

No one from J&L tried to force David to continue working after his employment with J&L ended. *Id.* ¶ 628. However, he stated that at the first meeting, Nancy told them they could not change jobs and could not quit their jobs because that was the only job they had for the people that were doing the culinary track. *Id.* at 82 ¶ 632. David did not have any contact with anyone from J&L or Tur-Pak after his employment ended. *Id.* at 82 ¶ 629. No one from J&L withheld food or housing from David, but his "free housing" was paid for with money that was withheld from his paycheck by J&L and WITCC. *Id.* ¶ 630; Doc. 285-7 at 11. No one from J&L told him he could not return home to Chile. *Id.* ¶ 631.

### 7. *Almendra Gonzalez De La Paz*

Almendra Gonzalez de la Paz (Almendra) was born on August 17, 1995. *Id.* ¶ 633. She attended and graduated from high school in Chile. *Id.* ¶ 634. After graduating

99

from high school, she attended the Institute Duoc UC, a professional institute, where she studied tourism and hospitality management for four years, from 2015 to 2019. *Id.* ¶ 635. She studied English for four years at the Institute Duoc UC because the career she was interested in was completely in English. *Id.* ¶ 636. Before applying for the J-1 Program, Almendra would rate her English skills as a 7 out of 10. *Id.* at 83 ¶ 637. When she applied for the J-1 Program she considered her English language skills to be fluent. *Id.* ¶ 638.

Almendra learned about the J-1 Program from a Facebook post in March 2019. Doc. 285-3 at 83 ¶ 639. On March 22, 2019, she submitted her application for the J-1 Program via email. *Id.* ¶ 640. Almendra did not speak with anyone from J&L prior to submitting her application. *Id.* ¶ 641. The first time she met with anyone from J&L was at the April 27, 2019, meeting in Santiago, Chile, when she met Nancy. *Id.* ¶ 642. Almendra does not remember anything Nancy said to the group at the April 27, 2019, meeting. *Id.* ¶ 643. She met with Nancy one-on-one and Nancy gave her a job offer letter. *Id.* ¶ 644. Almendra had time to review the document before she signed it and understood it was a job offer. *Id.* ¶ 645. At this time Almendra could read and write in English, understand spoken English, and speak in English. *Id.* at 84 ¶ 646. She does not remember anything Nancy said to her during this conversation. *Id.* ¶ 647.

The job description matches the work Almendra did at Tur-Pak. *Id.* ¶ 648. Based on the job description, she understood on April 27, 2019, that she would be working 30 to 40 hours per week. *Id.* ¶ 649. The total interaction between Nancy and Almendra lasted five to ten minutes. *Id.* ¶ 650. Almendra took the job offer letter with her from the interview and reviewed it again before arriving in the United States. *Id.* ¶ 651. Almendra's belief that she would be working in something related to the kitchen was based on what people in Chile like Carlos and Soledad told her. *Id.* ¶ 652. Almendra did not have any contact with Nancy or anyone from J&L from April 27, 2019, to the date she arrived in the United States. *Id.* ¶ 653. She received the June 12, 2019, email from Soledad and the letter from Rosana explaining the changes to the program. *Id.* ¶

100

654. Almendra testified that she knew she would be making the federal minimum wage of $7.25 an hour before she came to the United States. *Id.* at 85 ¶ 655.

Almendra's WITCC apartment had two bedrooms, a bathroom, a kitchen, furniture and had adequate space. *Id.* ¶ 657. Her apartment door had a lock that she had a key to and she could come and go when she wanted to. *Id.* ¶ 658. There was a laundry area in her apartment building. *Id.* ¶ 659. Her apartment had wireless internet and she was able to connect a laptop she received from WITCC to the wireless internet. *Id.* ¶ 660. She was able to exercise in the gym at the college and access it using a keycard. *Id.* at 86 ¶ 661. Almendra had a cell phone while she was at WITCC and was able to use it to communicate with her family when she had Wi-Fi. *Id.* ¶ 662. No one ever limited her ability to talk on the phone with her friends in Chile. *Id.* ¶ 663.

Almendra was able to freely communicate with anyone about anything while she was enrolled at WITCC. *Id.* ¶ 664. She had access to her passport, visa and social security card while she was enrolled at WITCC. *Id.* ¶ 665. She had control of her Wells Fargo bank account the entire time she was a J-1 Visa student. *Id.* ¶ 666. None of the defendants ever attempted to cut off her access to her bank account. *Id.* ¶ 667. The classes at WITCC were taught in English and Almendra was able to follow along with them and loved the classes she took. *Id.* ¶ 668. Almendra had access to other buildings on the WITCC campus including the library and the computer lab. *Id.* ¶ 669.

On September 13, 2019, Almendra participated in an orientation at the J&L offices, where she received and reviewed electronic copies of J&L's employee handbook, Tur-Pak's employee handbook in Spanish and the applicable attendance policy in Spanish. *Id.* at 87 ¶ 670. Before starting work at Tur-Pak, Almendra understood that she was required to call in if she was going to be absent from work, that two no call no shows would result in termination, and that this policy applied to everyone J&L placed at Tur-Pak. *Id.* ¶ 671. Almendra's J&L time records are accurate and show that she worked for J&L from September 18, 2019, to November 11, 2019. *Id.* ¶ 672. The most hours she worked in

101

a week was 40, which occurred on three occasions. The remainder of the weeks she was employed by J&L she worked less than forty hours per week. *Id.* ¶ 673.

Almendra never worked 45 to 50 hours a week for J&L and does not remember telling anyone that she did, though her obligations may have totaled about that much when accounting for transportation to and from work. *Id.* ¶ 674; Doc. 285-4 at 419. Almendra took the J&L van to work at Tur-Pak the "first few weeks" and then got rides to work from Lily's son Oscar with other J-1 students. Doc. 285-3 at 87 ¶ 675. Almendra generally worked Monday through Friday, never worked more than eight hours a day and never worked a Saturday or Sunday. *Id.* ¶ 676. She was paid for all of the hours she worked for J&L, though she disputes that she was fully compensated for these hours. *Id.* at 88 ¶ 677.

Almendra used her wages from Tur-Pak to purchase food, utensils, pots and pans, plates and marijuana. *Id.* ¶ 678. She was able to take breaks during her work, including meal breaks and would generally bring in food she prepared at her WITCC apartment to eat. *Id.* ¶ 679. Almendra would start in the freezer and then be moved to different positions during a shift. *Id.* ¶ 680. She testified that her right hand was "frozen" at work, so she had to wear a splint, and she thinks she fell two times. *Id.* ¶ 681. Almendra got the splint from WITCC. *Id.* ¶ 682. Almendra never reported the pain in her hand to anyone at J&L or Tur-Pak and did not report the two falls to any defendants. *Id.* ¶ 683.

While she was a J-1 Visa student, Almendra smoked marijuana about once a week and spent about $30.00 a week on marijuana that she bought from Lily's son, Oscar. *Id.* ¶ 687. She smoked marijuana with other J-1 students, including plaintiffs Nestor, Diego and Natalia. *Id.* ¶ 688. Almendra would smoke marijuana on WITCC's campus and sometimes in her WITCC apartment. *Id.* ¶ 690.

Almendra testified that Nancy "instilled fear" in the J-1 students and she interpreted her actions, such as telling students that there would be consequences for missing work, to be threats of firing and deporting them. Doc. 262-17 at 22. She further

102

testified that Nancy's "reactions were a bit brusque and a bit violent." *Id.* She stated that Nancy would have such reactions when "the guys would ask questions." *Id.*

On October 8, 2019, Almendra emailed Nancy and Araceli stating she was going to miss work to go to the dentist. Doc. 285-3 at 90 ¶ 693. Almendra did not work on October 8, 2019, and was not fired or deported. *Id.* ¶ 694. On October 14, 2019, Almendra sent Nancy an email with the subject line: "absent at work 10/15 & 10/16" and wrote that she would be absent on October 15 and 16, 2019 to go to the dentist and would let Nancy know when she could come back to work. *Id.* ¶ 695. Almendra did not work on October 15, 2019, or October 16, 2019 and was not fired or deported. *Id.* ¶ 696.

When Almendra's employment ended she had about $150.00 in her bank account. *Id.* ¶ 697. After her employment ended, no one from J&L contacted her or tried to force her to keep working. *Id.* ¶ 698. No one from J&L claimed that Almendra owed a debt to J&L or WITCC. *Id.* ¶ 699. Almendra testified that one from J&L withheld food or housing from her, however her "free housing" was paid for with money that was withheld from her paycheck by J&L and WITCC. *Id.* ¶ 700; Doc. 285-7 at 11.

### 8. *Natalia Tapia Levin*

Natalia Tapia Levin (Natalia) was born on June 17, 1989. Doc. 285-3 at 92 ¶ 705. She attended high school in Chile and graduated in 2013. *Id.* ¶¶ 706-07. After high school, she attended Mayor University in Santiago and obtained a degree in commercial engineering with an emphasis in exterior commerce. *Id.* ¶ 708. Natalia also attended University Alberto Hurado in Santiago and studied sociology and international culture. *Id.* ¶ 709. Natalia attended this University from 2017 to 2019 while she was also working for the government, until she obtained a degree. *Id.* ¶ 710.

Before coming to the United States, Natalia worked for Del Monte. *Id.* ¶ 711. She was able to read English but clarified that her English ability was "intermediate level with the ability to do basic kinds of tasks like ask where such-and-such street is or where

103

the bathroom is, things like that." Doc. 262-17 at 49. Natalia studied abroad in England two separate times as part of her studies in engineering. Doc. 285-3 at 92 ¶ 713.

Natalia first learned about the J-1 Program when her mom told her about a Facebook post made by Carlos Espinoza, who was her younger brother's teacher. *Id.* ¶ 714. She had an initial phone call with Carlos and then went to a meeting at the high school in Papudo. She remembers David, Almendra, Gonzalo and Alejandro were also at the meeting. *Id.* at 93 ¶ 715. Before coming to the United States, Natalia knew she would be working in a factory, which she learned from Nancy, but thought the factory job would relate to culinary arts. *Id.* ¶ 716; Doc. 285-8 at 136.

Natalia submitted her application for the J-1 Program on March 18, 2019. Doc. 285-3 at 93 ¶ 717. She had not spoken with anyone from J&L prior to submitting her application. *Id.* ¶ 718. The first time Natalia met anyone from J&L was when she met Nancy at the April 27, 2019, meeting in Santiago, Chile. *Id.* ¶ 720. Natalia spoke with Nancy for four minutes. *Id.* ¶ 721. Natalia told Nancy she could read and speak English. *Id.* ¶ 722. Nancy gave her a job offer letter with a job description. *Id.* ¶ 723. Natalia signed the document and understood she was accepting a job offer. *Id.* at 94 ¶ 724. The job description in the job offer letter matched the work Natalia did at Tur-Pak. *Id.* ¶ 725. Natalia testified that when she accepted the job offer, she understood she would be making $7.25 per hour for her work in the United States. *Id.* ¶ 726.

Natalia could use her cell phone to make calls using WhatsApp and had access to a laptop the entire time she was at WITCC. *Id.* ¶ 729. She had the unrestricted ability to communicate with her friends and family. *Id.* at 95 ¶ 730. She had possession of her passport the entire time she was enrolled at WITCC. *Id.* ¶ 731. On September 13, 2019, Natalia attended an orientation at the J&L offices where she reviewed and acknowledged receipt of J&L's employee handbook, Tur-Pak's safety package and attendance policy in Spanish. *Id.* ¶ 732. Natalia worked for J&L for five days, from September 16, 2019, to September 20, 2019. *Id.* ¶ 733. She worked eight-hour shifts at Tur-Pak. *Id.* ¶ 734.

She got breaks during each eight-hour shift that she worked, including a meal break. *Id.* ¶ 735.

Natalia's supervisor at Tur-Pak treated her with respect. *Id.* ¶ 736. Other than the J&L orientation on September 13, 2019, Natalia spoke with Nancy three times while she was in the United States. *Id.* ¶ 737. Natalia testified that Nancy threatened her with deportation at the first meeting at Tur-Pak before beginning work when she said that if she did not complete her work requirements that her visa would be canceled and she would be returned to Chile. *Id.* ¶ 738. She elaborated about the deportation threats, testifying, "I don't need it to be repeated a thousand times that they're going to send me back to Chile, despite the fact that they did that continuously in the meetings." Doc. 262-17 at 69. Natalia testified that she was forced to work by "Juline, Lily, Terry, the other Terry, James, Carlos, Soledad [...]." Doc. 285-3 at 96 ¶ 741.

Natalia testified that no one from J&L withheld food or housing from her, though her "free housing" was paid for with money that was withheld from her paycheck by J&L and WITCC. *Id.* ¶ 742; Doc. 285-7 at 11. Natalia testified that Nancy misrepresented the work she would be performing in Sioux City, stating "if she would have said what the work was, I would have come more willing or able to adapt. There was never any details about specifically what the jobs were inside the factory." Doc. 262-17 at 72. When asked about the job description Nancy provided her, Natalia stated, "That—that—that sheet, that paper, was talking about technical details in relation to work—to—to food. Why was I going to doubt or not trust the person that was giving me the information about the work?" *Id.*

### 9.    *Karla O'Nell Norambuena*

Karla O'Nell Norambuena (Karla) was born on March 30, 1999. Doc. 285-3 at 96 ¶ 745. She attended high school in Chile and graduated in 2016. *Id.* ¶ 746. Karla also attended university in Chile for eight or nine months in 2017. *Id.* ¶ 747. She worked different jobs before coming to the United States including as a salesperson, a cook in a

105

fire house, cleaning houses, at a restaurant, as a cashier and also worked in Argentina for a window and curtain company. *Id.* at 97 ¶ 748.

The first time Karla met anyone from J&L was at the April 27, 2019, meeting in Santiago, Chile. That was the only time Karla spoke with anyone from J&L before she arrived in the United States. *Id.* ¶ 749. She had already applied for the J-1 Program at this time. *Id.* ¶ 750. Karla's meeting with Nancy was under two minutes. *Id.* ¶ 751. Nancy gave Karla the job offer letter at this meeting and asked Lily to explain it. *Id.* ¶ 752. Lily told Karla that the document was confirming that she could lift the weights Nancy had brought to the meeting. Doc. 285-8 at 118. She did not translate anything else in the document. *Id.*

Karla did not ask Nancy any questions at the time because any questions she had were clarified before meeting Nancy. Doc. 285-3 at 97 ¶ 753. Nancy never spoke with Karla about how rent, utilities or food would be paid for in the United States. *Id.* ¶ 754. Karla signed the job offer letter about four months before she came to the United States. *Id.* ¶ 755. She took the job offer letter home with her. *Id.* ¶ 756. Karla signed the job offer letter a second time in the United States before she started working for J&L and understood what it said. *Id.* at 98 ¶ 757. The job description in the job offer letter matches the work Karla did at Tur-Pak. *Id.* ¶ 759.

Karla was in the United States for about a month before she started work. *Id.* ¶ 760. During this time, she spent time at her apartment, went to the gym and signed up for a Taekwondo workshop. *Id.* ¶ 761. Prior to starting work, Karla went to the J&L offices and received, reviewed and signed workplace policies. *Id.* ¶ 762. She understood that she was required to call in to J&L if she was going to be absent and that if she did not go in to work or call in two times, her employment would be terminated. *Id.* ¶ 763. Karla understood these policies applied to all employees placed by J&L at Royal Canin and Tur-Pak. *Id.* at 99 ¶ 764.

Karla does not dispute that her J&L timesheets are accurate. *Id.* ¶ 765. Karla's timesheets show she never worked more than 30 hours a week. *Id.* ¶ 766. Karla worked

106

at Royal Canin for eight days. *Id.* ¶ 767. She received breaks during her shifts at Royal Canin. *Id.* ¶ 768. Karla worked with plaintiffs Gonzalo and Alejandro at Royal Canin and was able to speak with her Royal Canin co-workers on breaks. *Id.* ¶ 769. Karla was terminated from Royal Canin for missing work twice. *Id.* ¶ 770. Nancy told Karla she was fired from Royal Canin because she did not show up for work. *Id.* ¶ 771. Nancy told Karla, "We will offer you a job at Tur-Pak to start on Monday. Please let me know if this is the route you want to take." *Id.* ¶ 772. Karla replied that she would take it because that was her only option, but she preferred to continue working at Royal Canin. *Id.* at 100 ¶ 774.

Karla worked 13 days at Tur-Pak. *Id.* ¶ 775. She received breaks during her shifts at Tur-Pak. *Id.* ¶ 776. She did not speak with Nancy in person more than three times while she was in the United States. *Id.* ¶ 777. Karla testified that Nancy threatened her on two occasions. *Id.* ¶ 778. The first time was when she had already been fired from Royal Canin and Nancy was handing her a check. *Id.* ¶ 779. Karla testified that Nancy told her that if she did not keep her job at Tur-Pak, they were going to send her back to Chile because they did not have any more job placements for her. *Id.* ¶ 780. The second threat was when Nancy told her, at a meeting at Tur-Pak, that this was the last job they had for her and that if she kept missing work, they would fire her and she would return to Chile. *Id.* ¶ 781. Karla missed at least one day of work per week she was employed by J&L. *Id.* ¶ 782. She was not deported, no one took her passport and her visa was not canceled. *Id.* ¶ 783. No one else from J&L made any threats to Karla. *Id.* ¶ 784.

Karla testified that no one from J&L withheld food or housing from her, though her "free housing" was paid for with money that was withheld from her paycheck by J&L and WITCC. *Id.* at 101 ¶ 785; Doc. 285-7 at 11. Regarding her ability to quit her jobs with J&L, she testified, "it was emphasized to me that there would not be any more work for me, and, for that reason, I would be returned to Chile." Doc. 262-17 at 105. Eventually Karla did quit her job at Tur-Pak without immigration consequences, but she

107

testified that, "at that point the school did want to cut things with J&L. There were many meetings regarding that. And so they started to emphasize that if we did not want to go to work, you know, we could quit the job and look for another job[.]" *Id.* No one from J&L ever tried to force Karla to keep working after she quit. *Id.* ¶ 788. No one from J&L ever told Karla she owed a debt. *Id.* ¶ 789.

### 10. Alejandro Pizarro

Alejandro Pizarro (Alejandro) was 34 years old when he applied for the J-1 Program. *Id.* ¶ 791. He studied environmental engineering in a professional technical program and received a degree in environmental engineering. *Id.* ¶¶ 793, 794.

Alejandro did not pay anything to apply for the J-1 Program. *Id.* ¶ 796. Prior to applying for the J-1 Program, he traveled in Peru, Paraguay, Bolivia and "South America" in 2012, 2015, 2016 and 2017. *Id.* ¶ 797. He also owned his own construction company in Chile and worked on construction of houses, remodels, new pools and remodels of pools. *Id.* ¶ 798. Alejandro understood that he would have to work as part of the J-1 Program and when he made the decision to apply, he did not know the type of work he would be doing and it did not matter to him at the time he applied. *Id.* ¶ 799. Alejandro signed the J-1 Student Agreement, agreeing to attend classes, maintain a 2.0 GPA, attend his internship, live in student housing and not use tobacco, alcohol or drugs. *Id.* at 103 ¶ 800. He understood that failure to abide by the terms of the agreement would result in "deportation" or "punishment." *Id.* ¶ 801.

Rosana and Lily told Alejandro the program would be free at several meetings that occurred. *Id.* ¶ 802. The entire time Alejandro was enrolled in the J-1 Program, he had access to his cell phone and used it to communicate with his family and friends in Chile and he spoke to his family on the weekend. *Id.* ¶ 803. He also had access to his passport and his J-1 Visa document. *Id.* ¶ 804.

The first time Alejandro met anyone from J&L was when he met Nancy at the April 27, 2019, meeting. That was the only communication he had with Nancy before

he came to the United States. *Id.* ¶ 805. Alejandro met one-on-one with Nancy at the meeting. *Id.* ¶ 806. He does not remember anything Nancy said to him or he said to Nancy at the meeting. Nancy gave Alejandro a job offer letter with a job description that he signed at the hotel in Santiago. *Id.* ¶ 808. The job he actually did at Royal Canin matched the job duties in the job description Nancy gave him. *Id.* ¶ 807. Alejandro understood that by signing the document, he was accepting a job. *Id.* ¶ 809. Nancy did not tell him anything else about the job other than what was in the job description. *Id.* ¶ 810. Alejandro testified that he knew he was going to be making $7.25 an hour before he came to the United States. *Id.* ¶ 811.

Alejandro was told by Lily, Soledad, and Carlos to lie at his interview with the consulate and say that he was not coming to work. *Id.* ¶ 812. Soledad, Lily, and Carlos told Alejandro to destroy documents before he traveled to the United States. *Id.* ¶ 813.

Alejandro lived in the apartments provided by WITCC. *Id.* ¶ 814. After Alejandro arrived in the United States, he had about four weeks before he started work. *Id.* at 105 ¶ 815. During this time, he tried to get to know the city, went out to a bar one or two times and went out to dinner. *Id.* ¶ 816. He went to class and he also went to parties. *Id.* ¶ 817. Before going to work for J&L, Alejandro went to the J&L offices to complete paperwork. *Id.* ¶ 818. His time records from J&L are accurate and show that he worked for J&L from September 17, 2019, to November 12, 2019, but do not include the time it took him to get to and from work. *Id.* ¶ 819; Doc. 285-4 at 419.

On September 22, 2019, Alejandro took a sick day from Royal Canin. *Id.* ¶ 820. He was aware that as part of the attendance policy he needed to let Royal Canin know if he was absent. *Id.* ¶ 821. Alejandro injured his thumb at Royal Canin and reported it the following day, completing documents with the help of a co-worker who spoke fluent Spanish. Doc. 262-17 at 188. Alejandro did not report the injury the day it happened because he was "a bit afraid as to what Nancy was going to say" and he "thought it was just having gotten hit." *Id.* He was offered modified work at Royal Canin but declined

it because he had a lot of homework and was then notified that he was terminated for not coming to work and not reporting his job injury. Doc. 285-3 at 106 ¶ 824.

Alejandro worked one Saturday while employed by J&L and otherwise worked five days a week. *Id.* ¶ 825. He did not have classes on the weekends, so he would rest, sleep and try to do WITCC homework. *Id.* ¶ 826. Alejandro never had any phone conversations with Nancy when he was in the United States. *Id.* ¶ 827. The only email communication he had with her was on September 23, 2019, about when he missed work on September 22, 2019. In that email exchange, he told her he was confused about when he was supposed to go in to work. *Id.* ¶ 828. Alejandro testified that Nancy "constantly" threatened to deport the students and would specifically threaten deportation when she handed the students their paychecks on Fridays. Doc. 262-17 at 184.

Alejandro's placement at Tur-Pak ended when WITCC told him no one could go back to work there. Doc. 285-3 at 107 ¶ 835. No one from J&L ever claimed he owed a debt. *Id.* ¶ 836. No one from J&L ever withheld food or housing from Alejandro, though his "free housing" was paid for with money that was withheld from his paycheck by J&L and WITCC. *Id.* ¶ 838; Doc. 285-7 at 11.

During this time, Alejandro also had a "joking conversation" with another J-1 student in which he responded "Who told you that nonsense?" to her concerns about deportation. Doc. 262-17 at 187. He then messaged her, "I told her Lily I hope I'm not the next one to leave ha ha ha." *Id.* Alejandro contextualized this conversation in his deposition by saying that he jokes around in internet chats and that "the context of what you're reading here is not the same as what I wrote." *Id.* He further contextualized the conversation by testifying:

> I was always afraid to do something bad at WIT. You know, miss classes or miss—miss work for the same reason. Because I didn't want to have any problem with any opinion, which is something that always happened at WIT regarding deportation.
>
> And maybe I joked around in this conversation because I had missed work, and I said that would be the next one—perhaps I would be the next one

110

deported. Since many people were already leaving, you know, it's logical that one would feel certain—fear—fearful—fearfulness that someone would come and say, "Alejandro, we're going to deport you and send you back to Chile."

*Id.*

### 11. *Bairon Andres Morel Guerra*

Bairon Andres Morel Guerra (Bairon) was born on January 16, 2000. *Id.* ¶ 853. He attended high school in Chile at the Liceo Tecnico and Profesional of Papudo. *Id.* at 110 ¶ 854. He graduated from high school in 2018. *Id.* ¶ 855. Bairon studied engineering and the administration of financial businesses for one semester at the University of Vina in March 2019. *Id.* ¶¶ 856, 857.

Bairon first learned about the J-1 Program through Carlos, who was his professor at the time of his application. *Id.* ¶ 858. He applied for the J-1 Program on March 25, 2019. *Id.* ¶ 859. When he applied, he had not spoken with anyone from J&L. *Id.* ¶ 860. When Bairon met with Nancy he did not speak to her personally because he did not know English. *Id.* ¶ 861. Nancy gave Bairon a job offer letter that he signed. *Id.* ¶ 862. He did not read the document when he signed it, as he could not read English. Doc. 262-18 at 9. Bairon understood that by signing the document he was accepting a job offer. Doc. 285-3 at 111 ¶ 864. The job description matches the work he did at Tur-Pak. *Id.* ¶ 865. In Chile, Carlos explained to him that he would have to work on the line and put products on trays. Carlos said the job would be very easy but workers had to stand for long periods. *Id.* ¶ 866. Bairon did not ask Nancy questions, as he did not understand English. *Id.* ¶ 867.

Carlos and Soledad were the individuals who gave Bairon guidance about how to answer questions at his interview to get his visa. *Id.* ¶ 869. Bairon arrived in the United States on August 17, 2019. *Id.* at 112 ¶ 870. He shared a bedroom at his WITCC apartment with Andres and his apartment had a bathroom and a kitchen. *Id.* ¶ 871.

111

Bairon and his roommates all had keys to the apartment door and were able to come and go from the apartment as they wanted. *Id.* ¶ 872. He went to the Omaha Zoo and also attended a "foam" party at WITCC, where he took a photo with Nestor and another student Sebastian Alexander (Sebastian). *Id.* ¶¶ 873-74. Bairon, Eduardo, Sebastian, Diego, another student named Guillermo and Gonzalo went to a church and afterwards ate together. *Id.* ¶ 875.

Before Bairon went to work at Tur-Pak he went to the J&L offices and completed paperwork on a computer. *Id.* ¶ 876. Araceli was at the meeting and answered any questions he had. *Id.* ¶ 877. Bairon worked from September 17, 2019, to October 28, 2019. *Id.* ¶ 878. Before he started working for J&L, he understood there was an attendance policy that required him to call in if he was going to be absent from work. *Id.* at 113 ¶ 880. Bairon understood that if he did not call in or report to work two times his employment would be terminated. *Id.* ¶ 881. He never worked more than five days in one week. The students were told that working on Saturdays and Sundays was an option and it was their decision if they wanted to go to work on Saturday or Sunday. *Id.* ¶ 882. Bairon does not remember co-workers being hostile at Tur-Pak. *Id.* ¶ 884. Bairon never made any complaints to Nancy, J&L or Tur-Pak while he was a J&L employee. *Id.* ¶ 886. He testified that no one from J&L ever withheld food or housing or told him he could not quit or change his job or not return home, however the "free housing" was paid with money that was withheld from his paycheck by J&L and WITCC. *Id.* at 114 ¶ 890; Doc. 285-7 at 11. Bairon was paid for all of the hours he worked for J&L, though he disputes that he was compensated fully for his labor. *Id.* ¶ 891.

The entire time Bairon was in the United States, he had access to his visa and his passport. *Id.* ¶ 892. When the semester ended, Bairon quit the J-1 Program and booked a flight to New York to visit a friend. *Id.* ¶ 893. After visiting his friend in New York, he booked a flight home to Chile. *Id.* ¶ 894.

### 12. *Claudio Ramos*

Claudio Ramos "(Claudio") was born on June 11, 1992. *Id.* ¶ 895. From 2014 to 2018, he was enrolled in a university in Chile pursuing a degree in engineering. *Id.* ¶ 896. Claudio stopped attending the university prior to applying for the J-1 Program. *Id.* at 115 ¶ 897. He first learned of the J-1 Program when his sister sent him a screenshot of a Facebook post by Carlos. *Id.* ¶ 898. After seeing the post, Claudio spoke with Carlos and went to a meeting with Carlos in Papudo. *Id.* ¶¶ 899-900.

Claudio submitted his J-1 Visa application documents on March 18, 2019, via email. *Id.* ¶ 901. When Claudio applied, he had not spoken with anyone from J&L. *Id.* ¶ 902. Claudio authored a letter in English using Google Translate to translate words from Spanish to English. *Id.* ¶ 904. The only time Claudio met with anyone from J&L was at the April 27, 2019, meeting. *Id.* at 116 ¶ 905. He met with Nancy for about two minutes. *Id.* ¶ 906. Claudio testified that he did not understand anything Nancy said because she spoke in English and he spoke in Spanish. *Id.* ¶ 907.

Nancy gave Claudio a job offer letter with a job description. He does not remember reading it but he signed it. *Id.* ¶ 910. Claudio testified that he would not have accepted a job offer if he was told in Chile that the job was in a meat factory. *Id.* ¶ 911. Claudio also wrote in his T-Visa application: "In my country, they had said we would work in a meat factory, which was not done." Doc. 262-19 at 11. Claudio testified that this statement was an error and that he had prepared the statement with Google Translate because he could not write in English. *Id.* When pressed on the statement he reiterated that, "If it was a meat packing plant, I would not have accepted it. I wouldn't have come. I would have stayed in Chile." *Id.*

The meeting in Santiago was the only time he interacted with anyone from J&L before he came to the United States. Doc. 285-3 at 117 ¶ 915. Claudio arrived in the United States on August 17, 2019. *Id.* ¶ 916. He started working for J&L at Tur-Pak on September 23, 2019, meaning he had about a month in the United States before starting

work. *Id.* ¶ 917. During this month Claudio went to activities at the school, went to the gym and spent time meeting his classmates. *Id.* ¶ 918.

Claudio testified that Terry Yi and Rosana forced him to work while he was a J-1 Visa student. *Id.* ¶ 919. Before starting work at Tur-Pak, Claudio understood there was an attendance policy requiring him to call in if he was going to miss work, and that if he missed work or did not call in two times his employment would be terminated. *Id.* at 118 ¶ 921. Claudio's last day of work for J&L at Tur-Pak was November 12, 2019. *Id.* ¶ 922. He never worked more than five days a week. *Id.* ¶ 923. He did not work on September 26, 2019, and was not fired or deported. *Id.* ¶ 924. Claudio never worked 12 consecutive days in a row. *Id.* ¶ 926. His shifts were about eight hours but his timesheets do not account for his time getting to and from work. *Id.* ¶ 927; Doc. 285-4 at 419. Claudio received breaks while he worked. Doc. 285-3 at 118 ¶ 928. He had time to eat meals at Tur-Pak and bought food at Tur-Pak or brought his own food. *Id.* at 119 ¶ 929.

Claudio became ill and vomited after one shift and suspected that it was related to the "putrid" conditions at Tur-Pak. Doc. 262-20 at 12-14. Claudio never asked anyone from J&L to go to the hospital, rather a Hispanic co-worker took him to Walmart to buy medication. Doc. 285-3 at 119 ¶¶ 933-34. Claudio described seeing feces on the floor and co-workers urinating on the floor outside of the bathroom because of limited space in the bathrooms, and he also thought people were urinating on boxes. Doc. 262-20 at 14. Claudio saw people using marijuana and cocaine in the bathroom but did not report that to anyone with J&L. Doc. 285-3 at 119 ¶ 937. A co-worker also hit Claudio on the shoulder but he did not report this incident to J&L. *Id.* at 121 ¶ 955.

Claudio had weekends off. *Id.* at 119 ¶ 938. When Claudio did not have work or school on the weekends, he went to the library, did homework and laundry and went out to eat. *Id.* ¶ 939. Claudio would go out to have drinks and went to out dancing on one occasion. *Id.* ¶ 940. Claudio would go to a bar close to WITCC where he could get drinks and talk. *Id.* ¶ 941.

114

Claudio testified that Nancy "threatened" him at "every opportunity at every meeting." *Id.* ¶ 942. He stated that "Nancy had a very strong, forceful voice, and she practically yelled every time she had the opportunity and would say that, you know, we should not miss work. For me, that's a threat." Doc. 262-20 at 4. He further stated that this yelling was "reflective of we were going to be returned to our countries." *Id.*

No one from J&L prevented Claudio from accessing his bank account. Doc. 285-3 at 120 ¶ 947. No one from J&L ever prevented him from contacting his friends or family. *Id.* ¶ 948. No one from J&L ever physically abused Claudio. *Id.* at 121 ¶ 949. Claudio was paid for all of the hours he worked, though he disputes that he was fully compensated for these hours. *Id.* ¶ 950. He had access to his passport the entire time he was enrolled as a student at WITCC. *Id.* ¶ 955.

## VI. DISCUSSION

The J&L Defendants argue that they are entitled to summary judgment on each of the remaining counts. I will address each count in turn. However, before discussing the counts, I must address the parties' arguments regarding civil conspiracy liability.

### A. Civil Conspiracy Liability

The J&L Defendants argue that plaintiffs are using a civil conspiracy theory of liability to circumvent my previous ruling that dismissed plaintiffs' RICO conspiracy claims. Doc. 293 at 8. The J&L Defendants further argue that even under a TVPRA[19] conspiracy theory of liability, plaintiffs cannot establish liability unless they "knew or should have known that WITCC's employees were engaging in human trafficking[]" and that this theory of liability risks duplicative recovery because WITCC has already settled with the plaintiffs. *Id.* at 9. Finally, the J&L Defendants argue that even if the TVPRA

---

[19] "TVPRA" refers to the Trafficking Victims Protection Reauthorization Act of 2005, 22 U.S.C. chapter 78.

allows for liability under a civil conspiracy theory of liability, the undisputed facts do not support such a theory as against the J&L Defendants. *Id.* at 9-12.

The Iowa Supreme Court has summarized civil conspiracy as follows:

> Under Iowa law, "[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful." *Basic Chems., Inc. v. Benson,* 251 N.W.2d 220, 232 (Iowa 1977). Our court has also relied on the principles stated in the Restatement (Second) of Torts section 876 to set the parameters of this claim:
>
> > Under the Restatement, a person becomes subject to liability for harm caused by the tortious conduct of another when that person: (a) does a tortious act in concert with the other or pursuant to a common design with the other (traditional conspiracy)....
>
> *Ezzone v. Riccardi,* 525 N.W.2d 388, 398 (Iowa 1994) (emphasis added) (citing Restatement (Second) of Torts § 876, at 315 (1979)). Under this theory of liability, "an agreement must exist between the two persons to commit a wrong against another." *Id.* (emphasis added).
>
> "Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action." *Basic Chems.,* 251 N.W.2d at 233; *accord Adam v. Mt. Pleasant Bank & Trust Co.,* 387 N.W.2d 771, 773 (Iowa 1986). Thus, conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert. *See John's Insulation, Inc. v. Siska Constr. Co.,* 774 F. Supp. 156, 162 (S.D.N.Y.1991) ("Allegations of a civil conspiracy, therefore, are proper only for the purpose of establishing joint liability by co-participants in tortious conduct."); 2 Dobbs § 340, at 936–37 (characterizing cases applying a civil conspiracy theory as employing a model of vicarious liability). Thus, the wrongful conduct taken by a co-conspirator must itself be actionable. *See John's Insulation, Inc.,* 774 F. Supp. at 161 ("A claimant must plead specific wrongful acts which constitute an independent tort."); *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.,* 88 Md. App. 672, 596 A.2d 687, 700 (1991) ("[T]he act (or means) need only be 'of such a character as to create an actionable wrong.' " (citation omitted)); 16 Am.Jur.2d Conspiracy § 50, at 275–76 (1998) ("[I]f the acts alleged to

116

constitute the underlying wrong provide no cause of action, then neither is there a cause of action for the conspiracy itself.").

*    *    *

"While a civil conspiracy is based upon intentional activity, the element of intent is satisfied when a defendant knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner. There is no such thing as accidental, inadvertent or negligent participation in a conspiracy. A defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy. A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees … to do its part to further those objectives, however, is liable as a conspirator. Once a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature." [*Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 206 Ill. Dec. 636, 645 N.E.2d 888, 894-895 (1995)]

*Wright v. Brooke Group Ltd.,* 652 N.W.2d 159, 171-73 (Iowa 2002).

This summary is helpful to show why J&L Defendants' "circumvention" argument fails. RICO conspiracy is an independent cause of action, which I dismissed due to insufficient allegations that "*each defendant's* alleged *racketeering* activities took place over a year's time[]" and insufficient allegations of open-ended continuity, as required by the RICO statute. *Norambuena v. Western Iowa Tech Community College,* No. C20-4054, 2022 WL 987946 at *19 (N.D. Iowa Mar. 31, 2022). Conversely, civil conspiracy is a theory of vicarious liability that may be used to hold one party accountable for acting tortiously in concert with another party, with no open-ended continuity element. *Wright,* 652 N.W.2d at 172. As such, plaintiffs' civil conspiracy claims are not a new cause of action to replace the previously dismissed RICO claims, but rather a theory of liability to support the properly pleaded claims that are currently before the court. The J&L Defendants imply throughout their reply brief that plaintiffs' conspiracy liability claims are a surprise tactic. *See* Doc. 293 at 8. However, plaintiffs allege group activity in

117

furtherance of tortious conduct throughout the Third Amended Complaint. Doc. 93 at 103-123. While they may have only used the words "conspiracy" in the context of their RICO claims, the allegations in the TAC sufficiently put the J&L Defendants on notice that plaintiffs may rely on a civil conspiracy theory of liability.

The next question then is whether civil conspiracy is a proper avenue to impose liability under the TVPRA. I find that it is. The Supreme Court has explained that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley,* 537 U.S. 280, 285 (2003). "This practice reflects the fact that federal statutes are generally intended to have uniform nationwide application." *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 740 (1989) (quotation omitted). "A civil liability claim under § 1595 is essentially a tort action." *A.D. v. Wyndham Hotels and Resorts, Inc.,* No. 19-cv-120, 2020 WL 9550005, at *3 (E.D. Va. 2020). Because the TVPRA essentially creates a tort action, Congress typically "intends its legislation to incorporate [tort-related vicarious liability rules]" and "conspiracy is merely an avenue for imposing vicarious liability," civil conspiracy liability is a workable theory under the TVPRA. *Meyer,* 537 U.S. at 285; *Wright,* 652 N.W.2d at 172.

In addition, numerous courts have held that vicarious liability applies in the context of the TVPRA. *Wyndham,* 2020 WL 9550005, at *3; *Doe (K.E.C.) v. G6 Hospitality, LLC,* No. 23-CV-00270, 2024 WL 4501095, at *6 (E.D. Tex. 2024); *J.K. v. Ramada Worldwide, Inc.,* No. 23-CV-108, 2023 WL 5621913, at *4 (N.D. Ga. 2023); *J.G. v. Northbrook Industries, Inc.,* 20-CV-05233, 2024 WL 4513034, at *9 (N.D. Ga. 2024); *Treminio v. Crowley Maritime Corporation,* 649 F. Supp. 3d 1223, 1232 (M.D. Fla., 2023); *Doe v. Hotels,* 23-cv-1012, 2024 WL 2955728, at *5 (M.D. Fla. 2024); *T.S. v. Wyndham Hotels & Resorts, Inc.,* 23-CV-2530, 2024 WL 3927382, at *3 (D. Minn. 2024). While these courts have analyzed whether vicarious liability theories apply in the context of agency liability, the same principles apply in the context of civil conspiracy liability, as "conspiracy is merely an avenue for imposing vicarious liability on a party

118

for the wrongful conduct of another with whom the party has acted in concert." *Wright,* 652 N.W.2d at 172. At least one other federal court has incorporated civil conspiracy liability in a TVPRA case. *Elat v. Ngoubene,* 993 F. Supp. 2d 497, 531-32 (D. Md. 2014).

The J&L Defendants further argue that even if plaintiffs may assert their claims under a civil conspiracy theory of liability, the TVPRA's beneficiary liability prong means that "Plaintiffs cannot establish the liability of the J&L Defendants based on the conduct of the WITCC Defendants, unless they can also establish that the J&L Defendants knew or should have known that WITCC's employees or agents were engaging in human trafficking." Doc. 293 at 9. I disagree. The *Wyndham* court explained the interplay between beneficiary liability under the TVPRA and indirect theories of liability such as vicarious liability:

> The Court rejects Wyndham's contention that the TVPRA is not silent on indirect liability. Wyndham argues that the TVPRA provides for indirect liability by creating beneficiary liability. But beneficiary liability is not third-party liability. Rather, it is another form of direct liability. Those who knowingly benefit from participating in a venture that they knew or should have known was sex trafficking are themselves directly liability for the harms caused to the victims. Whether a third party—such as an employer or parent company—can be held indirectly liability for the beneficiary's tortious conduct is a separate question, which the TVPRA does not address.

*Wyndham,* 2020 WL 9550005, at *3 n.1.[20] I agree with this distinction. As such, I find that the TVPRA allows for not only beneficiary liability, but also civil conspiracy liability under a  perpetrator theory of liability. Finally, I note that civil conspiracy liability clearly applies to plaintiffs' more traditional tort claims of fraudulent misrepresentation and intentional infliction of emotional distress. *Wright,* 652 N.W.2d at 171.

---

[20] As explained above, the *Wyndham* court held that the TVPRA's silence as to indirect liability allowed for the incorporation of tort-related vicarious liability theories of liability. *Wyndham,* 2020 WL 9550005, at *3.

The final question is whether plaintiffs have established disputed facts showing that J&L Defendants entered into a civil conspiracy in this case. As this court has previously observed:

> [T]he Third Circuit Court of Appeals warned, "'that direct evidence of a conspiracy is rarely available and that the existence of a conspiracy must usually be inferred from the circumstances.'" *Capogrosso v. The Supreme Court of New Jersey,* 588 F.3d 180, 184–86 (3d Cir.2009) (quoting *Crabtree v. Muchmore,* 904 F.2d 1475, 1481 (10th Cir.1990)); *see Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999) (noting that "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence."); *see also Weber v. Paul,* 241 Iowa 121, 40 N.W.2d 8, 11 (1949) ("It is of course elementary that a conspiracy may be proven by circumstantial evidence. It is frequently incapable of direct proof.").

*McFarland v. McFarland,* 684 F. Supp. 2d 1073, 1083 (N.D. Iowa 2010). Based on the record before me, plaintiffs have established sufficient facts for a jury to reasonably infer that the J&L Defendants engaged in a civil conspiracy with WITCC. To prevail on a civil conspiracy theory of liability, plaintiffs must show that the J&L Defendants combined with WITCC "by concerted action to accomplish an unlawful purpose." *Wright,* 652 N.W.2d at 171. Plaintiffs have put forth facts establishing that the J&L Defendants and WITCC entered into an agreement to bring plaintiffs to Sioux City to work, as both parties executed the "Global Workforce Program" MOU. Doc. 321 at 29 ¶¶ 110, 111. In the MOU, the J&L Defendants and WITCC agreed on the mechanics of the "internship" program, in which WITCC would recruit students to Sioux City and J&L would place students in internships, provide scholarships and provide transport for the students to get to their job sites. *Id.* at 29-30 ¶¶ 110-112.

Further, plaintiffs have put forth sufficient facts to infer that the J&L Defendants and WITCC entered this agreement for an unlawful purpose, namely placing students into unskilled positions to boost the Sioux City labor force in contravention of J-1 Program guidelines. For example, Coburn acknowledged that students would "have to be placed in a job that pertains to their major." *Id.* at 53 ¶ 181. In the same email,

Coburn stated that the only compliant options for the robotics program would be at Royal Canin's new plant, which would not be available to the students at Tyson (which J&L ultimately did not use). *Id.* Coburn further stated that "students will need to be in the knife position to stick to the J1 visa guidelines." *Id.* This supports an inference that the J&L Defendants knew the job sites they ultimately chose were not compliant with J-1 Program regulations.

The J&L Defendants argue that they innocently found non-compliant job placements for the students because they were assured by WITCC that the job placements were compliant with J-1 Program guidelines. Doc. 293 at 9-10. That is for the jury to decide. However, plaintiffs have put forth sufficient facts for a jury to infer otherwise. For example, Rosana vocally objected to J&L's early suggestions for job placements. Doc. 321 at 51 ¶ 176. While these job placements were ultimately not used, such objections would put J&L on notice of the types of jobs that would be compliant. However, instead of finding more compliant jobs, the J&L Defendants placed students in jobs that were arguably less compliant than those to which Rosana had objected. Rosana objected to jobs where the students would be primarily slicing meat. *Id.* While still not a compliant job for the J-1 Program, slicing meat is arguably more related to culinary arts than the jobs assembling "Lunchmakers" at Tur-Pak. *Id.* ¶ 30.

In addition, J&L employed an executive recruiter, Curt Baker, to find compliant internships. *Id.* at 32 ¶ 120. When he was discharged because he "didn't produce anything," J&L did not attempt to find more "high-level employers," but rather pushed forward with their existing unskilled job placements. *Id.* at 116 ¶ 367. As Michael explained, the relationship between J&L and Royal Canin had not previously been for J&L to supply skilled labor and J&L did not attempt to put students in skilled positions at Royal Canin. *Id.* Moreover, Nancy was provided with course descriptions by WITCC. *Id.* ¶ 213; Doc. 285-4 at 503. A jury could infer that this put the J&L Defendants on notice of what types of jobs would be appropriate for the plaintiffs but the J&L Defendants instead chose non-compliant, unskilled jobs for their own benefit.

121

Plaintiffs have also put forth sufficient facts to show that the J&L Defendants knew it was unlawful to be involved in the J-1 Program but still participated in the program to further their own, unlawful purpose of using J-1 students to increase the labor supply in Sioux City. Doc. 321 at 45-46, 63 ¶¶ 161-162, 209-210. For example, by May 13, 2019, WITCC knew that J&L, a staffing agency, could not participate in the program. *Id* at 83 ¶ 267. Juline then emailed the J&L Defendants that they needed to make changes to the program and she would "go over everything at the meeting." *Id*. at 84 ¶ 271. This supports an inference that WITCC informed the J&L Defendants at that meeting that J&L could not be involved in the program, yet J&L chose to remain involved.

This inference is buttressed by J&L's later actions. John and Kelly expressed concern about drawing "too much attention" to their involvement in the program in conversations about a press release in August 2019. *Id*. at 114 ¶ 363. While a jury may find this conversation innocuous, it supports the inference that J&L knew it was illegal to be involved in the program and did not want to draw attention to that fact. Even more tellingly, a jury could reasonably infer that the J&L Defendants explicitly acknowledged the illegality of their involvement in October 30, 2019, email messages. *Id*. at 167 ¶ 539. In those emails, Nancy updated J&L's leadership team regarding a meeting she had with WITCC about next steps for the program and described how WITCC was garnishing the wages of students who no longer worked for WITCC or J&L. *Id*. ¶¶ 540-541. Matt Short responded, "Was it addressed that it is against the law and the agreement that we have with WIT that the students are not working for J&L or WIT?" *Id*. ¶ 542. Gene Wockenfuss replied, "I would strongly add one more piece for future recruitment.… Not only does the student sign off on our stipulations, BUT need to have 'skin' in the game to assure their vested and understand the expectation! My suggestion is a $500 deposit! Why, well, if they don't work out, we use it to send them home!" *Id*. at 168 ¶ 544.

A jury could reasonably infer from this conversation that the J&L Defendants became aware of the illegality of their involvement in the program at some point but,

122

rather than removing themselves from the program, doubled down by addressing how they could assert even more control over the students.[21]

In sum, plaintiffs have put forth sufficient disputed facts to show that J&L Defendants and WITCC took "concerted action to accomplish an unlawful purpose," and thus J&L Defendants may be held liable as co-conspirators. *Wright,* 652 N.W.2d at 172. I will address how this applies to the specific counts at issue in the following sections.

## B.    Counts 1 to 3 – Violations of TVPRA

Plaintiffs allege the following violations of TVPRA against the J&L Defendants.

- Count 1: Trafficking in violation of 18 U.S.C. § 1590
- Count 2: Forced labor in violation of 18 U.S.C. § 1589
- Count 3: Peonage in violation of 18 U.S.C. § 1581

Allegations under § 1590 (trafficking) require a plaintiff first establish a predicate violation of § 1589 (forced labor). For this reason, I will address Count 2 (the forced labor predicate violation) first.

### 1.    Count 2: Forced Labor – 18 U.S.C. § 1589

#### a.    Legal Standards

Section 1589(a) provides what some courts have referred to as the "perpetrator theory" of liability under the forced labor statute:

(a)    Whoever knowingly provides or obtains the labor services of a person by any one of, or by any combination of, the following means—

---

[21] Of course, this evidence, like much of the evidence in this case, is subject to both innocent and sinister interpretations. A jury could also reasonably infer that Matt Short was not referring to the illegality of J&L's involvement, but rather the illegality of students being placed at internships without J&L's involvement. At the summary judgment stage, however, I must view this email conversation in the light most favorable to the plaintiffs.

123

(1)    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2)    by means of serious harm or threats of serious harm to that person or another person;

(3)    by means of the abuse or threatened abuse of law or legal process; or

(4)    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

Plaintiffs allege violations of the TVRPA under the perpetrator theory of liability against the J&L Defendants, specifically under Sections 1589(a)(2) and (a)(3). Comparably, 18 U.S.C. § 1589(b) provides what is known as the "beneficiary" theory of liability:

(b)    Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

18 U.S.C. § 1589(b). Plaintiffs further allege that the J&L Defendants are liable under the beneficiary theory of liability.

### b.    *1589(a) – "Perpetrator" Liability*

Plaintiffs allege that the J&L Defendants are liable under §§ 1589(a)(2) and (3) because (1) they threatened serious harm through threats of deportation and by tying plaintiffs' food and housing to working in non-compliant jobs and (2) abused the legal process by coercing plaintiffs to provide labor through an unlawful use of the J-1 Program and threatening deportation. Doc. 285-1 at 80-86. I will address each in turn.

124

## i. Threats to Withhold Food and Housing

Plaintiffs allege that the J&L Defendants threatened "serious harm" by threatening to withhold food and housing. "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).

The J&L Defendants argue that discovery has proven that plaintiffs do not allege that they withheld food or housing, nor that the J&L Defendants used any other form of serious harm to force plaintiffs to work. Doc. 262 at 60. Furthermore, the J&L Defendants state, "Plaintiffs agree that WITCC was responsible for providing them with housing, and that J&L had nothing to do with their housing." *Id.*

As a preliminary matter, it is not true that "J&L had nothing to do with [plaintiffs'] housing." *Id.* As John explained, J&L provided "scholarships to cover the cost of . . . housing expenses." Doc. 321 at 26 ¶ 100. The MOU further defined the mechanics of these scholarships and provided that the "scholarships" would be funded by the plaintiffs' labor for J&L. *Id.* at 29 ¶ 112. Far from having "nothing to do" with the plaintiffs' housing, this arrangement explicitly tied plaintiffs' employment with J&L to the cost of their housing. When the plaintiffs quit their J&L jobs, or were fired, they were forced to make payments to WITCC. *Id.* at 165 ¶ 535. While the bills cited in the record do not explicitly state that these payments were for housing costs, it is a reasonable inference that housing was included in the plaintiffs' debts to WITCC.

Nancy was at the meeting in Santiago, Chile, where the J-1 Visa Program was described as a "free program." Doc. 321 at 68 ¶ 225. Despite knowing that this is how

125

the program was being characterized, the J&L Defendants tied plaintiffs' "free housing" to providing labor for J&L. Tying plaintiffs' housing to labor in this way thus could have plausibly induced the plaintiffs to work for J&L under the threat of serious harm.

There is a genuine factual question of whether the plaintiffs were actually induced to perform labor based on the mechanics of their scholarship. For example, most of the plaintiffs responded "no" in their depositions when asked if J&L or Nancy ever withheld housing from them. Plaintiffs also did not become aware of the money being withheld from their paychecks until towards the end of their employment with J&L, suggesting that the mechanics of their scholarship may not have induced their labor for the majority of their employment. Doc. 321 at 158-60 ¶¶ 512-520. However, at the summary judgment phase, the contrary inference is also reasonable: that for at least some period of plaintiffs' employment with J&L, tying their labor with J&L to continued housing constituted a threat of serious harm that induced plaintiffs' labor.

With regard to plaintiffs' allegations that J&L withheld food, plaintiffs argue that WITCC promised them free food as part of the program, then withdrew the food they were provided in the form of Walmart gift cards as soon as they began working for J&L. Doc. 285-1 at 81. Plaintiffs further point out that WITCC told the students that they could not work anywhere except Royal Canin or Tur-Pak, which essentially meant that without working in these J&L jobs, they could not support themselves. *Id.* The J&L Defendants counter that each plaintiff, except Diego, testified that J&L Defendants were not responsible for providing food and did not withhold food. Doc. 262 at 61. The J&L Defendants further note that Diego's testimony regarding food being withheld related to his perfect attendance voucher being revoked and that he still had access to food even without that voucher. *Id.*

Given this record, it would be reasonable for a jury to find that the J&L Defendants used the threat of withholding food to induce plaintiffs' labor. In a previous order in this case, I found it persuasive that WITCC's prohibition of seeking other employment put the plaintiffs in a position in which they could support themselves only by providing labor

126

for Tur-Pak or Royal Canin. *Norambuena v. Western Iowa Tech Community College,* C20-4054, 2022 WL 987946 at *10 (N.D. Iowa 2022). With the benefit of discovery, it is clear that the J&L Defendants played a significant role in putting the plaintiffs in this situation. Plaintiffs were told at various points that their only job options were Tur-Pak or Royal Canin. Doc. 321 at 161 ¶ 525. These representations fall into two categories. First, Eduardo and David testified that WITCC employees told the students they had to work at Royal Canin or Tur-Pak. *Id.* Second, Karla testified that after she was fired from Royal Canin, Nancy told her that Tur-Pak was her only other option. Doc. 285-3 at 100 ¶ 781.

A jury could infer from these facts that the J&L Defendants played a significant role in leading plaintiffs to believe that their only options to support themselves were Royal Canin or Tur-Pak, such that "serious harm" would befall them if they quit these jobs, as they stopped receiving gift cards for food as soon as they began working for J&L. Doc. 321 at 119 ¶ 383. Even if it was WITCC employees who directly told Eduardo and David that they did not have other employment options, it was J&L who decided job placements and WITCC simply "went along with that." Doc. 285-4 at 495. Further, Nancy's statements to Karla about Tur-Pak being her only remaining option show that J&L may have directly been representing to students that they could only work in J&L job placements. Of course, a jury could find that J&L did not threaten serious harm based on plaintiffs' testimony that J&L was not responsible for providing them with food. However, the contrary inference is also reasonable: without working at the only jobs the J&L Defendants and WITCC told plaintiffs were available, plaintiffs risked being unable to eat, thus constituting "serious harm."

The final question is whether these threats of harm would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." The J&L Defendants attempt to paint the plaintiffs as highly educated, experienced travelers who were never physically abused

127

by the J&L Defendants and maintained essential freedom of movement and communication throughout their time in the United States. This may be true, but it does not change the plaintiffs' particular vulnerabilities. As foreign nationals (many with only limited ability to speak English), plaintiffs were susceptible to feeling compelled to providing labor to avoid incurring harm. Further, many of the plaintiffs made immense financial sacrifices to participate in the program, with some selling nearly everything they owned, thus leaving them with no clear alternatives if they quit working for J&L. *See* Doc. 285-8 at 102; *see also* Doc. 285-8 at 239. As such, plaintiffs have established a sufficient factual basis of harm or threat of serious harm under 1589(a)(2) through the J&L Defendants' threats of withholding food and housing.

The same conclusion applies with equal force to a civil conspiracy theory of liability under 1589(a)(2). A jury could infer that by agreeing to fund the plaintiffs' supposedly "free" J-1 Program by having the plaintiffs supply labor, the J&L Defendants conspired with WITCC for an unlawful purpose, namely compelling the students' labor under the threat of serious harm of losing access to food and housing. Under this theory, it is immaterial whether the J&L Defendants were in charge of housing and feeding the students, as they would be equally liable for entering a conspiracy to compel plaintiffs' labor in this manner.

The J&L Defendants' motion for summary judgment as to plaintiffs' § 1589(a)(2) claim that they were compelled to work under threat of serious harm through threats of withholding food and housing is **denied**.

128

In the context of H-2B visas,[22] courts have determined that threats of deportation are sufficient to meet the "serious harm" element under either subsection 1589(a)(2) or (4) or "abuse of the legal process" element under subsection 1589(a)(3).  *See Aida v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93-94 (2d Cir. 2019) (allegations that defendants threatened to cancel plaintiff's immigration sponsorship or terminate his employment if he complained about not receiving overtime pay constituted an abuse of legal process for purposes of subsection 1589(a)(3) and a scheme intended to cause plaintiff to believe he would face serious harm under subsection 1589(a)(4)); *United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) (evidence that defendant repeatedly threatened foreign nationals with legal action, revocation of their visas, deportation and financial ruin were "precisely the types of threats that could 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to void incurring that harm.'") (quoting 18 U.S.C. § 1589(c)(2)); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107,115 (D.D.C. 2012) (rejecting defendant's motion to dismiss forced labor claim under 18 U.S.C. § 1589 because plaintiff sufficiently alleged that defendants abused the legal process by threatening her with deportation should she fail to perform the work demanded of her); *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 952 (N.D. Cal. 2019) (threats of deportation in addition to other threats were sufficient to state a claim under § 1589); *see also Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. Aug. 16, 2013) ("The threat of deportation alone may support a claim for forced labor.").

---

[22] "The H-2B program allows U.S. employers . . . to bring foreign nationals to the United States to fill temporary nonagricultural jobs."  *See* H-2b Temporary Non-Agricultural Workers, United States Citizenship and Immigration Services, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (last visited August 9, 2021).  The maximum period of stay for an H-2B visa is three years.

"Abuse or threatened abuse of law or legal process" is defined as "the use or threatened use of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). Courts have recognized that the threat of deportation "can constitute serious harm to an immigrant within the meaning of the forced labor statute." *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 523 (D. Md. Jan. 21, 2014) (quoting *United States v. Rivera*, No. 09-CR-619, 2012 WL 2339318, at *5 (E.D.N.Y. June 19, 2012)). *See also United States v. Kozminski*, 487 U.S. 931, 948 (1988) ("threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude."). *Ramo-Madrigal v. Mendiola Forestry Service, LLC*, 799 F. Supp. 2d 958, 960 (W.D. Ark. 2011) (when accepting plaintiffs' facts as true and viewing them in the light most favorable to plaintiffs, threatening H-2B workers with serious immigration consequences to prevent them from leaving employment constitutes "threatened abuse of the legal process" and states a valid claim under the TVPRA).

The J&L Defendants argue that any threats of deportation were not used to coerce the plaintiffs to work and thus lack the requisite causative link, as these alleged threats were reminders of legitimate work-related consequences. Doc. 262 at 61-65. They further argue that technical non-compliance with J-1 Visa program requirements does not rise to the level of trafficking. Doc. 293 at 36-37. I will begin by discussing the threats of deportation and abuse of the J-1 Visa program as they relate to § 1589(a)(3).

In *Martinez-Rodriguez v. Giles,* 31 F.4th 1139 (9th Cir. 2022), the Ninth Circuit addressed these issues in a case with striking similarities. The defendants, an Idaho dairy operation and its operators, were experiencing "labor issues." *Id.* at 1144. To alleviate these issues, the defendants turned to the TN Visa Program, a visa program established under the North American Free Trade Agreement (NAFTA) that allows "professional" Mexican and Canadian citizens to work in the United States. *Id.* Under the auspices of the TN Visa Program, the defendants recruited the six plaintiffs, all of whom had

130

completed four-year college degrees in Mexico as animal scientists or veterinarians, to work as "animal scientists" at the Idaho dairy operation. *Id.* During the recruitment process, the defendants made clear that they were interested only in applicants who were licensed in veterinary medicine or animal science and they were intentionally vague about the work the plaintiffs would be performing. *Id.* at 1145. In supporting letters for the visa application to the United States Embassy in Mexico, defendants described the work as professional-level and sophisticated, such that a bachelor's degree was required. *Id.* at 1146. At least one of the plaintiffs was instructed to tell consular officials that she would not be "milking" as part of her job responsibilities. *Id.* Each plaintiff obtained a TN Visa, understood that their employment was "at-will" and believed they would be subject to removal to Mexico if their jobs with defendants ended. *Id.*

When the plaintiffs began work in Idaho, they learned that the work descriptions provided throughout their recruitment process were incomplete. *Id.* at 1147. In addition to professional labor, they were also required to perform significant amounts of unskilled labor that did not materially differ from the work of the dairy operation's general laborers. *Id.* The benefits of the plaintiffs' employment also differed from what was promised. Defendants did not cover transportation and housing costs. *Id.* Despite being told that airfare would be covered, plaintiffs' airline expenses were deducted from their paychecks. *Id.* Defendants required plaintiffs to begin paying rent after initially covering housing costs and the housing they provided was unsanitary. *Id.* Plaintiffs also suffered severe injuries on the job and defendants responded with indifference and inadequate medical care. *Id.* at 1147-48. Defendants referenced deportation throughout plaintiffs' employment. *Id.* at 1148. On the other hand, defendants did not restrict the plaintiffs' freedom to travel, did not restrict access to their passports, did not control their communications with the outside world and each plaintiff eventually parted ways with defendants without experiencing immigration consequences. *Id.*

131

In reversing the district court's grant of summary judgment to the defendants, the Ninth Circuit began by describing the three elements a plaintiff must prove to show a violation of § 1589(a)(3):

> (1) that [defendants] used a law or legal process in a manner or for a purpose for which it was not designed; (2) that [defendants] did so "in order to exert pressure" on the Plaintiff to cause him or her to provide labor; and (3) that [defendants] obtained the Plaintiff's labor "by means of" the pressure created by that abuse—*i.e.*, that the resulting pressure *caused* the Plaintiff to provide the labor that [defendants] obtained.

*Id.* at 1150. In analyzing the first element, the court distinguished between "bad employer-employee relationships" and forced labor. *Id.* at 1151 (citing *United States v. Dann,* 652 F.3d 1160, 1170 (9th Cir. 2011)). Specifically, the court distinguished between (1) the defendants' failure to provide all of the promised employment benefits, which would not itself provide a basis for a finding that defendant abused the TN Visa process, and (2) whether defendants used the TN Visa to fill non-compliant general laborer positions, which would provide a basis for a finding that they abused the TN Visa process. *Id.* at 1151. The court held that the defendants' representations to the plaintiffs and United States consular officials that their TN Visa program would be for professional "animal science" jobs, when contrasted with the reality of the general labor jobs that awaited the plaintiffs, sufficiently established the first element. *Id.* at 1151-52. This was despite the fact that the plaintiffs performed some "animal scientist" tasks. *Id.* at 1153. The court reasoned, "the fact that [p]laintiffs performed *some* such tasks would not preclude a reasonable jury from nonetheless concluding that, viewing Plaintiffs' work duties as a whole, Plaintiffs were employed substantially as general laborers and that the 'Animal Scientist' tasks constituted a limited portion of their duties." *Id.*

Next, the court held that the plaintiffs had properly alleged the second element, that defendants misused the TN Visa "in order to exert pressure" on the plaintiffs to cause them to provide labor. *Id.* at 1154-55. The court began as follows:

132

> First, [defendants'] abuse of the TN Visa program placed Plaintiffs in a bait-and-switch situation in which Plaintiffs journeyed from Mexico to Idaho with one set of work expectations, only to be required upon arrival to perform a substantial volume of menial work. As a practical matter, the resulting situation would be expected to, and did, exert substantial pressure on Plaintiffs to go along with providing labor that was very different from what they had agreed and expected to perform. Given the record evidence showing that [defendants] evaded supplying any specifics about job tasks and that he helped to foster a belief that the work would be professional in nature, a reasonable jury could find that [defendants] acted "in order to exert" that "pressure." 18 U.S.C. § 1589(c)(1). That is, the jury could find that the inherently coercive pressure of [defendants'] bait-and-switch was *intended* rather than incidental.

*Id.* at 1154. The court went on to reason that defendants' multiple threats of deportation throughout plaintiffs' employment constituted demands for the plaintiffs to supply non-compliant labor. *Id.*

Finally, the court rejected the argument that when the defendants told the plaintiffs that they would be required to return to Mexico if they left their jobs, the defendants were merely making accurate statements of the TN Visa program's requirements. *Id.* at 1154-55. The court reasoned, "[b]y fostering *false* beliefs about the immigration consequences of failing to comply with what [defendants] wanted, [defendants] exacerbated the pressure to go along with the bait-and-switch inherent in [defendants'] abuse of the TN Visa program." *Id.* at 1155.

Finally, in holding that plaintiffs had sufficiently alleged facts to prove the third element, that defendants' abuse of the TN Visa actually caused plaintiffs to provide labor, the court reasoned:

> We conclude that a reasonable jury could find that the substantial coercive pressures created by [defendants'] bait-and-switch abuse of the TN Visa program proximately caused Plaintiffs to provide different, nonprofessional labor instead of the professional work they had agreed to. Indeed, Defendants conceded that all Plaintiffs subjectively believed that, if they were fired by [defendants], they would be required to return to Mexico. That fact, coupled with the objectively coercive circumstances discussed above, amply supports an inference that [defendants'] misconduct caused

133

Plaintiffs to provide menial labor that was different from the professional animal-science work they had agreed to perform. *Cf. Adia v. Grandeur Mgmt., Inc.,* 933 F.3d 89, 93 (2d Cir. 2019) (holding that the plaintiff, who was required to work overtime without extra pay, stated a claim for violation of § 1589(a)(3) by alleging that the defendant told the plaintiff he "would cancel or withdraw his immigration sponsorship").

Defendants argue that any inference of causation is conclusively refuted by the fact that several Plaintiffs ultimately left employment with [defendants] of their own volition. The district court similarly reasoned that "[i]f [defendants were] truly forcing Plaintiffs to perform labor, they would not have allowed three Plaintiffs to quit, nor terminated three Plaintiffs themselves." We reject this flawed reasoning. **The fact that [defendants'] coercive pressures were not indefinitely successful in obtaining the sought-after nonprofessional labor from Plaintiffs would not preclude a jury from reasonably finding that it was initially successful for a significant period of time.** That partial success is sufficient to establish the requisite causation as to the labor thereby obtained.

Defendants also contend that, given Plaintiffs' ability to freely to communicate and to travel, their circumstances did not involve the sort of conditions that are comparable to "modern-day slavery." This argument ignores the breadth of the statutory language of § 1589, which we have previously observed was enacted to abrogate, as a practical matter, the Supreme Court's narrow interpretation of "involuntary servitude" in *United States v. Kozminski,* 487 U.S. 931, 952, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988) (construing 18 U.S.C. §§ 241, 1584 (1982 ed.)). *See Dann,* 652 F.3d at 1169. The fact that Plaintiffs were not reduced to slave-like peonage does not mean [defendants] did not violate the particular prohibition set forth in § 1589(a)(3).

*Id.* at 1156 (emphasis added). *Martinez-Rodriguez* thus demonstrates that under § 1589(a)(3), threats of deportation alone may not only establish the abuse of law or legal process, but can also support an abuse of law claim in a visa abuse context.

The J&L Defendants argue that plaintiffs were not threatened with deportation but rather were reminded of legitimate work policies. Doc. 262 at 61-62, 67 (citing *Saraswat v. Bus. Integra, Inc.,* No. 15-CV-4680, 2019 WL 1865193 (E.D.N.Y. Apr. 25, 2019)). The J&L Defendants further argue that "bad employer-employee relationships" do not

suffice to prove a § 1589(a)(3) claim. *Id.* at 67. Finally, they discuss *Salem v. Michigan State University,* No. 1:19-cv-220, 2021 WL 1381149 (W.D. Mich. 2021), in which the court held that the TVPRA "[d]oes not require employers to shield financially desperate or otherwise vulnerable employees from the expected consequences of losing their jobs. Even where those consequences might be severe for a particular individual, labor performed under threat of such consequences does not thereby become forced or compelled." Doc. 262 at 69-70 (citing *Salem,* 2021 WL 1381149, at *2).

Beginning with the argument that any threats of deportation were merely reminders of legitimate consequences for failing to follow work policies, this argument fails. In *Saraswat,* a case the J&L Defendants rely on, the plaintiff came to the United States through the legitimate use of the H-1B Visa program. *Saraswat,* 2019 WL 1865193, at * 9. When the plaintiff failed to fulfill the terms of his at-will work contract, and the terms of the H-1B Visa, his employer threatened to cancel his H-1B Visa, which would result in deportation. *Id.* at *8. The court held that the plaintiff could not demonstrate "that the work he was made to perform transcended the satisfaction of his legitimate job duties, which may have been necessary to maintain his eligibility for an H-1B Visa." *Id.* (quoting *Walia v. Veritas Healthcare Sols.,* No. 13-CV-6935, 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015)).

Unlike the work at issue in *Saraswat,* the work required by the J&L Defendants was not compliant with the terms of the J-1 Visa. This means that the plaintiffs *can* show that the work they were made to perform "transcended" legitimate job duties that would be necessary to maintain eligibility in the J-1 Program. *Id.* In fact, the plaintiffs in this case faced the opposite issue as *Saraswat*: continuing to work in the jobs provided by J&L Staffing actually put their J-1 Visa status at risk because those jobs did not comply with the requirements of J-1 Visas. *See* Doc. 321 at 181-82 ¶ 593. The J&L Defendants' argument that plaintiffs were simply in a "bad employer-employee relationship" fails for similar reasons. Telling plaintiffs that they could lose their J-1 Visas and thus be deported for failing to attend their jobs at Royal Canin and Tur-Pak would not be a "legitimate

135

stance," Doc. 262 at 67 (citing *United States v. Bradley,* 390 F.3d 145, 151 (1st Cir. 2004)), but rather a means to threaten the plaintiffs into continuing to work in non-compliant jobs.

Finally, the J&L Defendants' discussion of *Salem* is unavailing. The dispositive issue for the *Salem* court was that even though the defendant may have been abusive to the graduate students he employed, the plaintiffs failed to allege that he had threatened "specific harm for Plaintiffs' failure to continue their labor[.]" *Salem,* 2021 WL 1381149, at *5. As such, despite the fact that the defendants' behavior in *Salem* was arguably more abusive than that of the J&L Defendants, the behavior in *Salem* is not analogous to the present allegations. Here, as discussed in greater detail below, there are sufficient facts showing a nexus between the J&L Defendants' specific threats of deportation and misuse of the law and the plaintiffs' labor.

The next issue is whether plaintiffs have put forth sufficient facts for a jury to infer that the J&L Defendants actually threatened them with deportation. Plaintiffs' allegations fall into two categories: threats delivered directly by the J&L Defendants and threats delivered by WITCC. As for the first category of threats, plaintiffs have put forth sufficient facts for a jury to infer that Nancy made threats of deportation to Alejandro, Karla and Nestor. Doc. 321 at 161 ¶ 529. As for the alleged threats delivered by WITCC and its employees, these can also be sufficiently tied to J&L Defendants in two ways.

First, a jury could infer from the circumstantial evidence that the J&L Defendants worked in concert to deliver threats of deportation to each of the plaintiffs. For example, plaintiffs state that Rosana and Terry Yi threatened deportation in response to plaintiffs' missing work. *Id.* ¶¶ 527-28. A jury could infer that the J&L Defendants were involved in encouraging these threats, given how intertwined the threats were with the plaintiffs' labor for the J&L Defendants. Second, as discussed above, a jury could also reasonably infer that J&L Defendants entered into a civil conspiracy with WITCC. *See supra,* Section VI(A). Here, the jury could infer that the J&L Defendants acted in concert with WITCC to make plaintiffs believe that they would be deported for not working in the

136

non-compliant jobs at Tur-Pak and Royal Canin. This "concerted action to accomplish an unlawful purpose" means that WITCC's threats would not necessarily need to be at the behest of J&L Defendants. *Wright,* 652 N.W.2d at 171. Rather, J&L Defendants' status as TVPRA co-conspirators could make them liable for WITCC's threats of deportation. *Id.* at 172.

The final question is whether plaintiffs have put forth sufficient facts for a jury to infer that the J&L Defendants obtained their labor through threats of deportation or abuse of the J-1 Program. They have. First, they have put forth sufficient facts of the abuse of the J-1 Program, which a jury could infer compelled their labor under § 1589(a)(3). Second, they have put forth sufficient facts of threats of deportation as a standalone theory of § 1589(a)(2) or (3) liability. I will discuss each in more detail below.

Beginning with the abuse of the J-1 Program, plaintiffs have asserted sufficient facts to meet the first *Martinez-Rodriguez* element, that J&L Defendants "used a law or legal process in a manner or for a purpose for which it was not designed." *Martinez-Rodriguez,* 31 F.4th at 1150. In *Martinez-Rodriguez,* the court found the difference between representations made during the TN Visa application and interview process and the reality of the jobs that awaited plaintiffs to support a finding that the defendants had used the TN Visa impermissibly. *Id*. at 1152-53. In this case, there were similar misrepresentations during the J-1 Visa application and interview process.

For example, plaintiffs were told to destroy their job offer letters from J&L and to avoid mentioning filling a labor need in their consular interviews. Doc. 321 at 107-108 ¶¶ 341, 342, 349. The J&L Defendants attempt to obscure their role in these misrepresentations by arguing that any efforts to mislead the State Department were between the plaintiffs and WITCC. Doc. 293 at 4-7. A jury could infer otherwise. The J&L Defendants and WITCC were in communication throughout the period of time that WITCC found out that J&L could not appear in the J-1 Visa materials. *See* Doc. 321 at 84 ¶ 271. After confirming that J&L could not be a part of the J-1 Program, Juline emailed the J&L Defendants that she would "go over everything at the meeting." *Id*.

137

A jury could also infer from the J&L Defendants' subsequent conduct that they had assisted in obscuring their role by telling WITCC to list them as Premier Services instead of J&L Staffing on forms. Doc. 321 at 111 ¶ 358. A jury could further infer that the purpose of these misrepresentations was to use the J-1 Visa for an impermissible purpose, namely, to bring the plaintiffs to the Sioux City area to fill a labor need by working in non-compliant manual labor jobs that were unrelated to their academic studies. Indeed, the jobs waiting for the plaintiffs in Sioux City were manual labor jobs that were completely unrelated to the purposes of the J-1 Program. As such, a jury could reasonably infer that J&L Defendants used the J-1 Visa program "for a purpose for which it was not designed." *Martinez-Rodriguez,* 31 F.4th at 1150.

Plaintiffs have also put forth sufficient facts to show that the J&L Defendants' misuse of the J-1 Program was done "in order to exert pressure" on the plaintiffs to provide their labor. *Id.* at 1154. Like the plaintiffs in *Martinez-Rodriguez,* the J&L Defendants helped create a "bait-and-switch situation" in which plaintiffs expected to work in jobs related to their academic programs at WITCC but instead were placed in manual labor positions by the J&L Defendants. *Id.* To be sure, *Martinez-Rodriguez* is distinguishable in that the defendants in that case were intentionally vague about providing any specifics of the jobs the plaintiffs would perform, while the J&L Defendants provided the plaintiffs with job offer letters with job descriptions that matched many aspects of the Tur-Pak and Royal Canin jobs. *Id.*; Doc. 285-3 at 8 ¶ 49. However, a jury could infer that the circumstances surrounding those job offer letters muddied the expectations of the plaintiffs.

For example, the job offer letters were provided to the plaintiffs during the Santiago meeting in which the program was described as free and related to Culinary Arts and Robotics academic programs. Doc. 321 at 68 ¶ 225. Further, while the job offer letters may have contained truthful descriptions of the jobs available through J&L, the letters were in English and not translated for plaintiffs despite their varying degrees of English proficiency. Doc. 321 at 73 ¶ 247. Each of the plaintiffs also met with Nancy

138

for an extremely short period of time. Doc. 321 at 67 ¶¶ 229, 230. A jury could infer from these circumstances that the goal of the meetings with Nancy in Chile was not to adequately inform plaintiffs of the jobs available, but rather to quickly shuffle the plaintiffs through the process and obtain their consent to place them in jobs that wildly differed from how the J-1 Program was being marketed.

This is, in essence, the inverse situation of *Martinez-Rodriguez,* but equally compelling as evidence that the J&L Defendants misused the J-1 Program to exert pressure on plaintiffs to work. In *Martinez-Rodriguez,* the job offer included some factually correct descriptions of the labor the plaintiffs would be performing, but the bait-and-switch involved the later inclusion of non-compliant labor. *Martinez-Rodrigues,* 31 F.4th at 1153. Here, the job offer letters included accurate descriptions of the work that would be performed, but the plaintiffs would have reasonably expected the jobs would also relate to the academic training that had been described to them at the same Santiago meeting. Doc. 321 at 68 ¶ 226. Viewing the record most favorably to the plaintiffs, the J&L Defendants were thus part of a bait-and-switch scheme in which the plaintiffs were placed in jobs that had nothing to do with academics, despite representations throughout the recruitment process that suggested otherwise. A jury could infer that the J&L Defendants were aware of this scheme, as they knew the jobs had to be J-1 Visa compliant and were provided with course descriptions for the students' academic programs. Doc. 285-4 at 503; Doc. 285-7 at 24-25. This bait-and-switch scheme, coupled with pervasive threats of deportation that incorrectly stated the J-1 Visa requirements, "foster[ed] *false* beliefs about the immigration consequences of failing to comply with what [J&L Defendants] wanted," thus "exacerbat[ing] the pressure to go along with the bait-and-switch inherent in" the J&L Defendants' abuse of the J-1 Program. *Martinez-Rodriguez,* 31 F.4th at 1154-55.

Finally, plaintiffs have put forth sufficient facts for a jury to infer that the J&L Defendants actually obtained their labor "by means of" the pressure created by their J-1 Program abuse. *Id*. at 1150. Like the plaintiffs in *Martinez-Rodriguez,* there is sufficient

record evidence for a jury to infer that the plaintiffs believed they would have to return to Chile if they were fired from the jobs provided by J&L. As Natalia stated, "I don't need it to be repeated a thousand times that they're going to send me back to Chile[.]" Doc. 262-17 at 69. Further, it is reasonable to infer that the plaintiffs believed they would be deported if they did not provide labor, as two other J-1 students were sent back to Chile for not providing labor. Doc. 321 at 170 ¶ 557 (Rosana stating, "I don't know how we are going to explain Sebastian and Angelica."). Alejandro explained how other J-1 students being sent home affected the plaintiffs:

> I was always afraid to do something bad at WIT. You know, miss classes or miss—miss work for the same reason. Because I didn't want to have any problem with any opinion, which is something that always happened at WIT regarding deportation.
>
> And maybe I joked around in this conversation because I had missed work, and I said that would be the next one—perhaps I would be the next one deported. Since many people were already leaving, you know, it's logical that one would feel certain—fear—fearful—fearfulness that someone would come and say, "Alejandro, we're going to deport you and send you back to Chile."

Doc. 262-17 at 187. This fear of deportation among the plaintiffs, along with the coercive nature of the misuse of the J-1 Program, supports an inference that the J&L Defendants' conduct actually caused plaintiffs to provide labor that was different from their expectations.

The J&L Defendants' counterarguments mirror those that failed in *Martinez-Rodriguez*. First, they highlight that after leaving their employment with J&L, the plaintiffs had no further contact with any J&L employees and were not deported. Doc. 262 at 73. As the *Martinez-Rodriguez* court explained, the lack of indefinite success in obtaining plaintiffs' labor does not preclude a jury from finding that the J&L Defendants were successful for a period of time. *Martinez-Rodriguez,* 31 F.4th at 1156. While the plaintiffs' employment with J&L was for a shorter period of time than the employment in *Martinez-Rodriguez,* there is no durational element to § 1589(a)(3) and a jury could

140

find that the plaintiffs' labor, even though of short duration, was obtained by abuse of legal process. Second, the J&L Defendants note throughout their filings that plaintiffs had freedom of movement, access to their passports, freedom to communicate with family and friends, comparatively comfortable housing and healthy social lives. *See* Doc. 262 at 73-74. This may be true, and some of the conditions were undoubtedly harsher in *Martinez-Rodriguez,* but I agree with the *Martinez-Rodriguez* court that this "ignores the breadth of the statutory language of § 1589" and does not preclude a finding that the J&L Defendants obtained the plaintiffs' labor through the abuse of law or legal process. *Martinez-Rodriguez,* 31 F.4th at 1156. As such, because the final *Martinez-Rodriguez* element has been met, a jury could find that J&L Defendants violated § 1589(a)(3) through abuse of the J-1 Visa.

As for the theory that the J&L Defendants obtained plaintiffs' labor through threats of deportation, the jury could reasonably find that the threats of deportation discussed earlier suffice for plaintiffs to prevail under a "serious harm" theory under § 1589(a)(2) or an "abuse of law or legal process" theory under § 1589(a)(3). As previously noted, in the context of H-2B visas courts have determined that threats of deportation are sufficient to meet the "serious harm" element under either subsection 1589(a)(2) or (4) or "abuse of the legal process" element under subsection 1589(a)(3). There is no reason that this logic does not also apply to the context of J-1 Visas.

The J&L Defendants attempt to differentiate their treatment of plaintiffs from the often more severe treatment in other TVPRA cases. Doc. 293 at 12-17. As another court explained:

> Because "a victim has fewer means of escape where the threats in her case involve immigration," *Dann*, 652 F.3d at 1172, courts have "found that the threat of deportation alone may support a claim for forced labor," *Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, 2021 WL 7186030, at *8 (E.D.N.Y. Apr. 30, 2021) (collecting cases); *see also Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019) (finding that "a threat to expose [plaintiff] to deportation" can constitute serious harm); *United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) (finding that threats

141

that immigrant nurses' visas would be revoked and that they would be deported and financially ruined were sufficient to constitute threats of serious harm under the TVPA); *United States v. Rivera*, 2012 WL 2339318, at \*5–6 (E.D.N.Y. June 19, 2012), *aff'd*, 799 F.3d 180. Still, "[t]ypically … 'forced labor' situations involve" more than just threats of deportation. *Muchira*, 850 F.3d at 618. They often involve some combination of "circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are 'used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.' " *Id.* at 618–19 (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)) (citing, *inter alia, Rivera*, 799 F.3d at 183); *cf. Elat v. Ngoubene*, 993 F. Supp. 2d 497, 525 (D. Md. 2014) (collecting cases) ("[I]n the majority of the cases in which the plaintiffs alleged threats of deportation in a TVPRA claim …, the courts noted that the defendants made multiple threats of deportation, often accompanied by threats of other harm, and/or threatened to take action to have the plaintiffs deported.").

*Anora v. Oasis Professional Management Group, Ltd.,* 19-cv-11732, 2023 WL 2307180, at \*8 (S.D.N.Y. 2023). With this guidance in mind, the J&L Defendants' argument fails for two reasons. First, the fact that forced labor often involves more than just threats of deportation does not displace the more categorical approach taken by the United States Supreme Court that "threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude." *Kozminski*, 487 U.S. at 948.

Second, even if the treatment of the plaintiffs in the present case does not rise to the level of many TVPRA cases, a jury could infer that this situation involved a combination of circumstances that would have forced plaintiffs to work for J&L for some period of time. Specifically, the plaintiffs displayed a concerning lack of English proficiency both before arriving in Sioux City and throughout the application process for the program, of which the J&L Defendants were well aware. Doc. 321 at 61 ¶ 206. This factor, in combination with the underlying risk of losing access to food and housing if plaintiffs left the program and the serial nature of the threats of deportation, would

142

permit a jury to find that plaintiffs were threatened with abuse of legal process or serious harm through threats of deportation. Doc. 321 at 29 ¶ 112; Doc. 285-8 at 154.

In sum, viewing the record in the light most favorable to the plaintiffs, a jury could reasonably find that the J&L Defendants obtained the plaintiffs' labor through threats of deportation and the abuse of the J-1 Program as perpetrators under § 1589(a)(2) and (3).

### c. Beneficiary Liability

Section 1589(b) requires that defendants "knowingly benefit[ed] financially or by receiving anything of value from" participation in a venture they knew or should have known has engaged in providing or obtaining of labor or services by any means described in subsection (a). Therefore, there are two knowledge components: (1) knowledge of the benefit and (2) knowledge or reckless disregard of the means by which the venture obtained the labor.

Regarding the first element, there are sufficient facts in the record that the J&L Defendants had knowledge of the benefit. Specifically, they benefited from "the endeavor of the quest of increasing both the student and labor population in the Siouxland market…" Doc. 321 at 23 ¶ 87. Communications between WITCC and the J&L Defendants throughout the J-1 Program referenced how helpful the J-1 Program was for supplying a new stream of workers who could help alleviate the labor shortage in the Sioux City area. See Id. at 24 ¶ 91. In response to an email about further sources of J-1 students, John messaged J&L Staffing employees: "[S]o this is going to be another advantage we have over the competition!" Id. at 45-46 ¶ 162. Even as the J-1 Program collapsed, Nancy displayed concern about losing this source of workers, texting, ""So none of this has to do with Royal correct [?] If we can save Royal then were [sic] still in the game I'm scared." Id. at 173 ¶ 559. It would thus be reasonable for a jury to infer that the J&L Defendants knowingly received a benefit from the venture.

The real issue is whether the J&L Defendants possessed "knowledge" or displayed "reckless disregard of the means by which the venture obtained the labor." 15 U.S.C. §

143

1589(b). They argue that "there is nothing about the situation that should have caused J&L and Nancy to know Plaintiffs were subject to trafficking or forced labor." Doc. 262 at 71. The J&L Defendants further argue that they complied with the advice of their attorney throughout the J-1 Program and WITCC failed to provide the J&L Defendants with any information about legal compliance issues with the J-1 Program. *Id.* I will address each in turn.

I reject the J&L Defendants' argument that they could not have known that plaintiffs were subject to trafficking or forced labor. The J&L Defendants point to the Fourth Circuit's observation in *Muchira v. Al-Rawaf* that:

> Typically ... "forced labor" situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent vulnerable victims from leaving and to keep them bound to their captors.

850 F.3d 605, 618-19. As noted above, however, a jury could infer that the present situation *did* involve some of these circumstances, specifically threats of legal process and exploitation of the plaintiffs' lack of familiarity with the English language. *See supra,* Section VI(B)(1)(b)(ii). Further, the J&L Defendants were aware that the J-1 students were having severe issues with the program. Gonzalo emailed Nancy imploring her to reconsider his schedule because he needed "study and rest." Doc. 321 at 140 ¶ 455. Diego notified Nancy of "very strong pain" in his leg. Doc. 285-14 at 7. Another J-1 student, Catalina (not a party to this lawsuit), asked to miss work due to health issues and Nancy told her to take Ibuprofen. Doc. 321 at 141 ¶ 458. Eduardo informed Nancy of an illness and she responded that he must go to work, or otherwise risk losing his job. *Id.* at 148 ¶ 479.

Against this backdrop, WITCC employees attempted to work with Nancy to adjust the students' schedules and treat them better. Specifically, after WITCC tried to talk to

Nancy about the Royal Canin schedules, Nancy replied, "Juli please do not talk to Royal about the schedule, the students just need to be told this is the way it is until December." *Id.* at 145 ¶ 470. As Juline noted, WITCC president Terry Murrell even visited J&L to emphasize that the students' studies were more important than their work. Doc. 308-1 at 11.

The J&L Defendants point out that some of the plaintiffs never complained to the J&L Defendants. Doc. 293 at 31. This ignores the fact that the J&L Defendants were well aware of the plaintiffs' poor working situations, given the raft of complaints from other plaintiffs and even WITCC employees asking the J&L Defendants to dial back their hard-driving approach. In addition to this dissatisfaction, the J&L Defendants should have known that something was amiss when the students continuously failed E-Verify. Rather than investigate this situation, the J&L Defendants contacted E-Verify in an effort to keep the students working. Doc. 321 at 153 ¶ 495. A jury could infer from all of these facts that not only were the J&L Defendants aware of the forced labor situation plaintiffs had been placed in, but they were indifferent to that situation so they could continue to benefit from the venture.

The J&L Defendants next argue that they followed the advice of their legal counsel and thus could not possess the requisite knowledge of the forced labor situation. Doc. 262 at 71. This argument also fails at the summary judgment phase. "[R]eliance on the advice of counsel requires independent evidence 'showing (1) [the defendant] made full disclosure of all material facts to his [or her] attorney before receiving the advice at issue; and (2) he [or she] relied in good faith on the counsel's advice that his [or her] course of conduct was legal.'" *Covey v. U.S.,* 377 F.3d 903, 908 (8th Cir. 2004). At this stage, the record contains limited information as whether the J&L Defendants made full and complete disclosures to their legal counsel.

The record does include some disclosures from the J&L Defendants to their counsel. *See* Doc. 321 at 22-26, 37-39, 175. However, a jury could infer from this record that J&L Defendants did not provide all the material facts to their counsel. For

example, the record is devoid of evidence that the J&L Defendants informed legal counsel of the category of J-1 Visa the program would fall under, the specifics of the types of jobs they would provide the J-1 students, that WITCC was scrubbing references to J&L from J-1 Visa application materials,[23] or that there were issues with E-Verify after the program began. Doc. 321 at 22-23, ¶¶ 86, 89, 271, 475. Further, even if WITCC was responsible for informing the J&L Defendants of the J-1 Program's legal requirements, a jury could infer that the J&L Defendants were aware of the illegality of the J-1 Program, as described in detail above. *See supra,* Section VI(B)(1)(b)(ii). As such, the J&L Defendants' argument that they did not, as a matter of law, possess the requisite state of mind under § 1589(b) because they relied on advice of legal counsel fails.

Because a jury could reasonably find that the J&L Defendants were knowing beneficiaries of forced labor, J&L Defendants' motion for summary judgment as to § 1589(b) beneficiary liability is **denied.**

### 2. *Count 1: Trafficking – 18 U.S.C. § 1590*

Section 1590 provides:

(a) Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

Violations of this section require at least one predicate violation of the forced labor statute. Because I have found that the plaintiffs have put forth sufficient facts for a jury to find that forced labor violation occurred under § 1589(a) or (b), I will now consider their trafficking allegations.

As with the forced labor statute, a defendant may be guilty under a perpetrator theory or a beneficiary theory. The beneficiary theory of liability originates in 18 U.S.C. § 1595, which allows a victim to bring a claim against "whoever knowingly benefits . .

---

[23] As noted earlier, it is a reasonable inference that the J&L Defendants were aware of WITCC being told that J&L could not be involved with the J-1 Program. Doc. 321 at 84 ¶ 271.

146

. from participation in a venture which that person knew or should have known" was engaged in a violation of Section 1590(a). Therefore, under the beneficiary theory a plaintiff must put forth sufficient facts for a jury to infer that the defendants knowingly benefitted from participating in a venture they knew or should have known engaged in human trafficking.

In allowing plaintiffs' § 1590 claim against the J&L Defendants to advance past a motion to dismiss, I wrote:

> The TAC alleges that the J-1 program at issue was largely a partnership between WITCC and J&L. WITCC and J&L worked together to find a way to fund the program. J&L was tasked with finding employment opportunities for the plaintiffs. The J&L defendants traveled with the WITCC defendants to Chile to recruit students and gave presentations about the program. The TAC alleges that the J&L defendants asked plaintiffs to perform strength tests during their interviews, which was at odds with the representations the WITCC defendants were making about the program. During the interviews, the J&L defendants acted somewhat bizarrely, presenting a $100 bill and telling one plaintiff, "If [the plaintiffs] wanted that money, they should work hard for her." After the plaintiffs arrived in the United States, the J&L defendants repeatedly threatened to deport any plaintiffs who did not work at Tur-Pak or Royal Canin. Meanwhile, J&L received a portion of plaintiffs' paychecks.

*Norambuena,* 2022 WL 987946, at *15 (internal citations omitted). Discovery has revealed sufficient evidence for a jury to infer that these allegations from the TAC occurred, with minor modifications. The J&L Defendants and WITCC worked closely together in designing the J-1 Program, funding the J-1 Program, recruiting students and threatening immigration consequences for students who did not want to work at Tur-Pak and Royal Canin. *See* Doc. 321 at 29, 66-67, 129 ¶¶ 110-112, 221, 423. Nancy had the plaintiffs lift weights during the Santiago, Chile, meeting and did not otherwise explain the jobs the students would be performing in Spanish. *Id.* at 72 ¶ 240; Doc. 285-7 at 15. Discovery has clarified that Nancy's conduct in presenting the $100 bill occurred at an introductory meeting in the United States, but this does not materially change the analysis. Doc. 321 at 117 ¶ 374. Further, the J&L Defendants received a portion of plaintiffs'

147

paychecks but they sent this portion of the money to WITCC. *Id.* at 29 ¶ 112. The J&L Defendants' actual profit from the program came from providing labor to their clients, Royal Canin and Tur-Pak, which also suffices as a benefit received. *Id.* at 30 ¶ 114.

These facts support inferences that the J&L Defendants knew the plaintiffs were being recruited or transported to perform forced labor and that the J&L Defendants benefitted from this forced labor. A jury could infer the following facts: The J&L Defendants knew that the plaintiffs had to work in jobs related to their majors. Doc. 285-7 at 24-25. They knew the students' academic program descriptions. Doc. 285-4 at 503. They knew that the only jobs they had available did not relate to the plaintiffs' majors. Doc. 285-7 at 24-25. They knew the J-1 Program was being marketed as a free program, despite the mechanics of the scholarships being anything but free. Doc. 321 at 68 ¶ 225; Doc. 321 at 29 ¶ 112.

Instead of questioning the legality of the program, the J&L Defendants focused on how plaintiffs could meet their labor needs. *Id.* at 168, 172 ¶¶ 544, 559. Nancy pushed students to work when they were sick and injured, even as she was being reminded that the plaintiffs needed to focus on their studies. *See Id.* at 148 ¶ 479; Doc. 285-14 at 7. Each of these facts supports a § 1590 claim under both a perpetrator and beneficiary theory of liability. As such, the J&L Defendants are not entitled to summary judgment on plaintiffs' § 1590 claim.

### 3. *Count 3: Peonage – 18 U.S.C. § 1581*

Section 1581 provides

(a) Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1581. The Eighth Circuit has summarized the law concerning peonage as follows:

148

> Peonage is 'compulsory service in payment of a debt.' *Bailey v. Alabama*, 219 U.S. 219, 242 (1911). '[C]ompulsory service' is the equivalent of 'involuntary servitude,' *id.* at 243, which the Supreme Court has defined as 'a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process.' *United States v. Kozminski*, 487 U.S. 931, 952 (1988). Thus, in order to prove peonage, the government must show that the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force. *See id.* at 952-53. In determining whether 'physical or legal coercion or threats thereof could plausibly have compelled the victim to serve,' the jury is entitled to consider 'evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities.'

*United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009). Again, under § 1595 a defendant may be guilty under a perpetrator theory or a beneficiary theory.

The J&L Defendants argue that plaintiffs had the option of quitting their jobs with J&L and that no one forced them to work for J&L until their debts were paid to WITCC. Doc. 262 at 74. In support of this argument, the J&L Defendants quote *In re Gordon,* 465 B.R. 683, 701 (Bankr. N.D. Ga. 2012), which discusses the Anti-Peonage Act, 42 U.S.C. § 1994, and states: "Where a debtor can cease working, peonage does not exist because the debtor can breach the obligation to work and be subject to damages, but is not under legal or physical coercion to work." 465 B.R. 683, 701 (Bankr. N.D. Ga. 2012). In *Farrell,* the Eighth Circuit addressed similar arguments regarding the voluntariness of workers' employment:

> [Defendants] repeatedly claim that the workers' employment was voluntary and because voluntariness is a defense to the peonage charge, it is impossible for the workers' employment to have constituted involuntary servitude. As discussed above, the workers would not have been able to pay their debt by working in the Philippines, and they believed that the [defendants] would physically harm them if they failed to pay. Thus, a reasonable jury could conclude that the workers believed they had no choice but to return to United States and did not do so voluntarily. *See United States v. Bibbs,* 564 F.2d 1165, 1168 (5th Cir.1977) ("[A] defendant is

149

guilty of holding a person to involuntary servitude if the defendant has placed him in such fear of physical harm that the victim is afraid to leave, regardless of the victim's opportunities for escape."). **Even assuming that there were points at which the workers could have escaped the [defendants'] control, a rational jury could have concluded that the workers' employment "was involuntary for at least *some* portion of [their] stay. And that involuntary portion would suffice to sustain the conviction."** *Djoumessi,* 538 F.3d at 552–53 (emphasis in original) (citing 18 U.S.C. § 1584, which requires the involuntary servitude be for "any term").

*Farrell,* 563 F.3d at 375 (emphasis added). Thus, while voluntariness is a defense to the plaintiffs' peonage claim, if "at least *some* portion" of their time in the J-1 Program was involuntary, they may still prevail. *Id.; See also Martinez-Rodriguez,* 31 F.4th at 1156 ("The fact that [defendants'] coercive pressures were not indefinitely successful in obtaining the sought-after nonprofessional labor from Plaintiffs would not preclude a jury from reasonably finding that it was initially successful for a significant period of time.").

There are sufficient facts in the record for a jury to infer that some portion of the plaintiffs' time working in the J-1 Program, and working for J&L, was compulsory in the service of their payment of a debt. As discussed in greater detail above, there are sufficient facts for a jury to find that the J&L Defendants used legal coercion to force the plaintiffs to work. *See supra,* Section VI(B)(1)(b)(ii). The J&L Defendants were acutely aware that plaintiffs owed a debt to WITCC, as J&L was the party that remitted payment to WITCC from money taken out of plaintiffs' paychecks. Doc. 321 at 27 ¶ 112. Further, the J&L Defendants placed an emphasis on plaintiffs working at the expense of their coursework. Doc. 321 at 145-46 ¶¶ 469-472; Doc. 285-14 at 2-3; Doc. 308-1 at 11. A jury could infer from their conduct near the end of the J-1 Program that this emphasis was motivated by a desire for the plaintiffs to pay their debts to WITCC[24] and

---

[24] Section 1581 does not require that the alleged debt must be owed to the defendant. *See Bailey v. Alabama*, 219 U.S. 219, 242 (1911) (defining peonage as "compulsory service in payment of a debt.").

to earn J&L more money. *See* Doc. 321 at 184 ¶ 602. In response to Royal Canin's suggestion of hiring students directly to make the J-1 Program legally compliant, Jennifer Coburn asked, "[A]ny that [Royal Canin] hire will be taking revenue from us correct?" *Id*.

There are also sufficient facts in the record that plaintiffs were aware, for some portion of their employment with J&L, that their compelled labor was for the payment of a debt to WITCC. As discussed in Section VI(B)(1)(b)(i), plaintiffs did not become aware of the money being withheld from their paychecks until the latter part of their employment with J&L. *See* Doc. 321 at 158-60 ¶¶ 512-520. The J&L Defendants argue that they quickly held a meeting about the mechanics of the plaintiffs' paychecks when plaintiffs raised complaints. Doc. 262 at 75-76. Far from creating an undisputed fact that the J&L Defendants did not use indebtedness to compel the plaintiffs' labor, this meeting supports an inference that the J&L Defendants did just that. For example, after the students asked Araceli why Nancy was making them work when they were ill, Araceli responded that Nancy was making sure the students met their hours required for them to remain in the J-1 Program. Doc. 321 at 160 ¶¶ 518, 519. As the J&L Defendants concede in their brief, plaintiffs then continued to work for J&L for weeks following that meeting. Doc. 262 at 76.

A jury could infer from these facts that the students received the message at this meeting that they owed a debt to WITCC and they would be unable to repay that debt without working for J&L, even when they were ill or had class obligations. Moreover, and as described in great detail throughout this order, the jobs Nancy forced students to work during this time were not compliant with J-1 regulations. These hours were thus not required for the plaintiffs to remain in the J-1 Program, but actually risked the students' legal status under the J-1 Visa regulations. Each of these facts would allow a reasonable jury to find that for some portion of the time the plaintiffs worked for J&L, their labor was compulsory in the service of their payment of a debt.

The J&L Defendants may also be found liable under a civil conspiracy theory of liability, as they played a pivotal role in designing scholarships that paid for the plaintiffs' "free" education and housing with their own labor. *See supra,* Section VI(A). A jury could infer from the mechanics of the J-1 Program's scholarships that their purpose was to unlawfully compel plaintiffs' labor in service of a debt. This "concerted action to accomplish an unlawful purpose" means that even if plaintiffs had no contact with the J&L Defendants after their employment with J&L ended, the J&L Defendants may be held liable for WITCC's actions in forcing the J-1 Students to repay the debt for their "free" program. *Wright,* 652 N.W.2d at 172. Moreover, the J&L Defendants remained aware of, and involved, in the J-1 Program after plaintiffs left J&L's employ. Upon discovering that WITCC was still forcing the plaintiffs to repay their debts, the J&L Defendants discussed a new plan to use debt to exert more control over future J-1 students, with John emailing: "I would strongly add one more piece for future recruitment…. Not only does the student sign off on our stipulations, BUT need to have 'skin' in the game to assure their vested and understand the expectation! My suggestion is a $500 deposit! Why, well, if they don't work out, we use it to send them home!" Doc. 321 at 168 ¶ 544.

Each of the facts discussed above also support a finding of beneficiary liability. The J&L Defendants knew that plaintiffs owed WITCC a debt, as they themselves remitted payment of that debt to WITCC from plaintiffs' paychecks. As described above, there are sufficient facts to infer that the J&L Defendants also knew that plaintiffs' labor was being compelled in service of that debt. The J&L Defendants benefitted from this arrangement in the form of an increased labor force and payments from their clients, Tur-Pak and Royal Canin. As such, a jury could reasonably find the J&L Defendants liable as beneficiaries of peonage.

In sum, a jury could reasonably infer that for some portion of plaintiffs' time in the J-1 Program, the J&L Defendants compelled their labor for payment of a debt, in violation of 15 U.S.C. § 1591 or, in the alternative, knowingly benefitted from the

152

plaintiffs' peonage.  As such, the J&L Defendants motion for summary judgment on this count must be **denied**.

### C.    *Count 7 – Fraud*

Fraudulent misrepresentation under Iowa law requires proof of: (1) a representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury.  *See Smidt v. Porter,* 695 N.W.2d 9, 22 (Iowa 2005).  Fraud must be proved "by a preponderance of clear, satisfactory, and convincing evidence." *Id.*

While plaintiffs concede that Nancy truthfully described manual labor positions in English, the circumstances surrounding plaintiffs' interactions with Nancy support a fraudulent misrepresentation claim.  Doc. 285-1 at 92-93.  It would be reasonable for a jury to infer that the J&L Defendants entered into a civil conspiracy to fraudulently misrepresent the J-1 Program to the plaintiffs in order to benefit from an increase labor supply.  The J-1 Program was described a "free program" at the Santiago, Chile, meeting where Nancy met with the students.  Doc. 321 at 68 ¶ 225.  Nancy shuffled students through her "interviews" with them and did not translate any information into Spanish except for her requests for the students to lift weights.  Doc. 321 at 69-70 ¶¶ 232, 235, 236; Doc. 285-7 at 11.  She did not explain how the students' own labor would fund the "free" program, despite J&L Defendants being acutely aware of how the "scholarships" would be funded.  Doc. 321 at 37 ¶¶ 136, 137; Doc. 321 at 29 ¶ 112.  Some students testified that they knew what rate of pay they would receive in the United States, but a jury could find that they were unaware that some of the wages paid to J&L would be withheld by J&L to pay WITCC.  Doc. 321 at 37 ¶¶ 136, 137.  And, of course, under conspiracy liability the J&L Defendants need not have made every false representation to be held liable for fraudulent misrepresentation.  *Wright,* 652 N.W.2d at 172.

In addition, there are sufficient facts in the record to permit findings of falsity, intent and scienter.  At the Santiago meeting, Nancy's most significant interaction with

153

the plaintiffs in their own language was asking them to lift weights to demonstrate physical fitness for manual labor. Doc. 285-7 at 11. This suggests that the J&L Defendants knew the plaintiffs would not be participating in an internship in their fields of study, but rather the unskilled labor the plaintiffs ultimately performed. Again, the J&L Defendants knew that students had to work in jobs related to their majors and knew that their own clients could not provide such internships, but nonetheless pushed forward with arranging these job placements. *See* Doc. 285-7 at 24-25.

There is also sufficient evidence in the record that the representations were material and the plaintiffs justifiably relied on them. Plaintiffs were promised free tuition, housing, an internship related to their degree and a technical diploma. Doc. 321 at 191 ¶ 322. A jury could infer that these promises were central to plaintiffs' decisions to participate in the J-1 Program and that they were justified in relying on them. Finally, the fact that plaintiffs did not receive technical diplomas, worked manual jobs unrelated to their academic studies and had to pay for their tuition and housing through their own labor are all sufficient for a jury to find that they were injured by the fraudulent misrepresentation.

For these reasons, the J&L Defendants' motion for summary judgment as to Count 7 – Fraudulent Misrepresentation is **denied.**

### D.  *Count 9 – Intentional Infliction of Emotional Distress*

A plaintiff must prove the following elements to prevail on a claim of intentional[25] infliction of emotional distress under Iowa law:

(1)     outrageous conduct by the defendant;

---

[25] *See Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985) (noting that while Iowa cases refer to this claim as an "intentional infliction of emotional distress," neither the Restatement nor Iowa law require proof of an intentional act; a "reckless disregard of the probability of causing" emotional distress is enough).

154

(2)     the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress;

(3)     plaintiff suffered severe or extreme emotional distress; and

(4)     the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (quoting *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)). Outrageous conduct is conduct that is "so extreme in degree as to go beyond all possible bounds of decency" and is "regarded atrocious, and utterly intolerable in a civilized community." *Id.* "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!" *Smith v. Iowa State University of Sci. and Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156-57 (Iowa 1996)). "[I]t is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Smith*, 851 N.W.2d at 26 (quoting *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118-19 (Iowa 1984)). "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.* (quoting Restatement (Second) of Torts § 46, cmt. *h*, at 77 (1965)).

Extreme emotional distress requires a plaintiff to "establish more than the fact that they felt bad for a period of time." *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 71 (Iowa 2002) (internal quotation marks and citation omitted). There must be "direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct." *Smith*, 851 N.W.2d at 30 (internal quotation marks and citation omitted). *Compare Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 855-60 (Iowa 1973) (describing abdominal pains and cramps, losing 40 pounds, receiving medication for her nerves, multiple

breakdowns and vomiting in public as sufficient evidence to generate a jury question) *with Pousen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981) (evidence that plaintiff "was very, very down," "was feeling super badly" and "felt he lost everything" during a month or two-month time period was insufficient evidence of extreme emotional distress).

"When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable." *Smith*, 851 N.W.2d at 26 (quoting *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990)). In determining whether conduct is outrageous "the court should consider the relationship between the parties" such as whether the conduct arises "from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Vinson*, 360 N.W.2d at 118 (quoting Restatement (Second) of Torts § 46, comment e (1965)). "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Id.*

In allowing plaintiffs' intentional infliction of emotional distress claim to advance to the summary judgment stage, I wrote:

> The issue is whether trafficking alone constitutes "outrageous conduct," as plaintiffs sufficiently allege more than "feeling bad" for a period of time. Criminal intent is not sufficient to demonstrate outrageous conduct. However, I am to consider the relationship between the parties, and this is no ordinary employer-employee dispute. Plaintiffs were effectively at the mercy of the WITCC and the J&L defendants upon entering the United States. They were far removed from their homes and families, with some of them in need of English proficiency classes. Further, human trafficking is not a typical crime. One court has found that once a plaintiff plausibly alleged human trafficking, any arguments that the defendants did not engage in outrageous conduct were "meritless" and on the verge of "frivolousness." *Franco v. Diaz*, 51 F. Supp. 3d 235, 247 (E.D.N.Y. 2014). I agree. Plaintiffs have sufficiently alleged both the WITCC defendants and the J&L defendants engaged in human trafficking. Such

156

conduct, if it occurred, is sufficient to support the "outrageous conduct" element of an intentional infliction of emotional distress claim. This claim may proceed against the WITCC defendants and the J&L defendants.

*Norambuena,* 2022 WL 987946, at *24.

The record developed during discovery does not disturb this finding. In fact, the plaintiffs have produced evidence that further supports their intentional infliction of emotional distress claim. In short, and as discussed in detail throughout this order, a jury could find that the J&L Defendants treated the plaintiffs appallingly, viewing them as an economic opportunity rather than students who were in the United States as cultural exchange visitors. Because a jury could find that this appalling behavior rose to the level of human trafficking under 15 U.S.C. §§ 1581, 1589, 1590 and 1595, plaintiffs have put forth sufficient facts to meet the "outrageous conduct" element of an intentional infliction of emotional distress claim. *Franco,* 51 F. Supp. 3d. at 247; *see supra,* Section VI(B). There is also a sufficient factual basis for a jury to find that the J&L Defendants intentionally caused, or recklessly disregarded the probability of causing, emotional distress, and that plaintiffs actually suffered this emotional distress. *See* Doc. 321 at 190-192.[26] As such, the J&L Defendants' motion for summary judgment is **denied** as to Count 9 – Intentional Infliction of Emotional Distress.

---

[26] While the J&L Defendants correctly point out that the plaintiffs packaged legal conclusions as facts in this section of their statement of facts, I have reviewed the underlying testimony and find that there are sufficient facts for a jury to find that the plaintiffs' distress involved more than merely "feeling bad" for a period of time. *See, e.g.,* Doc. 285-17 at 26 (Karla describing the emotional distress from the J-1 Program as more severe than her traumatic childhood which included sexual abuse at the hands of her father and her father threatening to kill her mother); *see also* Doc. 285-8 at 199 (Almendra describing fainting, vomiting and other physical issues related to the J-1 Program); Doc. 285-8 at 75 (David describing suicidal ideation as a result of the J-1 Program); Doc. 285-21 at 17, 21 (Fernando describing mental health struggles and their physical manifestations from the J-1 Program); Doc. 285-8 at 101 (Alejandro discussing psychological treatment he required after the J-1 Program); Doc. 285-8 at 24 (Eduardo describing psychological treatment he required after the J-1 Program).

157

## VII.  CONCLUSION

For the reasons set forth herein:

1.      Plaintiff Carilyns Jorquera is hereby **dismissed** as a plaintiff to this action because the third amended complaint (Doc. 93) does not assert any claims on her behalf against any remaining defendant.

2.       The motion (Doc. 261) for summary judgment filed by defendants Premier Service Inc., d/b/a J&L Enterprises, also d/b/a J&L Staffing and Recruiting, Inc., and Nancy Albrecht is **denied in its entirety**.

3.      This case shall proceed to trial as scheduled on all remaining counts asserted against the J&L Defendants in the third amended complaint (Doc. 93).

**IT IS SO ORDERED** this 27th day of March, 2025.

_____
Leonard T. Strand
United States District Judge